# EXHIBIT "A"

# P | K | H

LISA R. PETERSEN
lrp@pkhlawyers.com

PARSONS KINGHORN HARRIS
A PROFESSIONAL CORPORATION

October 25, 2013

**NOTICE OF CLAIM**

ATTORNEYS AT LAW
111 East Broadway, 11th Floor
Salt Lake City, Utah 84111
Phone 801 363 4300
Fax 801 363 4378
www.pkhlawyers.com

**VIA HAND-DELIVERY AND
CERTIFIED MAIL – RETURN RECEIPT REQUESTED**

Office of the Utah Attorney General
350 North State Street, Suite 230
Salt Lake City, UT  84114

University of Utah
Risk and Insurance Management Office
201 South President Circle, Room 408
Salt Lake City, UT  84112-9018

University of Utah
Office of General Counsel
201 South Presidents Circle, Room 309
Salt Lake City, UT  84112-9018

      Re:    Dr. Judith Pinborough Zimmerman/University of Utah -- Notice of Claim

Dear Counsel:

      This firm represents Dr. Judith Pinborough Zimmerman ("Dr. Zimmerman") regarding her report of privacy violations and subsequent retaliation by Dr. William McMahon, ("McMahon") Chairman of the Department of Psychiatry at the University of Utah.  This Notice of Claim is made on behalf of Dr. Zimmerman against the University of Utah (the "University" or the "Dept."), and McMahon.  Pursuant to Utah Code Ann. § 63G-7-403, Dr. Zimmerman provides this Notice of Claim 60 days in advance of commencing legal action.

      McMahon abruptly removed Dr. Zimmerman as the Director of the Utah Registry of Autism and Developmental Disabilities ("URADD") grant effective December 15, 2012, and terminated Dr. Zimmerman's contract with the University effective June 30, 2013.  This action followed only after Dr. Zimmerman's inquiries into privacy concerns she brought to the University's privacy office and Dean of Research, Dr. Li.  This retaliation by McMahon was

{00178350.DOCX /}

P | K | H

October 25, 2013
Page 2

further followed by the University's commitment to move Dr. Zimmerman's grant and faculty position to another department. A brief statement of the facts is set forth below:

## STATEMENT OF FACTS

Dr. Zimmerman is a licensed certified speech-language pathologist and was an assistant research professor in the Department of Psychiatry at the University of Utah. During her previous employment with the Utah Department of Health ("UDOH") from 1978-2005, she created the Utah Registry of Autism and Developmental Disabilities ("URADD") in 2002. The URADD was originally funded by a grant for which Dr. Zimmerman was the primary author and received from the Centers for Disease Control (the "CDC").

In December of 2005, Dr. Zimmerman accepted a faculty position with the University offered by McMahon. During the tenure of Dr. Zimmerman's employment at the University, she was subjected to long standing discrimination by McMahon and the Dept. based on her age, perceived disability, and religion. When she attempted to voluntarily move to another Dept. away from McMahon, she was subjected to further retaliation and discrimination for her efforts.

In 2011, Dr. Zimmerman notified the University that she did not have an IRB in place for Dr. Bilder, another faculty member, to do research analysis. Bilder became extremely upset when Dr. Zimmerman informed her that an IRB would likely be needed from the University and UDOH prior to Dr. Zimmerman being able to assist her with a URADD data request and analysis. In fact, Bilder laughed and told Dr. Zimmerman that "Bakian [another University employee] had already given her the data." Bilder also stated that she did not need an IRB since it was a "preliminary study." Dr. Zimmerman indicated to Bilder that she would double check with the health department and University of Utah IRB just to make sure, and, indeed, Dr. Zimmerman's understanding was correct.

The Utah Department of Education had already rescinded UDOH's access to education data due to FERPA concerns, but Dr. Zimmerman was able to negotiate access through a grants award and they trusted that she would keep her commitment for non-disclosure of identifiable data to other researchers.

Dr. Zimmerman underwent a lengthy review, promotion, and tenure process ("RPT") including the letters of support in May 2012, contained in Dr. Zimmerman's personnel file from Drs. Sperry and Li. Dr. Zimmerman's annual work-related performance reviews were always positive and often outstanding prior to her working under McMahon's supervision. Alleged performance concerns only arose, as indicated by McMahon, immediately following Dr. Zimmerman's report of serious ethical concerns, potential research misconduct, and discrimination to the University's administration.



October 25, 2013
Page 3

Dr. Zimmerman's reputation with the CDC was outstanding. She received excellent letters of support from researchers and colleagues outside the Dept. during RPT process, which ironically, included endorsement by McMahon.

Dr. Zimmerman believed that as the Principal Investigator ("PI"), she had the academic freedom and authority to choose with whom she worked on her grants, and with whom she collaborated on projects. Dr. Zimmerman chose someone other than McMahon after seven years of dealing with his negativity, discrimination, and lack of assistance. McMahon never supported Dr. Zimmerman in providing clinical speech-language, and, at the time, Dr. Zimmerman was the *only faculty member in the department* whose position was contingent upon generating her own funding.

Dr. Zimmerman made enormous efforts to try and resolve these issues directly with McMahon and others through appropriate channels at the University and Utah Department of Health ("UDOH"). Nevertheless, Dr. Zimmerman became concerned that University employees were obtaining unauthorized access to data and that data was not secure. Dr. Zimmerman was also concerned about her own personal liability based on grant contracts that she had signed personally. Dr. Zimmerman was also concerned that if she did not report her concerns, McMahon would blame her for any and all future problems.

In June of 2012, Bakian chose to move the spatial analysis study to McMahon's IRBs without consultation or disclosure to Dr. Zimmerman. Upon learning of this change, and because McMahon was now duplicating and taking Dr. Zimmerman's research ideas with a different group of researchers, Dr. Zimmerman did not want to be in a position of competing with the Chairman over research projects or other faculty, so she removed Bakian from her IRB's and told McMahon that she was voluntarily relinquishing any co-authorship on manuscripts that she previously assisted Bakian to prepare. Dr. Zimmerman removed herself from McMahon's IRB as she no longer wished to be involved if McMahon was "taking over" years of her prior work. Dr. Zimmerman also believed that Bakian breached her data security and non-disclosure agreements with Dr. Zimmerman by taking this project to a different group of researchers, including use of identifiable health and education data. In addition, Dr. Zimmerman did not feel comfortable with the accuracy of Bakian's analysis or skills.

Dr. Zimmerman was unaware whether Bakian or McMahon notified the Health Department that Bakian was moving research that she was paid by Dr. Zimmerman to do and was moving it from under Dr. Zimmerman to McMahon. Subsequently, the Health Department IRB initiated contact with Dr. Zimmerman and she informed them of the authorship change by Bakian. McMahon had not applied at the Utah State Office of Education to use this data.

By August 2012, Dr. Zimmerman had *no idea about the chain of custody* of the research data she had collected for her grants, yet her name was on the contractual agreements promising confidentiality. Dr. Zimmerman knew the State IT Department had informed employees they

P | K | H

October 25, 2013
Page 4

could be held personally responsible for costs related to data breaches if negligence was involved. Dr. Zimmerman had signed contracts with the State IT Department and did not know whether the data was or was not shared.

As stated above, URADD was the name of Dr. Zimmerman's 2002 grant award from the CDC that she authored while working at the health department prior to her employment at the University. McMahon did little or no grant related work, yet demanded authorship, used his authority as Chairman to remove Dr. Zimmerman's name from the UDOH contract that Dr. Zimmerman had established, undermined the authority of Dr. Zimmerman's PI status on her grant awards (including telling faculty they did not need to follow their signed CDC security guidelines and health department protocols for data access), dictated who Dr. Zimmerman could and could not use as grant personnel, and made grant budgetary decisions that are customarily the PI's decision.

Dr. Parks, Vice President of Research, suggested to Dr. Zimmerman in 2011 that this is not the usual and customary practice at the University, and suggested that it may be Dr. Zimmerman's ethnical obligation to report it. At that time, Dr. Zimmerman indicated that she wanted to do everything possible to work out these issues amicably with McMahon. Parks also stated that McMahon was positively viewed by upper University administration.

Dr. Zimmerman was repeatedly warned by UDOH officials that she ***did not have the authority*** to share data she collected under the health rule, unless she received written approval from the ***UDOH oversight committee and UDOH IRB***. Drs. Bilder, McMahon, and Bakian all signed non-disclosure forms with Dr. Zimmerman and were fully aware of her agreements regarding data security and privacy. Nevertheless, they all made it very clear to Dr. Zimmerman that they did not want to follow those agreements. Dr. Zimmerman attempted to meet with McMahon to discuss these concerns, but McMahon failed and refused to meet with Dr. Zimmerman.

Receiving no redress, Dr. Zimmerman filed a privacy complaint with the University's Privacy Office in August of 2012. In approximately December 2012, Dr. Zimmerman filed a complaint with the head of Research and Compliance, Dr. Jeffrey Botkin, regarding her ethical concerns about McMahon. Dr. Zimmerman is unaware whether McMahon was ever investigated by the University for these ethical concerns. Allegedly, the University's investigation of Dr. Zimmerman's privacy concerns submitted in August 2012 was completed in May 2013. Interestingly, no such report of this investigation was provided to Dr. Zimmerman.

Indeed, in June 2013 (after the alleged investigation was supposedly completed), Dr. Zimmerman received an email from Stephanie A. Argoitia ("Ms. Argoitia"), Deputy Privacy Officer with the University's Privacy office requesting additional information. In response, counsel for Dr. Zimmerman, Lisa R. Petersen ("Ms. Petersen") responded to Ms. Argoitia's requests on June 12, 2013. As set forth in Ms. Petersen's June 12 letter, on October 2, 2012,

P | K | H

October 25, 2013
Page 5

Jerry Smith ("Mr. Smith") submitted his brief findings regarding Dr. Zimmerman's complaints in a short Memo to Chris Kidd, whereby Mr. Smith indicated that his investigation consisted only of speaking with Dr. Zimmerman and Dr. McMahon.

Mr. Smith stated that it was explained to him (presumably by Dr. McMahon) that both Drs. Zimmerman and McMahon "have agreements with the Utah Department of Health and the University of Utah regarding the data, as well as the agreements that existed between the Utah Department of Health and the Utah Department of Education on data use." Following Mr. Smith's extremely limited investigation, he summarily concluded "In my opinion, these agreements allow both Dr. McMahon and Dr. Zimmerman legitimate access to the data." *Id.* Mr. Smith does not reference by date, title, or otherwise any specific agreements which he reviewed or upon which he relied in reaching this opinion.

Following Mr. Smith's brief inquiry regarding the privacy issues, Dr. Zimmerman's legal counsel, Lisa R. Petersen, immediately contacted University counsel to address the privacy concerns and the blatantly insufficient nature of Mr. Smith's so-called investigation. She spoke tp Phyllis Vetter, Associate General Counsel for the University ("Ms. Vetter") and informed her of the absolute lack of due diligence and investigation conducted by Mr. Smith. Ms. Vetter indicated that an investigation of such privacy concerns certainly should not consist solely of simple discussions with Drs. Zimmerman and McMahon, that such an investigation would be insufficient, and that she would review the investigation conducted.

Subsequently, Dr. Zimmerman and Ms. Petersen met with Phyllis Vetter, Associate General Counsel for the University ("Ms. Vetter"), along with Dr. Dean Li ("Dr. Li"), Vice Dean for Research at the University of Utah Medicine and Chief Officer University of Utah Health Care on October 4, 2012. Following the meeting, Ms. Vetter emailed Ms. Petersen on November 1, 2012, setting forth various inquiries made by Dr. Li. Ms. Petersen responded to these inquires by letter to Ms. Vetter dated November 8, 2012. No response to Ms. Petersen's letter of November 8 was received, and on November 15, 2012, Ms. Petersen emailed Ms. Vetter regarding the status of the investigation. Again, no response was received.

On December 4, 2012, Ms. Petersen sent a follow-up email to Ms. Vetter requesting that she advise her as soon as possible regarding the status of her office's investigation. Ms. Vetter responded on December 4, 2012, that she was meeting with Dr. Li the following Monday and requested additional information regarding Dr. Zimmerman's HIPAA and FERPA concerns. Ms. Petersen responded to these inquiries in a letter dated December 7, 2012. Copies of all relevant documentation was resubmitted to Ms. Argoitia with Ms. Petersen's June 12 letter, including Dr. Zimmerman's formal grievance regarding her wrongful retaliatory termination by the University.

{00178350.DOCX /}

P | K | H

October 25, 2013
Page 6

On December 20, 2013, Ms. Vetter acknowledged receipt of Dr. Zimmerman's formal grievance and indicated that it would be forwarded. Yet again, Ms. Petersen and Dr. Zimmerman heard nothing. Dr. Zimmerman had a meeting scheduled with Dr. McMahon on December 20, 2012, which McMahon failed to attend.

On January 4, 2013, Dr. Zimmerman's access to necessary grant files was removed while she was on vacation, along with her staff's access to files by all CDC grant staff. Dr. Zimmerman emailed Bilder on January 7, 2013, requesting that her personal grant and research files be returned. Dr. Zimmerman's request was denied stating that files transferred to Dr. Zimmerman from these drives must be "free of URADD data." URADD was Dr. Zimmerman's original CDC grant. These files included Dr. Zimmerman's work product that she generated prior to her employment at the University. When Dr. Zimmerman asked that her research files for which she had IRB approval be returned to her, this request was denied. As a result of these actions, McMahon halted correction of major data errors made by other faculty that impacted grant and multiple manuscript and research activities in progress under Dr. Zimmerman's direction.

McMahon had signed a confidentiality and security agreement, so he was fully aware and knew the policies and procedures required of Dr. Zimmerman for security and data sharing.

Bilder was retroactively required to purge education data from the URADD data which she took from Dr. Zimmerman on January 4, 2013 and February 27, 2013. For years, Dr. Zimmerman had University IT and someone from the privacy office assist her with grant security measures. The assistant financial director, Burbidge, was unaware of grant security requirements and that they were extremely more stringent than the requirements for the University's IT department.

Ms. Petersen sent another request for a status update to Ms. Vetter on January 17, 2013, and nothing was received until six months later on June 3, 2013, when Dr. Zimmerman received an email from Ms. Argoitia requesting information to aid in the investigation. As noted above, Ms. Argoitia's email requesting additional information to "aid" in the investigation suggests that the investigation was on-going at that time and was not completed in May 2013.

Again, the parties scheduled a meeting for January 21, 2013. McMahon cancelled this meeting with Dr. Zimmerman. In February, Dr. Zimmerman requested to meet with McMahon and Dr. Dean Li. She never received a response to this request.

On February 26, 2013, McMahon falsely claimed in written correspondence to Dr. Zimmerman that she would "not meet with him nor speak to him." On February 26, 2013, McMahon removed Dr. Zimmerman as the Principle Investigator on a CDC grant which she was the primary author and lead investigator that she had received through a highly competitive process. On this same date, McMahon had the University Police present to lock Dr. Zimmerman

{00178350.DOCX /}

P | K | H

October 25, 2013
Page 7

out of her office and the department research area, and removed her access to any of her remaining grant and research files.

McMahon, in written correspondence said that Dr. Zimmerman would "no longer have any role in this grant nor receive funds from the CDC grant." He also instructed "University of Utah IT personnel to disable access to grant related information." It was reported to Dr. Zimmerman by several grant staff that had been under her supervision that on this same date Dr. McMahon in a meeting with grant staff and police present he told grant staff "not to talk to Dr. Zimmerman."

Dr. Zimmerman's computer was confiscated by McMahon on February 26, 2013 and no comparable computer or software replacement was given. She was not given access to mail, and was prevented by McMahon's actions to complete multiple manuscripts that had a major detrimental impact on Dr. Zimmerman's career and continued collaboration with her peers.

Nevertheless, Dr. Zimmerman continued to attempt to resolve issues with the Dept. and McMahon and on March 20, 2013, responded to McMahon's letters. As stated in Dr. Zimmerman's letter, she scheduled numerous meetings with McMahon, all of which he either cancelled, or to which he simply failed to come. Dr. Zimmerman continued to explain her concerns to McMahon and to provide the information requested of her by the Dept. Dr. Zimmerman believed she had complied with the Dept. and McMahon's request for information and as stated by Dr. Zimmerman: "It is not clear to me what other information I could provide to you."

Dr. Zimmerman was prevented from attending the national CDC grant related meeting on May 14, 2013 that was held to discuss data that she had collected as the principle investigator over the past three years. On May 18, 2013, McMahon indicated his intent to give a research manuscript that Dr. Zimmerman was the lead author to other faculty if she did not finish it before June 30, 2013, yet it was McMahon who took away the necessary data, tools, and staff for Dr. Zimmerman to complete the manuscripts and told her she could not work on it.

Dr. Zimmerman's termination from the University was effective June 30, 2013, her last day of work.

All of these actions took place after Dr. Zimmerman raised her concerns about privacy and the fact that protected data was being compromised and accessed without proper authority. This action has been in retaliation against Dr. Zimmerman by McMahon and the University for raising these concerns of privacy and information security violations.

P | K | H

October 25, 2013
Page 8

## STATEMENT OF CLAIM

The Utah Protection of Public Employees Act ("Act"), Utah Code Ann. § 67-21-1 *et seq.*, protects employees who communicate violations of a state or federal law, rule, or regulation. Utah Code Ann. § 67-21-3(1)(a) states:

> An employer may not take adverse action against an employee because the employee, or a person authorized to act on behalf of the employee, communicates in good faith, . . . a violation or suspected violation of a law, rule, or regulation adopted under the law of this state, a political subdivision of this state, or any recognized entity of the United States.

The Act, Utah Code Ann. § 67-21-3 (2), also protects employees who give information in an inquiry or administrative review:

> An employer may not take adverse action against an employee because an employee participates or gives information in an investigation, hearing, court proceeding, legislative or other inquiry, or other form of administrative review held by the public body.

As set forth above, the University and McMahon's actions constitute a violation of the Act and Dr. Zimmerman has been injured as result of their actions.

## STATEMENT OF DAMAGES

Therefore, Dr. Zimmerman is entitled to recover: back wages and lost benefits; front pay; emotional distress damages in an amount to be proven at trial; punitive damages in an amount to be proven at trial; and her attorneys' fees and costs incurred in bringing this action.

Please contact us at your earliest convenience in response to Dr. Zimmerman's Notice of Claim.

Very truly yours,

PARSONS KINGHORN HARRIS

Lisa R. Petersen

cc: Dr. Judith Pinborough Zimmerman

{00178350.DOCX /}

| 2. Article Number | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| 7196 9008 9115 5730 8214 | A. Received by (Please Print Clearly): Michele Mozen  B. Date of Delivery: 10/28/1  C. Signature: X Michele Mozen  ☒ Agent  ☐ Addressee  D. Is delivery address different from item 1? ☐ Yes ☐ No |
| 3. Service Type  **CERTIFIED MAIL**™ | |
| 4. Restricted Delivery? (Extra Fee)  ☐ Yes | |
| 1. Article Addressed to:  University of Utah  Office of General Counsel  201 South Presidents Circle, Room 309  Salt Lake City, UT 84112-9018 | |

PS Form 3811, January 2005                                Domestic Return Receipt

76071.01

| 2. Article Number | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| 7196 9008 9115 5730 8221 | A. Received by (Please Print Clearly)  B. Date of Delivery: 10-28-13  C. Signature: X Kristin Phillips  ☐ Agent  ☐ Addressee  D. Is delivery address different from item 1? ☐ Yes ☐ No |
| 3. Service Type  **CERTIFIED MAIL**™ | |
| 4. Restricted Delivery? (Extra Fee)  ☐ Yes | |
| 1. Article Addressed to:  University of Utah  Risk and Insurance Management Office  201 South President Circle, Room 403  Salt Lake City, UT 84112-9018 | |

PS Form 3811, January 2005                                Domestic Return Receipt

76071.01

| 2. Article Number | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| 7196 9008 9115 5730 8238 | A. Received by (Please Print Clearly): Received  B. Date of Delivery: OCT 28 2013  C. Signature: X State Mail & Distribution Svcs  ☐ Agent  ☐ Addressee  D. Is delivery address different from item 1? ☐ Yes ☐ No |
| 3. Service Type  **CERTIFIED MAIL**™ | |
| 4. Restricted Delivery? (Extra Fee)  ☐ Yes | |
| 1. Article Addressed to:  Office of the Utah Attorney General  350 North State Street, Suite 230  Salt Lake City, UT 84114 | |

PS Form 3811, January 2005                                Domestic Return Receipt

76071.01