APRIL L. HOLLINGSWORTH (Bar No. 9391)
ASHLEY LEONARD (Bar No. 14899)
**HOLLINGSWORTH LAW OFFICE, LLC**
1115 South 900 East
Salt Lake City, Utah 84105
Telephone: 801-415-9909
april@aprilhollingsworthlaw.com
ashley@aprilhollingsworthlaw.com

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **JUDITH PINBOROUGH ZIMMERMAN, Ph. D.,**<br><br>Plaintiff,<br><br>vs.<br><br>**THE UNIVERSITY OF UTAH,** and **WILLIAM MCMAHON,** in his official and individual capacities,<br><br>Defendants. | **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:13-cv-1131<br>Judge Jill Parrish<br>Magistrate Judge Brooke Wells<br><br>**ORAL ARGUMENT REQUESTED** |

Plaintiff Judith Pinborough Zimmerman, Ph.D. ("Dr. Zimmerman"), by and through her

attorneys, submits this Memorandum in Opposition to Defendants' Motion for Summary

Judgment, pursuant to Federal Rules of Civil Procedure 7 and 56, and D. U. Civ. R. 7-1.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... 3

INTRODUCTION ....................................................................................... 6

**RESPONSE TO DEFENDANTS' STATEMENT OF ..... 9 ELEMENTS AND MATERIAL FACTS** ............................................................................................... 9

**ADDITIONAL MATERIAL FACTS OMITTED BY DEFENDANTS** ............................ 29

**ARGUMENT** ........................................................................................ 49

I. Summary judgment standard. ............................................................ 49

II. Dr. Zimmerman's Utah Protection of Public Employees Act cause of action is not time-barred. .................................................................................... 49

III. Dr. Zimmerman had a protected property interest in her employment with the University. ................................................................................... 50

IV. Summary judgment should be denied on Dr. Zimmerman's breach of contract claim. ............................................................................................ 53

V. Summary judgment should be denied on Dr. Zimmerman's liberty interest claims. 56

VI. Summary judgment should be denied on Dr. Zimmerman's free speech claims. 59

VII. Summary judgment should be denied on Dr. Zimmerman's disability discrimination claim because the University discriminated against Dr. Zimmerman based on her perceived disability. .................................................... 64

VIII. Summary judgment should be denied on Dr. Zimmerman's age discrimination claim because Dr. Zimmerman has established evidence of an inference of discrimination based on age. ............................................................. 67

IX. Summary judgment should be denied because on Dr. Zimmerman's religious discrimination claim because Dr. Zimmerman has established circumstances giving rise to an inference of discrimination based on religion. ........................... 69

X. Dr. Zimmerman's state constitutional claims are not barred by governmental immunity. ...................................................................................... 70

XI. Dr. Zimmerman's notice of claim was sufficient to put Defendants on notice of the nature of the claims asserted. ....................................................... 71

**CONCLUSION** ...................................................................................... 73

**CERTIFICATE OF SERVICE** ...................................................................... 75

2

# TABLE OF AUTHORITIES

**Cases**

*American Bush v. City of South Salt Lake,*
 2006 UT 40, 140 P.3d 1235 ................................................................... 60

*Archuleta v. Colorado Dep't of Insts., Div. of Youth Servs.,*
 936 F.2d 483 (10th Cir. 1991) .............................................................. 50

*Ashcroft v. Iqbal,*
 556 U.S. 662 (2009) ............................................................................. 54

*Baird v. Cutler,*
 883 F. Supp. 591 (D. Utah 1995) ......................................................... 60

*Bauchman v. West High School,*
 900 F. Supp. 254 (D. Utah 1995) ......................................................... 71

*Board of Regents of State Colleges v. Roth,*
 408 U.S. 564 (1972) ............................................................................. 53

*Bott v. Deland,*
 922 P.2d 732 (Utah 1996) ........................................................ 15, 59, 71

*Brammer–Hoelter v. Twin Peaks Charter Academy,*
 492 F.3d 1192 (10th Cir. 2007) ............................................................ 64

*Brantley v. Unified School Dist. No. 500,*
 2008 WL 2079411 (D. Kan. May 15, 2008) ......................................... 62

*Café Rio, Inc. v. Larkin-Gifford-Overton, LLC,*
 2009 UT 27, 207 P.3d 1235 .................................................................. 55

*Caster v. Hennessey,*
 781 F.2d 1569 (11th Cir. 1986) ............................................................ 54

*Cheney v. Studstrup,*
 32 F. Supp. 2d 1278 (D. Utah 1998) ..................................................... 71

*Conaway v. Smith,*
 853 F.2d 789 (10th Cir. 1988) .................................................. 62, 63, 64

*Connick v. Myers,*
 461 U.S. 138 (1983) ............................................................................. 61

*Crown Point I, LLC v. Intermountain Rural Electric Ass'n,*
 319 F.3d 1211 (10th Cir. 2003) ............................................................ 52

*Davita Inc. v. Nephrology Associates, P.C.,*
 253 F. Supp. 2d 1370 (S.D. Ga. 2003) .................................................. 54

*Deutsch v. Jordan,*
 618 F.3d 1093 (10th Cir. 2010) ............................................................ 64

*Doyle v. Lehi City,*
 2012 UT App 342, 291 P.3d 853 ..................................................... 72, 73

*Freitag v. Ayers,*
 468 F.3d 528 (9th Cir. 2006) ............................................................... 61

*Gaines-Tabb v. ICI Explosives, USA, Inc.,*
 160 F.3d 613 (10th Cir. 1998) ....................................... 50, 56, 57, 61

*Garcetti v. Ceballos,*
 547 U.S. 410 (2006) ................................................................... 63, 64

*Gates v. L.G. DeWitt, Inc.,*

528 F.2d 405 (5th Cir. 1976) ................................................................................ 54

*Green River Canal Co. v. Thayn*,
2003 UT 50, 84 P.3d 1134 ................................................................................ 55

*Hardeman v. City of Albuquerque*,
377 F.3d 1106 (10th Cir. 2004) ........................................................................ 62

*Harlow v. Fitzgerald*,
457 U.S. 800 (1982) .......................................................................................... 60

*Hennigh v. City of Shawnee*,
155 F.3d 1249 (10th Cir. 1998) ............................................................... 50, 53

*Jones v. Office Max, Inc.*,
38 F. Supp. 2d 957 (D. Utah 1999) .................................................................. 65

*Kendrick v. Penske Transp. Servs., Inc.*,
220 F.3d 1220 (10th Cir. 2000) ............................................................. 22, 23, 68

*Kingsford v. Salt Lake City Sch. Dist.*,
247 F.3d 1123 (10th Cir. 2001) .............................................................. 10, 51

*McDonald v. Wise*,
769 F.3d 1202 (10th Cir. 2014) ................................................. 13, 14, 57, 58

*Michaels v. City of McPherson, Kan.*,
71 F. Supp. 3d 1257 (D. Kan. 2014) ................................................................ 58

*Monroe v. City of Lawrence, Kan.*,
2015 WL 5006081, -- F. Supp. 3d -- (D. Kan. Aug. 20, 2015) .......................... 58

*Moore v. Utah Technical College*,
727 P.2d 634 (Utah 1986) ................................................................................ 53

*N. Natural Gas Co. v. Nash Oil & Gas, Inc.*,
526 F.3d 626 (10th Cir. 2008) .......................................................................... 49

*Pickering v. Board of Ed. of Tp. High School Dist. 205, Will County, Ill.*,
391 U.S. 563 (1968) .......................................................................................... 64

*Plotke v. White*,
405 F.3d 1092 (10th Cir. 2005) ................................................................. 22, 68

*Sorbo v. United Parcel Service*,
432 F.3d 1169 (10th Cir. 2005) .......................................................... 22, 67, 68, 69

*Spackman ex rel. Spackman v. Board of Educ. of Box Elder County School Dist.*,
2000 UT 87, 16 P.3d 533 ..................................................................... 15, 59, 60, 71

*Thorpe v. Washington City*,
2010 UT App 297, 243 P.3d 500 ............................................................... 49, 50

*Tiscareno v. Frasier*,
Civ. No. 2:07-cv-336, 2012 WL 1377886 (D. Utah Apr. 19, 2012) ...................... 59

*West Gallery Corp. v. Salt Lake City Bd. of Com'rs*,
586 P.2d 429 (Utah 1978) ......................................................................... 60, 61

*West v. Grand County*,
967 F.2d 362 (10th Cir. 1992) .......................................................................... 10

*Workman v. Jordan*,
32 F.3d 475 (10th Cir. 1994) ..................................................................... 14, 57

## Constitutions & Statutes

42 U.S.C. § 12102 ............................................................................................ 64

42 U.S.C. § 12111 ................................................................................................ 64
42 U.S.C. § 12112 ................................................................................................ 64
Utah Code Ann. § 67-21-1 ................................................................................... 49
Utah Code Ann. § 67-21-4 .............................................................................. 49, 50
Utah Code Ann. § 63G-7-101 ........................................................................ 49, 71
Utah Code Ann. § 63G-7-402 ..............................................................................49
Utah Code Ann. § 63G-7-403 ............................................................................... 49
Utah Const. art. I, § 15 ......................................................................................... 60

**Rules**

Fed. R. Civ. P. 56 ................................................................................................. 49

**Regulations**

29 C.F.R. § 1630.2 ............................................................................................... 66
Appendix to part 1630 – Interpretive Guidance on Title I of the Americans with
Disabilities Act............................................................................................... 20, 65

## INTRODUCTION

Dr. Zimmerman is an accomplished speech-language pathologist and researcher in the autism community. Dr. Zimmerman worked at the Utah Department of Health from 1978 through 2005, until she became a University of Utah Department of Psychiatry ("Department") employee. At the time Dr. Zimmerman was hired in 2005, she was promised a research assistant professorship, and the University intended to make Dr. Zimmerman a research assistant professor at that time. On or about November 30, 2008, Dr. Zimmerman received an offer letter from Dr. William McMahon ("McMahon"). Beginning on or about late 2008, McMahon was Dr. Zimmerman's direct supervisor and mentor.

Dr. Zimmerman was a productive Department employee, securing a Center for Disease Control & Prevention ("CDC") grant when she began her University employment. Dr. Zimmerman was Principal Investigator ("PI") of the CDC grant, and she was the Director of Utah's Registry of Autism and Developmental Disabilities ("URADD"), a network which housed confidential, identifiable data of school-aged children. Dr. Zimmerman performed successfully in her roles within the Department until she began asking legal questions regarding the sharing of confidential data as part of her federal grants. On or about April 14, 2011, Dr. Zimmerman reported concerns about researchers' access, including McMahon's, to collected data as part of her CDC grant. Two months later, McMahon, knowing Dr. Zimmerman had reported concerns about him, gave Dr. Zimmerman an "outline of expectations" letter. McMahon's letter was the first negative review Dr. Zimmerman had received as a University of Utah ("University") employee.

Dr. Zimmerman responded to the 2011 letter, and she thought things had been resolved, as she passed the University's stringent Retention, Promotion, and Tenure ("RPT") review in late

2011. McMahon wrote a letter of recommendation that strongly supported Dr. Zimmerman's retention, and Dr. Zimmerman received a letter from the Dean of the School of Medicine that indicated the University looked forward to working with Dr. Zimmerman for years to come.

Dr. Zimmerman became further concerned about confidential, identifiable data after a University employee allegedly copied identifiable data, in violation of confidentiality and security agreements, to share with individual researchers, including McMahon, who did not have access to identifiable data. Dr. Zimmerman was also concerned that University employees were "double-dipping" because time spent on research for one group of researchers was being charged as time to another group of researchers. On or about August 16, 2012, Dr. Zimmerman reported her concerns of research misconduct and ethical misconduct to the University's Privacy & Security office. She also reported her financial concerns to the University's legal department, and the legal department requested that the University's financial audit office complete an investigation; the audit office's determinations were concluded on or about September 25, 2012.

McMahon became aware of Dr. Zimmerman's concerns on or about September 19, 2012. Within 4 weeks of being notified of Dr. Zimmerman's complaints, McMahon initiated conversations with University employees about not renewing Dr. Zimmerman's contract with the University. These conversations began within 2 weeks of McMahon being notified of the University's determination to Dr. Zimmerman's complaints. McMahon subsequently notified Dr. Zimmerman on or about December 12, 2012, that her contract was not being renewed with the University. Two days later, McMahon removed Dr. Zimmerman as Director of URADD. Dr. Zimmerman immediately filed a second complaint with the Privacy & Security office, stating she was being retaliated against for filing her first complaint. The University's reaction to Dr. Zimmerman's second complaint was to direct the "investigation" into alleged performance

concerns about Dr. Zimmerman.

Dr. Zimmerman subsequently made complaints of discrimination against McMahon to the University's Office of Equal Opportunity and Affirmative Action ("OEO/AA"). She complained that McMahon made derogatory comments about her age, religion, and disability throughout her career with the University. Less than 3 weeks after making her OEO/AA complaint, McMahon restricted Dr. Zimmerman's access to necessary research files she needed to do her job. He subsequently removed Dr. Zimmerman as PI from her CDC grant, relocated her office to a different building, and told Dr. Zimmerman's staff that they could not talk to her and if she was seen around the building, she should be reported. Dr. Zimmerman's termination was effective June 30, 2013.

Dr. Zimmerman was a successful University employee until she accused McMahon, among others, of research misconduct and ethical misconduct. Defendants retaliated against Dr. Zimmerman for raising legal and ethical questions of employees' impropriety, and took multiple adverse actions against Dr. Zimmerman because of her protected speech; her age; her disability; and her religion. Defendants also breached its contract with Dr. Zimmerman and denied her due process and liberty rights. Defendants' procedural and legal arguments regarding each of Dr. Zimmerman's claims are either incorrect, unfounded, or disputed; summary judgment should therefore be denied.

## RESPONSE TO DEFENDANTS' STATEMENT OF
## ELEMENTS AND MATERIAL FACTS

*Whistleblower Claim*

1.      An employee who alleges a violation of the Utah Protection of Public Employees

Act, (UPPEA) must bring an action "within 180 days after the occurrence of alleged violation of

this chapter." Section 67-21-4 (2) of the Utah Code.

**RESPONSE:** Agreed.

2.      An employee who alleges a violation of the UPPEA must file a Utah Code Ann.

Section 63-30d-401 Notice of Claim before the elapse of 120 days from the date of the alleged

whistleblower act violation. Section 67-21-4(2) of the Utah Code.

**RESPONSE:** Agreed.

3.      Plaintiff claims "[a]lleged performance concerns arose, as indicated by

McMahon, only after Dr. Zimmerman's report of serious ethical concerns, potential research

misconduct, and discrimination to the University Administration. She was subsequently

terminated." *See* First Amended Complaint (First Am. Compl.) ¶ 59.

**RESPONSE:** Undisputed.

4.      On December 12, 2012, McMahon delivered a letter to Plaintiff notifying her that

her contract would not be renewed. Deposition of Judith Zimmerman (Zimmerman Dep.) 156:5-

157:10, September 16, 2015, portions attached hereto as Exhibit (Ex.) 1. A true and accurate

copy of the letter delivered to Plaintiff on December 12, 2012 (Non-Renewal Letter) is attached

hereto as Ex. 2.

**RESPONSE:** Undisputed, but incomplete. Dr. Zimmerman was terminated on or about June 30,

2013.

5.      Plaintiff alleges she served a Notice of Claim (NOC) pursuant to Utah Code Ann.

§ 63-30d-401 on October 25, 2013.  *See* First Am. Compl. ¶ 6.

**RESPONSE:** Undisputed. October 25, 2013, is 117 days from June 30, 2013, the date Dr. Zimmerman was terminated.

7. 6. Plaintiff commenced her action on December 27, 2013.  *See* Original Complaint (Doc. 2).

**RESPONSE:** Undisputed. December 27, 2013, is 180 days from June 30, 2013, the date Dr. Zimmerman was terminated.

*Property Interest and Breach of Contract Claims*

7. To establish a protected property interest, a plaintiff must demonstrate "a legitimate claim of entitlement." *Teigen v. Renfrow*, 511 F.3d 1072, 1078 (10th Cir. 2007).  The property interest is created by "independent sources such as a state or federal statute, a municipal charter or ordinance, or an implied or express contract." *Id.* at 1079.

**RESPONSE:** Agreed, but incomplete. When "there are substantive restrictions on the ability of the employer to terminate the employee," a continued expectation of employment is established. *Kingsford v. Salt Lake City Sch. Dist.*, 247 F.3d 1123, 1129 (10th Cir. 2001). "[W]hen a person's employment can be terminated only for specified reasons, his or her expectation of continued employment is sufficient to invoke the protections of the Fourteenth Amendment." *West v. Grand County*, 967 F.2d 362, 366 (10th Cir. 1992).

8. The *prima facie* elements of a breach of contract claim are: "'(1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages.'" *America West Bank Members, L.C. v. State*, 2014 UT 49, ¶ 15, 342 P.3d 224 (*quoting Bair v. Axiom Design, L.L.C.*, 2001 UT 20, ¶ 14, 20 P.3d 388).

**RESPONSE:** Agreed.

9.    Plaintiff and the University of Utah ("University") entered into a contract in 2008.  Deposition of William McMahon (McMahon Depo.) 69:2-70:3, September 1, 2015, portions  attached hereto as Ex. 3; Offer Letter dated November 30, 2008, attached as Ex. 4; Defendants'  First Set of Requests for Admissions, Interrogatories, and Requests for Production of Documents  ("Defendants' Discovery Request") Ex. 2 and 3, attached hereto as Ex. 5; Plaintiff's Responses to Defendant's First Set of Interrogatories, Requests for Production, and Requests for  Admissions ("Plaintiff's Discovery Response"), Requests for Admissions Nos. 1, 2, and 4,  attached hereto as Ex. 6; a true and accurate copy of the contract between Plaintiff and the  University (the "Contract") is attached hereto as Ex. 7.

**RESPONSE:** Disputed. Dr. Zimmerman was previously an Adjunct Assistant Professor in the Communications Sciences and Disorders Department of the University beginning on or about 1987. *See* Dr. Zimmerman's curriculum vitae, attached as Exhibit A. The University planned to appoint Dr. Zimmerman as a Research Assistant Professor in the Department of Psychiatry as early as February 2006. *See* Chair of Psychiatry letter, dated December 2, 2005, attached as Exhibit B. She was also appointed as an Adjunct Assistant Professor in the Department of Psychiatry on or about December 19, 2005. Ex. A. Dr. Zimmerman believed that she had been "processed" as a research assistant professor by Dr. Grosser, and the 2008 contract was given to her because McMahon had become the Chair of the Department of Psychiatry. Zimmerman Depo. at 14:5-12, attached as Exhibit C.

10.    Pursuant to the Contract, Plaintiff was appointed as a Research Assistant Professor with a "renewable one-year term;" she did not receive tenure, was subject to a 7-year probationary period, and her appointment automatically ended on June 30 of each academic year, unless reappointed." *See* Ex. 7, Contract.

**RESPONSE:** Disputed. Dr. Zimmerman's 2008 contract continued "with yearly review and renewal contingent on progress." Dock. no. 46-8. The University was obligated to give Dr. Zimmerman written notice if her 2008 contract was not renewed. *Id.* McMahon signed this contract as the Chair of the Psychiatry Department. *Id.* In addition, Dr. Zimmerman's 2008 contract includes all applicable University policies. *See* dock. no. 46-5; Zimmerman Depo. at 17:4-7 ("Q: Okay, and also where it states: 'University policies are available online,' and it references the manuals and references the site where you can go as an employee and review those?" A: Yes.").

11.     University Policy 6-300: University Faculty, Revisions 14 and 15 were in effect from February 10, 2003 to June 30, 2013. *See* Declaration of Carrie Byington, ¶¶ 4-5, Ex. A-B attached hereto as Ex. 8.

**RESPONSE:** Undisputed.

12.     Policy 6-300, Section 4.D.1 states that "[a]ppointments to 'research' positions are without significance for the achieving or holding of tenure" and subject to a 7-year probationary period. *Id.* at Ex. A-B.  Section 4.B further states that auxiliary faculty appointments "are for limited terms only."  Moreover, the Policy states four times that such appointments "end automatically each June 30." *Id.* at Ex. A-B, Sections 4.B and 4.D.1.

**RESPONSE:** Undisputed.

13.     Plaintiff refers to four University policies in the First Amended Complaint: 6-302,  6-303, 6-310, and 6-316.  First Am. Compl. ¶¶ 64-66, 71-72, 78.

**RESPONSE:** Undisputed.

14.     Policy 6-302 addresses "Appointments of Faculty," Policies 6-303 and 6-316 do not apply to non-tenured auxiliary faculty, and Policy 6-310 addresses the "Appointment,

Reappointment and Evaluation of Auxiliary Faculty and Other Instructional Personnel."  Ex. 8, Byington  Decl. ¶¶ 6-16, Exs. C-M.

**RESPONSE:** Disputed. The University's Policy 6-316, "Code of Faculty Rights and Responsibilities," applies to "faculty members," which includes an assistant professor "holding an auxiliary appointment." *See* dock. no. 46-9 at 150-51, Policy 6-316(1)(C). All provisions of Policy 6-316 apply to "faculty members." *Id.* This response also disputes Defendants' Fact No. 14 to the extent Defendants are saying that Policy 6-302 and Policy 6-310 do not apply to Dr. Zimmerman. Policies 6-302 and 6-310 apply to "auxiliary faculty," which included Dr. Zimmerman's research assistant professor position. *See* dock. no. 46-9 at 40, 48, 107, 111.

15.     On December 12, 2012, McMahon delivered a letter to Plaintiff notifying her that her contract would not be renewed. Ex. 1, Zimmerman Dep. 156:5-157:10; Ex. 2, Non-Renewal Letter.

**RESPONSE:** Undisputed.

*Liberty Interests in Violation of §1983 and Utah Constitution*

16.     The elements of a liberty interest claim are in pertinent part: "(1). . . a statement that 'impugn[s] the good name, reputation, honor, or integrity of the employee'; . . . (3) the statement is made during the course of termination . . . '; and (4) the statement is published, in other words disclosed publically." *McDonald v. Wise*, 769 F.3d 1202, 1212 (10th Cir. 2014).

**RESPONSE:** Agreed. The complete elements of a liberty interest claim are when: (1) the government "makes a statement that 'impugn[s] the good name, reputation, honor, or integrity of the employee'; (2) the statement is false; (3) the statement is made during the course of termination *and* 'foreclose[s] other employment opportunities'; and (4) the statement is published, in other words disclosed publically." *McDonald v. Wise*, 769 F.3d 1202, 1212 (10th

Cir. 2014) (quoting *Workman v. Jordan*, 32 F.3d 475, 481 (10th Cir. 1994)).

17.     Plaintiff alleged, "Defendant University infringed upon this liberty interest by impugning the good name, reputation, honor and integrity of Dr. Zimmerman by terminating her employment based on false allegations of unsatisfactory job performance and failure to meet University criteria."  *See* First Am. Compl. ¶¶ 86, 94.

**RESPONSE:** Undisputed, but incomplete. Dr. Zimmerman's fifth and sixth causes of action incorporated all preceding provisions of her Complaint. *See* dock. no. 32 at 22-24. Some of the allegations incorporated into Dr. Zimmerman's fifth and sixth causes of action include that she was terminated by Defendants "after Dr. Zimmerman raised her concerns about privacy and the fact that protected data was being compromised and accessed without proper authority." *Id.* at 15. "This action was in retaliation against Dr. Zimmerman by McMahon and the University for raising these concerns of privacy and information security violations." *Id.*

18.     Plaintiff alleged, "Defendant McMahon infringed upon this liberty interest by impugning the good name, reputation, honor and integrity of Dr. Zimmerman by terminating her employment based on false allegations of unsatisfactory job performance and failure to meet the University's criteria."  *See* First Am. Compl. ¶ 87.

**RESPONSE:** Undisputed, but incomplete. Dr. Zimmerman's fifth and sixth causes of action incorporated all preceding provisions of her Complaint. *See* dock. no. 32 at 22-24. Some of the allegations incorporated into Dr. Zimmerman's fifth and sixth causes of action include that she was terminated by Defendants "after Dr. Zimmerman raised her concerns about privacy and the fact that protected data was being compromised and accessed without proper authority." *Id.* at 15. "This action was in retaliation against Dr. Zimmerman by McMahon and the University for raising these concerns of privacy and information security violations." *Id.*

*First Amendment Rights and Free Speech Claims*

19.     Plaintiff must establish that Article 1, Section 15 of the Utah Constitution is self-executing. *Tiscareno v. Frasier*, 2012 WL 1377886 (D. Utah 2012).

**RESPONSE:** Agreed, but incomplete. "A constitutional provision is self-executing if it articulates a rule sufficient to give effect to the underlying rights and duties intended by the framers." *Spackman ex rel. Spackman v. Board of Educ. of Box Elder County School Dist.*, 2000 UT 87, ¶ 7, 16 P.3d 533 (internal citations omitted). "[A] constitutional provision that prohibits certain government conduct generally qualifies as a self-executing clause 'at least to the extent that courts may void incongruous legislation.'" *Id.* at ¶ 8. (quoting *Bott v. Deland*, 922 P.2d 732, 738 (Utah 1996).

20.     Plaintiff must demonstrate a "flagrant" violation of her constitutional rights under Utah law before she may proceed with a private lawsuit for monetary damages. *Tiscareno v. Frasier*, 2012 WL 1377886 (D. Utah 2012).

**RESPONSE:** Agreed.

21.     To establish a "flagrant" violation of her constitutional rights, Plaintiff must show that Defendants "violated 'clearly established' constitutional rights 'of which a reasonable person would have known.'" *Spackman v. Bd. of Educ. of Box Elder Cnty. Sch. Dist.*, 2000 UT 87, ¶ 23, 16 P.3d 533.

**RESPONSE:** Agreed.

22.     To be protected a public employee's speech must involve a "matter of public concern." *Moore v. City of Wynnewood*, 57 F.3d 924, 931 (10th Cir. 1995).

**RESPONSE:** Agreed.

23.     Plaintiff alleged "Dr. Zimmerman engaged in activity protected by the First

Amendment because she engaged in speech that addressed a matter of public concern." First Am. Compl. ¶ 100.

**RESPONSE:** Undisputed.

24.     Plaintiff alleged "Dr. Zimmerman engaged in activity protected by Article I, Section 15 of the Utah Constitution, because she engaged in speech that addressed a matter of public concern." First Am. Compl. ¶ 106.

**RESPONSE:** Undisputed.

25.     Plaintiff alleged "Dr. Zimmerman chose someone other than McMahon after dealing with his negativity, discrimination and lack of assistance. McMahon never supported Dr. Zimmerman in providing clinical speech language[.]" First Am Compl. ¶ 14.

 **RESPONSE:** Disputed as to characterization. This statement is not the basis for Dr.

 Zimmerman's free speech claims. Dr. Zimmerman was concerned that Amanda Bakian

 ("Bakian"), a University employee, had copied identifiable data, in violation of confidentiality

 and security agreements, to share with individual researchers who did not have access to

 identifiable data. Zimmerman Depo. at 153:8-13. Dr. Zimmerman was particularly concerned

 that this misconduct, including McMahon's, violated FERPA, HIPAA, and HITECH. *See*

 Privacy & Security office memo, attached as Exhibit D. The Privacy & Security Office

 understood Dr. Zimmerman's concerns to be "agreements [] in place with the Utah Department

 of Education and the disposition of the data that was identifiable in the data set that had been

 compiled" and about the University's liability because of unauthorized access to a research

 database and potential violations of HIPAA and FERPA. *Id*; Stephanie Argoitia Depo. ("Argoitia

 Depo.") at 36:18-37:6, attached as Exhibit E; *see also* Dr. Zimmerman's Additional Material

 Facts ("AMF") 38-48; 55-56.

26.     Plaintiff testified:

Q.  Okay, so then let's turn to Page 24, which is your seventh cause of action and this one is against both the University of Utah and Dr. McMahon.  This is your deprivation of first amendment right under Section 1983.  What is the basis for this claim?

. . . .

THE WITNESS:  I believe that because I raised questions and sought clarification about privacy issues and the sharing of identifiable data that I was retaliated against.

Ex. 1, Zimmerman Dep. 188:11-20.

**RESPONSE:** Undisputed, but incomplete. Dr. Zimmerman "also reported that [University researchers] were publishing data under people's names who had not done the work and that the data contained uncorrected errors and that [researchers] had made false claims with the IRB regarding who had sponsorship, who had sponsored that research and their relationship to the sponsor." Zimmerman Depo. at 41:22-42:2. Dr. Zimmerman testified, "I think the fact that I reported data errors, research misconduct, is significant," in response to Defendants' counsel's question about whether there was "any other speech that has not been mentioned in your deposition that you consider to be protected?" *Id.* at 190: 16-21; *see also* Response to Fact No. 25.

27.     Plaintiff testified McMahon "was claiming to have authored my grants.  He was claiming that he was the lead principal investigator.  He was claiming that Hilary Coon and he wrote the grant.  He gave in a magazine article credit to another junior faculty member for my research." *Id*. at 46:9-13.

**RESPONSE:** Disputed as to characterization. This statement is not the basis for Dr. Zimmerman's free speech claims. *See* Response to Fact Nos. 25-26.

28.     Plaintiff testified: "I believed it was a misrepresentation that [McMahon] was a PI  (principal investigator) on a grant that he had not received, nor was he doing any work on the

grant that was listed on the IRB (Institutional Review Board)." *Id.* At 125:16-19.

**RESPONSE:** Disputed as to characterization. This statement is not the basis for Dr.

Zimmerman's free speech claims. *See* Response to Fact Nos. 25-26.

29.     Plaintiff testified: "So I had a contract with the Utah State Office of Education

that did not allow me to share URADD (Utah Registry of Autism and Developmental

Disabilities) data, so I don't believe I had the authority to agree to share any data I collected . . ."

*Id*. at 79:12-15.

**RESPONSE:** Undisputed, but incomplete. *See* Response to Fact Nos. 25-26; *see also* AMF 38-

48; 55-56; 65-66; 68-69.

30.     Plaintiff testified:

Q.  And you would be the only person who would be able to use this data?

A.  Yes, that we could not share identifiable data.

*Id.* at 79:25-80:3.

**RESPONSE:** Undisputed, but incomplete. *See* Response to Fact Nos. 25-26; *see also* AMF 38-

48; 55-56; 65-66; 68-69.

31.     Plaintiff testified: "My testimony was – my testimony is that I was the principal

investigator on a contract that I had with the Utah State Office of Education.  I went to the State

Office of Education and asked them if I could share the data and they said no." *Id.* at 82:16-20.

**RESPONSE:** Undisputed, but incomplete. *See* Response to Fact Nos. 25-26; *see also* AMF 38-

48; 55-56; 65-66; 68-69.

32.     Plaintiff testified: "I had sought clarification because I knew, had reason to

believe that identifiable data from my CDC (Centers for Disease Control) grant activity was

shared without my knowledge and I'd lost the chain of custody for that data and I had received

no permission from the Utah State Office of Education to share identifiable data with other researchers at the University of Utah. Id. at 83:23-84:4.

**RESPONSE:** Undisputed, but incomplete. *See* Response to Fact Nos. 25-26; *see also* AMF 38-48; 55-56; 65-66; 68-69.

33.   Plaintiff testified: "According to the CDC guidelines, I can't share." *Id.* at 89:10-11.

**RESPONSE:** Undisputed, but incomplete. *See* Response to Fact Nos. 25-26; *see also* AMF 38-48; 55-56; 65-66; 68-69.

34.    Plaintiff testified: "Yes, but it also doesn't give me the authority to share it with anyone outside of URADD." *Id.* at 114:22-23.

**RESPONSE:** Undisputed, but incomplete. *See* Response to Fact Nos. 25-26; *see also* AMF 38-48; 55-56; 65-66; 68-69.

35.   Plaintiff testified:

A: My question to the IRB was that – and to Dr. Botkin was that McMahon was listing on an IRB that he was conducting the research and had cooperative agreements with the CDC when he, in fact, had none and I was concerned about my liability with him continuing to list his name as the principal investigator of that study when, in fact, he wasn't.

Q. Okay, and what was your question to ethics?

A. The same.

*Id.* at 40:1-9.

**RESPONSE:** Undisputed, but incomplete. *See* AMF 38-48; 55-56; 65-66; 68-69.

36.   Plaintiff testified:

Q. Okay, and then your response is: 'The legal implications are huge for me. . . .'

A. Yes.

*Id.* at 124:3-13; Email dated August 3, 2012, copy attached hereto as Ex. 9.

**RESPONSE:** Undisputed, but incomplete. *See* Response to Fact Nos. 25-26; *see also* AMF 38-48; 55-56; 65-66; 68-69.

37.     Plaintiff testified: "Yes, I had asked to be able to talk to him about the IRB issues and resolve that to find out which data I could share, which data I couldn't . . ." *Id.* at 146:21-23.

**RESPONSE**: Undisputed, but incomplete. *See* Response to Fact Nos. 25-26; *see also* AMF 38-48; 55-56; 65-66; 68-69.

*ADA Claim*

38.     To prevail on a perceived disability claim, "the plaintiff must present evidence showing that [her] employer perceived [her] as being unable to perform either a class of jobs or a broad range of jobs in various classes, as compared to the average person having comparable training, skills, and abilities." *Jones v. Office Max, Inc.*, 38 F. Supp. 2d 957, 962 (D. Utah 1999).

**RESPONSE:** Disputed. Defendants' cited case law pre-dates the 2009 Americans with Disabilities Act ("ADAAA") Amendments. Dr. Zimmerman may "establish coverage under the 'regarded as' prong by showing that [she was] treated adversely because of an impairment, without having to establish the [employer's] beliefs concerning the severity of the impairment." Appendix to part 1630 – Interpretive Guidance on Title I of the Americans with Disabilities Act. "To illustrate how straightforward application of the 'regarded as' prong is, if an employer refused to hire an applicant because of skin graft scars, the employer has regarded the applicant as an individual with a disability." Appendix to part 1630. "Similarly, if an employer terminates an employee because he has cancer, the employer has regarded the employee as an individual with a disability." *Id.*

39.     Plaintiff claims McMahon regarded Dr. Zimmerman as having one or more

mental disorders, such as emotional or mental illness(es). McMahon told Dr. Zimmerman he

thought she had post-traumatic stress disorder ("PTSD") as a result of working at the DOH

(Department of Health)[.]" *See* First Am. Compl. ¶ 9a.

**RESPONSE:** Undisputed, but incomplete. Deborah Bilder ("Bilder"), another University

employee supervised by McMahon, told McMahon that Dr. Zimmerman had "borderline

personality disorder." Deborah Bilder Depo. ("Bilder Depo.") at 119:20-23, attached as Exhibit F.

40.     Plaintiff testified as follows regarding her alleged disability claims:

MR. ROBINSON: Okay, so the only conversation you had with Dr. Mahon about
you having PTSD was sometime in the 2005-2007 timeframe; is that correct?

THE WITNESS: No, there were—there was a couple other times he alluded to the
fact.

MR. ROBINSON: Alluded to it or said it? THE WINESS: Just alluded.

Ex. 1, Zimmerman Dep. 22:7-13.

. . .

Q.   Okay.   Did you –did he ever make any derogatory comments about
you because of his perception of you having PTSD?

A.  He alluded to the fact that it would be very stressful to continue working with
the health department.

Q.  Other than alluding to the fact that it would be stressful to work with the
health department –

A.  I don't recall anything else at this point.

*Id.* at 23:15-22.

**RESPONSE:** Undisputed, but incomplete. Bilder told McMahon that Dr. Zimmerman had

"borderline personality disorder." Bilder Depo. at 119:20-23. Bilder acknowledged that that

mental illness has "negative connotations." *Id.* at 120:3-4. *See* AMF 82-87.

41.     A charge of discrimination under the ADA, "shall be filed by or on behalf of the

person aggrieved within three hundred days after the alleged unlawful employment practice."

*See* 42 U.S.C. §2000e-5(e)(1).

**RESPONSE:** Undisputed.

42.     "Dr. Zimmerman filed a Charge of Discrimination with the E.E.O.C. on June 6, 2013, alleging, among other things, discrimination based on disability. *See* First Am. Compl.¶ 121.

**RESPONSE:** Undisputed, but incomplete. Dr. Zimmerman filed a formal complaint with the University's Office of Equal Opportunity and Affirmative Action ("OEO/AA") on or about December 14, 2012, alleging, *inter alia*, discrimination on the basis of disability. Zimmerman Depo. at 158:4-18.

*ADEA Claim*

43.     To establish a *prima facie* case of age discrimination, Plaintiff must show: 1) she was at least forty-years old at the time of the adverse employment action; 2) she was performing satisfactory work; 3) she was terminated from employment; and 4) the University hired a younger person to fill her position. *Zoutomou v. Kennecott Utah Copper*, 2013 WL 1213386, at *7.

**RESPONSE:** Disputed. A *prima facie* claim for age discrimination includes establishing that 1) the Plaintiff is a member of the protected age group; 2) the Plaintiff was qualified for the position; 3) the Plaintiff was adversely affected; and 4) an inference of discrimination based on age is established by circumstantial or direct evidence. *Sorbo v. United Parcel Service*, 432 F.3d 1169, 1173 (10th Cir. 2005). "The critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred 'under circumstances which give rise to an inference of unlawful discrimination.'" *Plotke v. White*, 405 F.3d 1092, 1100 (10th Cir. 2005) (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1227

(10th Cir. 2000) (explaining that when an employer contends a termination was for

"unsatisfactory conduct," the status of the employee's former position is "irrelevant.").

44.     Plaintiff alleges she was "an excellent University of Utah employee[.]" *See* First

Am. Compl. ¶ 129.

**RESPONSE:** Undisputed. *See* AMF 12-18.

45.     McMahon testified as follows:

Q.  And I believe you testified earlier that you did consult with Liz Winter[1]
when  you wrote that outline of expectations, is that correct?

A.  Yes.  I think several weeks before I actually wrote the letter.

Ex. 3, McMahon Dep. 192:12-16.

**RESPONSE:** Undisputed, but incomplete. Dr. Zimmerman received McMahon's letter "directly

after" reporting concerns about McMahon to Jeffrey Botkin ("Botkin"), the University's Vice

President of Research, and IRB about plagiarism. Zimmerman Depo. at 43:5-12. The letter was

Dr. Zimmerman's first negative feedback since she had joined the Department of Psychiatry in

2005. *See also* Response to Fact No. 46.

46.     The "Outline of Expectations" Letter, dated June 27, 2011, states in relevant part:

"I expect you to engage in professional, collegial, and constructive interactions with all members

of the Department. There is a perception you are not meeting these expectations. . . . Second, it is

my perception, as well as that of the URADD oversight committee, that your enthusiasm to

identify associations related to autism may overshadow your adherence to scientific rigor and the

generally accepted scholarly peer review process."  *See* Outline of Expectations Letter, dated

June 27, 2011, attached hereto as Ex. 10.

 **RESPONSE:** Undisputed that the document speaks for itself. Dr. Zimmerman disputes that

 McMahon's "perceptions" had anything to do with her performance, as his letter came "directly

after" Dr. Zimmerman reported concerns to Botkin and IRB about plagiarism. Zimmerman Depo. at 43:5-12. The letter was Dr. Zimmerman's first negative feedback regarding work performance since she had joined the Department of Psychiatry in 2005. Furthermore, Dr. Zimmerman wrote a response after Dr. Zimmerman received McMahon's 2011 "outline of expectations." William McMahon Depo. ("McMahon Depo") at 78:3-14, attached as Exhibit G. McMahon viewed Dr. Zimmerman's response as being "proactive." *Id.* at 78:19-21.

47.     Regarding Plaintiff's Third-Year Appointment Review, McMahon testified:

Q. So by the time this third-year review came around, it wasn't something that just you as her Department Chair viewed that there was performance and collegiality issues, now people outside of the Department were noticing these performance and collegiality issues as well?

A. Yes.

Ex. 3, McMahon Dep. 181:16-22.

**RESPONSE:** Disputed. There is no evidence in the record that substantiates McMahon's statement. On the contrary, Dr. Zimmerman has been described as a "really great mentor." Amy Henderson Depo. ("Henderson Depo.") at 22:5-7, attached as Exhibit H. Dr. Zimmerman was "thorough and so concerned about [] doing things well, doing it the right way, not just following protocols, but making sure that the job was really well done." *Id.* at 22:12-15. She was also "fair [] with staff and [] she always gave people the benefit of the doubt, easily approachable. I could discuss things with her. We could even disagree and have a really great conversation . . . ." *Id.* at 22:22-23:1.

48.     On May 27, 2012, Dr. Deborah Bilder sent McMahon a letter stating among other things, "Dr. Zimmerman treats URADD like it is her very own, state-funded resource exclusively for her purposes.  Collegiality and reciprocity are foreign concepts to her."  *See* Letter from Dr.  Deborah Bilder (Bilder Letter) dated May 27, 2012, attached hereto as Ex. 11.

**RESPONSE:** Undisputed that the letter speaks for itself, but Dr. Zimmerman disputes Defendants' characterization that she had a pattern of being "uncollegial." McMahon testified that Dr. Zimmerman was not "collegial" with four University employees. McMahon Depo. at 114:14-24. He testified that one University employee left because of Dr. Zimmerman, but the employee actually left because of her husband's job opportunity. Bilder Depo. at 125:9-13. Two other University employees that allegedly complained about Dr. Zimmerman were Bilder and Bakian; both of which were the subjects of Dr. Zimmerman's complaints to the University's Privacy & Security office. McMahon Depo. at 114:14-24. Bilder and Bakian are still University employees. *Id.* at 114:14-24. Furthermore, Bilder's May 27, 2012, letter regarding Dr. Zimmerman was written at McMahon's request. *Id.* at 88:20-89:3. McMahon never gave Dr. Zimmerman the letter. *Id.* at 209:11-14. Additionally, Bilder testified that she could not work with Dr. Zimmerman; she did not say that Dr. Zimmerman could not work with her. Bilder Depo. at 36:19-21.

49.     McMahon testified he had an annual evaluation meeting with Plaintiff on or about  August 17, 2012.  *See* Ex. 3, McMahon Dep. 187:12-15.

**RESPONSE:** Undisputed.

50.     Regarding that evaluation meeting, McMahon testified:

Q. What about these other issues about collegiality and the growth and development of the program and some of these other issues that you had mentioned before; how were those addressed during this meeting on August of 2012.

A. She was, by this point, she was not very forthcoming in details, so my memory for it is hazy but what I do remember is she was not talking very much.

Q.  Did you feel that the collegiality issues had been addressed?

A. Oh, she was not at all collegial with me. We had gone through the IRB issues earlier in May.  I believe where I had started an IRB.  She had not done her part

on it, and finally after several reminders she said, well, I am not going to be a part of that. She declined being a part of it. So to me that said I don't want to work with you.  So things were not better.

Q.  In your opinion, were things worse?

A.  They were worse, yes.

Ex. 3, McMahon Depo. 189:16-190:11.

**RESPONSE:** Disputed. There is nothing in the record to substantiate McMahon's opinion. Dr. Zimmerman testified that the meeting on or about August 17, 2012, lasted about 30-45 minutes, and the only thing McMahon asked Dr. Zimmerman was whether she had included Eric Fommbone's name (Mr. Fommbone was one of McMahon's personal friends) as an author on one of Dr. Zimmerman's publications. Zimmerman Depo. at 144:7-10. Dr. Zimmerman did add Mr. Fommbone to her study. *Id.* McMahon asked Dr. Zimmerman about helping Bilder, and Dr. Zimmerman told McMahon that she was unaware of any studies Bilder was doing with URADD data. *Id.* at 144:12-14. They also discussed Dr. Zimmerman's accomplishments and what she was working on with her CDC grant. *Id.* at 144:15-18. At this meeting, McMahon was aware that Dr. Zimmerman wanted to transfer out of the Department. *Id.* at 145:5-9.

51.       On December 10, 2012, McMahon issued Plaintiff a letter, which states among other things: For the past two years, I have discussed your performance deficiencies with you in person…We met last year on June 22, 2011, and a letter summarizing those issues, dated June 27, 2011, was presented to you. . . .This year, I discussed these deficiencies with you in person on August 17, 2012. . . . Given these ongoing performance concerns, your contract will not be renewed for the next academic year[.]

*See* Ex. 2, Non-Renewal Letter.

**RESPONSE:** Undisputed that the document speaks for itself. Dr. Zimmerman disputes that alleged

performance deficiencies were the reason she was terminated. *See* Response to Fact Nos. 45-50;

*see also* AMF 12-21; 101-114.

*Religious Discrimination Claim*

52.     To establish a *prima facie* case of religious discrimination, a plaintiff must show:

1) she belongs to a protected group; 2) she suffered an adverse employment action; 3) the

challenged action took place under circumstances giving rise to an inference of discrimination.

*Sorbo v. United Parcel Serv.*, 432 F.3d 1169, 1173 (10th Cir. 2005).

**RESPONSE:** Undisputed.

53.     A charge of discrimination under Title VII, "shall be filed by or on behalf of the

person aggrieved within three hundred days after the alleged unlawful employment practice."

*See* 42 U.S.C. §2000e-5(e)(1).

**RESPONSE:** Undisputed.

54.     Plaintiff alleges she "faced derogatory and negative comments regarding her

pursuit to become a chaplain."  *See* First Am. Compl. ¶ 141.

**RESPONSE:** Undisputed.

55.     During her deposition, Plaintiff testified these comments were made "three or

four  times" while she was "studying to be a chaplain""[a]round 2008. I'm not exactly sure."  *See*

Ex.1,  Zimmerman Depo. 35:17- 25.

 **RESPONSE:** Undisputed, but incomplete. McMahon also made derogatory comments about

 Dr. Zimmerman's pursuit of theology in her RPT committee meeting review. *See* Declaration of

 Lyn Gardiner, attached as Exhibit I. Before committee members had a chance to view Dr.

 Zimmerman's RPT file, McMahon told committee members that Dr. Zimmerman did not take

 her employment position with the Department seriously because she took time off to pursue

becoming a chaplain. *Id.*

56.     Plaintiff also testified as follows regarding her requests to adjust her schedule

while studying to become a chaplain:

> MR. ROBINSON: I think you said you asked Dr. McMahon to adjust your
> schedule for the summer and he did allow you to do that; is that correct?

> THE WITNESS:  Yes.

Ex. 1, Zimmerman Depo. 37:16-19.

**RESPONSE:** Undisputed, but irrelevant.

57.     Plaintiff filed a Charge of Discrimination with the E.E.O.C. on June 6, 2013,

alleging among other things discrimination based on religion.  *See* First Am. Compl. ¶ 143.

**RESPONSE:** Undisputed, but incomplete. Dr. Zimmerman filed a formal complaint with the

OEO/AA on or about December 14, 2012, alleging, *inter alia*, discrimination on the basis of

religion. Zimmerman Depo. at 158:4-18.

*Claims Barred By Defective Notice of Claim*

58.     Failure to comply with the strict notice requirements of the Governmental

Immunity Act "results in a lack of jurisdiction."  Heidenman v. Washington City, 2007 UT App

11 ¶ 12, 155 P.3d 900.

**RESPONSE:** Undisputed.

59.     Plaintiff alleges she served a Notice of Claim (NOC) pursuant to Utah Code Ann.

§ 63-30d-401 on October 25, 2013.  *See* First Am. Compl. ¶ 6.

**RESPONSE:** Undisputed.

60.     Plaintiff's NOC lists one cause of action, Violation of the Utah Protection of

Public Employees Act.  *See* NOC, attached as Ex. A to Original Complaint. (Doc. 2-1).

**RESPONSE:** Undisputed, but irrelevant.

**ADDITIONAL MATERIAL FACTS OMITTED BY DEFENDANTS**

**A. Dr. Zimmerman's background**

1. Dr. Zimmerman has a Bachelor's degree in Speech Pathology and a Ph.D. in Speech Language Pathology. Zimmerman Depo. (Ex. C) at 208:20-25.

2. Dr. Zimmerman is a speech-language pathologist who was heavily involved in the autism research community beginning on or about 2002. Ex. A.

3. Dr. Zimmerman worked at the Utah Department of Health ("UDOH") from 1978 through 2005. Zimmerman Depo. at 13-14. She was a speech-language pathologist and public health program manager while at the UDOH. Ex. A

4. Dr. Zimmerman worked and collaborated with experts in autism research, such as Eric Fombonne. Zimmerman Depo. at 53:4-15.

**B. Dr. Zimmerman's hiring at the University**

5. Dr. Zimmerman was hired by the University's Department of Psychiatry on or about 2005. Zimmerman Depo. at 8:11-12.

6. The Department of Psychiatry is within the University's School of Medicine, and the School of Medicine is within the University's Health Sciences. McMahon Depo. (Ex. G) at 62:25-63:7.

7. At the time of her hiring in 2005, Dr. Zimmerman was verbally promised a faculty position as a research assistant professor. Zimmerman Depo. at 8:15-18.

8. Dr. Zimmerman testified that Dr. Grosser and McMahon did not properly process her research assistant professorship in 2005 because she thought she was a research assistant professor from the time she was hired. *Id.* at 13:18-25; 34:19-35:1.

9. McMahon became the Chair of the Department of Psychiatry on or about July 2007.

McMahon Depo. at 60:18-20.

10. McMahon was Dr. Zimmerman's direct supervisor as of November 30, 2008, if not before. Dock. no. 46-5.

11. Although it was a University policy to conduct annual reviews with faculty members, Dr. Zimmerman was not given an annual review until 2011. Zimmerman Depo. at 17:19-18:5.

**C. Dr. Zimmerman's demonstrated performance and collegiality**

12. Dr. Zimmerman has been described as a "really great mentor." Henderson Depo. (Ex. H) at 22:5-7.

13. Dr. Zimmerman was "thorough and so concerned about [] doing things well, doing it the right way, not just following protocols, but making sure that the job was really well done." *Id.* at 22:12-15.

14. She was also "fair [] with staff and [] she always gave people the benefit of the doubt, easily approachable. I could discuss things with her. We could even disagree and have a really great conversation . . . ." *Id.* at 22:22-23:1.

15. Dr. Zimmerman "was not just concerned about the work but also cared about people, not just her staff, but even these children that we were – these files that we were looking at, the files and the kids and the families were important to her." *Id.* at 23:6-10.

16. During the 2011-2012 academic year, Dr. Zimmerman passed the University's stringent RPT process and was reappointed as a research assistant professor. On or about October 17, 2011, McMahon wrote a letter of recommendation to the Dean of the School of Medicine that strongly supported Dr. Zimmerman's retention after the RPT process. McMahon Depo. at 85:14-86:14; *see* October 17, 2011, retention letter, attached as Exhibit J.

17. On or about May 29, 2012, Dr. Zimmerman received a letter from Vivian Lee, the Dean of the School of Medicine, stating that the Dean wished Dr. Zimmerman well in the "years to come." Zimmerman Depo. at 43:1-4; *see* Vivian Lee letter, attached as Exhibit K.

18. Throughout her career at the University, Dr. Zimmerman had multiple letters of recommendation from distinguished faculty members, including McMahon. *See* letters of recommendation, attached as Exhibit L. Similarly, Dr. Zimmerman wrote letters of recommendation for other University faculty members, such as Bakian. McMahon Depo. at 80:4-7.

19. During the 2012-2013 academic year, Dr. Zimmerman was interested in transferring departments within the University so she would not have to work with McMahon. Zimmerman Depo. at 71:14-19; 195:16-1. The University's College of Health held a faculty vote and approved giving Dr. Zimmerman a research assistant professor position within the College of Health on or about May 25, 2012. *See* Dr. Zimmerman's emails with the College of Health, attached as Exhibit M.

20. Dr. Zimmerman had an annual review with McMahon and Dr. McIntosh on or about August 17, 2012. Zimmerman Depo. at 141:22-24. As part of her annual review, Dr. Zimmerman prepared and discussed goals for the upcoming academic year. *Id.* at 143:14-19. At the time of her review on August 17, 2012, McMahon was aware Dr. Zimmerman wanted to transfer departments. *Id.* at 145:14-25.

21. After completing the RPT process on or about May 29, 2012, and having an annual review on or about August 17, 2012, Defendants' subsequent employment action was to demote and terminate Dr. Zimmerman, as explained below.

**D. Background and context for Dr. Zimmerman's privacy & security concerns**

22. Dr. Zimmerman and her staff studied autism in the state of Utah. As part of their research, staff members would go out to "health sources" and "school sources" to collect pre-identified children's records. Henderson Depo. at 11:17-23.

23. Data that was collected and stored in the research databases included children's names, birthdates, characteristics that may represent autism, classifications of special education, and parents' names and addresses. McMahon Depo. at 24:7-25:3.

24. Different health sources included the Children's Center, Primary Children's, and the University of Utah, among others. *Id.* at 21:23-22:9. Different school sources included various school districts, such as Granite School District, Jordan School District, and Salt Lake School District, among others. *Id.* at 22:10-17.

25. The CDC had set protocols for how this data was collected. Henderson Depo. at 13:17-19; McMahon Depo. at 77:17-20. The various school districts also had "different review bodies that needed to give approval for that district." McMahon Depo. at 23:1-12.

26. Because of the data being collected, school sources were concerned with their potential FERPA liability, and health sources were concerned with their potential HIPAA liability. *Id.* at 23:24-24:6.

27. In addition to these protocols, before any human subject research can be done, the University has to give its approval through the Institutional Review Board ("IRB"). *Id.* at 36:13-17. Researchers get IRB approval by submitting a protocol of the proposed study, including "a lot of detail about what exactly [the researcher] is going to do." *Id.* at 37:11-17.

28. Individual researchers would also need to get IRB approval from UDOH if health data

was going to be used in a research study. *Id.* at 38:21-25.

29. On or about February 13, 2009, the Utah State Office of Education ("USOE") rescinded the UDOH's authority to collect education data. *See* February 13, 2009, letter, attached as Exhibit N.

**E. Dr. Zimmerman's privacy & security concerns**

**i.    2011 Concerns**

30. In 2011, Dr. Zimmerman began asking legal questions regarding the sharing of confidential data as part of her federal grants. Zimmerman Depo. at 38:15-17.

31. Dr. Zimmerman raised questions to the University's IRB, which oversees research conducted on human subjects; Botkin, the University's Vice President of Research, and several individuals at UDOH. *Id.* at 38:18-21; McMahon Depo. at 32:9-13.

32. Dr. Zimmerman's "concerns were related to the institutional review, IRBs, and what authorizations were needed from which governmental entities in order for researchers to access birth files with identifiers and identifiable and identified data that [she] had collected as part of [her] grant activities." Zimmerman Depo. at 39:2-7.

33. Because UDOH did not have authority to collect education data, Dr. Zimmerman "was trying to get clarification as to process for researchers to [] access data that [she] had collected as part of [her] CDC grants." *Id.* at 39:9-18; *see* AMF 29.

34. The CDC had its own requirements in terms of who could use identifiable data. Zimmerman Depo. at 41:8-9. If a researcher wanted to use CDC data, the researcher would need to get approval from individual data sources. *Id.* at 41:11-14.

35. Dr. Zimmerman raised her concerns with Botkin on or about April 14, 2011. *See* April 14, 2011, email, attached as Exhibit O. Botkin denied any wrongdoing by McMahon and did

not disclose his prior relationship with McMahon to Dr. Zimmerman. Zimmerman Depo. at 135:3-16 ("They were coauthors on manuscripts and a book.").

36. McMahon issued his "outline of expectations" to Dr. Zimmerman on or about June 27, 2011, but had consulted a University attorney about the negative letter "several weeks" earlier. Dock. no. 46-11; McMahon Depo. at 192:12-16. McMahon knew about Dr. Zimmerman's concerns, which included McMahon's authority over research, because Dr. Zimmerman met with him prior to going to Botkin. Zimmerman Depo. at 134:15-135:1.

37. Dr. Zimmerman received McMahon's letter "directly after reporting [her] concerns to [] Botkin and IRB about plagiarism." Zimmerman Depo. at 43:5-12. The letter was Dr. Zimmerman's first negative feedback regarding work performance since she had joined the Department of Psychiatry in 2005.

**ii.      2012 Concerns**

38. Dr. Zimmerman did not have authority to release identifiable data outside of members of her staff; individual researchers would have to request permission to access USOE data from the USOE. Zimmerman Depo. at 79:14-17. The CDC had the same restrictions. *Id.* at 80:15-19; 105:23-25; *see also* October 24, 2011, Zimmerman letter to McMahon, attached as Exhibit P ("[A]ccess to URADD public health surveillance data for research purposes is driven by multiple data sharing agreements across multiple state agencies, state law, and agreements with funding sources such as the [] CDC. Access decisions are made in concert with the [] UDOH, the [] USOE, and the CDC, and, as necessary, with input from the Utah Attorney General's Office. Data access decisions are not made independently by me.").

39. Members of the URADD grant staff had access to identifiable education and health data

on a "need to know" basis "based on the ability to do their job." Zimmerman Depo. at 103:17-104:2.

40. Bakian was hired by Dr. Zimmerman as a senior research analyst on or about January 2010. Amanda Bakian Depo. ("Bakian Depo.") at 7:12-20, attached as Exhibit Q.

41. Amanda Bakian's access to CDC data was restricted on or about May 2012, when she was removed from her position as Data Manager. *Id.* at 16:17-25; 35:5-8.

42. Amanda Bakian's access to URADD files was removed on or about July 2012.  Bakian Depo. 35:9-14; Bilder Depo. (Ex. F) at 195:5-12. McMahon admitted that Dr. Zimmerman, as the Director of URADD, decided which University employees had access to the federally-funded research database. McMahon Depo. at 28:25-29:4. McMahon had "some" input. *Id.*

43. In addition, an oversight committee at UDOH had to approve outside access to investigators from outside of the URADD staff. McMahon Depo. at 29:5-9.

44. On or about July 2012, McMahon, Bilder, and Bakian submitted an IRB that indicated they were using identifiable data, including birth certificate data, from the CDC grant(s). Zimmerman Depo. at 147:6-8; 148:1-4; Henderson Depo. at 61:10-18.

45. The UDOH had not told Dr. Zimmerman that these researchers had been given access to, or to give them access to, identifiable data. Zimmerman Depo. at 147:9-10. Similarly, the USOE had not given Dr. Zimmerman permission to share identifiable data with these researchers. *Id.* at 147:10-12; *see* Dr. Zimmerman email to Botkin, attached as Exhibit R.

46. Dr. Zimmerman was concerned that Bakian had copied identifiable data, in violation of confidentiality and security agreements, to share with individual researchers who did not have access to identifiable data. Zimmerman Depo. at 153:8-13.

47. Dr. Zimmerman was particularly concerned that this misconduct, including McMahon's, violated the Family Educational Rights & Privacy Act ("FERPA"), the Health Insurance Portability & Accountability Act ("HIPAA"), and other federal regulations. *See* Ex. D.

### iii.      Dr. Zimmerman's Privacy & Security office complaint

48. On or about August 16, 2012, Dr. Zimmerman filed a complaint with the University's Privacy & Security office. Argoitia Depo. (Ex. E) at 35:11-13. The Privacy & Security office follows a general procedure for every complaint the office receives. *Id.* at 23:1-24:22.

49. The Privacy & Security office uses an incident management system to "keep everything standardized." *Id.* at 32:13-15. Every faculty complaint that the Privacy & Security office takes is documented in the incident management system and all activities taken during the course of the Privacy & Security office's investigation are documented. *Id.* at 20:22-22:21. There's also an "outcome" section on the incident management system that summarizes the Privacy & Security office's conclusions of each investigation. *Id.* at 22:22-25.

50. Based on what is in a complaint to the Privacy & Security office, investigators determine if they need to interview any witnesses; collect any documentation; "look through systems and find access logs or letters that were written or any indication of evidence that can either support or refute what the allegation is." *Id.* at 23:13-19.

51. After gathering all that information, an interview with the subject of the investigation is scheduled, along with the subject's supervisor, and the subject's response is "documented." *Id.* at 23:20-24:5.

52. Dr. Zimmerman and Amy Henderson met with Jerry Smith, a Security Analyst in the Privacy & Security office, to discuss Dr. Zimmerman's concerns. Henderson Depo. at

55:18-19; 56:18-25; Argoitia Depo. at 13:17-20.

53. When Dr. Zimmerman and Ms. Henderson told Jerry Smith their concerns, he was
    "incensed and upset," and Amy Henderson remembers him crying. Henderson Depo. at
    57:5-9.

54. Chris Kidd assigned Dr. Zimmerman's complaint to Stephanie Argoitia. Argoitia Depo. at
    35:22-36:9. Ms. Argoitia knew Dr. Zimmerman and recused herself from the investigation
    to avoid the appearance of bias. *Id.* Dr. Zimmerman's complaint was then assigned to
    Jerry Smith, a security analyst. *Id.*

55. The Privacy & Security Office understood Dr. Zimmerman's concerns to be "agreements
    [] in place with the Utah Department of Education and the disposition of the data that was
    identifiable in the data set that had been compiled" and about the University's liability
    because of unauthorized access to a research database and potential violations of HIPAA
    and FERPA. Ex. D; Argoitia Depo. at 36:18-37:6.

56. Dr. Zimmerman "also reported that [University researchers] were publishing data under
    people's names who had not done the work and that the data contained uncorrected errors
    and that [researchers] had made false claims with the IRB regarding who had sponsorship,
    who had sponsored that research and their relationship to the sponsor." Zimmerman Depo.
    at 41:22-42:2.

57. Jerry Smith spoke to Dr. Zimmerman and McMahon about Dr. Zimmerman's concerns,
    then issued an opinion on or about October 2, 2012. *See* Ex. D. This was the extent of the
    University's "investigation."

58. No final report was generated. Argoitia Depo. at 39:1-13. No one at the Privacy &
    Security office interviewed Amy Henderson, who had accompanied Dr. Zimmerman to

report privacy and security concerns. Henderson Depo. at 57:22-58:2. Jerry Smith did not document his interview with McMahon; nor did he interview McMahon with McMahon's supervisor after gathering all information, which was the Privacy & Security office's standard procedure. Argoitia Depo. at 40:22-41: 18; *see* INC-1190 report log, attached as Exhibit S.

59. The only documented activity shows that on or about September 7, 2012, someone left contact information for Dr. Zimmerman, and that on or about October 1, 2012, a "final report was completed. Ex. S.

60. The "final report" is Jerry Smith's memo to Chris Kidd, which indicates that Jerry Smith spoke to Dr. Zimmerman and McMahon, then issued his opinion on whether HIPAA had been violated. Ex. D.

61. This "investigation" was completely contrary to the Privacy & Security office's general procedure for complaints. *See* AMF 49-51.

62. McMahon received notification of Jerry Smith's opinion on or about October 2, 2012. *See* Scott Smith email to McMahon, attached as Exhibit T. Within two weeks, McMahon initiated conversations with University employees about not renewing Dr. Zimmerman's contract. *See* October 16, 2012, redacted email, attached as Exhibit U.

**iv.     Dr. Zimmerman's IRB office complaint**

63. Dr. Zimmerman also filed a complaint with the University's IRB office. Zimmerman Depo. at 165:3-6.

64. The IRB office deferred to the Privacy & Security office's determination and did not investigate Dr. Zimmerman's complaint. October 29, 2012, IRB completion letter, attached as Exhibit V.

65. Dr. Zimmerman testified, "I think the fact that I reported data errors, research misconduct, is significant," in response to Defendants' counsel's question about whether there was "any other speech that has not been mentioned in your deposition that you consider to be protected?" Zimmerman Depo. at 190: 16-21.

66. On or about December 2012, Dr. Zimmerman also reported the same concerns she had made to the University's Privacy & Security office to the United States Department of Health and Human Services ("HHS") and the United States Department of Education ("DOE"). *Id.* at 198:22-199:6. She also reported her concerns that school data had been copied to the USOE. Bilder Depo. at 104:20-105:4. She reported her concerns to the CDC as well. Henderson Depo. at 61:24-62:5.

67. Dr. Zimmerman reported her concerns of research misconduct to the CDC "right before she was taken off the grant." Zimmerman Depo. at 190:22-191:5.

**F. Dr. Zimmerman's financial concerns**

68. Dr. Zimmerman was also concerned that University employees were "double-dipping" because time spent on research for one group of researchers was being charged as time to another group of researchers. Zimmerman Depo. at 138:16-19. In other words, funding for one grant was being intermingled with other funding with the University's finance department. *Id.* at 140:20-23.

69. Dr. Zimmerman reported her concerns to the University's legal department. *See* September 25, 2012, audit office memo, attached as Exhibit W.

70. Scott Smith, a University attorney, requested that the University's audit office complete an investigation. Ex. W. The University's audit office talked to McMahon and Dr. Zimmerman, along with two other University employees, and issued a memorandum of its

findings. *Id.*

71. Three weeks after the audit office's determination, McMahon contacted Scott Smith about not renewing Dr. Zimmerman's contract. *See* Ex. U.

## G. Dr. Zimmerman's second privacy & security complaint

72. Dr. Zimmerman filed a second complaint with the Privacy & Security office on or about December 21, 2012, alleging she had been retaliated against for filing her first complaint with the Privacy & Security office. Argoitia Depo. at 45:2-13; *see* INC-1462 report log, attached as Exhibit X.

73. Stephanie Argoitia investigated Dr. Zimmerman's second complaint, even though she had recused herself from the first investigation. Argoitia Depo. at 45:14-17.

74. The Privacy & Security office contacted McMahon, Bakian, and Bilder, the three subjects of Dr. Zimmerman's retaliation complaint, between January and February 2013, to discuss Dr. Zimmerman's second complaint. *Id.* at 46:11-18; 48:13-49:4.

75. The Privacy & Security office never talked to Dr. Zimmerman, or Dr. Zimmerman's attorney, about Dr. Zimmerman's second complaint alleging retaliation. *Id.* at 49:13-50:2.

76. The Privacy & Security office never talked to anyone in the Department of Psychiatry about Dr. Zimmerman's second complaint, except for the three subjects of the complaint, even though the Privacy & Security office was supposed to be gathering information "about relationships and timing." *Id.* at 48:8-12; 50:3-24.

77. The direction of the Privacy & Security office's investigation was clearly not designed to root out retaliation. For example, Ms. Argoitia asked the subjects of Dr. Zimmerman's complaint: "[p]lease describe any incidents or circumstances that demonstrate how this relationship with Dr. Zimmerman met, or failed to meet, your expectations." *Id.* at 51:10-

14. When asked how that related to whether Dr. Zimmerman was retaliated against, Ms. Argoitia answered, "I really don't remember how this was evolving . . . [s]o I don't know what my intent with this was." *Id.* at 51:21-52:1.

78. Although the report log states that "extensive work" was done on Dr. Zimmerman's second complaint, the Privacy & Security office did nothing to investigate Dr. Zimmerman's complaint of retaliation other than talking to the three subjects of the complaint. *Compare* Ex. X *with* Argoitia Depo. at 52:2-11. The final determination was "inconclusive." *Id.* at 53:5-7.

79. This "investigation" completely contradicted the Privacy & Security office's standard procedures for investigating complaints made by faculty members. *See* AMF 48-51.

80. Similarly, Dr. Zimmerman filed a second complaint with the University's IRB office on or about January 4, 2013, after McMahon removed Dr. Zimmerman's access to research and grant files. Zimmerman Depo. at 168:25-169:3.

81. The IRB deferred to the Privacy & Security office's determination, again, and did not investigate Dr. Zimmerman's complaint. *See* July 22, 2013, IRB completion letter, attached as Exhibit Y. By the time the IRB office responded to Dr. Zimmerman's January 2013 complaint, Dr. Zimmerman was no longer a University employee.

**H. Discrimination based on Dr. Zimmerman's perceived disability**

82. During Dr. Zimmerman's employment with the University, McMahon told Dr. Zimmerman she suffered from post-traumatic stress disorder ("PTSD"). Zimmerman Depo. at 19:10-20. He alluded to Dr. Zimmerman suffering from PTSD a couple of times. *Id.* at 22:7-11.

83. In his deposition, McMahon denied telling Dr. Zimmerman she had a mental disorder.

McMahon Depo. at193:7-9.

84. Dr. Zimmerman complained to Tom Parks, the University's Vice President for Research, that the Chair of the Department of Psychiatry was making mental health diagnoses of individuals he did not like. Zimmerman Depo. at 22:18-22. (Deborah Bilder acknowledged that McMahon had made comments about another University employee having some sort of autism spectrum disorder). Bilder Depo. at 120:18-25.

85. McMahon's administrative assistant would tell University employees that Dr. Zimmerman was a "nut case." *See* Ex. I.

86. Bilder told McMahon that Dr. Zimmerman had "borderline personality disorder." Bilder Depo. at 119:20-23. Bilder acknowledged that that mental illness has "negative connotations." *Id.* at 120:3-4.

87. Dr. Zimmerman filed a formal complaint with the University's Office of Equal Opportunity and Affirmative Action ("OEO/AA") on or about December 14, 2012, alleging that McMahon had discriminated against Dr. Zimmerman based on, *inter alia*, her age, perceived disability, and religion, throughout her career at the University. Zimmerman Depo. at 158:4-10.

**I. Discrimination based on Dr. Zimmerman's age**

88. McMahon often asked Dr. Zimmerman when she was going to retire because older employees could not keep up with younger employees. Zimmerman Depo. at 35:2-7.

89. McMahon also made derogatory comments about Dr. Zimmerman's age in her RPT committee meeting review. Ex. I.

90. In his deposition, McMahon denied making derogatory comments about Dr. Zimmerman's age in her RPT committee meeting review. McMahon Depo. at 195:5-11.

91. After not renewing her contract and restricting her access to research data, McMahon gave Dr. Zimmerman's research-in-progress to younger female faculty members. Zimmerman Depo. at 192:1-4.

92. Dr. Zimmerman filed a formal complaint with the University's Office of Equal Opportunity and Affirmative Action ("OEO/AA") on or about December 14, 2012, alleging that McMahon had discriminated against Dr. Zimmerman based on, *inter alia*, her age, perceived disability, and religion, throughout her career at the University. Zimmerman Depo. at 158:4-10.

93. On or about January 3, 2013, McMahon told Dr. Zimmerman that she no longer had authority to collect health data to conduct autism research. *See* January 3, 2013, letter, attached as Exhibit Z.

94. McMahon also told Dr. Zimmerman she could not ascertain cases through the Utah Department of Education, and that he had replaced her position as URADD director with Deborah Bilder. *Id.* At the time, Bilder was 39 years old. Bilder Depo. at 128:2-6.

**J. Discrimination based on Dr. Zimmerman's religion**

95. During Dr. Zimmerman's career at the University, McMahon made derogatory comments about Dr. Zimmerman becoming a chaplain. Zimmerman Depo. at 35:14-16. McMahon made it clear that he didn't approve of Dr. Zimmerman studying to become a chaplain, and that chaplains "feed the delusions of religious people" and that "individuals who had certain religious beliefs were delusional." *Id.* at 36:5-11; 194:14-16.

96. McMahon also made derogatory comments about Dr. Zimmerman's pursuit of theology in her RPT committee meeting review. *See* Ex. I.

97. Before committee members had a chance to view Dr. Zimmerman's RPT file, McMahon

told committee members that Dr. Zimmerman did not take her employment position with the Department seriously because she took time off to pursue becoming a chaplain. Ex. I.

98. In his deposition, McMahon denied making derogatory comments about Dr. Zimmerman's religion in her RPT committee meeting review. McMahon Depo. at 195:14-15.

99. The University only supported Dr. Zimmerman providing her services as a chaplain if she did it for free, even though the University paid other individuals to do chaplaincy work. Zimmerman Depo. at 196:12-21. Dr. Zimmerman was offended by the University's demand that she volunteer her chaplaincy services. *Id.*

100. Dr. Zimmerman filed a formal complaint with the University's Office of Equal Opportunity and Affirmative Action ("OEO/AA") on or about December 14, 2012, alleging that McMahon had discriminated against Dr. Zimmerman based on, *inter alia*, her age, perceived disability, and religion, throughout her career at the University. Zimmerman Depo. at 158:4-10.

## K. Retaliation

101. McMahon first knew of Dr. Zimmerman's privacy & security complaint on or about September 19, 2012, when he met with Jerry Smith to discuss Dr. Zimmerman's complaint. McMahon Depo. at 191:1-5; Ex. D.

102. McMahon initiated conversations with Scott Smith, a University attorney, about not renewing Dr. Zimmerman's contract on or about October 16, 2012. *See* Ex. U. These conversations began within two weeks after McMahon was notified of the Privacy & Security office's "opinion" regarding Dr. Zimmerman's concerns. *Compare* Ex. T *with* Ex. U.

103. Even though Dr. Zimmerman had passed the University's RPT review process on or about May 29, 2012, and had a regular annual review on or about August 17, 2012, McMahon notified Dr. Zimmerman that her contract was not going to be renewed on or about December 10, 2012. Dock. no. 46-3; AMF 16-17; 20-21. Dr. Zimmerman received the non-renewal letter on or about December 12, 2012. Zimmerman Depo. at 157:4-10.

104. When asked, "[w]hy was it your first instinct to figure out how to file a retaliation complaint when you learned of your non-renewal?," Dr. Zimmerman answered, "I believe that I was being retaliated for reporting privacy concerns and plagiarism . . . [a]nd ethical concerns." *Id.* at 157:15-21.

105. On or about December 13, 2012, McMahon told Dr. Zimmerman that she was removed as the URADD director. *See* December 13, 2012, letter, attached as Exhibit AA. McMahon notified Dr. Zimmerman through Amy Henderson; he gave Ms. Henderson an envelope and told Ms. Henderson to give the letter to Dr. Zimmerman. Henderson Depo. at 76:12-18.

106. On or about January 3, 2013, McMahon told Dr. Zimmerman that she no longer had authority to collect health data to conduct autism research. Ex. Z. McMahon also told Dr. Zimmerman she could not ascertain cases through the Utah Department of Education, and that he had replaced her position as URADD director with Deborah Bilder. *Id.*

107. McMahon again notified Dr. Zimmerman through Amy Henderson by giving her the letter to give to Dr. Zimmerman. Henderson Depo. at 80:15-21. Ms. Henderson felt like McMahon tried to put her in the middle of things between him and Dr. Zimmerman. *Id.* at 81:15-16.

108. On or about February 26, 2013, McMahon removed Dr. Zimmerman as Principal

Investigator from her CDC grant. *See* February 26, 2013, letter, attached as Exhibit BB.

McMahon also told Dr. Zimmerman he had disabled her access to grant-related

information and unilaterally moved her office space to a different location. *Id.* (McMahon

also removed Amy Henderson's access to data. Bilder Depo. at 190:4-22. Ms. Henderson

was the individual who accompanied Dr. Zimmerman to the University's Privacy &

Security office to report privacy and security concerns. Henderson Depo. at 55:18-19;

56:18-25).

109. At the time McMahon removed Dr. Zimmerman as PI from her CDC grant, he had not

gone through the CDC's proper channels to remove Dr. Zimmerman. *See* CDC February

27, 2013, email to the University, attached as Exhibit CC ("[I]t appears that Ms. Judith

Zimmerman will no longer serve as the Principal Investigator (PI) for this agreement. I am

writing to inquire whom from your organization will now take on that role and

responsibility to continue the referenced grant award?").

110. McMahon replaced Dr. Zimmerman's Principal Investigator position with Deborah

Bilder. *See* Memo to Staff, attached as Exhibit DD. McMahon also re-keyed the locks of

the building, told department employees that Dr. Zimmerman was not allowed access to

the building, and told Dr. Zimmerman's staff not to talk to Dr. Zimmerman at all. *Id.*;

Henderson Depo. at 85:9-10.

111. McMahon had police present on February 26, 2013, which is the day McMahon notified

Dr. Zimmerman she was no longer Principal Investigator on the CDC grant. McMahon

Depo. at 123:14-17. This was the only time McMahon had police present at the University

for an employment issue during his time as Chair of the Department of Psychiatry. *Id.* at

130:21-131:4.

112. McMahon's January and February adverse actions against Dr. Zimmerman immediately followed Dr. Zimmerman's complaints of retaliation to the Privacy & Security office and the IRB office. AMF 72-81. McMahon's decisions also immediately followed Dr. Zimmerman's OEO/AA complaints of discrimination against McMahon. AMF 87, 92, 100.

113. Dr. Zimmerman testified that Defendants retaliated against her for "asking questions about plagiarism, privacy concerns and the sharing of identifiable data without the appropriate consents." Zimmerman Depo. at 41:17-20.

114. Similarly, when Defendants' counsel asked Dr. Zimmerman what the basis for her wrongful termination in violation of public policy claim was, Dr. Zimmerman answered, "I believe that I was reporting legitimate concerns about privacy and research misconduct, plagiarism, and that that was why I was terminated." *Id.* at 198:3-11.

## L. Dr. Zimmerman's reputation and future opportunities

115. Before McMahon notified Dr. Zimmerman that her contract would not be renewed, he told Bilder and individuals employed at UDOH that she was no longer going to be a University employee. Bilder Depo. at 153:9-17.

116. Bilder told the CDC that Dr. Zimmerman would not work with them [the CDC], when actually McMahon had forbidden Dr. Zimmerman from working on the CDC grant. Zimmerman Depo. at 177:16-18.

117. Dr. Zimmerman's research-in-progress was given to Bilder and Bakian, and Dr. Zimmerman was not credited with contributing to at least two years' worth of work. *Id.* at 178:4-6.

118. Dr. Zimmerman was told that if she was seen near the University's building, where she

had worked for the past 7+ years, she was to be reported. Zimmerman Depo. at 179:9-10.

119. Dr. Zimmerman's transfer to the College of Health fell through because her contract was not renewed by McMahon. *Id.* at 179:4-8.

120. In addition, "[t]o do research, you billed on your past research, so McMahon took away all of [Dr. Zimmerman's] research in progress and the data [Dr. Zimmerman] had collected over a 10-year period, so it's [] very difficult to start all over again when you have worked for 10 years to collect data and start research that you can't finish." *Id.* at 179:12-19.

121. An HHS investigator requested that the University respond to Dr. Zimmerman's complaints that she had made to the federal agency. The Privacy & Security office responded on behalf of the University. *See* University Response to HHS investigation, attached as Exhibit EE.

122. As part of the University's response, the Privacy & Security office requested a more detailed memo from Jerry Smith on or about May 24, 2013, because his October 2012 report was so minimal. Argoitia Depo. at 60:8-20.

123. The University's response to HHS again did not focus on Dr. Zimmerman's allegations of retaliation, but rather focused on Dr. Zimmerman's alleged performance deficiencies. Ex. EE.

124. The University's response made false allegations against Dr. Zimmerman that she "persisted in her patterns of destructive behavior that hindered the growth and development of her fellow researchers and hindered the progress of research." Ex. EE at 4. Dr. Zimmerman did not have an opportunity to respond to these allegations that hindered her reputation and destroyed her integrity.

**ARGUMENT**

## I.     Summary judgment standard.

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a), but the Court must "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party." *N. Natural Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

## II.    Dr. Zimmerman's Utah Protection of Public Employees Act cause of action is not time-barred.

Under the Utah Protection of Public Employees Act ("Whistleblower Act"), Utah Code Ann. § 67-21-1 *et seq.*, an employee may bring a "civil action" within "180 days after the occurrence of the alleged violation" under the Act. Utah Code Ann. § 67-21-4. An additional limitation is placed on public employees under the Utah Governmental Immunity Act ("GIA"), Utah Code Ann. § 63G-7-101 *et seq.*, which mandates that a "Notice of Claim" must be filed "within one year after the claim arises." Utah Code Ann. § 63G-7-402. The GIA also mandates that a claimant must effectively wait to file a civil lawsuit for 60 days after filing a Notice of Claim to allow for "approval" or "denial" of the Notice by the public entity. Utah Code Ann. § 63G-7-403. Read in conjunction, these two statutes put the following restraints on public employees who have suffered adverse actions for reporting protected activity under the Whistleblower Act: "employees wishing to file suit under the [Whistleblower Act] must proceed more quickly than either the [Whsitleblower Act] or the GIA would suggest when their respective terms are considered in isolation." *Thorpe v. Washington City*, 2010 UT App 297, ¶ 21, 243 P.3d 500. "[B]ecause the GIA requires that the governmental entity be allowed 60 days to review the notice of claim . . . it follows that the plaintiff must submit the notice of claim before the elapse of

120 days from the date of the alleged [Whistleblower Act] violation . . . ." *Id.*

While these constraints are obstructive, to say the least, Dr. Zimmerman was terminated on or about June 30, 2013. Dock. no. 46-3. Her Notice of Claim was filed on or about October 25, 2013, which was 117 days from her termination. *See* Response to Defendants' Fact No. 5. Furthermore, Dr. Zimmerman's Complaint was filed on or about December 27, 2013, which was 180 days from her termination. *See* Response to Defendants' Fact No. 6. Because Dr. Zimmerman filed her Notice of Claim and her "civil action" within "180 days after the occurrence of the alleged violation," her Whistleblower claim is timely and properly before this Court. Utah Code Ann. § 67-21-4.

Because Defendants do not dispute the elements of Dr. Zimmerman's Whistleblower Act claim in their motion for summary judgment, this Court should allow Dr. Zimmerman's Whistleblower Act cause of action to go to a jury. *See Gaines-Tabb v. ICI Explosives, USA, Inc.*, 160 F.3d 613, 624 (10th Cir. 1998) ("[A]rguments not set forth fully in the opening brief are waived.").

### III.   Dr. Zimmerman had a protected property interest in her employment with the University.

"'[P]rocedural due process ensures that a state will not deprive a person of life, liberty or property unless fair procedures are used in making that decision.'" *Hennigh v. City of Shawnee*, 155 F.3d 1249, 1253 (10th Cir. 1998). (quoting *Archuleta v. Colorado Dep't of Insts., Div. of Youth Servs.*, 936 F.2d 483, 490 (10th Cir. 1991)) (alteration in original). Two steps are used to determine if procedural due process was violated: "(1) Did the individual possess a protected interest to which due process protection was applicable? (2) Was the individual afforded an appropriate level of process?" *Id.*

When "there are substantive restrictions on the ability of the employer to terminate the

employee," a continued expectation of employment is established. *Kingsford v. Salt Lake City Sch. Dist.*, 247 F.3d 1123, 1129 (10th Cir. 2001). While Dr. Zimmerman's 2008 contract was for a renewable term, Defendants had "substantive restrictions" on the ability to terminate Dr. Zimmerman. University Policy 6-310 explains the substantive restrictions Defendants were obligated to follow, but which were not followed in Dr. Zimmerman's case. *See* dock. no. 46-9 at 111-15.[1]

Policy 6-310 mandates, "[a]ll faculty appointing units which appoint any auxiliary faculty . . . must develop and present for approval a Statement of academic unit rules that provide for procedures, criteria and standards for the evaluation and reappointment of each category of auxiliary faculty . . . ." *Id.* at 112. Each "appointing unit" must designate a committee or individual to evaluate auxiliary faculty for reappointments. *Id.* at 113. The designated committee or individual also makes a recommendation before committee members vote on reappointment or non-reappointment. *Id.* In addition, the "unit rules" that faculty appointing units use "must provide for action, such as developing and implementing a plan for improvement or non-reappointment, if an evaluation of a candidate indicates areas of concern." *Id.* The University established this particular policy "[i]n pursuit of the University's commitment to excellence." *Id.* Policy 6-310 also states that reappointments of auxiliary faculty members must be consistent with University Policy 6-302. *Id.* Policy 6-302 reiterates that reappointment of auxiliary faculty must be voted on by the department's appointments advisory committee. *Id.* at 49-50. The chairperson of a department, in this case McMahon, may not vote. *Id.*

In this case, Defendants bypassed these policies and terminated Dr. Zimmerman. The

---

[1] References to page numbers are to the page numbers created by the electronic docketing system.

criteria and standards for Dr. Zimmerman's annual evaluation were never used; the Department's faculty appointments committee never voted on Dr. Zimmerman's reappointment; and no recommendation was made regarding Dr. Zimmerman's reappointment. McMahon took it upon himself to terminate Dr. Zimmerman's contract with the University, within the same year that Dr. Zimmerman passed the RPT process and after a regular annual review on or about August 17, 2012. *See* AMF 16-21.

Dr. Zimmerman's case is unlike *Crown Point I, LLC v. Intermountain Rural Electric Ass'n*, 319 F.3d 1211 (10th Cir. 2003), which Defendants cite in support of their argument. *Crown Point* involved a City's approval to construct an electrical transmission line through a company's property without first holding a public hearing. 319 F.3d at 1213. The company sued the City, claiming the company had a due process right to a hearing prior to the City's decision. *Id.* The Tenth Circuit explained that "when a party challenges a land use decision by a governing body on due process grounds, the proper inquiry is whether that body had limited discretion in granting or denying a particular zoning or use application." *Id.* at 1217. This is not the appropriate standard in Dr. Zimmerman's case, nor does it make sense in employment cases. If Defendants' standard applied to employees' due process claims, such that "[t]here is no protected property interest if the outcome of the proceeding is not determined by the specified procedure," there would be no point in having grievance and/or appeal procedures in place for employees with protected property interests.

Regardless, Defendants' discretion was limited in terminating Dr. Zimmerman because the Department's appointments advisory committee should have been involved, evaluated, and voted on Dr. Zimmerman's reappointment. *See* dock. no. 46-9 at 111-15. If there were "areas of concern," a plan should have been addressed and put into place with Dr. Zimmerman. *Id.* Because

these were "substantive restrictions" on Defendants' ability to terminate Dr. Zimmerman, Dr.

Zimmerman had a protected property interest in her employment. Because Dr. Zimmerman had a

protected property interest, she was entitled to an appropriate level of process. *Hennigh*, 155 F.3d

at 1253. Because she did not receive the level of process that was due, she was deprived of due

process under 42 U.S.C. § 1983 and Article I, Section 7, of the Utah constitution. Summary

judgment should therefore be denied to Dr. Zimmerman's third and fourth causes of action.

Furthermore, Dr. Zimmerman has alleged a liberty interest protected by the Fourteenth

Amendment. Dock. no. 32. A decision not to rehire a non-tenured teacher deprives the teacher of

his or her liberty interest when the decision was in retaliation for the teacher's exercise of his or

her constitutional rights. *Moore v. Utah Technical College*, 727 P.2d 634, 637 (Utah 1986) (citing

*Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 574-75 (1972)). As explained in

Argument Section V and VI, *infra*, because Defendants decision to terminate Dr. Zimmerman was

in retaliation for her exercise of her constitutionals rights, her due process rights were violated.

## IV.    Summary judgment should be denied on Dr. Zimmerman's breach of contract claim.

Summary judgment must be denied on Dr. Zimmerman's second cause of action because

Dr. Zimmerman sufficiently pled a breach of contract. Furthermore, the University breached its

own policies, which it was obligated to follow, and the University's breach caused harm to Dr.

Zimmerman.

### A.    Dr. Zimmerman's breach of contract claim meets the minimum pleading requirements.

The University alleges that Dr. Zimmerman's breach of contract claim "failed to allege the

minimum essential elements identified by the Utah Supreme Court;" therefore, the breach of

contract claim must fail. Dock. no. 46 at 29-30. Dr. Zimmerman disputes the University's

characterization of her well-plead Complaint; regardless, to the extent Utah law requires more specific pleadings, it is preempted by the federal standard. *Davita Inc. v. Nephrology Associates, P.C.*, 253 F. Supp. 2d 1370, 1381 (S.D. Ga. 2003) (citing *Gates v. L.G. DeWitt, Inc.,* 528 F.2d 405, 411 (5th Cir. 1976)); *Caster v. Hennessey*, 781 F.2d 1569, 1570 (11th Cir. 1986). While Utah substantive law may govern Dr. Zimmerman's breach of contract claim, federal procedural law governs. *Caster*, 781 F.2d at 1570. Under Federal Rule of Civil Procedure 8(a), Dr. Zimmerman's Complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8. A claim for relief is plausible when the plaintiff pleads facts adequate to draw a reasonable inference that the defendant is liable for the alleged misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In Dr. Zimmerman's Amended Complaint, she alleged, "[t]he University's policies constitute a contract that was binding upon Dr. Zimmerman and Defendant University." Dock. no. 32 at 18. Dr. Zimmerman also alleged that she "performed all of her legal obligations under these contracts." *Id.* Dr. Zimmerman alleged that she suffered harm by the University's breach of its own policies, and she specifically alleged breach of Policies 6-302, 6-303, 6-310, and 6-316. *Id.* at 18-19. Dr. Zimmerman also incorporated ¶¶ 1-60 in her "Second Cause of Action," which laid out her "General Allegations" against Defendants. *Id.* at 18. Some of the allegations incorporated into Dr. Zimmerman's breach of contract cause of action were that Dr. Zimmerman entered into an employment relationship with the University on or about 2005 (indicating when the University's policies took effect) and that Dr. Zimmerman was terminated, effective June 30, 2013, in retaliation for raising concerns of privacy and information security violations. *Id.* at 3, 15. Dr. Zimmerman's breach of contract claim alleged that the specific policies 6-302, 6-303, 6-310, and 6-316 were breached by the University "by terminating Dr. Zimmerman for exercising these

rights" and "when McMahon made the unilateral decision to terminate Dr. Zimmerman and did

not require a vote by the department's faculty appointments advisory committee or the

department's auxiliary faculty." *Id.* at 18-19. These allegations, under either Fed. R. Civ. P. 8 or

the stricter Utah pleading standard, are sufficient to state a claim for relief for breach of contract.

### B. The University breached its own policies, which caused harm to Dr. Zimmerman.

Summary judgment should be denied on Dr. Zimmerman's breach of contract claim

because the University breached its own policies when terminating Dr. Zimmerman, and the

termination caused Dr. Zimmerman to suffer damages. The University alleges that "[n]othing in

[Dr. Zimmerman's 2008] Contract made any policies applicable to Plaintiff and nothing in the

policies made any appeal or grievance process applicable to probationary, non-tenured, contract

faculty, like Plaintiff." Dock. no. 46 at 30. To the contrary, Dr. Zimmerman's 2008 contract with

the University states, "University policy for this [employment position] is available at:

http://medicine.utah.edu/facultyadmin/policy/appointment/tracks.htm#research." Dock. no. 46-5.

The contract also directs Dr. Zimmerman to "University policies [] available online at

http://www.admin.utah.edu/ppmanual." *Id.* The contract explicitly incorporates University

policies; the former URL website addresses faculty ranks and tracks within the School of

Medicine and the latter URL website is a link to the University's "Regulations Library," which

contains all University policies, including Policies 6-302, 6-303, 6-310, and 6-316. Under Utah

law, the University's policies must be considered in relation to the other contract provisions of

the 2008 contract, "'with a view toward giving effect to all and ignoring none.'" *Café Rio, Inc. v.

Larkin-Gifford-Overton, LLC*, 2009 UT 27, ¶ 25, 207 P.3d 1235 (quoting *Green River Canal Co.

v. Thayn*, 2003 UT 50, ¶ 17, 84 P.3d 1134). Furthermore, during Dr. Zimmerman's deposition,

Defendants' counsel recognized that the aforementioned policies were a part of Dr.

Zimmerman's 2008 contract. Zimmerman Depo. at 17:4-7 ("Q: Okay, and also where it states: 'University policies are available online,' and it references the manuals and references the site where you can go as an employee and review those?" A: Yes.").

As explained in Argument Section II, *supra*, Defendants had "substantive restrictions" on the ability to terminate Dr. Zimmerman. University Policy 6-310 explains the substantive restrictions Defendants were obligated to follow, but which were not followed in Dr. Zimmerman's case. *See* dock. no. 46-9 at 111-15. Policy 6-310 also states that reappointments of auxiliary faculty members must be consistent with University Policy 6-302. *Id.* Instead of following its own policies, McMahon terminated Dr. Zimmerman without requiring a vote by the department's faculty appointments advisory committee or the department's auxiliary faculty. Under the applicable policies, McMahon would not get a vote for Dr. Zimmerman's reappointment. Dock. no. 46-9 at 49-50. Because 1) the University's policies were a part of the University's 2008 contract with Dr. Zimmerman; 2) Dr. Zimmerman performed her obligations under the contract; 3) the University breached its policies in terminating Dr. Zimmerman; and 4) Dr. Zimmerman suffered harm as a result of her termination, summary judgment must be denied.[2]

### V.   Summary judgment should be denied on Dr. Zimmerman's liberty interest claims.

Defendants allege Dr. Zimmerman's fifth and sixth causes of actions fail because Dr. Zimmerman failed to sufficiently plead a deprivation of liberty interest and there was no deprivation of liberty interest. Dock. no. 46 at 31. Summary judgment should be denied because

---

[2] Defendants do not dispute the second or fourth elements of Dr. Zimmerman's *prima facie* case of breach of contract; these elements have therefore been conceded. *See Gaines-Tabb*, 160 F.3d at 624 ("[A]rguments not set forth fully in the opening brief are waived.").

both of Defendants' arguments are baseless.

"A public employee has a liberty interest in his good name and reputation as they relate to his continued employment." *McDonald v. Wise*, 769 F.3d 1202, 1212 (10th Cir. 2014). A deprivation of a person's liberty interest exists when (1) the government "makes a statement that 'impugn[s] the good name, reputation, honor, or integrity of the employee'; (2) the statement is false; (3) the statement is made during the course of termination *and* 'foreclose[s] other employment opportunities'; and (4) the statement is published, in other words disclosed publically." *McDonald*, 769 F.3d at 1212 (quoting *Workman*, 32 F.3d at 481). Defendants do not address the falsity of Defendants' statements (the second element of the claim) or the foreclosure of other employment opportunities (the second factor of the third element); these factors have therefore been conceded. *See Gaines-Tabb*, 160 F.3d at 624 ("[A]rguments not set forth fully in the opening brief are waived.").

Dr. Zimmerman alleged in her Amended Complaint that Defendants terminated her "based on false allegations of unsatisfactory job performance and failure to meet University criteria," when her termination was actually "in retaliation against Dr. Zimmerman by McMahon and the University for raising [] concerns of privacy and information security violations." Dock. no. 32 at 15, 22-23. McMahon made statements about Dr. Zimmerman to officials at the UDOH, prior to even informing Dr. Zimmerman that he intended to terminate her. AMF 115. McMahon's statements to UDOH "impugned" Dr. Zimmerman's good name and reputation with the state agency (where she had previously worked for over 25 years). Similarly, Bilder told the CDC that Dr. Zimmerman would not work with it (the CDC), when actually McMahon had forbidden Dr. Zimmerman from working with the CDC. AMF 116. Dr. Zimmerman's reputation with the CDC was damaged as a result, and she was unable to complete current research or be

involved in future research due to these false statements. AMF 117, 120. Furthermore, Defendants publicly disclosed these false statements to the HHS as part of its response to the federal agency's inquiry into Defendants. *See* AMF 121-124; Ex. EE. Defendants' false statements regarding Dr. Zimmerman's "patterns of destructive behavior that hindered the growth and development of her fellow researchers and hindered the progress of research" are "stigmatizing statements" that implicated Dr. Zimmerman's integrity and ability to work with anyone in any research field, and were more than allegations of "unsatisfactory job performance." AMF 115-124; Ex. EE; s*ee McDonald*, 769 F.3d at 1212; *see also Michaels v. City of McPherson, Kan.*, 71 F. Supp. 3d 1257, 1260 (D. Kan. 2014).

Although this Circuit has not considered "whether public dissemination occurs when a government employer makes a mandatory disclosure to a separate government agency, this Circuit has recognized that "disclosure of stigmatizing information to prospective employers may quality as publication." *Michaels*, 71 F. Supp. 3d at 1261. Here, a reasonable fact-finder could conclude that Dr. Zimmerman had been a central part of the Utah (and national) autism research community for over 10 years, and that Defendants' false statements were stigmatizing to her reputation and her ability to obtain a similar employment opportunity with any state or federal agency involved in autism research because the statements were published to UDOH (her former employer of over 25 years), the CDC, and HHS. *Monroe v. City of Lawrence, Kan.*, 2015 WL 5006081, -- F. Supp. 3d --, at *19 (D. Kan. Aug. 20, 2015); *Michaels*, 71 F. Supp. 3d at 1260-61 (explaining that whether statements are sufficiently "stigmatizing" may be an issue for the jury); AMF 1-4; 115-124. Defendants did not provide Dr. Zimmerman an opportunity to "clear her name" after making these false allegations; therefore, she was deprived of her liberty interest. *See* Argument Section III, *supra*. These factual disputes are for a fact-finder to

determine, and summary judgment should be denied.

### VI. Summary judgment should be denied on Dr. Zimmerman's free speech claims.

Because Article I, Section 15 of the Utah Constitution is self-executing, and because the University committed a "flagrant violation" of the statute, Dr. Zimmerman's free speech state claim must survive summary judgment. Similarly, Dr. Zimmerman's 42 U.S.C. § 1983 free speech claim must survive summary judgment because her speech was a matter of public concern.

### A.  This Court should find Article I, Section 15, of the Utah Constitution self-executing.

Defendants cite to *Tiscareno v. Frasier*, Civ. No. 2:07-cv-336, 2012 WL 1377886 (D. Utah Apr. 19, 2012), for the proposition that Article I, Section 15, of the Utah Constitution is not "self-executing." *Tiscareno* does not hold that the state's free speech clause is not self-executing, though. *See id.* The case does not even mention Article I, Section 15, of the Utah Constitution. *Id.* Although this Court has not determined whether Article I, Section 15 is self-executing, *Spackman ex rel. Spackman v. Board of Educ. of Box Elder County School Dist.*, 2000 UT 87, 16 P.3d 533, provides guidance.

*Spackman* recognized that "[a] constitutional provision is self-executing if it articulates a rule sufficient to give effect to the underlying rights and duties intended by the framers." *Spackman*, 2000 UT at ¶ 7 (internal citations omitted). "[A] constitutional provision that prohibits certain government conduct generally qualifies as a self-executing clause 'at least to the extent that courts may void incongruous legislation.'" *Id.* at ¶ 8. (quoting *Bott v. Deland*, 922 P.2d 732, 738 (Utah 1996). *Spackman* recognized that Article I, Section 7, of the Utah Constitution is self-executing, and the same rationale should be applied here. Similar to Article I, Section 7, the state's free speech clause is mandatory and prohibitory. It states, "[n]o law shall be

passed to abridge or restrain the freedom of speech or of the press." Utah Const. art. I, § 15.

Similarly, the clause is "judicially definable and enforceable." *Spackman*, 2000 UT at ¶ 12; *see*

*also American Bush v. City of South Salt Lake*, 2006 UT 40, ¶¶ 21-28; 41-50, 140 P.3d 1235

(articulating and defining the legislative history of the clause). Finally, the clause suggests "the

framers intended to constitutionalize existing concepts of free speech rather than create a new

provision requiring legislative implementation." *Id.* at ¶ 13. The concepts of free speech were

established and well-known by the time the state implemented the provision; in fact, "[t]he

drafters of the Utah Constitution borrowed heavily from other state constitutions and the United

States Constitution." *American Bush*, 2006 UT at ¶ 31. This Court should construe Article I,

Section 15, of the Utah Constitution self-executing, following *Spackman*'s rationale. 2000 UT

87.

**B.  The University committed a "flagrant violation" when it terminated Dr. Zimmerman for exercising her rights under the Utah Constitution.**

To establish a "flagrant" violation of her constitutional rights, Dr. Zimmerman must show

that the University "violated 'clearly established' constitutional rights 'of which a reasonable

person would have known.'" *Spackman*, 2000 UT ¶ 23 (quoting *Harlow v. Fitzgerald*, 457 U.S.

800, 818 (1982)). Because Article I, Section 15's prohibition on the restraint of free speech is

nearly identical to the First Amendment's prohibition under federal law, the constitutional right

is clearly established and a reasonable person would have known when s/he terminated Dr.

Zimmerman for exercising her free speech rights, that s/he was violating clearly established

constitutional rights. *See Baird v. Cutler*, 883 F. Supp. 591, 605-06 (D. Utah 1995) (recognizing

that when the Utah Supreme Court has discussed the interpretation of the free speech provision

of the Utah Constitution, federal case law has been cited and relied upon); *see also West Gallery*

*Corp. v. Salt Lake City Bd. of Com'rs*, 586 P.2d 429, 430 (Utah 1978) ("There are certain

relevant principles of constitutional law so well established as not to require supporting citation. The United States Constitution and the Utah Constitution both prohibit the making of laws 'abridging freedom of speech.'"). Because Article I, Section 15, of the Utah Constitution is self-executing and the University committed a "flagrant violation" of the provision, Dr. Zimmerman's eighth cause of action must not be dismissed as a matter of law.

## C.  Summary judgment should be denied because Dr. Zimmerman's speech was a matter of public concern.

Defendants allege that Dr. Zimmerman's federal free speech claim should be dismissed because Dr. Zimmerman's speech was not a matter of "public concern,"[3] although Defendants provide no background or context for Dr. Zimmerman's speech. *See* AMF 22-69. The elements of a First Amendment claim against a public employer are: 1) the employee engaged in protected speech; 2) the employer took adverse action against the employee; and 3) the employee's speech was a substantial or motivating factor in the adverse action. *Freitag v. Ayers*, 468 F.3d 528, 542-43 (9th Cir. 2006). Speech is "protected" if it touches on a matter of public concern. *Id.* "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers,* 461 U.S. 138, 147-48 (1983). In this case, Dr. Zimmerman's statements were made to the University's Security and Privacy Office; the University's Institutional Review Board office; and the University's legal department regarding concerns of research misconduct with federal grants, potential legal liability as a result of the research misconduct, and financial concerns about

---

[3] Defendants do not argue that 1) Dr. Zimmerman's speech was pursuant to her official duties; 2) Dr. Zimmerman was speaking as an employee, and not a citizen; 3) Defendants' interests substantially outweighed Dr. Zimmerman's interests in speaking; or 4) that Dr. Zimmerman's speech was a substantial or motivating factor in the decision to terminate her; these elements are therefore conceded. *See Gaines-Tabb*, 160 F.3d at 624 ("[A]rguments not set forth fully in the opening brief are waived.").

"double dipping" in different University departments. *See* AMF 22-81. Matters of public concern include complaining of potential illegal activity or improprieties within a government agency. *See Hardeman v. City of Albuquerque*, 377 F.3d 1106, 1113-14 (10th Cir. 2004) (challenging city's audit of contracts where there was evidence of corruption, impropriety, and malfeasance by city officials). Similarly, "[s]peech aimed at exposing improper operations or questioning the integrity of government officials clearly concerns public interests." *Brantley v. Unified School Dist. No. 500*, 2008 WL 2079411 (D. Kan. May 15, 2008) (citing *Conaway v. Smith*, 853 F.2d 789, 796 (10th Cir. 1988)). Dr. Zimmerman's speech falls into these categories of protected speech. The following material facts establish that Dr. Zimmerman's speech was a matter of public concern.

Dr. Zimmerman alleged concerns that University employees were obtaining unauthorized access to identifiable highly sensitive health and education data and that data was not secure, and that Dr. Zimmerman filed a privacy complaint with the University's Privacy Office in August of 2012. Dock. no. 32 at ¶¶ 15, 22.  "Dr. Zimmerman spoke out and identified her concerns about the privacy issues and unauthorized access to secure data at the University." *Id.* at ¶¶ 100, 106.

Dr. Zimmerman's deposition testimony focused on the ethical concerns and research misconduct that McMahon (and Bilder and Bakian) allegedly condoned and participated in. AMF 38-47. Dr. Zimmerman testified that she was concerned Bakian had copied identifiable data, in violation of confidentiality and security agreements she had signed, to share with individual researchers who did not have access to identifiable data. *Id.* Dr. Zimmerman was particularly concerned that this misconduct, including McMahon's, violated FERPA, HIPAA, and HITECH. *See* Ex. D. The Privacy & Security Office understood Dr. Zimmerman's concerns to be "agreements [] in place with the Utah Department of Education and the disposition of the

data that was identifiable in the data set that had been compiled" and about the University's liability because of unauthorized access to a research database and potential violations of HIPAA and FERPA. *Id*; AMF 55-56.

Dr. Zimmerman testified, "I think the fact that I reported data errors, research misconduct, is significant," in response to Defendants' counsel's question about whether there was "any other speech that has not been mentioned in your deposition that you consider to be protected?" Zimmerman Depo. at 190: 16-21. On or about December 2012, Dr. Zimmerman also reported the same concerns she had made to the University's Privacy & Security office to the HHS and the DOE. AMF 66. She also reported her concerns that school data had been copied to the USOE. *Id.* She reported her concerns to the CDC as well. *Id.*

Defendants try to classify all of Dr. Zimmerman's speech as an interpersonal dispute, but the material facts Defendants omitted demonstrate that Dr. Zimmerman's concerns were a "matter of public concern." AMF 38-47; 66-68. Dr. Zimmerman's choice to go through proper University channels before speaking to outside entities is "not dispositive." *Garcetti v. Ceballos*, 547 U.S. 410, 420-21 (2006); *Conaway*, 853 F.2d at 797. Furthermore, because going through the proper channels proved useless, Dr. Zimmerman subsequently reported her concerns to HHS and the DOE. AMF 66.  HHS's investigation is ongoing, and Defendants responded to Dr. Zimmerman's concerns on or about August 22, 2013. *See* Ex. EE. Dr. Zimmerman's efforts were to bring to light potential wrongdoing and breaches of ethical research misconduct on the part of public employees, not to "air her personal grievance with her supervisor," as Defendants allege. Dock. no. 46 at 36.

In addition, although Dr. Zimmerman's concerns also recognized her own employment (and legal liability), that recognition is nondispositive. *Garcetti*, 547 U.S. at 421. As *Garcetti*

recognized, certain categories of public employees are the "members of a community most likely to have informed and definite opinions . . . ." *Id.* (quoting *Pickering v. Board of Ed. of Tp. High School Dist. 205, Will County, Ill.*, 391 U.S. 563, 572 (1968)). Here, because of her experience and unique position as contractor with different state and federal entities, Dr. Zimmerman was in the best position to have informed opinions about whether research misconduct occurred. *See id.*; AMF 38-39. "'Speech concerning potential illegal conduct by government officials is inherently a matter of public concern' even if the plaintiff's motivation was that the complained-of illegal conduct affected them." *Deutsch v. Jordan*, 618 F.3d 1093, 1101 (10th Cir. 2010) (quoting *Brammer–Hoelter v. Twin Peaks Charter Academy*, 492 F.3d 1192, 1206 (10th Cir. 2007)); *see also Conaway*, 853 F.2d at 796-97 (explaining that speech made for the purpose of informing superiors of alleged improper and illegal conduct, even if somewhat motivated by personal hostility, was a matter of public concern). Because Dr. Zimmerman's speech was a matter of public concern, summary judgment must be denied.

### VII.   Summary judgment should be denied on Dr. Zimmerman's disability discrimination claim because the University discriminated against Dr. Zimmerman based on her perceived disability.

Under the ADAAA, an employer cannot discriminate against an employee because of the employee's disability. 42 U.S.C. § 12112. As an initial point, the University must be an "eligible employer" under the ADAAA. 42 U.S.C. § 12111(5)(A). The University did not make an argument regarding the "eligible employer" element; this element has therefore been conceded. In addition, Dr. Zimmerman must either 1) have a disability as defined under the ADAAA, 2) suffer from a history of such disability, or 3) be "regarded as" having such a disability. 42 U.S.C. § 12102(2).

The University regarded Dr. Zimmerman as having a disability while a University

employee. "[A]n individual is 'regarded as having such an impairment' if the individual is subjected to a prohibited action because of an actual or perceived physical or mental impairment, whether or not that impairment substantially limits, or is perceived to substantially limit, a major life activity." 29 C.F.R. § 1630.2(l). "Prohibited actions include but are not limited to . . . demotion . . . [and] termination . . . ." *Id.* Dr. Zimmerman may "establish coverage under the 'regarded as' prong by showing that [she was] treated adversely because of an impairment, without having to establish the [employer's] beliefs concerning the severity of the impairment." Appendix to part 1630 – Interpretive Guidance on Title I of the Americans with Disabilities Act.[4] Because Dr. Zimmerman was subjected to disparate treatment, including her termination, because of her perceived disability, the University "regarded" Dr. Zimmerman as being disabled. *Id.* Defendants' statement of the law under *Jones v. Office Max, Inc.*, 38 F. Supp. 2d 957 (D. Utah 1999), is incorrect because the 2009 Amendments to the ADAAA abolished the restrictive view Defendants propose. *See id.*

Here, McMahon told Dr. Zimmerman she suffered from post-traumatic stress disorder ("PTSD"). AMF 82. He alluded to Dr. Zimmerman suffering from PTSD a couple other times. *Id.* In his deposition, McMahon denied telling Dr. Zimmerman she had a mental disorder. AMF 83. Dr. Zimmerman complained to Tom Parks, the University's Vice President for Research, that the Chair of the Department of Psychiatry was making mental health diagnoses of individuals he did not like. AMF 84. (Deborah Bilder acknowledged that McMahon had made comments about another University employee having some sort of autism spectrum disorder). *Id.* In addition,

---

[4] "To illustrate how straightforward application of the 'regarded as' prong is, if an employer refused to hire an applicant because of skin graft scars, the employer has regarded the applicant as an individual with a disability. Appendix to part 1630. Similarly, if an employer terminates an employee because he has cancer, the employer has regarded the employee as an individual with a disability. *Id.*

McMahon's administrative assistant would tell University employees that Dr. Zimmerman was a "nut case." AMF 85; Ex. I. Not only that, but Deborah Bilder told McMahon that Dr. Zimmerman had "borderline personality disorder." AMF 86. Bilder acknowledged that that mental illness has "negative connotations." *Id.* A reasonable fact-finder could determine that these material facts, particularly the disputed material fact that McMahon diagnosed Dr. Zimmerman with PTSD, contributed to McMahon treating Dr. Zimmerman differently than other employees he supervised, including McMahon's decision to demote Dr. Zimmerman, restrict her access to necessary data she needed to do her job, and terminate her.

Furthermore, on or about December 14, 2012, Dr. Zimmerman made a formal complaint to the University's OEO/AA office regarding McMahon's discrimination against her based on her perceived disability (and age and religion).[5] AMF 87. On or about January 3, 2013, McMahon told Dr. Zimmerman that she no longer had authority to collect health data to conduct autism research. AMF 106; Ex. Z. McMahon also told Dr. Zimmerman she could not ascertain cases through the Utah Department of Education, and that he had replaced her position as URADD director with Deborah Bilder. AMF 106; Ex. Z. Bilder was the individual who told McMahon that Dr. Zimmerman had "borderline personality disorder." AMF 86. Bilder acknowledged that that mental illness has "negative connotations." *Id.*

On or about February 26, 2013, McMahon removed Dr. Zimmerman as Principal Investigator from her CDC grant. AMF 108; Ex. BB. McMahon also told Dr. Zimmerman he had disabled her access to grant-related information and unilaterally moved her office space to a different location. AMF 108; Ex. BB. McMahon replaced Dr. Zimmerman's Principal

---

[5] This protected activity, and the retaliatory acts that followed it, was well within the EEOC's 300-day limitations period.

Investigator position with Deborah Bilder, even though he had not gone through the proper channels with the CDC to request a change in PI. AMF 109-110; Ex. CC; Ex. DD. McMahon also re-keyed the locks of the building, told department employees that Dr. Zimmerman was not allowed access to the building, and told Dr. Zimmerman's staff not to talk to Dr. Zimmerman at all. AMF 110; Ex. DD.

McMahon had police present on February 26, 2013, which is the day McMahon notified Dr. Zimmerman she was no longer Principal Investigator on the CDC grant. AMF 111. This was the only time McMahon had police present at the University for an employment issue during his time as Chair of the Department of Psychiatry. *Id.* These decisions came after Dr. Zimmerman made a formal complaint to the University's OEO/AA office regarding McMahon's discrimination against her based on her perceived disability (and age and religion). AMF 112. A reasonable fact finder could conclude that Defendants took these additional adverse actions against Dr. Zimmerman because of her complaints to the University's OEO/AA office regarding discrimination based on disability (and age and religion), especially considering the disputed material fact that McMahon made derogatory comments about Dr. Zimmerman's perceived disability during her employment with the University. Summary judgment should therefore be denied.

### VIII. Summary judgment should be denied on Dr. Zimmerman's age discrimination claim because Dr. Zimmerman has established evidence of an inference of discrimination based on age.

A *prima facie* claim for age discrimination includes establishing that 1) the Plaintiff is a member of the protected age group; 2) the Plaintiff was qualified for the position; 3) the Plaintiff was adversely affected; and 4) an inference of discrimination based on age is established by circumstantial or direct evidence. *Sorbo v. United Parcel Service*, 432 F.3d 1169, 1173 (10th Cir.

2005). "The critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred 'under circumstances which give rise to an inference of unlawful discrimination.'" *Plotke v. White*, 405 F.3d 1092, 1100 (10th Cir. 2005) (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1227 (10th Cir. 2000) (explaining that when an employer contends a termination was for "unsatisfactory conduct," the status of the employee's former position is "irrelevant.").

As Defendants acknowledge, Dr. Zimmerman was at least 40 years old when she was terminated. Dock. no. 46 at 41. Dr. Zimmerman was adversely affected in her position with the University when the University 1) removed Dr. Zimmerman as Director of URADD; 2) restricted her access to necessary data to be able to do her job; 3) removed her as PI of her CDC grant; 4) relocated her to a different building; 5) locked her out of her office and building and told her staff members that if she came near the building she should be reported; and 6) terminated her. *See* AMF 101-114.

Defendants argue that Dr. Zimmerman "cannot present evidence that she was performing satisfactory work," focusing its motion regarding Dr. Zimmerman's age discrimination claim on the second element. Dock. no. 46 at 41-43. Dr. Zimmerman disputes Defendants' characterization of Dr. Zimmerman's work performance; the material facts omitted by Defendants establish a material factual dispute regarding Defendants' stated reason for the above-mentioned adverse actions. *See* Response to Fact Nos. 25-37; 44-51; AMF 12-21; 30-81; 101-114. Dr. Zimmerman additionally alleges that her age made the difference in Defendants' adverse actions against her.

McMahon often asked Dr. Zimmerman when she was going to retire because older employees could not keep up with younger employees. AMF 88. McMahon also made

derogatory comments about Dr. Zimmerman's age in her RPT committee meeting review. AMF 89; Ex. I. In his deposition, McMahon denied making derogatory comments about Dr. Zimmerman's age in her RPT committee meeting review. AMF 90. Subsequent to McMahon's derogatory comments about Dr. Zimmerman's age during her RPT review meeting, Dr. Zimmerman made a formal complaint to the University's OEO/AA office regarding McMahon's discrimination against her based on her age (and disability and religion) on or about December 14, 2012. AMF 92. Defendants took additional adverse employment actions against Dr. Zimmerman on or about January 3, 2013, and February 26, 2013. *See* Argument Section VII, *supra*; *see also* AMF 93-94. These decisions came after Dr. Zimmerman's OEO/AA complaint. A reasonable fact finder could conclude that Defendants took these additional adverse actions against Dr. Zimmerman because of her complaints to the University's OEO/AA office regarding discrimination based on age (and disability and religion), especially considering the disputed material fact that McMahon made derogatory comments about Dr. Zimmerman's age during her employment with the University. Summary judgment should therefore be denied.

IX.     **Summary judgment should be denied because on Dr. Zimmerman's religious discrimination claim because Dr. Zimmerman has established circumstances giving rise to an inference of discrimination based on religion.**

Title VII prohibits disparate treatment of an employee because of religion. Defendants allege that Dr. Zimmerman has not established a *prima facie* case of religious discrimination, which includes showing that Dr. Zimmerman 1) belongs to a protected group; 2) she suffered an adverse employment action; and 3) the challenged action took place under circumstances giving rise to an inference of discrimination. *Sorbo*, 432 F.3d at 1173. Similar to Dr. Zimmerman's disability and age discrimination claims, Dr. Zimmerman's evidence of Defendants' retaliatory acts taken after she made a formal complaint of discrimination to the University's OEO/AA

office show "circumstances giving rise to an inference of discrimination." *Id.*; *see* Argument Sections VII, VIII, *supra*.

During her employment with the University, McMahon made derogatory comments about Dr. Zimmerman becoming a chaplain. AMF 95. McMahon made it clear that he didn't approve of Dr. Zimmerman studying to become a chaplain, and that chaplains "feed the delusions of religious people" and that "individuals who had certain religious beliefs were delusional." *Id.* McMahon also made derogatory comments about Dr. Zimmerman's pursuit of theology in her RPT committee meeting review. AMF 96; Ex. I. Before committee members had a chance to view Dr. Zimmerman's RPT file, McMahon told committee members that Dr. Zimmerman did not take her employment position with the Department seriously because she took time off to pursue becoming a chaplain. AMF 97; Ex. I. In his deposition, McMahon denied making derogatory comments about Dr. Zimmerman's religion in her RPT committee meeting review. AMF 98.

A reasonable fact finder could conclude that Defendants took additional adverse actions against Dr. Zimmerman (as outlined in Argument Sections VII, VIII, *supra*) because of her complaints to the University's OEO/AA office regarding discrimination based on religion (and disability and age), especially considering the disputed material fact that McMahon made derogatory comments about Dr. Zimmerman's religion during her employment with the University. Summary judgment should therefore be denied. AMF 100.

**X.     Dr. Zimmerman's state constitutional claims are not barred by governmental immunity.**

Dr. Zimmerman asserts three state constitutional claims. The first is under Article I, Section 7, of the Utah constitution for deprivation of due process. Dock. no. 32. The second is again under Article I, Section 7, of the Utah constitution for violations of Dr. Zimmerman's

liberty interest. *Id.* The third is under Article I, Section 15, of the Utah constitution for violations of Dr. Zimmerman's right to free speech. *Id.* Defendants allege these claims must fail at this stage because the University has not waived its immunity under the GIA. Utah Code Ann. § 63G-7-101 *et seq.*; dock. no. 46 at 45-46.

This Court has recognized that adopting Defendants' argument would bar "all claims for violation of state constitutional rights due to governmental immunity." *Cheney v. Studstrup*, 32 F. Supp. 2d 1278, 1283 (D. Utah 1998). The *Cheney* court declined to dismiss state constitutional claims, including a due process claim under Article I, Section 7, of the Utah constitution, as barred by governmental immunity because the GIA's "legislative restrictions . . . unreasonably regulated, impaired, or destroyed state constitutional rights." *Id.* The *Cheney* court found support in its holding from a Utah Supreme Court case that also declined to apply governmental immunity because the immunity constituted an "unreasonable regulation" of a Plaintiff's state constitutional rights. *Bott*, 922 P.2d at 736-37 (abrogated by *Spackman*, 2000 UT 87). Both courts recognized that "'[c]onstitutional rights serve to restrict government conduct. These rights would never serve this purpose if the state could use governmental immunity to avoid constitutional restrictions.'" *Cheney*, 32 F. Supp. 2d at 1283 (quoting *Bott*, 922 P.2d at 736-37).[6] This Court should deny summary judgment on Dr. Zimmerman's state constitutional claims on these grounds.

### XI. Dr. Zimmerman's notice of claim was sufficient to put Defendants on notice of the nature of the claims asserted.

Defendants' last attempt to get Dr. Zimmerman's state claims thrown out on summary

---

[6] Defendants' cited case law pre-dates these decisions. *See Bauchman v. West High School*, 900 F. Supp. 254 (D. Utah 1995). Furthermore, *Bauchman* concerned an allegation of negligent violation of civil rights. *Id.* Dr. Zimmerman has alleged that the University acted maliciously and/or in reckless disregard of her state constitutional rights. Dock. no. 32 at 22, 24, 26.

judgment is to claim that Dr. Zimmerman did not "mention[] with enough specificity" four of her

six state causes of action. Dock. no. 46 at 46-47. This argument is baseless, as a review of Dr.

Zimmerman's notice of claim establishes, *inter alia*, a statement of the facts and the nature of the

claims asserted. Utah Code Ann. § 63G-7-401. As Defendants point out, Dr. Zimmerman "need

not specifically mention each potential cause of action in the 'nature of the claim' section of []

her notice of claim." *Doyle v. Lehi City*, 2012 UT App 342, ¶ 42, 291 P.3d 853. Defendants also

agree that Dr. Zimmerman's breach of contract claim and Utah Protection of Public Employees

Act claim are not included in their argument for dismissal on summary judgment on these

grounds. Dock. no. 46-47. Dr. Zimmerman's notice of claim is more than sufficient for

Defendants to "appraise its potential liability" for Dr. Zimmerman's remaining four state claims.

*Doyle*, 2012 UT App at ¶ 42.

      For example, Dr. Zimmerman's notice of claim states that 1) she became a Department

of Psychiatry employee in 2005; 2) she underwent a lengthy review, promotion, and tenure

process in 2012; and 3) she was terminated, effective June 30, 2013. *See* Notice of Claim, dock.

no. 32-3. The notice of claim states that alleged performance concerns only arose, as indicated

by McMahon, immediately following Dr. Zimmerman's report of serious ethical concerns,

potential research misconduct, and discrimination to the University's administration. *Id.* The

notice of claim also states Dr. Zimmerman's concerns that University employees were obtaining

unauthorized access to data and that data was not secure. *Id.* The notice of claim details Dr.

Zimmerman's complaints to the University's privacy office in August 2012 and her subsequent

notice of termination in December 2012. *Id.* The notice of claim also documents the

University's mishandling of Dr. Zimmerman's complaints to the privacy office; Dr.

Zimmerman's removal as Director of URADD; Dr. Zimmerman's removal as PI of her grant;

and Dr. Zimmerman's restricted access to research, all of which took place after Dr. Zimmerman made complaints to the University's privacy office. *Id.* The notice of claim states, "[t]his action [termination] has been in retaliation against Dr. Zimmerman by McMahon and the University for raising these concerns of privacy and information security violations." *Id.*

The notice of claim is nine pages, single-spaced. The summary of the notice of claim, provided above, clearly establishes the nature of potential claims against Defendants, including Dr. Zimmerman's state claims for 1) deprivation of property interest; 2) deprivation of liberty interest; 3) deprivation of free speech rights; and 4) wrongful termination in violation of public policy. Dr. Zimmerman's Complaint and Amended Complaint closely track her notice of claim because of its specificity. *See* dock. nos. 2, 32. Because the legal theories underlying these four state claims are "within the scope of the facts in the notice of claim such that it would have been reasonably clear to the [University] that the causes of action could potentially be pleaded," this Court should deny summary judgment. *Doyle*, 2012 UT App ¶ 42.

## CONCLUSION

For the reasons set forth above, Dr. Zimmerman respectfully requests this Court deny Defendants' Motion for Summary Judgment and allow Dr. Zimmerman's claims to go to a jury. Dr. Zimmerman requests oral argument on Defendants' motion because the issues are complex and Defendants have moved for summary judgment on 12 causes of action; this Court will therefore be benefited by oral argument.

Dated this <u>4th</u> day of January, 2016.

**HOLLINGSWORTH LAW OFFICE, LLC**

 _/s/ Ashley F. Leonard_

Ashley F. Leonard
Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of **PLAINTIFF'S MEMORANDUM IN OPPOSITION**

**TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** has been served via the

court's CM/ECF system, on this 4th day of January, 2016, to the following:

YVETTE DONOSSO (8667)
JEFFREY ROBINSON (4129)
Assistant Utah Attorneys General
SEAN D. REYES (7969)
Utah Attorney General
160 East 300 South, Sixth Floor
P.O. Box 140856
Salt Lake City, Utah 84114-0856
(801) 366-0100
ydonosso@utah.gov
jeffreyrobinson@utah.gov

/s/Ashley F. Leonard____
Ashley F. Leonard