

# Judith Pinborough Zimmerman, Ph. D.
# vs.
# University of Utah
# Case No. 2:13cv1131



## Deposition of: Judith Zimmerman
Date Taken: September 16, 2015

Alpine Court Reporting
Locations in Salt Lake City and Provo
801-691-1000

Judith Zimmerman
September 16, 2015

## Page 1

IN THE UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

_____

JUDITH PINBOROUGH          |
ZIMMERMAN, Ph.D.,          |
          |
          Plaintiff,    |
          |
V.          | Case No. 2:13cv1131
          |
UNIVERSITY OF UTAH,        |
          |
          Defendant.    |
_____|

DEPOSITION OF JUDITH ZIMMERMAN

TAKEN:  September 16, 2015

9:11 a.m. to 5:59 p.m.

LOCATION:  UTAH ATTORNEY GENERALS'S OFFICE
          Heber Wells Building
          160 East 300 South
          Sixth Floor
          Salt Lake City, Utah 84114

Reported by:  DONNA M. WARD, CSR, RPR

## Page 2

1  APPEARANCES
2
3  FOR THE PLAINTIFF:
4          HOLLINGSWORTH LAW OFFICE, LLC
          BY:  ASHLEY F. LEONARD, ESQ.
5          1115 South 900 East
          Salt Lake City, Utah 84105
6          Tele:  801-415-9909
          Email:  ashley@aprilhollingworthlaw.com
7
8  FOR THE DEFENDANT:
9          UTAH ATTORNEY GENERAL'S OFFICE
          BY:  YVETTE DONOSSO, ESQ.
          JEFFREY ROBINSON, ESQ.
10          160 East 300 South
          Sixth Floor
11          Salt Lake City, Utah 84114
          Tele:  801-366-0100
12          Email:  ydonosso@utah.gov
          jeffreyrobinson@utah.gov
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1
2          INDEX
3  WITNESS:  Judith Zimmerman
4  EXAMINATION BY                    PAGE
   Mr. Donosso.............................  6
5
6  EXHIBITS:
7
8  Exhibit 73  Research Track/University
          Policy.........................  17
9  Exhibit 74  Letter addressed to William
          McMahon, M.D. from Carmen
10          Pingree, dated June 20, 2001...  51
11  Exhibit 75  Letter to Judy Zimmerman, Ph.D.
          from Jack Dolcourt, M.D., M.Ed.
12          dated May 17, 2002.............  53
13  Exhibit 76  IRB Application June 3, 2003...  53
14  Exhibit 77  E-mail exchange between Dean Li
          and Judy Zimmerman Subject: Re:
15          Request for a Meeting-PHI......  61
16  Exhibit 78  E-mail exchange between Judy
          Zimmerman and Michael Blomgren
17          Subject:  FW: Letter to
          Dr. Parks-PHI..................  71
18
   Exhibit 79  E-mail String Subject: Growing
19          and Sharing URADD.............  77
20  Exhibit 80  Memorandum of Agreement
          Between Utah Department of
21          Health and Utah State Office
          Of Education...................  90
22
   Exhibit 81  Letter addressed to Dr.
23          Delavan and Ms. Watkins from
          Dr. Patti Harrington, dated
24          February 13, 2009.............  91
25

## Page 4

1  Exhibit 82  Letter addressed to Amy
          Henderson from Clyde
2          Mason, dated November 9
          2011..........................  100
3  Exhibit 83  Email chain between Judy
          Zimmerman and Christine Lasalle
4          Subject: Touching base........  123
5  Exhibit 84  Letter addressed to Dean Li
          From Judy Zimmerman, dated
6          August 16, 2012...............  130
7  Exhibit 85  E-mail from Judy Zimmerman to
          Jeff Botkin, dated April 14
8          2011 Subject: IRB 00011805....  133
9  Exhibit 86  Email from Judy Zimmerman to
          Maureen Brinkman, dated April
10          26, 2011, Subject: IRB Final
          Notice........................  136
11  Exhibit 87  Confidential Memorandum to
          Scott Smith from Marjorie
12          Goodrich, dated September 25
13          2012, Subject: Department of
          Psychiatry Effort Reporting
14          Allegations...................  139
15  Exhibit 88  E-mail from Judy Zimmerman to
          Jeffrey Botkin from Judy Zimmerman
16          Dated November 30, 2012.......  148
17  Exhibit 89  E-mail chain between Judy
          Zimmerman and Jeff Botkin
18          Subject:  Follow-up to our
          Meeting-PHI...................  150
19  Exhibit 90  E-mail from Judy Zimmerman to
20          Jeff Botkin, dated December 12
          2012..........................  155
21  Exhibit 91  OEO Discrimination Complaint
22          Form..........................  158
23  Exhibit 92  E-mail from Judy Zimmerman to
24          Harper Randall and Nan Streeter
          Subject: USM:Re: Privacy.......  160
25

1 (Pages 1 to 4)

Judith Zimmerman
September 16, 2015

Page 5

1    Exhibit 93  U of U IRB Privacy Concerns
        Report Introduction............ 165
2
     Exhibit 94  IRB Report Completion Letter... 167
3
     Exhibit 95  U of U IRB Privacy Concerns
4        Report Introduction............ 168
5    Exhibit 96  IRB Report Completion Letter... 169
6    Exhibit 97  E-mail chain between Judy
        Zimmerman and Susan Roberts
7        Subject:  Backup Responder..... 194
8    Exhibit 98  Letter addressed to Judy
        Zimmerman from Brian Nicholls
9        Dated July 22, 2013........... 200
10   Exhibit 99  Letter addressed to Office of
        the Utah Attorney General from
11       Lisa R. Peterson, Esq., dated
         October 25, 2013.............. 201
12
     Exhibit 100 Certificates of Completion of
13       Judy Zimmerman................ 204
14   Exhibit 101 Concern Intake Form........... 206
15   Exhibit 102 Curriculum Vitae of Judy
         Zimmerman.................... 208
16
17
18
19
20
21
22
23
24
25

Page 6

09:07:07   1    Salt Lake City, Utah, September 16, 2015, 9:11 a.m.
09:07:07   2         JUDITH ZIMMERMAN
09:07:07   3    was duly sworn, was examined and
09:07:07   4    testified as follows:
09:07:21   5         EXAMINATION
09:07:21   6    BY MS. DONOSSO:
09:13:34   7    Q.   Good morning.  How are you?
09:13:35   8    A.   Fine.
09:13:36   9    Q.   So you're here this morning to have a
09:13:37   10   deposition taken.  You understand that you're under oath?
09:13:42   11   A.   Yes.
09:13:42   12   Q.   And so before we get started, I just wanted
09:13:45   13   to give you some brief instructions.  I know that you sat
09:13:50   14   through some of the other depositions, but I just wanted
09:13:53   15   to make sure that you understand.  I'm not sure, have you
09:13:56   16   ever had your deposition taken?
09:13:57   17   A.   No.
09:13:58   18   Q.   So it's very important that you speak
09:14:01   19   clearly, as the court reporter is trying to take notes of
09:14:05   20   everything that we say; that you wait for me to finish
09:14:08   21   the question, so that if you're attorney wants to make an
09:14:14   22   objection, she can, or if you have a question or you
09:14:16   23   don't under my question, that you have time to do that as
09:14:20   24   well.
09:14:22   25        Obviously, although your attorney can enter

Page 7

09:14:26   1    objections on the record, you are -- you do have to
09:14:29   2    answer all of my questions unless something that I asked
09:14:32   3    happens to be privileged, which I'm not going to ask you
09:14:36   4    anything that is privileged.
09:14:37   5    A.   Okay.
09:14:38   6    Q.   Is there anything -- did you take anything
09:14:41   7    this morning?  Are you under any substances that would
09:14:43   8    prevent you from answering any of my questions truthfully
09:14:47   9    this morning?
09:14:47   10   A.   No.
09:14:49   11   Q.   Do you have any health issues that would
09:14:51   12   prevent you from answering my questions truthfully this
09:14:55   13   morning?
09:14:56   14   A.   Just nervous.
09:14:56   15   Q.   Yes, that is understandable.  Okay, so I'm
09:15:02   16   going to hand you a copy of the first amended
09:15:07   17   complaint in this matter.  Do you recognize this
09:15:11   18   document?
09:15:11   19   A.   Yes.
09:15:12   20   Q.   Okay, and we'll begin the deposition this
09:15:17   21   morning just by going through it.  I would like you to
09:15:21   22   first turn to Paragraph 9, which is on Page 3.  On about
09:15:33   23   Line 3, it says, quote:  "She was subjected to
09:15:40   24   long-standing discrimination by McMahon and the
09:15:46   25   department."  Do you see that line?

Page 8

09:15:47   1    A.   Yes.
09:15:48   2    Q.   Approximately when did Dr. McMahon first
09:15:53   3    start doing anything that you considered to be
09:15:57   4    discriminating against you?
09:16:01   5    A.   During the hiring process.
09:16:04   6    Q.   Okay.  What did you consider to be
09:16:07   7    discriminating?  So this would have been around 2005; is
09:16:12   8    that correct?
09:16:16   9    A.   It would have been December 2005 through
09:16:16   10   2006.
09:16:19   11   Q.   But you were hired in 2005?
09:16:23   12   A.   Yes.
09:16:24   13   Q.   Okay.  What was discriminating during the
09:16:28   14   hiring process?  Can you describe specifics?
09:16:32   15   A.   I was promised a faculty, assistant research
09:16:37   16   faculty position and I didn't receive it.
09:16:39   17   Q.   Okay.
09:16:41   18   A.   In a timely manner.
09:16:42   19   Q.   How did he make these promises to you?
09:16:47   20   A.   How did he make these promises to me?
09:16:49   21   Q.   Yes.
09:16:50   22   A.   Verbally and I was asked to provide outside
09:16:58   23   letters, as well as inside letters, and Dr. Grosser
09:17:06   24   indicated they would be processing me as a regular
09:17:09   25   faculty position.

2  (Pages 5 to 8)

Judith Zimmerman
September 16, 2015

## Page 9

09:17:10 1    Q.   Okay, so was anybody else present when you
09:17:16 2    had these discussions?  So who did you have these
09:17:19 3    discussions with?  Was it Dr. McMahon or was it Dr.
09:17:26 4    Grosser?
09:17:26 5        A.   It was -- it was files, personnel files that
09:17:28 6    were going back and forth.  I thought they were
09:17:32 7    processing it as an assistant research faculty position
09:17:37 8    from the beginning.
09:17:38 9        Q.   Okay, so we have at the time Dr. Grosser was
09:17:43 10   the chair, not Dr. McMahon --
09:17:45 11       A.   Right.
09:17:46 12       Q.   -- right?  Okay, and so you provided -- and
09:17:55 13   at the time did you provide all of the letters that were
09:18:02 14   required for you --
09:18:05 15       A.   Yes.
09:18:05 16       Q.   -- to be a research -- what was required for
09:18:17 17   you to be a research candidate?
09:18:21 18       A.   Yes.
09:18:21 19       Q.   Okay, and it's your testimony that, even
09:18:24 20   though you provided everything, the university didn't
09:18:28 21   make you a research professor?
09:18:31 22       A.   I provided everything that was asked of me.
09:18:34 23       Q.   Okay.  Who did you provide that to?
09:18:35 24       A.   It went -- the documents I believe went to
09:18:40 25   Dr. Grosser's office.

## Page 10

09:18:42 1        Q.   Okay.
09:18:45 2        A.   And his administrative assistant.
09:18:47 3        Q.   So if this occurred back in 2005, why did you
09:19:01 4    wait until December 14th of 2012 to bring anything to the
09:19:09 5    attention of the OEO?
09:19:11 6        A.   I brought my concerns to other people long
09:19:15 7    before that.
09:19:16 8        Q.   Who did you bring those concerns to?
09:19:18 9        A.   So which concerns?  I'm confused.
09:19:22 10       Q.   You believed that you were discriminated
09:19:24 11   against during the hiring process.
09:19:26 12       A.   Yes.
09:19:27 13       Q.   So why didn't you bring those concerns to
09:19:32 14   anybody?
09:19:32 15       A.   I thought it had been processed that way.
09:19:36 16       Q.   Okay.
09:19:37 17       A.   I didn't know it hadn't been processed that
09:19:40 18   way.
09:19:40 19       Q.   But you subsequently got a letter in 2008?
09:19:54 20       A.   Correct.
09:19:55 21       Q.   That didn't make clear that you became a
09:20:00 22   research professor until 2008?
09:20:02 23       A.   Say that again.
09:20:04 24       Q.   You didn't get your offer letter clarifying
09:20:09 25   that you became a research professor until 2008?

## Page 11

09:20:12 1        A.   I did not, but I didn't know I was supposed
09:20:16 2    to.
09:20:19 3        Q.   Okay, so -- so -- so why did you think that
09:20:31 4    you -- why did you think that -- what did you make of
09:20:34 5    that letter that you got in 2008 that was your offer
09:20:39 6    letter making you a research professor officially?
09:20:41 7        A.   What did I make of it?
09:20:43 8        Q.   Yes, why did you think the university gave
09:20:47 9    you a letter of 2008 clarifying that you were a research
09:20:51 10   professor in 2008?
09:20:53 11       A.   I thought it was because they changed
09:20:56 12   chairmans and he was just clarifying it and he was doing
09:21:03 13   different parameters of the same position.
09:21:07 14       Q.   But the letter made it very clear that you
09:21:16 15   were -- that you were on an annual contract and that you
09:21:21 16   were on a research track.
09:21:25 17       A.   Yes.
09:21:26 18       Q.   Let's -- let me -- let's turn to that offer.
09:21:31 19       A.   But I already thought I was on a research
09:21:35 20   track.
09:21:44 21       Q.   Why would you need to be told that you were
09:21:45 22   on a research track if you were already on a research
09:21:50 23   track?
09:21:51 24       A.   He was changing -- McMahon gave me benefits.
09:21:57 25   I had not had benefits before.

## Page 12

09:22:10 1        Q.   So let me show what has been previously
09:22:13 2    marked as Exhibit No. 9.  Have you seen that letter
09:22:46 3    before?
09:23:01 4        A.   Yes.
09:23:02 5        Q.   And what's the date on the top?
09:23:05 6        A.   November 30th, 2008.
09:23:08 7        Q.   And the letter says -- this letter offers you
09:23:16 8    a position as a research assistant professor; correct?
09:23:20 9        A.   Correct.
09:23:21 10       Q.   It doesn't say this letter renews your
09:23:23 11   position as a research assistant professor; correct?
09:23:28 12       A.   No.
09:23:35 13       MR. ROBINSON:  No, that's not correct or, no,
09:23:37 14   it doesn't say that?  The way the question was answered,
09:23:40 15   I think the answer may be, yes, that's correct.
09:23:43 16       THE WITNESS:  It was offering me a different
09:23:46 17   position -- the same position with different benefits.
09:23:46 18   BY MS. DONOSSO:
09:23:52 19       Q.   Why was it offering you a different position?
09:23:54 20       A.   It was offering me a different position in
09:24:01 21   terms of the salary and benefits.
09:24:01 22       Q.   Actually it says this position will be
09:24:05 23   contingent upon approval by our promotion, retention and
09:24:10 24   tenure committee.  So how could it be a -- how could it
09:24:15 25   be renewing a position if it was contingent upon

3 (Pages 9 to 12)

Judith Zimmerman
September 16, 2015

## Page 13

| | | |
|---|---|---|
| 09:24:18 | 1 | approval? |
| 09:24:19 | 2 | A. I thought it had already been approved but I |
| 09:24:23 | 3 | also thought the changes in the parameters of the offer |
| 09:24:26 | 4 | were changing that needed to be approved by this |
| 09:24:29 | 5 | committee as well. |
| 09:24:33 | 6 | Q. Okay, so the letter goes on to say: "Dr. |
| 09:24:38 | 7 | McMahon will serve as your mentor and supervisor." Do |
| 09:24:42 | 8 | you see that? |
| 09:24:42 | 9 | A. Yes. |
| 09:24:43 | 10 | Q. And there are three major responsibilities |
| 09:24:46 | 11 | associated with this position; right? |
| 09:24:51 | 12 | A. Yes. |
| 09:24:51 | 13 | Q. And, now, following that, it says: "The |
| 09:24:56 | 14 | initial term of your appointment will begin on March 1st, |
| 09:25:02 | 15 | 2009." If this was a continuing position, why would the |
| 09:25:07 | 16 | letter specify that this was your initial term of your |
| 09:25:10 | 17 | appointment? |
| 09:25:11 | 18 | A. I think that my appointment was not processed |
| 09:25:16 | 19 | properly by Dr. Grosser and McMahon in 2005. |
| 09:25:21 | 20 | Q. Or could it be because before you were an |
| 09:25:26 | 21 | adjunct professor and now you're becoming a research |
| 09:25:28 | 22 | professor and there is a difference in the definition of |
| 09:25:32 | 23 | those two terms? |
| 09:25:33 | 24 | A. I thought I had an assistant, a research |
| 09:25:36 | 25 | assistant professor position already. |

## Page 14

| | | |
|---|---|---|
| 09:25:39 | 1 | Q. But you didn't and, therefore, now it was |
| 09:25:43 | 2 | being corrected and you were beginning your term as a |
| 09:25:46 | 3 | research professor? |
| 09:25:49 | 4 | A. I don't understand your question. |
| 09:25:51 | 5 | Q. So when Dr. McMahon became chair, he |
| 09:26:00 | 6 | processed your appointment so that you would be a |
| 09:26:03 | 7 | research assistant professor and your term as a research |
| 09:26:08 | 8 | professor began and, therefore, that is why you got this |
| 09:26:11 | 9 | letter, this offer letter? |
| 09:26:13 | 10 | A. I saw it as only my term under McMahon as |
| 09:26:17 | 11 | chairman. I thought it had already been processed under |
| 09:26:20 | 12 | Grosser. |
| 09:26:20 | 13 | Q. Okay, but you understand that that's not what |
| 09:26:25 | 14 | this letter says? |
| 09:26:30 | 15 | A. All this says to me is this is an offer for |
| 09:26:34 | 16 | this one year. |
| 09:26:35 | 17 | Q. Okay. That's my next point. You understand |
| 09:26:38 | 18 | that this is for the initial year and that it's |
| 09:26:41 | 19 | renewable, that this also makes very clear that your |
| 09:26:48 | 20 | employment with the university was renewal year after |
| 09:26:51 | 21 | year. Was that clear to you based on this letter? |
| 09:26:54 | 22 | A. That was clear to me in 2005. |
| 09:26:58 | 23 | Q. So you understood that every year the |
| 09:27:01 | 24 | university would renew your contract every year? |
| 09:27:04 | 25 | A. What I didn't understand was why I was going |

## Page 15

| | | |
|---|---|---|
| 09:27:08 | 1 | through RPT if it was a yearly contract. |
| 09:27:12 | 2 | Q. But you understood that you were not a tenure |
| 09:27:15 | 3 | professor; correct? |
| 09:27:16 | 4 | A. Correct. |
| 09:27:16 | 5 | Q. And you understood that you were on an annual |
| 09:27:19 | 6 | contract? |
| 09:27:20 | 7 | A. Yes. |
| 09:27:20 | 8 | Q. Okay. |
| 09:27:22 | 9 | A. During this timeframe. |
| 09:27:24 | 10 | Q. What do you mean by this timeframe? You were |
| 09:27:29 | 11 | always on an annual contract. |
| 09:27:31 | 12 | A. I never got a contract after this year. |
| 09:27:36 | 13 | Q. Well, because you were a probationary |
| 09:27:43 | 14 | employee, right, for the seven-year period that you were |
| 09:27:47 | 15 | there. Did you ever go look at this policy that was |
| 09:27:51 | 16 | cited in this offer letter? |
| 09:27:52 | 17 | A. No. |
| 09:27:53 | 18 | Q. Okay, so let me go -- and why didn't you go |
| 09:28:22 | 19 | look at the policy in this website? |
| 09:28:28 | 20 | A. I trusted that the university would be honest |
| 09:28:31 | 21 | with me. |
| 09:28:31 | 22 | Q. But do you understand that the policy on this |
| 09:28:36 | 23 | website would provide you the resources so that you would |
| 09:28:41 | 24 | understand the terms of this offer letter? |
| 09:28:43 | 25 | A. This offer letter was only for one year. |

## Page 16

| | | |
|---|---|---|
| 09:28:46 | 1 | Q. Renewable year after year? |
| 09:28:50 | 2 | A. Correct. |
| 09:28:50 | 3 | Q. Okay, so this provided you with the |
| 09:28:55 | 4 | responsibilities associated with this position. Did you |
| 09:28:57 | 5 | understand that? |
| 09:28:57 | 6 | A. Yes. |
| 09:28:58 | 7 | Q. Okay, and you understood this letter, this |
| 09:29:07 | 8 | offer letter, specified, quote: "Your appointment will |
| 09:29:13 | 9 | be subsequently renewed each year thereafter contingent |
| 09:29:16 | 10 | on your progress and the availability of funds for the |
| 09:29:19 | 11 | successive terms of your appointment, unless either you or the |
| 09:29:24 | 12 | university gives you written notice for the other of its |
| 09:29:27 | 13 | intent not to renew your appointment." Did you see that, |
| 09:29:32 | 14 | that statement in the letter? |
| 09:29:33 | 15 | A. I see that. What I -- what I understood from |
| 09:29:37 | 16 | this is that it was a one year contract only and that I |
| 09:29:40 | 17 | would get a contract the following year. |
| 09:29:43 | 18 | Q. But according to the terms of the letter, |
| 09:29:47 | 19 | unless the contract wasn't renewed, they didn't need to |
| 09:29:51 | 20 | give you a letter year after year, unless they gave you |
| 09:29:55 | 21 | written notice otherwise. Did you see that in the |
| 09:29:57 | 22 | letter? |
| 09:29:59 | 23 | A. It's in the letter. |
| 09:30:02 | 24 | Q. Okay. Did you also see in Paragraph 4 where |
| 09:30:13 | 25 | it states: "As an employee of the university, you will |

4 (Pages 13 to 16)

Judith Zimmerman
September 16, 2015

## Page 17

09:30:16   1   be required to comply with all applicable policies and
09:30:19   2   procedures of the university"?
09:30:20   3       A.  Yes.
09:30:20   4       Q.  Okay, and also where it states:  "University
09:30:27   5   policies are available online," and it references the
09:30:35   6   manuals and references the site where you can go as an
09:30:39   7   employee and review those?
09:30:41   8       A.  Yes.
09:31:56   9       Q.  Okay.
09:31:56  10       (Whereupon Exhibit 73 was marked for identification.)
09:31:56  11   BY MS. DONOSSO:
09:31:58  12       Q.  Do you recognize this document?
09:31:59  13       A.  No.
09:31:59  14       Q.  Okay, so this is the university's policy that
09:32:06  15   explains research track appointments and I'll give you an
09:32:19  16   opportunity to review it, since you've never seen it
09:32:22  17   before.
09:32:49  18       A.  Okay.
09:32:49  19       Q.  Okay.  In the middle of Paragraph 1 where it
09:33:00  20   says research track, do you see where it states:  "Annual
09:33:09  21   reappointment reviews are conducted until the faculty
09:33:14  22   member has completed a probationary period of seven years
09:33:19  23   if initially appointed as a research instructor or
09:33:22  24   research assistant professor."  Did you see that part?
09:33:26  25       A.  I see it.

## Page 18

09:33:28   1       Q.  Okay.  After receiving this offer letter back
09:33:35   2   in 2008, did you bother looking up the policies that
09:33:43   3   applied to research assistant professors?
09:33:48   4       A.  I expected to receive annual reviews and I
09:33:51   5   did not receive any annual reviews until 2011.
09:33:55   6       Q.  Okay.  After receiving that annual review in
09:33:59   7   2011 though, did you look up the research track policies
09:34:07   8   so that you could see what your status at the university
09:34:11   9   was?
09:34:11  10       A.  I asked if I could appeal the review in 2011
09:34:17  11   and was denied any opportunity to appeal it.
09:34:20  12       Q.  That wasn't my question, ma'am.  Did you ever
09:34:25  13   look at the policy cited in the letter or look up on the
09:34:32  14   website of the university --
09:34:34  15       A.  No.
09:34:34  16       Q.  Okay.  Thanks.
09:34:36  17       MR. ROBINSON:  You might want to just finish
09:34:40  18   the question, so it's clear on the record what she's
09:34:42  19   asking, just to be clear for the record if you could, so
09:34:44  20   maybe let Yvette finish her question and then --
09:34:44  21       THE WITNESS:  Okay.
09:34:48  22       MR. ROBINSON:  -- answer, could you?
09:34:49  23   BY MS. DONOSSO:
09:34:49  24       Q.  Yeah, and my question was:  Or did you ever
09:34:50  25   look up on the website, the university's website, the

## Page 19

09:34:54   1   policies that are applicable for research track assistant
09:35:00   2   professors?
09:35:00   3       A.  No.  Can I rephrase that?  I did look it up
09:35:07   4   but I was confused by it in that I didn't feel like the
09:35:11   5   department had been following policy with regard to
09:35:16   6   annual reviews.
09:35:46   7       Q.  Okay.  Going back to the complaint in Page 4
09:36:02   8   beginning with Paragraph 9(a).
09:36:06   9       A.  What page?
09:36:07  10       Q.  Page 4, going back to this allegation of
09:36:14  11   long-standing discrimination, I want to break it down
09:36:22  12   more specifically, because in that paragraph you alleged
09:36:26  13   that you believed there was long-standing discrimination
09:36:30  14   regarding your age, perceived disability and religion.
09:36:38  15   In Subparagraph A you alleged that Dr. McMahon regarded
09:36:42  16   you as having one or more mental disorders or emotional
09:36:47  17   illnesses.  Can you -- can you tell me what the basis of
09:36:54  18   your allegations or statements regarding that paragraph
09:36:58  19   are?
09:36:59  20       A.  McMahon told me he thought I had PTSD.
09:37:05  21       Q.  When did he tell you that?
09:37:06  22       A.  Early on.  I would say in the first two years
09:37:13  23   that I worked there.
09:37:15  24       Q.  That's kind of a big timeframe, so between
09:37:22  25   2005 and 2007, can you be a little bit more specific?

## Page 20

09:37:27   1       A.  Not at this point.
09:37:28   2       Q.  Okay.  Was there anybody present when he made
09:37:31   3   those allegations?
09:37:32   4       A.  Not that I recall.
09:37:33   5       Q.  So all he said was I think you have PTSD or
09:37:41   6   can you be more specific about what he said to you?
09:37:43   7       A.  He was talking about the health department
09:37:45   8   and a physician that worked there.
09:37:48   9       Q.  That you worked there?
09:37:49  10       A.  That worked at the health department that he
09:37:52  11   did not like.
09:37:54  12       Q.  Who worked -- who worked at the health
09:37:57  13   department?
09:37:57  14       A.  Pardon?
09:37:59  15       Q.  That you had worked at the health department?
09:38:03  16   I'm sorry, I don't understand.
09:38:04  17       A.  McMahon indicated he thought I had PTSD from
09:38:14  18   working with the health department.
09:38:19  19       Q.  Okay, so from your previous employment at the
09:38:19  20   health department?
09:38:19  21       A.  And specific to an individual he worked with
09:38:21  22   as a physician.
09:38:23  23       Q.  Okay.  Did he say anything else regarding
09:38:29  24   that?
09:38:30  25       A.  Just derogatory comments about this

5 (Pages 17 to 20)

Judith Zimmerman
September 16, 2015

## Page 21

09:38:35  1  physician.

09:38:36  2  Q. So he was making derogatory comments about

09:38:40  3  somebody else?

09:38:41  4  A. Yes, and saying I had PTSD as a result of

09:38:46  5  working with that physician.

09:38:47  6  Q. Okay. Did he make those kind of comments

09:38:58  7  throughout your entire tenure at the Department of

09:39:04  8  Psychiatry?

09:39:04  9  A. He made comments routinely about individuals

09:39:10  10 he didn't like.

09:39:12  11  Q. Did those -- and, again, was anybody else

09:39:21  12 present when he made those comments?

09:39:23  13  A. About you mean this one incidence with the --

09:39:28  14 about the person at the health department?

09:39:30  15  Q. Any of those incidences regarding allegations

09:39:34  16 involving PTSD.

09:39:36  17  A. No, he did those in private.

09:39:40  18  Q. Okay, and how often would they occur?

09:39:43  19  A. Which? The PTSD?

09:39:50  20  Q. Yes.

09:39:51  21  A. The mental illness?

09:39:51  22  MR. ROBINSON: May I just clarify something?

09:39:51  23  THE WITNESS: Sure.

09:39:52  24  MR. ROBINSON: I'm really confused.

09:39:54  25  THE WITNESS: Me too.

## Page 22

09:39:55  1  MR. ROBINSON: If I understood correctly, you

09:39:58  2  only had one conversation with Dr. McMahon where he said

09:40:01  3  something about you having PTSD. There were other

09:40:05  4  conversations that you had where he made comments about

09:40:08  5  other people; is that correct?

09:40:10  6  THE WITNESS: Correct.

09:40:11  7  MR. ROBINSON: Okay, so the only conversation

09:40:13  8  you had with Dr. McMahon about you having PTSD was

09:40:17  9  sometime in the 2005-2007 timeframe; is that correct?

09:40:28  10  THE WITNESS: No, there were -- there was a

09:40:31  11 couple other times he alluded to the fact.

09:40:37  12  MR. ROBINSON: Alluded to it or said it?

09:40:39  13  THE WITNESS: Just alluded.

09:40:42  14  MR. ROBINSON: So we may want to explore

09:40:45  15 that, but go ahead, Yvette, and I just needed to clarify

09:40:49  16 that for me.

09:40:49  17  BY MS. DONOSSO:

09:40:50  18  Q. And regarding that statement regarding you

09:40:56  19 and PTSD, did you ever tell anybody about this incidence?

09:41:10  20  A. I told -- I told Tom Parks that -- that as a

09:41:29  21 faculty member, the chairman was making mental health

09:41:34  22 diagnoses about people he did not like.

09:41:36  23  Q. Did he actually -- did you actually feel like

09:41:41  24 he had diagnosed you? Because what was the actual

09:41:44  25 statement that he made to you?

## Page 23

09:41:46  1  A. You have PTSD.

09:41:51  2  Q. Okay. How many times did he say that to you?

09:41:57  3  A. He talked constantly about my former boss at

09:42:01  4  the heath department and how much he didn't like her and

09:42:05  5  how difficult she was to work with.

09:42:08  6  Q. Okay, so this was in reference to your former

09:42:11  7  boss, this wasn't necessarily a derogatory comment about

09:42:19  8  you?

09:42:19  9  A. In that he did not let it go. He constantly

09:42:25  10 talked about her. I mean, frequently talked about her.

09:42:32  11  Q. Okay. Did this adversely affect your

09:42:40  12 employment in any way?

09:42:42  13  A. Yes, because I still had to try and work

09:42:49  14 cooperatively with the health department.

09:42:52  15  Q. Okay. Did you -- did he ever make any

09:43:08  16 derogatory comments about you because of his perception

09:43:14  17 of you having PTSD?

09:43:25  18  A. He alluded to the fact that it would be very

09:43:30  19 stressful to continue working with the health department.

09:43:34  20  Q. Other than alluding to the fact that it would

09:43:38  21 be stressful to work with the health department --

09:43:42  22  A. I don't recall anything else at this point.

09:43:44  23  Q. Okay. Did he ever call you derogatory names?

09:43:55  24  MR. ROBINSON: With respect to the

09:43:56  25 disability.

## Page 24

09:43:57  1  BY MS. DONOSSO:

09:43:58  2  Q. With respect to the disability?

09:44:00  3  A. He -- I was hurt in an accident and he

09:44:07  4  laughed when he saw that I was hurt.

09:44:10  5  Q. What kind of accident was this?

09:44:12  6  A. It was a boating accident.

09:44:17  7  Q. And how were you hurt in this boating

09:44:22  8  accident?

09:44:22  9  A. I wrenched my knee and I couldn't walk very

09:44:27  10 well.

09:44:27  11  Q. How would -- how did you -- why would he

09:44:31  12 laugh because you got hurt? I don't understand why you

09:44:35  13 thought he laughed because you got hurt. I mean, was he

09:44:38  14 there during the accident?

09:44:38  15  A. When he saw me.

09:44:39  16  Q. When he saw you?

09:44:42  17  A. Afterwards, when I came to work on crutches.

09:44:46  18  Q. You think he laughed at you because you were

09:44:50  19 on crutches?

09:44:51  20  A. Yes.

09:44:52  21  Q. And you think that that's related to the

09:44:54  22 comment regarding PTSD?

09:44:58  23  A. I think it's related to how he views people

09:45:02  24 with disabilities.

09:45:04  25  Q. Is that your perception?

Alpine Court Reporting
801-691-1000

Judith Zimmerman
September 16, 2015

### Page 25

09:45:07   1     A.   That is my perception.

09:45:10   2     Q.   Okay.  Other than -- other than your

09:45:13   3   perception of him laughing when he saw you on crutches,

09:45:17   4   is there anything else regarding Paragraph 9(a) where you

09:45:26   5   thought he made any kind of comment that you considered

09:45:33   6   inappropriate regarding his views on this alleged mental

09:45:41   7   disorder?

09:45:42   8     A.   I did, you know, not in terms of mental

09:45:46   9   disorder, but I did have a surgery and asked if they

09:45:51  10   could give an accommodation and if I could listen into a

09:45:55  11   meeting, an annual departmental meeting by the phone, and

09:46:00  12   he said no.

09:46:02  13     Q.   When did that occur?

09:46:04  14     A.   That occurred -- good question.  Around 2012.

09:46:16  15     Q.   Okay, but that has nothing to do with PTSD or

09:46:22  16   a mental disorder?

09:46:26  17     A.   Not necessarily, no.

09:46:28  18     Q.   Okay.

09:46:29  19     MR. ROBINSON:  That's not necessarily yes.

09:46:32  20     THE WITNESS:  Not necessarily yes either.

09:46:34  21     MR. ROBINSON:  I think the way the question

09:46:35  22   is phrased, that was really the response you wanted to

09:46:38  23   make; right?  Yes, it doesn't have anything to do with

09:46:40  24   PTSD necessarily.

09:46:42  25     THE WITNESS:  I think that any time someone

### Page 26

09:46:45   1   goes through a serious surgery, injury, that they may

09:46:56   2   have --

09:46:59   3     MR. ROBINSON:  I apologize from interrupting.

09:47:01   4   I understand what you're trying to tell me, but the

09:47:04   5   question was:  That didn't have anything to do with PTSD,

09:47:08   6   and you said, no, and I believe what you really meant to

09:47:12   7   say was yes.  Because sometimes we ask questions in a

09:47:15   8   double negative way.

09:47:17   9     THE WITNESS:  I know.

09:47:18  10     MR. ROBINSON:  And the answer is really yes

09:47:19  11   rather than no.  Were you agreeing with the statement,

09:47:24  12   with the question or were you disagreeing with the

09:47:26  13   question?

09:47:27  14     THE WITNESS:  It could be related to PTSD.  I

09:47:35  15   have gone through a traumatic event and he did not

09:47:39  16   accommodate for that.

09:47:44  17     MR. ROBINSON:  But the surgery and the

09:47:49  18   accommodations doesn't relate to PTSD; is that correct?

09:47:53  19     THE WITNESS:  No.

09:47:54  20     MR. ROBINSON:  That is not correct.

09:47:57  21     THE WITNESS:  I'm confused.  I'm confused.

09:48:00  22   I'm saying that -- that the surgery was traumatic.

09:48:06  23     MR. ROBINSON:  I get that.  I understand

09:48:09  24   you're saying the surgery was traumatic, but surgery for

09:48:12  25   something, for a physical issue, doesn't relate to the

### Page 27

09:48:17   1   comment that you say Dr. McMahon made back in the

09:48:22   2   2005-2007 era regarding PTSD; right?

09:48:27   3     THE WITNESS:  Does it link to him saying I

09:48:29   4   had PTSD because of working with the health department?

09:48:33   5   No.

09:48:33   6     MR. ROBINSON:  Thank you.

09:48:33   7   BY MS. DONOSSO:

09:48:50   8     Q.   Now, on Paragraph 9(c), you also allege that

09:48:56   9   you were offered part-time employment while younger,

09:48:59  10   similarly situated employees were offered full-time

09:49:03  11   employment.  Did you ever work part time at the

09:49:07  12   university?

09:49:10  13     A.   Well, if you look at this offer letter, it

09:49:12  14   was part time.

09:49:13  15     Q.   And was that at your request?

09:49:19  16     A.   No.

09:49:20  17     Q.   Okay.  Let's look at what has been previously

09:49:32  18   marked as Exhibit 35.  Now, in this letter -- I know

09:50:23  19   you've probably have never seen this E-mail before

09:50:26  20   because it was between Dr. McMahon and Lynn and Dan

09:50:31  21   Hogge, although you were cc'd on it.  You were cc'd on it

09:50:36  22   and so Lynn Gardner and Barbara Young, so I'm assuming

09:50:41  23   you were cc'd on it.  It was dated April 8th, 2008, which

09:50:46  24   was just a few months before this offer letter was

09:50:51  25   drafted.  Have you had a chance to look at the April 8th?

### Page 28

09:50:56   1     A.   I've seen it before.

09:50:57   2     Q.   Now, here it says:  "Judy Zimmerman would

09:51:02   3   like to work 32 hours per week and then 40 hours a month

09:51:07   4   away and then she would like to take away from the URADD

09:51:10   5   in June and then only work for zero to four hours per

09:51:15   6   week and then she'd like to return in September about

09:51:18   7   24 hours per week or more thereafter."  Did you ever have

09:51:21   8   a conversation with Dr. McMahon where you might only want

09:51:24   9   to work a reduced schedule?

09:51:27  10     A.   No.

09:51:27  11     Q.   So then why would he write this E-mail?

09:51:30  12     A.   This E-mail was to adjust the hours that I

09:51:40  13   worked, so I had another job offer during that summer and

09:51:50  14   I wanted to -- so I wanted to do a nine -- get my hours

09:51:56  15   in the nine months instead of the 12 months, so it was

09:52:00  16   just to adjust the schedule.

09:52:05  17     Q.   Okay.  Can you turn the page?

09:52:08  18     A.   Uh-huh.

09:52:08  19     Q.   There is an E-mail in the back where it says

09:52:20  20   that you were trying to pursue a training opportunity not

09:52:24  21   related to autism and, in fact, that's why he says:

09:52:30  22   "From April and May, we can pay the extra hours from my

09:52:34  23   startup fund.  Beginning in July, the money from the

09:52:40  24   Department of Health should begin and I will support an

09:52:43  25   average 24 hours per week of Judy's time."  So he was

Alpine Court Reporting
801-691-1000

Judith Zimmerman
September 16, 2015

## Page 29

```
09:52:46   1   actually using startup funds to help you to do this
09:52:50   2   training.
09:52:50   3       A.   No.  No.  I was being paid from the contract
09:52:55   4   I brought with me from the health department for this
09:52:58   5   time and I had another job offer for the summer that I
09:53:02   6   was being paid separately, so my understanding was all my
09:53:07   7   time was being paid for from the contract from the health
09:53:10   8   department.
09:53:11   9       Q.   Judy, but that's not what this E-mail says
09:53:13  10   and that's being cc'd to Dan Hogge, so according to this
09:53:18  11   E-mail, actually Dr. McMahon was using his own startup
09:53:23  12   funds, his own -- you know, his own department money to
09:53:27  13   help pay you to get this training, so he was supporting
09:53:29  14   you so that you could get this training, and he also then
09:53:35  15   was talking to Lynn Gardner and he says:  "We have to
09:53:39  16   resume the process for appointment for Judy as a research
09:53:43  17   assistant professor.  I will cc Lynn and Barbara to help
09:53:47  18   us on this."  So he was the one who resumed the process
09:53:53  19   for appointment, so it doesn't say reappointment or
09:53:56  20   anything new.  He's the one that had you appointed to be
09:54:00  21   a research, so this is a brand-new thing.  You were just
09:54:04  22   an adjunct professor and he's the one that had you
09:54:09  23   appointed as a research professor.
09:54:11  24       A.   I thought I was an assistant research
09:54:14  25   professor.  All this memo -- all these memos had to do --
```

## Page 30

```
09:54:16   1   and I was working only part time.  Because I was only
09:54:22   2   working part time, I needed to supplement my money, my
09:54:27   3   job, with other funding, and I took a three-month job
09:54:31   4   that was paid at a hospital.  All I asked for is that the
09:54:37   5   part time be accounted for.  I would work more hours
09:54:42   6   before it started and more hours after to make up the
09:54:48   7   time I missed during the summer.
09:54:57   8       Q.   Okay.  I'd like to draw your attention to the
09:55:01   9   E-mail from Lynn above.  Do you see where it says:  "I
09:55:10  10   will send Dr. Zimmerman an E-mail outlining the process
09:55:15  11   again with her needing new letters of recommendation,
09:55:19  12   etc.  The file needs to be completed to meet the
09:55:23  13   June 24th deadline."
09:55:26  14            From the testimony that Dr. McMahon has
09:55:30  15   provided, and you sat through his deposition, the process
09:55:36  16   is a little bit more complex for research professors than
09:55:41  17   it is for just regular adjunct professors, and, so -- so,
09:55:47  18   you did need to have you new letters and that's when
09:55:51  19   Deborah Bilder came in and maybe it was you who asked her
09:55:56  20   and others to help you complete the file, so whatever had
09:56:01  21   happened is -- did something maybe happen and maybe you
09:56:03  22   had not completed the file before and that's why the file
09:56:08  23   wasn't completed until McMahon became chair?
09:56:15  24       A.   There were letters provided in 2005.  I
09:56:20  25   believed all the letters were provided.  Then I was asked
```

## Page 31

```
09:56:24   1   to do it all over again in 2000 and whatever.
09:56:29   2       Q.   Okay.
09:56:31   3            MR. ROBINSON:  2008?  2007?
09:56:42   4            THE WITNESS:  At this date.
09:56:45   5            MR. ROBINSON:  This date being what?
09:56:47   6            THE WITNESS:  Looks like 2008 from the
09:56:56   7   E-mail.  So in 2005 I got letters from three outside
09:57:01   8   people and three inside people.
09:57:10   9            MR. ROBINSON:  Can I just look at the exhibit
09:57:12  10   binder for a second?
09:57:14  11            THE WITNESS:  Sure.
09:57:14  12   BY MS. DONOSSO:
09:57:34  13       Q.   I'd like to draw -- let me draw your
09:58:58  14   attention to Exhibit 30.  That's an agenda for the
09:59:29  15   Department of Psychiatry faculty meeting, that's when
09:59:32  16   Dr. Grosser had I believe left and there was a transition
09:59:37  17   happening and there was a vote.  They were trying to
09:59:40  18   prepare to vote for you on January 10th, 2006, and you
09:59:48  19   had provided outside letters from Steve Kelley and
09:59:52  20   Claudia Kennedy but they still had not received inside
09:59:56  21   letters and so there's a note at the bottom that says
10:00:00  22   still need.  Do you see that?
10:00:02  23       A.   Correct.
10:00:03  24       Q.   Okay, so your assistant research -- you
10:00:14  25   remained as an assistant, your vote to become an
```

## Page 32

```
10:00:18   1   assistant research professor was never passed because
10:00:23   2   your inside letters were never received.  They only
10:00:25   3   received a letter from Hilary Coon at the time.  Do you
10:00:29   4   see those notes at the bottom, it says 02/27/06 still
10:00:33   5   need?
10:00:34   6       A.   So can I clarify this?  Bernie Grosser I
10:00:42   7   think was there until 2008.
10:00:45   8       Q.   That is correct.
10:00:46   9       A.   He wasn't just leaving.
10:00:47  10       Q.   Okay, so I misspoke.  This was an agenda from
10:00:52  11   January 10th, 2006.  One of the things on the agenda was
10:00:57  12   to vote to make you an assistant research professor.
10:00:59  13   They had listed the outside and the inside letters, and
10:01:02  14   according to this agenda, you had provided the outside
10:01:08  15   letters, but the inside letters, according to this agenda
10:01:14  16   in paren, it says not yet received and there's a notation
10:01:17  17   in writing that says still need, so does this refresh
10:01:21  18   your recollection that you never provided all of the
10:01:23  19   materials to them that were needed for them to make a
10:01:26  20   complete vote for them to be able to complete your packet
10:01:33  21   for assistant research professor?
10:01:36  22       A.   I didn't know they hadn't received the
10:01:39  23   letters.
10:01:40  24       Q.   Okay, so they were never able to make you an
10:01:51  25   assistant research professor in 2006, and that -- okay,
```

Alpine Court Reporting
801-691-1000

Judith Zimmerman
September 16, 2015

---

Page 33

```
10:02:02   1   so would you agree that according to this document that
10:02:05   2   is correct?
10:02:05   3       A.  No.
10:02:06   4       Q.  You don't believe that this document shows
10:02:12   5   that they never received the documentation that was
10:02:14   6   needed for them to process your request to be a research
10:02:19   7   professor?
10:02:20   8       A.  On this date, perhaps.  I don't know.  I've
10:02:26   9   never seen this before.
10:02:27  10       Q.  Okay.
10:02:27  11       A.  And I never got any feedback that they hadn't
10:02:30  12   received the letters that they needed.
10:02:33  13       Q.  Who was the person who was applying to be an
10:02:39  14   assistant research professor?
10:02:41  15       A.  My understanding was that the secretary
10:02:43  16   requested the letters and was supposed to keep me
10:02:46  17   informed if they were missing anything.
10:02:48  18       Q.  Who was applying to be an assistant research
10:02:52  19   professor?
10:02:52  20       A.  I had been told I was being appointed as that
10:03:00  21   and I thought all the --
10:03:00  22       Q.  You're not answering my question.  Who was
10:03:02  23   the person who was --
10:03:03  24       A.  I applied.
10:03:05  25       Q.  Yes, and so who was in charge of the
```

---

Page 34

```
10:03:07   1   follow-up to make sure that they had received everything
10:03:10   2   that was necessary in that packet to process that
10:03:13   3   application?
10:03:13   4       A.  I believed it was their responsibility
10:03:16   5   because -- because some of the letters, I wouldn't be
10:03:20   6   able to see.
10:03:21   7       Q.  But these would be -- who was the person who
10:03:25   8   was in charge of asking for people to write and send
10:03:28   9   letters?
10:03:29  10       A.  Bernie Grosser asked Bill McMahon to write a
10:03:34  11   letter.
10:03:34  12       Q.  Who asked Hillary Coon to write the letter?
10:03:38  13       A.  I did.
10:03:38  14       Q.  So who would have had to ask Bill McMahon to
10:03:42  15   write the letter?
10:03:42  16       A.  I did and Grosser asked him to write the
10:03:45  17   letter as well.
10:03:47  18       Q.  So who would've had to do the follow-up?
10:03:50  19       A.  I didn't know he hadn't done it.  I assumed
10:03:55  20   it had all been taken care of.  I had no feedback that it
10:04:00  21   hadn't been taken care of and that I hadn't had the
10:04:04  22   appointment.
10:04:04  23       Q.  Okay, and after not hearing back for several
10:04:18  24   weeks, you didn't think that you should do any follow-up?
10:04:22  25       A.  I didn't know there was a problem.  I've
```

---

Page 35

```
10:04:26   1   never seen this.
10:04:29   2       Q.  Okay.  Let's go back to the complaint.  On
10:05:15   3   Paragraph 9(d), you alleged that you were often asked
10:05:21   4   when you were going to retire because older employees
10:05:25   5   could not keep up with younger employees.  Who asked you
10:05:35   6   this?
10:05:36   7       A.  McMahon.
10:05:37   8       Q.  When did he begin to ask you this?
10:05:48   9       A.  I don't recall.  It was -- I don't recall
10:05:53  10   exactly when.
10:05:54  11       Q.  Was anybody else present when these comments
10:05:57  12   were made?
10:05:58  13       A.  No.
10:05:58  14       Q.  Who made derogatory comments about your
10:06:12  15   interest in becoming a chaplain?
10:06:15  16       A.  McMahon.
10:06:16  17       Q.  How often would he make these comments?
10:06:25  18       A.  I would say three or four times.
10:06:28  19       Q.  So these were made three or four times during
10:06:31  20   your entire tenure?
10:06:33  21       A.  During the timeframe I was studying to be a
10:06:37  22   chaplain.
10:06:37  23       Q.  And when were you studying to be a chaplain?
10:06:40  24       A.  I would have to look at the exact time.
10:06:44  25   Around 2008.  I'm not exactly sure.
```

---

Page 36

```
10:06:47   1       Q.  Was anybody else present when these comments
10:06:50   2   were made?
10:06:51   3       A.  No.
10:06:51   4       Q.  What were the nature of these comments?
10:06:55   5       A.  He -- I'm trying to remember.  He made it
10:07:20   6   clear that he didn't approve of me studying to be a
10:07:38   7   chaplain and that chaplains feed the delusions --
10:07:46   8   something to the effect of feed the delusions of
10:07:56   9   religious people and that the gist of it was that
10:08:10  10   individuals who had certain religious beliefs were
10:08:15  11   delusional.
10:08:21  12       Q.  Were you pursuing this training sometime in
10:08:23  13   the spring of 2008?
10:08:25  14       A.  I don't remember.  And I was also working as
10:08:43  15   a chaplain as well.
10:08:47  16       Q.  Where were you working as a chaplain?
10:08:50  17       A.  I worked at St. Mark's and I worked at Jordan
10:09:05  18   Valley Hospital.
10:09:05  19       Q.  Did he allow you to be able to take time away
10:09:14  20   from your duties at the university to go be able to work
10:09:19  21   at St. Mark's and Jordan Valley?
10:09:22  22       A.  My job at the university was only part time
10:09:24  23   and I adjusted my schedule.  It was -- it was flexible in
10:09:32  24   terms of my hours.  I didn't ask him to adjust anything
10:09:36  25   except for that summer.
```

---

9  (Pages 33 to 36)

Judith Zimmerman
September 16, 2015

## Page 37

| | | |
|---|---|---|
| 10:09:41 | 1 | Q. And did the university or McMahon make any |
| 10:09:46 | 2 | type of derogatory comments because you were adjusting |
| 10:09:51 | 3 | your schedule during that summer? |
| 10:09:53 | 4 | A. The only derogatory comment -- the comment |
| 10:10:01 | 5 | derogatory comment was I was asked to be on an advisory |
| 10:10:02 | 6 | board, a chaplain advisory board at the university, and I |
| 10:10:09 | 7 | had to go on my lunch hour to do that. I lost my train |
| 10:10:26 | 8 | of thought. Sorry. |
| 10:10:27 | 9 | Q. Did the university or McMahon have any |
| 10:10:29 | 10 | problem with you during that summer because you were |
| 10:10:31 | 11 | spending time at St. Mark's or Jordan Valley? |
| 10:10:36 | 12 | A. Not that I know of. |
| 10:10:37 | 13 | Q. Okay. |
| 10:10:40 | 14 | MR. ROBINSON: May I clarify? |
| 10:10:41 | 15 | THE WITNESS: Yes. |
| 10:10:43 | 16 | MR. ROBINSON: I think you said you asked Dr. |
| 10:10:45 | 17 | McMahon to adjust your schedule for the summer and he did |
| 10:10:49 | 18 | allow you to do that; is that correct? |
| 10:10:51 | 19 | THE WITNESS: Yes. |
| 10:10:53 | 20 | MR. ROBINSON: Okay, and that was 2008. |
| 10:10:55 | 21 | THE WITNESS: That was in the reference to |
| 10:10:57 | 22 | that previous exhibit, the hours. |
| 10:11:00 | 23 | MR. ROBINSON: Right. Okay. Good, and that |
| 10:11:02 | 24 | was in 2008? |
| 10:11:03 | 25 | THE WITNESS: Correct. |

## Page 38

| | | |
|---|---|---|
| 10:11:04 | 1 | MR. ROBINSON: Okay. Thank you. |
| 10:11:07 | 2 | MS. DONOSSO: And that was Exhibit No. 35. |
| 10:11:13 | 3 | MR. ROBINSON: That's the exhibit you were |
| 10:11:15 | 4 | referring to was Exhibit 35? |
| 10:11:18 | 5 | BY MS. DONOSSO: |
| 10:11:22 | 6 | Q. Thirty-five? |
| 10:11:22 | 7 | A. Yes. |
| 10:11:23 | 8 | Q. Okay. Okay. Now, let's go back to the |
| 10:11:28 | 9 | complaint, and I'd like you to turn to Page 16, so now |
| 10:11:44 | 10 | what we're going to do is in your amended complaint you |
| 10:11:47 | 11 | alleged 12 causes of action, so we're going to begin with |
| 10:11:52 | 12 | cause of action No. 1, which is your whistleblower claim |
| 10:11:57 | 13 | under the Utah Protection of Public Employees Act. What |
| 10:12:02 | 14 | is your basis for your whistleblower claim? |
| 10:12:15 | 15 | A. I asked questions beginning in 2011 |
| 10:12:22 | 16 | regarding -- legal questions regarding the sharing of |
| 10:12:28 | 17 | confidential data I had collected as part of my grants. |
| 10:12:34 | 18 | Q. Who did you ask these questions to? |
| 10:12:37 | 19 | A. I asked IRB, I asked the head of ethics, I |
| 10:12:47 | 20 | asked Jeffrey Botkin, I asked the health department, |
| 10:13:01 | 21 | several individuals at the health department. |
| 10:13:03 | 22 | Q. Who at the health department? |
| 10:13:04 | 23 | A. I asked Marc Babitz, I asked Nan Streeter, I |
| 10:13:18 | 24 | asked Harper Randall and I asked Lyle Odendahl, the AG |
| 10:13:27 | 25 | for the health department. |

## Page 39

| | | |
|---|---|---|
| 10:13:29 | 1 | Q. Okay, and what did you ask them? |
| 10:13:33 | 2 | A. I asked them -- my concerns were related to |
| 10:13:49 | 3 | the institutional review, IRBs, and what authorizations |
| 10:14:02 | 4 | were needed from which governmental entities in order for |
| 10:14:10 | 5 | researchers to access birth files with identifiers and |
| 10:14:20 | 6 | identifiable and deidentified data that I had collected |
| 10:14:26 | 7 | as part of my grant activities. |
| 10:14:36 | 8 | Q. What did these people tell you? |
| 10:14:41 | 9 | A. Which person? Let's start with -- let me |
| 10:14:51 | 10 | back up by saying that, prior to this time, the health |
| 10:14:56 | 11 | department had done and controlled the birth records and |
| 10:15:17 | 12 | the health department decided not to renew a contract |
| 10:15:21 | 13 | with the Utah State office -- well, the Utah State Office |
| 10:15:29 | 14 | of Education rescinded the health department's authority |
| 10:15:33 | 15 | to collect education data, so I was trying to get |
| 10:15:45 | 16 | clarification as to process for researchers to -- to |
| 10:15:54 | 17 | access data that I had collected as part of my CDC |
| 10:15:59 | 18 | grants. |
| 10:16:02 | 19 | Q. Okay. |
| 10:16:07 | 20 | A. And so my questions to the health department |
| 10:16:13 | 21 | to access health data was that it would need to go |
| 10:16:18 | 22 | through oversight committee and Utah Department of Health |
| 10:16:23 | 23 | IRB for health data. |
| 10:16:29 | 24 | Q. So that was your question to the UDOH. So |
| 10:16:33 | 25 | what was your question to the IRB? |

## Page 40

| | | |
|---|---|---|
| 10:16:36 | 1 | A. My question to the IRB was that -- and to Dr. |
| 10:16:44 | 2 | Botkin was that McMahon was listing on an IRB that he was |
| 10:16:50 | 3 | conducting the research and had cooperative agreements |
| 10:16:54 | 4 | with the CDC when he, in fact, had none and I was |
| 10:17:02 | 5 | concerned about my liability with him continuing to list |
| 10:17:09 | 6 | his name as the principal investigator of that study |
| 10:17:13 | 7 | when, in fact, he wasn't. |
| 10:17:17 | 8 | Q. Okay, and what was your question to ethics? |
| 10:17:24 | 9 | A. The same. |
| 10:17:26 | 10 | Q. Okay, and I'm assuming all of these people |
| 10:17:32 | 11 | gave you their responses to your questions? |
| 10:17:36 | 12 | A. The IRB deferred it to Botkin, who was the |
| 10:17:45 | 13 | head of ethics at the university. They did say I could |
| 10:17:52 | 14 | do my own IRBs for my study, but in terms of the chairman |
| 10:18:00 | 15 | listing himself as doing the research on someone else's |
| 10:18:04 | 16 | research, they referred me to Botkin, and Botkin said |
| 10:18:11 | 17 | Bill wouldn't do that and that I could put just -- |
| 10:18:22 | 18 | basically said he wouldn't do that and I had a right to |
| 10:18:27 | 19 | put my research under my name. |
| 10:18:30 | 20 | Q. Okay, and what did the health department say? |
| 10:18:36 | 21 | A. The health department, their response was |
| 10:18:45 | 22 | confusing. They -- my understanding was that -- that the |
| 10:18:55 | 23 | legal opinion was if the health -- if a researcher wanted |
| 10:19:01 | 24 | to use health data collected under the health rule, under |
| 10:19:06 | 25 | the authority of the health department, that the |

Alpine Court Reporting
801-691-1000

Judith Zimmerman
September 16, 2015

## Page 41

10:19:09  1   researcher would need to go through the oversight
10:19:14  2   committee first and then an IRB at the health department.
10:19:20  3       Q.   And so was it your understanding that as long
10:19:24  4   as the researcher had an IRB at the health department,
10:19:27  5   then they would be able to use the data?
10:19:30  6       A.   My understanding was it would depend on the
10:19:37  7   form of the data that they took.  So it's complicated by
10:19:41  8   the fact that the Centers for Disease Control also had
10:19:46  9   requirements in terms of who could use the data, so the
10:19:51 10   health department was only contributing partially to the
10:19:58 11   data in my data set.  So my understanding was that the
10:20:06 12   CDC, if they were wanting identifiable data, is that they
10:20:12 13   would need to get approval from the data sources to use
10:20:17 14   that data.
10:20:21 15       Q.   Okay, so going back to my question, what is
10:20:29 16   the basis of your whistleblower claim?
10:20:32 17       A.   I believe I was retaliated against for asking
10:20:36 18   questions about plagiarism, privacy concerns and the
10:20:46 19   sharing of identifiable data without the appropriate
10:20:52 20   consents.
10:20:59 21       Q.   Anything else?
10:21:03 22       A.   I also reported that they were publishing
10:21:13 23   data under people's names who had not done the work and
10:21:18 24   that the data contained uncorrected errors and that they
10:21:23 25   had made false claims with the IRB regarding who had

## Page 42

10:21:36  1   sponsorship, who had sponsored that research and their
10:21:46  2   relationship to the sponsor.
10:21:47  3       Q.   Okay.  Now, your second cause of action is a
10:21:50  4   breach of contract claim, and specifically, I'd like to
10:21:59  5   draw your attention to Page 18 of the complaint, you cite
10:22:09  6   University Policy 6-316 where you claim that that policy
10:22:14  7   gives faculty members, quote:  "The right to academic
10:22:18  8   freedom and right to examine and communicate ideas by any
10:22:23  9   lawful means."  What is the basis of your breach of
10:22:30 10   contract claim?
10:22:31 11       MS. LEONARD:  I'll just object that the
10:22:34 12   document speaks for itself and asks for a legal
10:22:37 13   conclusion.
10:22:38 14       You can answer.
10:22:45 15       THE WITNESS:  I believe that I had met the
10:22:50 16   obligations of my contract with the university and when I
10:23:00 17   raised the question of plagiarism in 2011, data security,
10:23:11 18   authorization, that I was retaliated against and that I
10:23:19 19   could not finish out my current contract, nor was I
10:23:25 20   allowed to have new contracts, so they stopped me from
10:23:35 21   performing my duties mid contract.
10:23:35 22   BY MS. DONOSSO:
10:23:59 23       Q.   You have previously testified that you
10:24:01 24   understand that you were on an annual renewable contract;
10:24:06 25   correct?

## Page 43

10:24:06  1       A.   My understanding was that I had just passed
10:24:10  2   my third year RPT review and the letter I received from
10:24:17  3   the head of the medical school stated that she looked
10:24:21  4   forward to me having years to come.
10:24:24  5       Q.   But you had a meeting with both Dr.
10:24:29  6   McMahon and Dr. Macintosh where they had met with you in
10:24:34  7   June of 2011 and given you an outline of expectations
10:24:39  8   where they had shared concerns with you; isn't that
10:24:42  9   correct?
10:24:42 10       A.   I received those concerns directly after
10:24:44 11   reporting my concerns to Sperry and Botkin and IRB and
10:24:53 12   about plagiarism.
10:24:54 13       Q.   Let's look at what has been marked as
10:24:56 14   Exhibit 10.  Do you recognize that document?
10:25:19 15       A.   Yes.
10:25:20 16       Q.   Is that a true and correct copy of the
10:25:26 17   outline of expectations that you received on or about
10:25:30 18   approximately June 27th of 2011?
10:25:33 19       A.   This is a copy of the letter I received.
10:25:36 20       Q.   Okay, and according to this letter, it states
10:25:40 21   that you and Dr. McMahon and Dr. Macintosh had your
10:25:45 22   annual performance review on June 22nd of 2011; is that
10:25:50 23   correct?
10:25:51 24       A.   I don't remember.  I'm sure that's correct.
10:25:54 25       Q.   Okay, and according to this, this cites your

## Page 44

10:26:01  1   offer letter, that we have previously reviewed, that is
10:26:05  2   dated November 30th of 2008, which is Exhibit 9, and
10:26:20  3   according to Dr. McMahon, it states the expectations for
10:26:26  4   you in your role as assistant professor, research
10:26:29  5   professor, were outlined in that offer letter of
10:26:34  6   November 30th and it is to maintain and develop URADD, to
10:26:38  7   work with me and other researchers to design and carry
10:26:42  8   out new studies and to collaborate in the development of
10:26:46  9   new grants.  Do you see that?
10:26:47 10       A.   Yes.
10:26:47 11       Q.   And then in paragraph -- approximately in the
10:26:56 12   middle of the page, it says:  "As we discussed on
10:27:00 13   June 22nd, I have concerns that need your immediate
10:27:04 14   attention."  Do you see that paragraph?
10:27:05 15       A.   Yes.
10:27:06 16       Q.   He says:  "As the leader, who is part of an
10:27:14 17   academic medical center, it is very important for you to
10:27:18 18   mentor and encourage other department researchers.  You
10:27:22 19   need to be approachable, available, demonstrate a
10:27:25 20   willingness to answer questions and support their
10:27:26 21   research ideas and efforts of others."  Do you see that?
10:27:29 22       A.   Yes.
10:27:30 23       Q.   And then in the first sentence of the last
10:27:36 24   paragraph:  "There is a perception that you are not
10:27:38 25   meeting these expectations; that at times you promote

Alpine Court Reporting
801-691-1000

Judith Zimmerman
September 16, 2015

Page 45

10:27:44  1   your own ideas, while dismissing or ignoring those of
10:27:46  2   more junior researchers; that you fail to provide
10:27:48  3   feedback; that you provide feedback that is hostile and
10:27:52  4   not constructive." Do you see that paragraph?
10:27:55  5       A.  Uh-huh.
10:27:56  6       Q.  "That your behavior is not conducive to our
10:28:00  7   very important task of building and developing an
10:28:07  8   outstanding autism research program." And then in the
10:28:10  9   second page, he goes on to say:  "It is my perception, as
10:28:15  10  well as that of the URADD oversight committee, that your
10:28:21  11  enthusiasm to identify associations relating to autism
10:28:24  12  may overshadow your adherence to scientific rigor." And
10:28:30  13  then he goes on to even offer to provide you executive
10:28:37  14  coaching to assist you in the process of improving your
10:28:41  15  interpersonal and collaborative skills at the bottom of
10:28:47  16  the page.
10:28:47  17           Now, I mean, this is a two-page, single
10:28:52  18  spaced basically annual review letter, and it's signed by
10:29:02  19  Dr. McMahon, as the chairman, and cc'd to Michael
10:29:07  20  Macintosh. I know that you provided, you know, a
10:29:27  21  response to this letter.  Do you not feel that in June of
10:29:42  22  2011, at the time that the university gave you this
10:29:47  23  outline of expectations, they had concerns that you were
10:29:51  24  not performing the offer letter that they gave you on
10:29:57  25  November 30th of 2008?

Page 46

10:29:58  1       A.  This letter followed me reporting concerns
10:30:06  2   about him and plagiarism and I reported to him I was
10:30:20  3   concerned about Deborah Bilder as she was -- did not have
10:30:33  4   IRBs for research that she was doing and that she was
10:30:42  5   bypassing the protocols set up by the health department
10:30:47  6   as well as with the CDC.
10:30:51  7       Q.  What do you mean by plagiarism? Let's break
10:30:55  8   down your response. What plagiarism?
10:30:57  9       A.  Bill was claiming to have authored my grants.
10:31:02  10  He was claiming that he was the lead principal
10:31:05  11  investigator. He was claiming that Hilary Coon and he
10:31:15  12  wrote the grant. He gave in a magazine article credit to
10:31:26  13  another junior faculty member for my research.
10:31:33  14          MR. ROBINSON:  Sorry, what was that last one?
10:31:35  15          THE WITNESS:  Pardon?
10:31:35  16          MR. ROBINSON:  What was that last one?
10:31:37  17          THE WITNESS:  So there was an article that
10:31:38  18  appeared in the Salt Lake City Magazine and they
10:31:46  19  published the article stating that another female junior
10:31:50  20  faculty had done the study. When I brought those
10:31:56  21  concerns to him, he said he'd make it up to me if I'd
10:32:01  22  just let it go by.
10:32:01  23  BY MS. DONOSSO:
10:32:13  24      Q.  How is that plagiarism?
10:32:15  25      A.  How is that plagiarism?

Page 47

10:32:17  1       Q.  How is he claiming to be co-PI or lead PI on
10:32:32  2   a grant that he has been thoroughly involved in since the
10:32:38  3   very beginning in 2003, how is that plagiarism?
10:32:41  4       A.  He did very little work.  He -- so when I
10:32:44  5   went up for RPT review, I had to prove that I wrote the
10:32:49  6   grant and he didn't write the grant. He was taking
10:32:52  7   credit for my intellectual work.
10:32:55  8       Q.  Okay. How is this your intellectual work?
10:33:00  9       A.  I wrote it.  I conducted the research.
10:33:02  10      Q.  While you were working for the University of
10:33:05  11  Utah?
10:33:05  12      A.  The health department.
10:33:06  13      Q.  You understand that when you were working for
10:33:10  14  the health department, you were a program director, and
10:33:13  15  that all of this data belongs to the Department of
10:33:19  16  Health. This is data that is public data. This is data
10:33:24  17  for children and birth data and private data of children
10:33:29  18  that has been gathered by collaborative state agencies
10:33:34  19  and privacy entities. This is not your data. Do you
10:33:38  20  understand that?
10:33:39  21      A.  I collected the data.
10:33:40  22      Q.  You collected the data.
10:33:42  23      A.  And I did the work and I wrote the grant
10:33:45  24  through a competitive process.
10:33:47  25      Q.  Yes, a grant, and who did the checks go to,

Page 48

10:33:51  1   like the CDC and stuff? Did the checks go to you or did
10:33:54  2   the checks go to university?
10:33:54  3       A.  The checks paid for my salary through the
10:33:57  4   university.  So in 2002, the health department was a
10:34:01  5   fiscal agent, and then that changed around 2009 to the
10:34:07  6   university.
10:34:09  7       Q.  Right, and so you were always working for
10:34:12  8   somebody else, but you -- and you weren't writing these
10:34:15  9   grants by yourself, correct, there were other people
10:34:18  10  helping you write these grants?
10:34:20  11      A.  McMahon did not help.
10:34:22  12      Q.  But you were -- but people were reviewing
10:34:24  13  your work, was reviewing your work at all times?
10:34:28  14      A.  People?  Who?
10:34:30  15      Q.  People on your staff, you were always
10:34:32  16  working -- you were always in a collaborative suite?
10:34:36  17      A.  In -- yes.
10:34:37  18      Q.  Right, and when you were publishing articles,
10:34:41  19  people were always helping, like you always had an
10:34:47  20  epidemiologist who was helping you gather the data, you,
10:34:49  21  yourself --
10:34:49  22      A.  It was a team effort, yes.
10:34:52  23      Q.  Okay, and in 2003, when the original IRB
10:34:59  24  11805, it was -- I'd like to show you what was previously
10:35:06  25  marked as Exhibit 3.  Whose name shows up as the PI?

12 (Pages 45 to 48)

Judith Zimmerman
September 16, 2015

## Page 49

```
10:35:18  1      A.   That's on the IRB that I raised concerns
10:35:21  2   about.
10:35:21  3      Q.   That's not my question.  Whose name shows up
10:35:26  4   on the university's IRB?
10:35:27  5      A.   On that particular IRB, his name.
10:35:30  6      MR. ROBINSON:  His name being Dr. McMahon?
10:35:33  7      THE WITNESS:  McMahon, yes.
10:35:34  8      MS. DONOSSO:  Okay.
10:35:44  9      MS. LEONARD:  Yvette, if you get to a
10:35:49 10   stopping point, it would be a good time to take a break.
10:35:57 11      MS. DONOSSO:  Sure, that's fine.  You can
10:35:59 12   take one now, if you'd like.
10:36:03 13        (Whereupon a recess was taken.)
10:36:03 14   BY MS. DONOSSO:
10:52:26 15      Q.   Okay.  We're back on the record.  You
10:52:31 16   previously testified that these were your grants and this
10:52:39 17   was your work; isn't that correct?
10:52:42 18      MS. LEONARD:  Objection.  Misstates
10:52:44 19   testimony.
10:52:44 20      MS. DONOSSO:  Can you please read back Dr.
10:52:44 21   Zimmerman's testimony?
10:52:44 22   (Whereupon the requested portion was read, Page 47, Line
10:53:43 23   4.)
10:53:43 24      MS. DONOSSO:  Thank you.
10:53:50 25      Q.   However, Dr. McMahon was involved in the
```

## Page 50

```
10:53:55  1   URADD project from the very beginning, wasn't he?
10:54:03  2      A.   He was involved peripherally.
10:54:07  3      Q.   Actually because of his broad contacts with
10:54:13  4   the community and his reputation as a very strong
10:54:17  5   researcher, he was able to gather a lot of strong support
10:54:22  6   for the project, wasn't he?
10:54:24  7      A.   He helped with two sources.  As I recall, he
10:54:32  8   was friends with Jordan School District as well as a
10:54:40  9   psychiatrist at The Children's Center.
10:54:43 10      Q.   Do you know who Carmen Pingree is?
10:54:46 11      A.   Yes.
10:54:47 12      Q.   Who is she?
10:54:48 13      A.   She is a parent of a child with autism.
10:54:51 14      Q.   Anything else?
10:54:55 15      A.   With regard to what?
10:54:56 16      Q.   With regard to her reputation in the autism
10:55:02 17   community.
10:55:03 18      A.   As it relates to getting the grant?
10:55:07 19      Q.   As her involvement in being an activist in
10:55:13 20   the autism community.
10:55:14 21      A.   She was an activist in the autism community.
10:55:18 22      Q.   Was she well known for her activism?
10:55:25 23      A.   On autism, yes.
10:55:27 24      Q.   Okay.  Was she someone who was very involved
10:55:29 25   at the very beginning of autism research?
```

## Page 51

```
10:55:33  1      A.   She did research, yes.
10:55:38  2      Q.   I'd like to show what has been marked as --
10:55:46  3   what we will mark as Exhibit 74.
10:56:09  4        (Whereupon Exhibit 74 was marked for identification.)
10:56:09  5   BY MS. DONOSSO:
10:56:19  6      Q.   You probably have never seen this before,
10:56:21  7   since it was written to Dr. McMahon, so I'll give you a
10:56:25  8   minute to read it.
10:56:34  9      A.   Okay.
10:56:35 10      Q.   Can you see the date at the top?
10:56:39 11      A.   Yes.
10:56:41 12      Q.   What date is that?
10:56:42 13      A.   2001.
10:56:43 14      Q.   Was this before or after you met Dr. McMahon?
10:56:52 15      A.   I don't remember.
10:56:54 16      Q.   When did you first start participating in
10:57:01 17   some of the meetings with Dr. McMahon and Eric Fombonne
10:57:06 18   and Carmen Pingree?
10:57:11 19      A.   Much later, 2011.
10:57:13 20      Q.   You don't recall meeting with Dr. McMahon and
10:57:20 21   Eric Fombonne in 2003?
10:57:25 22      A.   I don't recall that, no.
10:57:32 23      MR. ROBINSON:  May I just clarify?
10:57:32 24      THE WITNESS:  Yeah.
10:57:32 25      MR. ROBINSON:  So is it that you don't recall
```

## Page 52

```
10:57:34  1   and so it might have happened, you might have met with
10:57:36  2   him in 2003, you just don't remember?
10:57:41  3      THE WITNESS:  I don't recall meeting with him
10:57:42  4   that early.
10:57:46  5      MR. ROBINSON:  So you're saying that's not a
10:57:48  6   possibility, it could not have happened?
10:57:52  7      THE WITNESS:  I don't believe that's correct.
10:57:52  8   BY MS. DONOSSO:
11:01:57  9      Q.   Let me show what has been previously marked
11:02:01 10   as Exhibit 28.  These are notes taken by Dr. McMahon in
11:02:23 11   February of 2003.  They were of a meeting where Eric
11:02:42 12   Fombonne and Carmen Pingree and you were present.  Do you
11:02:48 13   see your name at the very top?
11:02:50 14      A.   I do.
11:02:50 15      Q.   I apparently you guys met, had kind of a
11:02:53 16   collaborative brainstorming meeting to discuss various
11:03:05 17   ideas regarding autism.  Does this refresh your memory?
11:03:09 18      A.   Vaguely.  By then, I already had the grant,
11:03:18 19   so this would be after we already had the grant.
11:03:22 20      Q.   How did you meet Eric Fombonne?
11:03:34 21      A.   Through Bill McMahon.
11:03:35 22      Q.   How did you meet Carmen Pingree?
11:03:41 23      A.   Through Bill.
11:03:48 24      MR. ROBINSON:  Just for the record, Bill
11:03:51 25   McMahon; correct?
```

Alpine Court Reporting
801-691-1000

Judith Zimmerman
September 16, 2015

Page 53

11:03:52  1            THE WITNESS:  Yes.
11:04:06  2     BY MS. DONOSSO:
11:04:06  3        Q.   Who is Eric Fombonne?
11:04:08  4        A.   Eric Fombonne is a psychiatrist who has done
11:04:17  5     autism research.
11:04:18  6        Q.   Where is he from?
11:04:22  7        A.   I think originally he's from Paris, from
11:04:28  8     France.
11:04:28  9        Q.   Is he pretty well known in his field?
11:04:31 10        A.   Yes.
11:04:32 11        Q.   Would you consider him an expert in autism?
11:04:39 12        A.   Yes.
11:04:40 13        Q.   Would you consider it a pretty big deal to be
11:04:43 14     working with him?
11:04:44 15        A.   Yes.
11:04:46 16        Q.   I now would like to give you Exhibit 75.
11:05:27 17        (Whereupon Exhibit 75 was marked for identification.)
11:05:27 18     BY MS. DONOSSO:
11:05:27 19        Q.   Do you recognize this document?
11:05:36 20        A.   Yes.
11:05:39 21        Q.   It's a letter from Jack Dolcourt, a doctor of
11:05:47 22     pediatrics; is that correct?
11:05:48 23        A.   Yes, it is.
11:05:57 24        Q.   And it's dated May 17th, 2002; is that
11:06:01 25     correct?

Page 54

11:06:01  1        A.   Yes.
11:06:01  2        Q.   I'd like to draw your attention just briefly
11:06:04  3     to a couple of sentences on the first page of this
11:06:11  4     letter, if I may.  He states:  "I am writing to assure
11:06:12  5     you of my enthusiasm for your proposal to study the
11:06:15  6     prevalence of autism and other developmental
11:06:19  7     disabilities."  And this is director of pediatrics and
11:06:23  8     continuation for education for Primary Children's.  He
11:06:28  9     goes on to say:  "I have a strong relationship with the
11:06:33 10     mental health community through the work of Dr. William
11:06:37 11     McMahon, your collaborator in the Department of
11:06:37 12     Psychiatry."  And then he goes on to say:  "Dr. McMahon
11:06:42 13     has been a valued member of our continuing medical
11:06:46 14     education program review for ten years and I will be
11:06:49 15     delighted to work with him."  Do you see that in the
11:06:51 16     first paragraph?
11:06:52 17        A.   Uh-huh.
11:06:53 18            MR. ROBINSON:  That is a yes?
11:06:55 19            MS. LEONARD:  Make sure you say yes.
11:06:56 20            THE WITNESS:  Yes.
11:06:56 21     BY MS. DONOSSO:
11:06:57 22        Q.   "I have discussed several specific activities
11:07:01 23     with Dr. McMahon that will contribute to your research."
11:07:07 24     Do you see that in the second paragraph?
11:07:07 25        A.   Uh-huh.

Page 55

11:07:08  1            MR. ROBINSON:  Yes.
11:07:10  2            THE WITNESS:  Yes.
11:07:10  3     BY MS. DONOSSO:
11:07:10  4        Q.   Then he goes on to say:  "Since Dr. McMahon
11:07:11  5     is one of our most popular speakers for pediatric grand
11:07:15  6     rounds and since the recent epidemiology studies of
11:07:18  7     autism suggest that it is a much greater public health
11:07:23  8     concern than previously recognized, I will work to
11:07:26  9     include him or other autism experts in the schedule as is
11:07:30 10     appropriate."  Do you see that?
11:07:31 11        A.   Yes.
11:07:31 12        Q.   Okay.  Is this a true and correct copy of the
11:07:37 13     letter that he sent you?
11:07:38 14        A.   It looks like it, yes.
11:07:42 15        Q.   What is your opinion of Dr. Dolcourt?  Do you
11:07:50 16     know him well?
11:07:50 17        A.   Just a clarification, he's not the director
11:07:53 18     of pediatrics.  Ed Clark is the director of pediatrics.
11:07:59 19     I know Jack's wife quite well but I do now know Jack.
11:08:07 20        Q.   Was he supportive of the research?
11:08:13 21        A.   They had no involvement in the research.
11:08:16 22        Q.   Okay.
11:08:20 23            MR. ROBINSON:  Was he supportive in the
11:08:22 24     research though?
11:08:23 25            THE WITNESS:  I don't know.  They weren't

Page 56

11:08:24  1     involved.
11:08:24  2     BY MS. DONOSSO:
11:08:26  3        Q.   So he just sent you a letter of support for
11:08:29  4     the study?
11:08:30  5        A.   For the application.
11:08:31  6        Q.   For the application, okay.
11:08:34  7            MR. ROBINSON:  Application for the grant?
11:08:35  8            THE WITNESS:  For the grant.
11:08:37  9            MS. DONOSSO:  Okay.
11:08:38 10            MR. ROBINSON:  The CDC grant?
11:08:40 11            THE WITNESS:  Yes.
11:08:42 12            MS. DONOSSO:  Okay.
11:08:46 13            MR. ROBINSON:  And just for the record, when
11:08:46 14     you corrected that he's not the director of pediatrics,
11:08:49 15     he is the director of pediatric continuing education;
11:08:54 16     correct?
11:08:54 17            THE WITNESS:  Primary Children's Hospital I
11:08:57 18     believe.
11:08:57 19            MR. ROBINSON:  Yeah, but the director of
11:09:00 20     pediatric continuing education?
11:09:02 21        A.   Yes.
11:09:54 22        (Whereupon Exhibit 76 was marked for identification.)
11:09:54 23     BY MS. DONOSSO:
11:10:19 24        Q.   Do you recognize this document?
11:10:20 25        A.   Yes.

Alpine Court Reporting
801-691-1000

Judith Zimmerman
September 16, 2015

Page 57

```
11:10:21   1      Q.   Can you tell me what it is?
11:10:23   2      A.   It's an IRB that I prepared while working at
11:10:28   3   the health department.
11:10:30   4      Q.   Okay, and who do you list as co-principal
11:10:40   5   investigators?
11:10:40   6      A.   Dr. McMahon.
11:10:41   7      Q.   In fact, at the bottom you list Zimmerman and
11:10:49   8   McMahon in the IRB application and even in the body on
11:10:54   9   Page 2 of 6 you say:  "Dr. McMahon also collaborated in
11:10:59  10   the Stanford Autism Sub Pair Genetic Linkage studies.  He
11:11:03  11   is also the principal investigator for a project in the
11:11:09  12   Department of Psychiatry known as the Utah Autism
11:11:13  13   Research Program."  So from the very beginning, even
11:11:16  14   before you came over to the Department of Psychiatry, you
11:11:22  15   basically referred to yourself as co-principal
11:11:26  16   investigator with Dr. McMahon; is that correct?
11:11:29  17      A.   Yes, but he was not the principal
11:11:34  18   investigator on any cooperative agreements with the CDC.
11:11:42  19      Q.   But he was on URADD?
11:11:46  20      A.   URADD was my CDC grant.
11:11:49  21      Q.   But at least on this document, you did list
11:11:53  22   him as a co-principal investigator?
11:11:55  23      A.   The university required an IRB for him to
11:12:02  24   participate in the grant and this is the IRB that was
11:12:06  25   prepared for him.
```

Page 58

```
11:12:08   1      Q.   Okay.
11:12:09   2           MR. ROBINSON:  To participate in the CDC
11:12:11   3   grant?
11:12:12   4           THE WITNESS:  Yes.
11:12:13   5           MR. ROBINSON:  Oh, okay, and you prepared
11:12:16   6   this document?
11:12:17   7           THE WITNESS:  My staff and I did, yes.
11:12:17   8   BY MS. DONOSSO:
11:12:20   9      Q.   Okay.  Can you turn to Exhibit 36?  And you
11:14:24  10   may have not seen this document before and it's your
11:14:31  11   third year formal review, the appointment review.  I'll
11:14:37  12   give you an opportunity to read through it.
11:14:37  13      A.   I have read through it.
11:14:38  14      Q.   You've read through it?
11:14:41  15           MR. ROBINSON:  Have you seen it before?
11:14:43  16           THE WITNESS:  Yes, it was provided to me.
11:14:43  17   BY MS. DONOSSO:
11:14:46  18      Q.   How was it provided to you?
11:14:47  19      A.   Through McMahon's office.
11:14:50  20      Q.   Okay, and when was it provided to you?
11:14:51  21      A.   Sometime after September 19th, 2011.
11:14:54  22      Q.   Okay, so you've seen this before, and did you
11:14:56  23   provide a response as a result of you receiving this
11:15:00  24   document?
11:15:00  25      A.   I don't recall.
```

Page 59

```
11:15:04   1      Q.   There is actually like a response letter in
11:15:08   2   here.
11:15:11   3      A.   I may have.  I don't recall.
11:15:13   4      Q.   Okay.  We'll get to that later.  So you've
11:15:16   5   seen this before?
11:15:16   6      A.   Yes.
11:15:17   7      Q.   Okay.  Now, in here there was a discussion on
11:15:28   8   September 19th, 2011, regarding your third year formal
11:15:32   9   review obviously, and as a result of that, some of the
11:15:46  10   people present expressed some concerns, but, for example,
11:15:56  11   in Bullet No. 3, concerned primarily with respect to
11:15:59  12   collegiality, working well with others in the department.
11:16:05  13   Do you see that?
11:16:06  14      A.   Yes.
11:16:06  15      Q.   Shared access in terms of autism research,
11:16:11  16   professional contact with psychiatry faculty is limited.
11:16:19  17   The following bullet point:  "She made it quite clear to
11:16:23  18   junior faculty that she views the use of the CDC and
11:16:26  19   register data as a direct threat to her and has proceeded
11:16:30  20   on many occasions to record any effort of any other
11:16:32  21   researcher to use the resource."
11:16:38  22           Now, there is some -- there is some positive
11:16:41  23   things.  "She is productive in terms of writing grants
11:16:44  24   and publishing papers.  As a clinical manager, she is
11:16:48  25   good with deadlines."  There are some positive in there,
```

Page 60

```
11:16:50   1   but there have been definitely some concerns that were
11:16:54   2   discussed with you in the previous exhibit that we
11:17:02   3   discussed regarding the outline of expectations.  Do you
11:17:05   4   agree with that?
11:17:07   5      A.   These were not discussed with me.
11:17:13   6      Q.   Right.  I mean, because you were not allowed
11:17:18   7   to be in this meeting, but the concerns regarding
11:17:22   8   collegiality, working well with others, were also brought
11:17:26   9   up in this review.  Do you agree with that?
11:17:32  10      A.   I believe that there like within -- what's
11:17:35  11   the time period?
11:17:36  12      Q.   So this was just three months, so this
11:17:40  13   meeting took place three months after the June 11th
11:17:44  14   meeting you had with Dr. Macintosh and --
11:17:48  15      A.   Yes.
11:17:49  16      Q.   -- Dr. McMahon.  Following --
11:17:59  17           MR. ROBINSON:  I'm sorry, did you ever get an
11:18:01  18   answer?
11:18:02  19           THE WITNESS:  I'm not sure what the question
11:18:03  20   is.
11:18:03  21   BY MS. DONOSSO:
11:18:04  22      Q.   So my question is:  Some of the same concerns
11:18:06  23   that have been raised in the June 2011 meeting by Dr.
11:18:09  24   McMahon and Dr. Macintosh were also raised by your
11:18:13  25   colleagues in the September 2011 meeting in your third
```

Alpine Court Reporting
801-691-1000

Judith Zimmerman
September 16, 2015

## Page 61

```
11:18:17   1      year reappointment review.
11:18:20   2          A.  I have no idea who raised the concerns.
11:18:22   3          Q.  You're correct.  We have no idea who raised
11:18:23   4      them, but they are listed in the document, which is a
11:18:26   5      summary of the meeting?
11:18:28   6          A.  Yes.
11:18:29   7          Q.  Okay.  Following your receipt of this or
11:18:44   8      following learning this, learning about this RPT, were
11:18:50   9      you concerned that your contract would not be renewed the
11:18:54  10      following year?
11:18:55  11          A.  I was concerned I wouldn't pass RPT.
11:19:02  12          Q.  You were not concerned that your contract
11:19:04  13      would not be renewed the following year?
11:19:06  14          A.  I saw that no matter what I did, I would have
11:19:11  15      no opportunity to defend myself.
11:19:14  16          Q.  But that wasn't my question.  My question
11:19:18  17      was:  Following this RPT process, were you at all
11:19:21  18      concerned that your contract would not be renewed?
11:19:23  19          A.  I was concerned my contract would not be
11:19:27  20      renewed because I reported the chairman of the department
11:19:36  21      with plagiarism.
11:20:07  22          (Whereupon Exhibit 77 was marked for identification.)
11:20:07  23      BY MS. DONOSSO:
11:20:17  24          Q.  Do you recognize this document?
11:20:19  25          A.  Yes.
```

## Page 62

```
11:20:28   1          Q.  I'll give you some time to read it.  So I
11:20:59   2      actually want to start reading it backwards.
11:21:02   3          A.  Okay.
11:21:02   4          Q.  There are three pages to it.  So let's start
11:21:07   5      with the third page, which has been marked 9952.  So this
11:21:18   6      is an E-mail from you to Dean Li and it states it's dated
11:21:29   7      July 2nd, 2012, it states:  "Dr. Parks gave me your name
11:21:33   8      and suggested that you would be the appropriate person
11:21:35   9      for me to contact for a consultation regarding a research
11:21:39  10      matter.  Would it be possible for me to schedule a one
11:21:41  11      hour meeting at your earliest convenience?"  Do you see
11:21:47  12      that?
11:21:47  13          A.  Yes.
11:21:48  14          Q.  Would it be fair to say that you didn't meet
11:21:50  15      with Dean Li for the first time until after this E-mail?
11:21:58  16          A.  So your question is:  Did I meet with Dr. Li
11:22:01  17      after this E-mail?
11:22:02  18          Q.  Did you meet with Dr. Li at all before this
11:22:06  19      E-mail?
11:22:06  20          A.  I met with Dr. Parks before this E-mail.
11:22:09  21          Q.  That's not my question.  Did you meet with
11:22:13  22      Dr. Li before sending this E-mail ever?
11:22:16  23          A.  No.
11:22:16  24          Q.  Okay.
11:22:20  25          A.  But I had sent him some correspondence.
```

## Page 63

```
11:22:25   1          Q.  But according to this E-mail, Dr. Parks gave
11:22:29   2      me your name and suggested that you would be appropriate
11:22:32   3      for me to consult with on this matter, so this sounds
11:22:35   4      like this is the first E-mail you ever sent Dr. Li.
11:22:40   5          A.  I believe there are some E-mails to his
11:22:42   6      administrative assistant, Christine Lasalle.
11:22:42   7          Q.  Okay, so the E-mails were between you and
11:22:45   8      Christine Lasalle, not between you and Dr. Li?
11:22:47   9          A.  Correct.
11:22:47  10          Q.  Okay.  Next page.
11:22:50  11          MR. ROBINSON:  May I just clarify?
11:22:53  12          THE WITNESS:  Yes.
11:22:53  13          MR. ROBINSON:  The E-mails to his
11:22:55  14      administrative support person, were those also in the
11:22:58  15      July 2012 timeframe?
11:23:01  16          THE WITNESS:  I think they were in June but
11:23:02  17      I'm not exactly sure.
11:23:09  18          MR. ROBINSON:  June of 2012?
11:23:09  19          THE WITNESS:  Correct.
11:23:10  20          MR. ROBINSON:  So not before June 2012?
11:23:13  21          THE WITNESS:  Dean Li, no.
11:23:14  22          MR. ROBINSON:  That is a, yes, not before
11:23:16  23      June 2012; right?
11:23:18  24          THE WITNESS:  Right, so prior to that, I had
11:23:20  25      been meeting with Dr. Parks over the matter.
```

## Page 64

```
11:23:23   1          MR. ROBINSON:  So your first contact with
11:23:26   2      Dean Li's office was at the earliest June 2012?
11:23:31   3          THE WITNESS:  I believe so.
11:23:33   4          MR. ROBINSON:  Thank you.
11:23:33   5      BY MS. DONOSSO:
11:23:40   6          Q.  Now, let's review the E-mail where the PRD
11:23:46   7      number is 9950, and at the very top, this E-mail is dated
11:23:53   8      July 6th, 2012.  Do you see that?
11:23:57   9          A.  Yes.
11:23:57  10          Q.  Do you believe that this E-mail thread is a
11:24:01  11      true and correct copy of the E-mails that you sent to Dr.
11:24:06  12      Li?
11:24:06  13          A.  Yes.
11:24:06  14          Q.  It's states:  "I have met with Dr. Blomgren
11:24:12  15      last year when Dr. McMahon indicated he may not renew my
11:24:16  16      contract during my third year RPT process."  How did Dr.
11:24:23  17      McMahon indicate he would not be renewing your contract
11:24:28  18      during the RPT process?
11:24:29  19          A.  Because he told me if I didn't do exactly
11:24:33  20      what he'd say, he'd get me.
11:24:36  21          Q.  What was said?  The RPT process or the
11:24:39  22      outline expectations?
11:24:40  23          A.  When I brought up to him the concerns about
11:24:42  24      the IRB and lack of IRBs, he told me I had to do exactly
11:24:49  25      what he said or he would get me.
```

16 (Pages 61 to 64)

Judith Zimmerman
September 16, 2015

---

Page 65

11:24:54  1      Q.  Okay.  Now, the out line of expectations
11:24:55  2  doesn't mention IRBs and you weren't present during the
11:25:00  3  RPT process.
11:25:02  4      A.  What is your question?
11:25:03  5      Q.  So when did he say this to you?  During the
11:25:07  6  meeting regarding the outline -- so let me back up.  You
11:25:11  7  weren't present during your RPT process because you're
11:25:14  8  not allowed to be there; isn't that correct?
11:25:16  9      A.  Yes.
11:25:17 10      Q.  Okay, so you were present during -- but you
11:25:20 11  were present during the meeting during the outline of
11:25:22 12  expectations as was Dr. Macintosh; correct?
11:25:26 13      A.  I received the letter of expectations after
11:25:28 14  the meeting with Dr. Macintosh.
11:25:30 15      Q.  Okay, so are you alleging that during the
11:25:33 16  meeting with Dr. Macintosh, Dr. McMahon said if you don't
11:25:38 17  do exactly as I say during the IRB process, I will get
11:25:43 18  the grant?
11:25:44 19      A.  I'm saying that he said to me when I asked
11:25:47 20  that the grant be transferred under my name, the IRB for
11:25:51 21  the grant be transferred under my name.
11:25:52 22      Q.  When did that conversation take place?
11:25:54 23      A.  It -- when I -- there are some E-mail strings
11:26:00 24  about that when I met with him over the IRB issues and I
11:26:05 25  believe it was April of 2011.

---

Page 66

11:26:06  1      Q.  Have you produced those during discovery?
11:26:10  2      MS. LEONARD:  Yes.
11:26:14  3  BY MR. DONOSSO:
11:26:14  4      Q.  And so that happened in April of 2011, so
11:26:17  5  that did not happen during the outline of expectations
11:26:21  6  meeting; correct?
11:26:22  7      A.  I think he said something to the effect that
11:26:25  8  I needed to do exactly what he said.
11:26:28  9      Q.  And that's a direct quote, you need to do
11:26:31 10  exactly as I say?
11:26:32 11      A.  To the best of my knowledge.  I mean, this
11:26:36 12  has been a long time and it's previously been provided.
11:26:46 13      MR. ROBINSON:  I'm sorry, what has been
11:26:48 14  previously provided?
11:26:50 15      THE WITNESS:  The conversation, about the
11:26:53 16  conversation.
11:26:54 17      MR. ROBINSON:  Where he said I'll get you?
11:26:56 18      THE WITNESS:  Uh-huh.
11:26:57 19      MR. ROBINSON:  And that language is in the
11:26:59 20  E-mail?
11:27:00 21      THE WITNESS:  No, I'm not sure.  That
11:27:02 22  language was said to me in a private meeting.
11:27:05 23      MR. ROBINSON:  All right, so the language
11:27:06 24  that you've given us that he would get you if you didn't
11:27:09 25  do exactly what he said is not within an E-mails?

---

Page 67

11:27:13  1      THE WITNESS:  No.
11:27:14  2      MR. ROBINSON:  All right, and the E-mails,
11:27:15  3  the purpose of the E-mails is to give us the timeframe --
11:27:15  4      THE WITNESS:  Yes.
11:27:19  5      MR. ROBINSON:  -- when he allegedly made that
11:27:21  6  statement?
11:27:21  7      THE WITNESS:  Yes, it was during the meeting
11:27:23  8  I had with him to talk about IRB issues and changing the
11:27:27  9  order of the PI on the IRBs.
11:27:32 10      MR. ROBINSON:  All right, Ashley, are those
11:27:34 11  E-mails within that group that you just sent us the other
11:27:38 12  day?
11:27:39 13      MS. LEONARD:  Yes.
11:27:41 14      MR. ROBINSON:  Okay.
11:27:41 15  BY MS. DONOSSO:
11:27:41 16      Q.  And do the E-mails also say do as I say or is
11:27:46 17  that also not on the E-mails?
11:27:50 18      A.  The conversation was in person.  The dates of
11:27:54 19  the conversation and my follow-up with Dr. Botkin are in
11:27:59 20  the E-mails.
11:28:00 21      Q.  Was anybody present during that conversation?
11:28:02 22      MS. LEONARD:  Objection.  Asked and answered.
11:28:05 23      MR. ROBINSON:  I didn't hear what she said.
11:28:07 24      THE WITNESS:  The meeting was alone with him
11:28:13 25  and that's why I asked for a different mentor.

---

Page 68

11:28:16  1      MR. ROBINSON:  I'm sorry.
11:28:18  2      THE WITNESS:  I asked for a different mentor.
11:28:21  3      MR. ROBINSON:  Oh, mentor.  May I ask a
11:28:53  4  clarifying question?  Did you report that conversation to
11:28:56  5  anybody?
11:28:59  6      THE WITNESS:  Yes.
11:29:00  7      MR. ROBINSON:  Who?
11:29:04  8      THE WITNESS:  Dean Li.
11:29:05  9      MR. ROBINSON:  After --
11:29:05 10      MS. LEONARD:  Jeff, you have a lot of
11:29:08 11  questions, and it's Yvette's deposition.  If she wants to
11:29:12 12  clarify, she can clarify.
11:29:15 13      MR. ROBINSON:  Okay.  I apologize.
11:29:15 14  BY MS. DONOSSO:
11:29:17 15      Q.  But you didn't meet with Dean Li until after
11:29:20 16  July of 2012?
11:29:21 17      A.  I also told my new mentor.
11:29:29 18      Q.  Who is Dr. Macintosh?
11:29:32 19      A.  Yes.
11:29:32 20      Q.  And when did you tell Dr. Macintosh?
11:29:36 21      A.  When we'd meet together and I don't have the
11:29:40 22  exact dates.
11:30:01 23      Q.  Okay.  When you met with Dean Li, however,
11:30:20 24  you were also trying to negotiate a transfer out of the
11:30:24 25  department?

---

17 (Pages 65 to 68)

Judith Zimmerman
September 16, 2015

Page 69

```
11:30:25   1        A.   I meet first with Dr. Parks over some
11:30:31   2   plagiarism issues and I believe it was May of 2012.
11:30:41   3        Q.   But you first had met with Dr. Blomgren
11:30:48   4   regarding the transfer before you met with Dean Li?
11:30:52   5        A.   I had met with Dr. Parks about the transfer.
11:30:56   6        Q.   Through Dr. Blomgren?
11:30:59   7        A.   I believe I first met with Dr. Parks.  I
11:31:02   8   think the year before I met with Dr. Parks about my
11:31:09   9   concerns and then I met again with him in May, so what I
11:31:16  10   recall is that I first met with him in 2011 about moving
11:31:23  11   my grant to a different department and then I met with
11:31:29  12   him again in May of 2012.
11:31:36  13        Q.   And what was their response about
11:31:38  14   transferring departments?
11:31:39  15        A.   If the grant was in my name, that shouldn't
11:31:43  16   be a problem.
11:31:45  17        Q.   But there was more to that.  They made you an
11:31:50  18   offer and what was the offer?
11:31:52  19        A.   What offer?
11:31:54  20        Q.   They had to take a vote before being able to
11:31:58  21   transfer departments.  They had to vote as a department
11:32:00  22   on what type of offer they could make you as far as a
11:32:04  23   professor position and what was their response to that?
11:32:09  24        A.   So who?  I'm not sure who.
11:32:11  25        Q.   Dr. Blomgren.
```

Page 70

```
11:32:13   1        A.   So I had approached him, Parks, in 2011 about
11:32:18   2   my concerns with Dr. McMahon and things that were
11:32:23   3   happening in the department and then I approached him
11:32:28   4   again in May 2012 and Blomgren said that the department
11:32:38   5   would need to approve my assistant research faculty
11:32:42   6   position.
11:32:46   7        Q.   What did they tell you when they got back to
11:32:49   8   you?
11:32:49   9        A.   That the faculty had approved my appointment.
11:32:53  10        Q.   And what were the terms of that appointment?
11:32:58  11        A.   I had to bring my grant with me.
11:33:09  12        Q.   Is that what they said?
11:33:12  13             MR. ROBINSON:  I don't want to incur the
11:33:12  14   wrath of Ashley, but the CDC grant?
11:33:14  15   BY MS. DONOSSO:
11:33:14  16        Q.   Or the URADD grant?
11:33:16  17        A.   The URADD grant is the CDC grant.
11:33:19  18             MR. ROBINSON:  So you're talking about the
11:33:23  19   CDC grant?
11:33:23  20             THE WITNESS:  I had to bring my own funding
11:33:25  21   to the department.  They didn't have money to fund my
11:33:28  22   position.
11:33:28  23             MR. ROBINSON:  I just want to make sure the
11:33:30  24   grant you're referring to is the CDC grant.
11:33:35  25             THE WITNESS:  Yes.
```

Page 71

```
11:33:35   1             MR. ROBINSON:  Okay.
11:33:35   2   (Whereupon Exhibit 78 was marked for identification.)
11:33:35   3   BY MS. DONOSSO:
11:37:25   4        Q.   This is another long thread and I apologize
11:37:28   5   about that.  Do you recognize this E-mail?
11:37:37   6        A.   Yes.
11:37:37   7        Q.   So it's an E-mail thread between you and Dr.
11:37:50   8   Michael Blomgren during the timeframe of July of 2012; is
11:37:56   9   that correct?
11:37:57  10        A.   Yes.
11:37:57  11        Q.   I'd like to draw your attention to the thread
11:38:07  12   that is marked 9942 and 9943.
11:38:16  13        A.   Okay.
11:38:16  14        Q.   And looks like it's dated May 25th, 2012, but
11:38:21  15   it's on Page 9943.  It says:  "Hi, Judy.  Sorry for the
11:38:28  16   delay in getting back to you.  We had a faculty vote to
11:38:31  17   offer you an assistant research faculty appointment."  Do
11:38:35  18   you see that?
11:38:35  19        A.   Yes.
11:38:35  20        Q.   "This is a nontenure track research position
11:38:39  21   with no implied teaching responsibilities.  This is also
11:38:42  22   soft money and would require you to fund yourself on your
11:38:46  23   grant projects."  And then it goes on to say:  "The only
11:38:50  24   departmental concern was making sure we didn't burn all
11:38:53  25   bridges with psychiatry.  Since the number of individuals
```

Page 72

```
11:38:56   1   have worked with psychiatry and hope to again in the
11:39:00   2   future, they wanted to make sure this played out in an
11:39:05   3   amicable fashion."  Do you see that?
11:39:07   4        A.   Yes.
11:39:08   5        Q.   Okay.  "I told them that was my expectation,
11:39:15   6   but, of course, I couldn't guarantee anything since we're
11:39:18   7   just starting this process.  I'm fine with the letter to
11:39:22   8   Tom Parks as you wrote it.  Do you want to send it or
11:39:26   9   should I?"  So basically it would be a nontenure
11:39:44  10   position, the way you were in psychiatry, right, as per
11:39:49  11   your offer letter, and you'd also have to come up with
11:39:52  12   your own grant money; correct?  Is that how you
11:39:58  13   understood that?
11:40:01  14        A.   It says that I would need to fund myself on
11:40:05  15   grants and contracts.
11:40:07  16        Q.   Right, because it's soft money.  What did you
11:40:09  17   understand the part about we want to make sure we don't
11:40:14  18   burn all bridges with psychiatry?  What did you
11:40:17  19   understand that to mean?
11:40:21  20        A.   That both of us wanted this to happen in as
11:40:26  21   congenial of a manner as possible.
11:40:32  22        Q.   What had been the discussions involving the
11:40:37  23   URADD and CDC grants?
11:40:39  24        A.   I don't know what the URADD grant is, so to
11:40:45  25   me, I collected all the data, I did all the research, so
```

18  (Pages 69 to 72)

Judith Zimmerman
September 16, 2015

## Page 73

11:40:50  1   to me, they were the same thing.
11:40:53  2        Q.   But you were notified in separate letters
11:40:58  3   that you were removed from this CDC grant and the URADD
11:41:02  4   directorship position, so they were separate in that
11:41:05  5   regard; correct?
11:41:08  6        A.   I don't know how.
11:41:09  7        Q.   But obviously to the university they were
11:41:11  8   because you received separate letters for that.
11:41:15  9        A.   I received separate letters.
11:41:18 10        Q.   Yes.  Do you want me to show them to you?
11:41:22 11        A.   No.
11:41:23 12        Q.   Okay.  Let me show you, for example,
11:44:22 13   beginning on Exhibit 21, this letter you were notified
11:44:31 14   that as of December 14th you were no longer the director
11:44:34 15   of the URADD program.  Do you see that?
11:44:36 16        A.   Yes.
11:44:37 17        Q.   Then through this letter, you were notified
11:44:46 18   that you were -- you're again just explicitly notified
11:44:51 19   that because now Deborah Bilder was the director, you
11:44:54 20   didn't have the right to access the data.  Do you see
11:44:58 21   that?
11:44:58 22        A.   I can read the E-mails, yes, the letters.
11:45:02 23        Q.   The letters, okay.  Then through this letter,
11:45:13 24   you were then removed from the access to complete the CDC
11:45:19 25   grants and this was subsequently in February, and this is

## Page 74

11:45:34  1   Exhibit No. 24, so obviously the university was notifying
11:45:46  2   you that you were no longer the principal investigator
11:45:49  3   for the CDC grant in a separate letter then from the
11:45:53  4   URADD one.
11:46:01  5        A.   What is the question?
11:46:03  6        Q.   Well, I asked you and you --
11:46:04  7        A.   I can read it, yes.
11:46:05  8        Q.   And you said that you didn't see the
11:46:06  9   difference, but obviously do you see that the university
11:46:09 10   saw it differently enough to send you two separate
11:46:15 11   letters for each grant?
11:46:17 12        A.   My understanding was --
11:46:17 13        Q.   Just answer my question yes or no.
11:46:17 14        A.   I don't know what your question is.
11:46:20 15        Q.   That the university saw a difference between
11:46:23 16   URADD and CDC enough to send you two separate letters to
11:46:27 17   remove you from each program?
11:46:29 18        A.   I was confused by this letter.
11:46:31 19        Q.   That's not my question.  Did they send you
11:46:33 20   two separate letters to remove you from each of the
11:46:36 21   programs?
11:46:36 22        A.   I see that they they sent me two different
11:46:39 23   letters.
11:46:39 24        Q.   Is that a yes?
11:46:41 25        A.   Yes, I see that there are two different

## Page 75

11:46:43  1   letters.
11:46:43  2        Q.   Okay, so going back to my question:  What did
11:47:00  3   Michael Blomgren -- what kind of discussions were you
11:47:05  4   having with him that he was concerned about burning
11:47:08  5   bridges with psychiatry if they brought you over to their
11:47:10  6   department?
11:47:11  7        A.   It would be very difficult for -- the grant
11:47:18  8   was a lot of money and we both wanted to be congenial.
11:47:31  9        Q.   Was there a discussion about maybe you
11:47:34 10   bringing over URADD -- I mean, you bringing CDC and
11:47:38 11   leaving URADD with the Department of Psychiatry?
11:47:41 12        A.   I'm not sure what their definition of URADD
11:47:44 13   was.  If it's the monies from the health department
11:47:46 14   contract, then there was some discussion of that.
11:47:57 15        Q.   So is the answer, yes, there was a discussion
11:48:00 16   about splitting the programs, you taking CDC and leaving
11:48:05 17   URADD with Bill?
11:48:06 18        A.   Discussions with who?
11:48:08 19        Q.   With Blomgren.
11:48:14 20        A.   I'm not sure we talked about that.  We may be
11:48:18 21   did.  I'm not sure.
11:48:19 22        Q.   Going back to Exhibit 21, that is the letter
11:48:51 23   that you received on December 13th, 2012.  Do you recall
11:49:01 24   receiving that letter?
11:49:02 25        A.   Not on that date but I recall receiving the

## Page 76

11:49:05  1   letter.
11:49:05  2        Q.   Is that the letter where you were informed
11:49:08  3   you were no longer the director of URADD?
11:49:11  4        A.   That's what it says.
11:49:12  5        Q.   Is that a true and correct copy of the letter
11:49:15  6   you received?
11:49:15  7        A.   Yes.
11:49:16  8        Q.   I'd like to show what has been previously
11:49:25  9   marked as Exhibit 22.  It's a letter dated January 3rd,
11:49:32 10   2013.  Do you recognize that document?  It is signed by
11:49:35 11   Dr. McMahon and Dr. Bilder.
11:49:39 12        A.   Yes.
11:49:40 13        Q.   That is the letter that clarifies you no
11:49:43 14   longer have authority to collect data under the URADD
11:49:50 15   program.  Do you recall receiving that letter?
11:49:52 16        A.   Yes.
11:49:52 17        Q.   And is Exhibit 24 a true and correct copy of
11:49:56 18   the letter that you received?
11:49:57 19        A.   Yes.
11:49:58 20        Q.   You earlier testified that you began having
11:50:34 21   conversations with Dr. Parks in July of 2012; is that
11:50:39 22   correct?
11:50:39 23        A.   2011.
11:50:40 24        Q.   2011.  Dr. Li, I'm sorry, you began having
11:50:46 25   conversations with Dr. Li in July of 2012; is that

19  (Pages 73 to 76)

Judith Zimmerman
September 16, 2015

Page 77

11:50:51  1  correct?
11:50:51  2      A.  I started in June to his administrative
11:50:55  3  assistant.
11:50:55  4      Q.  Yes.  Some of your discussions with Dr. Li
11:51:09  5  involved your concerns that Dr. Bakian and Dr. McMahon
11:51:15  6  and Dr. Bilder were applying -- were updating or amending
11:51:23  7  an IRB; is that correct?
11:51:25  8      A.  I sent him an E-mail outlining my concerns
11:51:33  9  about modifications to an IRB.
11:51:36 10      Q.  Okay.  Let me show what we'll now mark as
11:51:43 11  Exhibit 79.
11:51:44 12      (Whereupon Exhibit 79 was marked for identification.)
11:51:44 13  BY MS. DONOSSO:
11:53:07 14      Q.  Do you recognize this E-mail?
11:53:09 15      A.  Yes.
11:53:10 16      Q.  Okay, and there is a second page behind it,
11:53:14 17  by the way, it's kind of a complete thread.  Are these
11:53:21 18  some -- do these E-mails, are these some of the concerns
11:53:28 19  you shared with Dr. Li as well as with his administrative
11:53:34 20  assistant, Christine Lasalle, regarding Dr. McMahon's
11:53:41 21  amendments to the original IRB?
11:53:43 22      A.  I first shared these concerns with Dr. Parks
11:53:47 23  in 2011 and Dr. Botkin and with the IRB and then I met
11:53:55 24  with McMahon about separating out our research
11:53:59 25  activities, which we did in separate IRBs.

Page 78

11:54:03  1      Q.  Right, and this is where you begin alleging,
11:54:06  2  and I'll just read from the E-mail, since it speaks for
11:54:09  3  itself, that Dr. McMahon has taken portions of -- you say
11:54:13  4  my IRB and moved them under his IRB and then you asked
11:54:19  5  Dr. Li could you, please, include this as part of the
11:54:25  6  issues you're looking into as I'm very concerned about my
11:54:27  7  liability; is that correct?
11:54:28  8      A.  So what's your question?
11:54:29  9      Q.  So I'm just saying, so is this a true and
11:54:32 10  correct copy of the E-mail that you sent to Dr. Li?
11:54:34 11      A.  Yes.
11:54:34 12      Q.  Okay.  Now, in October of 2012, I'm in the
11:54:46 13  next page, Dr. Li asked you:  "I would like to resume the
11:54:58 14  conversation about a possible transfer for Judy to the
11:55:01 15  College of Health."  Do you see that?
11:55:02 16      A.  Yes.
11:55:03 17      Q.  But he said or -- yeah, that the E-mail says:
11:55:09 18  "The database will continue to be housed inside
11:55:13 19  psychiatry but will be accessible to all researchers with
11:55:19 20  the appropriate permissions.  Are each of you committed
11:55:23 21  to the shared access?  I appreciate a simple yes or no.
11:55:28 22  If both of you can commitment to this approach, then I
11:55:31 23  will arrange to get legal advice or other assistance
11:55:36 24  necessary to pursue this plan."  Do you see that question
11:55:39 25  there?

Page 79

11:55:39  1      A.  I see it.
11:55:40  2      Q.  Okay.  What was your response to that
11:55:46  3  proposal?
11:55:47  4      A.  We drafted a response to Dean Li about
11:55:54  5  privacy concerns and asked that they continue to look
11:56:05  6  into the privacy issues.
11:56:07  7      Q.  By the database, were they referring to
11:56:11  8  URADD?
11:56:12  9      A.  I don't know.
11:56:12 10      Q.  So how were you able to respond to privacy
11:56:17 11  concerns?
11:56:18 12      A.  So I had a contract with the Utah State
11:56:22 13  Office of Education that did not allow me to share URADD
11:56:27 14  data, so I don't believe I had the authority to agree to
11:56:32 15  share any data I collected, that they would have to go
11:56:34 16  back to the sources to ask for permission to share the
11:56:39 17  data.
11:56:39 18      Q.  But Bill and Debbie were on -- I mean, if
11:56:43 19  they were on those IRBs, they would all be able to use
11:56:47 20  that data.
11:56:48 21      A.  What IRB?
11:56:50 22      Q.  Okay.  You said that you had a contract with
11:56:53 23  whom?
11:56:54 24      A.  The Utah State Office of Education.
11:56:57 25      Q.  And you would be the only person who would be

Page 80

11:57:01  1  able to use this data?
11:57:02  2      A.  Yes, that we could not share identifiable
11:57:08  3  data.
11:57:08  4      Q.  But this was all de-identifiable information.
11:57:11  5      A.  The IRB was the sharing of identifiable data.
11:57:15  6      Q.  By the time the epidemiologist used this
11:57:21  7  information, there were no identifiable data.
11:57:24  8      A.  No, the IRB added -- Bill added to his IRB
11:57:29  9  that he wanted identifiable data that included -- from
11:57:33 10  the CDC grant that included school and health data that
11:57:37 11  was identifiable.  That was the concern.
11:57:44 12      Q.  Okay, so in some of his grant proposals -- so
11:57:53 13  was this a blanket statement that nobody could use this
11:57:58 14  data, only you could use this data?
11:58:01 15      A.  I was -- I had a contract and I was under
11:58:04 16  contractual arrangement with the State Office of
11:58:07 17  Education, as well as the CDC.  If a researcher wanted to
11:58:12 18  use identifiable data, they would have to go back to the
11:58:15 19  data sources for permission to use identifiable data.
11:58:18 20      Q.  And when did this contract come into play
11:58:21 21  with the Utah State Office of Education?
11:58:24 22      A.  So in 2000 -- oh, in 2009, so we had been
11:58:32 23  operating with a contract -- no, excuse me, not a
11:58:36 24  contract.  A memorandum of understanding between the
11:58:40 25  health department and the Utah State Office of Education.

20  (Pages 77 to 80)

Judith Zimmerman
September 16, 2015

Page 81

11:58:43 1 The attorney general at the Utah State Office of
11:58:48 2 Education rescinded the agreement with the health
11:58:51 3 department.
11:58:51 4     Q.   In 2008; is that correct?
11:58:54 5     A.   We'll have to look at the documents.  And
11:58:54 6 that was a violation, that that agreement was in
11:59:00 7 violation of FERPA.  The health department decided at
11:59:06 8 that point they did not want to negotiate with the State
11:59:10 9 Office of Education and they gave me approval to enter
11:59:14 10 into a contractual agreement with the State Office of
11:59:18 11 Education in order to meet FERPA requirements.
11:59:23 12     Q.   Would that only be for an individual or would
11:59:27 13 that be for an entity?  Why would a state entity only
11:59:30 14 grant an individual and not an agency the right to this
11:59:33 15 data?
11:59:33 16     A.   Because of FERPA privacy, so the data was
11:59:39 17 being collected, identifiable data was being collected on
11:59:45 18 children's education records without informed consent.
11:59:51 19     Q.   Why would a state agency limit this type of
11:59:55 20 information only to one person when it applies to
11:59:58 21 protected information?
12:00:00 22     A.   You would have to ask them.  That was my
12:00:04 23 understanding.
12:00:05 24     Q.   But that's your understanding.  You have a
12:00:07 25 copy of that contract where it says only --

Page 82

12:00:09 1     A.   I have a copy --
12:00:10 2     Q.   -- only Judy Zimmerman has the authority to
12:00:14 3 control this data?
12:00:22 4     A.   I have a contract with the State Office of
12:00:22 5 Education allowing me to collect --
12:00:22 6     Q.   So at that time --
12:00:24 7     A.   -- the grant.
12:00:25 8     Q.   -- in --
12:00:26 9         MS. LEONARD:  Will you let her finish her
12:00:28 10 answer?  You're just talking over each other.
12:00:31 11 BY MS. DONOSSO:
12:00:31 12     Q.   So at that time you're telling me that Patti
12:00:33 13 Harrington signed a contract that said the only person in
12:00:36 14 the State of Utah that can control this data is Judy
12:00:40 15 Zimmerman?  That's your testimony today?
12:00:41 16     A.   My testimony was -- my testimony is that I
12:00:45 17 was the principal investigator on a contract that I had
12:00:49 18 with the Utah State Office of Education.  I went to the
12:00:53 19 State Office of Education and asked them if I could share
12:00:57 20 the data and they said no.  That is my testimony.
12:01:04 21         MR. ROBINSON:  Is that one of the documents
12:01:08 22 that have been produced?
        23         MS. LEONARD:  I believe so.
        24         MR. ROBINSON:  In this last batch of
        25 documents or is it before?

Page 83

        1         MS. LEONARD:  No.
        2         MR. ROBINSON:  Is it one of the documents
        3 that have been marked as an exhibit?
12:01:09 4         MS. LEONARD:  I'm not sure.
12:01:09 5 BY MS. DONOSSO:
12:01:09 6     Q.   I've never seen this contract that says Patti
12:01:12 7 Harrington only gave you permission to share this very
12:01:15 8 highly protected --
12:01:19 9     A.   My contract was with Jocelyn Taylor.
12:01:21 10     Q.   Jocelyn Taylor is a program director.  She
12:01:24 11 would never have authority to give you that type of
12:01:27 12 permission.
12:01:29 13         MS. LEONARD:  Is that a question?
12:01:29 14 BY MS. DONOSSO:
12:01:31 15     Q.   Would Jocelyn Taylor be able to give you
12:01:31 16 permission to control the data for 160,000 children in
12:01:34 17 the State of Utah?  Does that make sense to you?
12:01:38 18     A.   Yes.
12:01:41 19     Q.   Okay, and so on that basis, you believe that
12:01:42 20 that that is what is allowing you to ask Dean Li to not
12:01:50 21 allow you to -- to allow you to transfer this database
12:01:56 22 with you to the Department of Health?
12:02:00 23     A.   I had sought clarification because I knew,
12:02:02 24 had reason to believe that identifiable data from my CDC
12:02:08 25 grant activity was shared without my knowledge and I'd
12:02:14

Page 84

12:02:19 1 lost the chain of custody for that data and I had
12:02:22 2 received no permission from the Utah State Office of
12:02:27 3 Education to share identifiable data with other
12:02:31 4 researchers at the University of Utah.
12:02:37 5         MR. ROBINSON:  Ashley, I know you don't want
12:02:40 6 me to ask questions but hoping to save some time.  I'm
12:02:43 7 just trying to find, get some identification information
12:02:47 8 regrading contracts so I can go find it.  Can you help?
12:02:50 9         MS. LEONARD:  Okay.
12:02:51 10         MR. ROBINSON:  Dr. Zimmerman, can you tell me
12:02:53 11 what the year of this contract was that you're talking
12:02:55 12 about?
12:02:55 13         THE WITNESS:  There were several grant awards
12:02:57 14 and they followed when Patti Harrington retracted the
12:03:03 15 contract with the health department.
12:03:03 16         MR. ROBINSON:  Oh, I'm sorry, I'm looking for
12:03:07 17 the contract that you referred to --
12:03:10 18         THE WITNESS:  It was a grant award.
12:03:10 19         MR. ROBINSON:  Wait a minute.  Let me finish,
12:03:13 20 if I could, please.  You said, if we need to look at your
12:03:19 21 testimony, we can, you said you had a contract with the
12:03:22 22 Utah State Office of Education and you claim that that
12:03:27 23 contract allowed you and only you to access the data in
12:03:32 24 the URADD database.  What contract is that?  Can you tell
12:03:36 25 me what that is, so I can go find it?

21 (Pages 81 to 84)

Judith Zimmerman
September 16, 2015

Page 85

12:03:39  1          THE WITNESS:  There is a C20 I think is the
12:03:42  2   term on it.
12:03:43  3          MR. ROBINSON:  C20.
12:03:44  4          THE WITNESS:  Grant award.
12:03:45  5          MR. ROBINSON:  C20 grant award, and what year
12:03:49  6   are we talking about?
12:03:50  7          THE WITNESS:  It followed after Patti
12:03:52  8   Harrington retracted, rescinded the MOA with the Utah
12:03:58  9   Department of Health.
12:03:58 10   BY MS. DONOSSO:
12:03:59 11     Q.   So that MOA was in 2008 and then -- that is
12:04:03 12   correct, I just saw this document yesterday.
12:04:06 13     A.   Uh-huh.  Uh-huh.  Uh-huh.
12:04:07 14     Q.    -- as I was preparing for this, and then
12:04:09 15   thereafter Carol Leer was involved; is that correct?  Do
12:04:12 16   you recognize that name?
12:04:14 17     A.   Yes.
12:04:14 18     Q.   And then after that there was just a simple
12:04:17 19   letter that was sent out that said with these parameters
12:04:22 20   and it was like -- it was a list, now we feel comfortable
12:04:25 21   with you guys using this data.  Is that what you're
12:04:29 22   talking about?  There was like a letter sent, kind of
12:04:31 23   like an MOA that just kind of listed it out, but it was
12:04:35 24   not a contract between you and anybody.  It was just like
12:04:38 25   a letter.

Page 86

12:04:39  1     A.   It was a grant award that I was listed as the
12:04:42  2   PI.  It went through the Office of Sponsored Projects.
12:04:46  3     Q.   So that's different.  If it went through the
12:04:49  4   Office of Sponsored Projects, it didn't come from the
12:04:53  5   Utah State Office of Education then.
12:04:55  6     A.   Let me -- let me see if I can clarify.
12:04:56  7          MR. ROBINSON:  Was it a CDC grant award?
12:04:59  8          THE WITNESS:  Let me see if I can clarify for
12:05:00  9   you.  So the CDC, so we collected identifiable health and
12:05:06 10   education data.
12:05:07 11   BY MS. DONOSSO:
12:05:07 12     Q.   Okay.  You're confusing the issue.  Let's --
12:05:10 13   let's --
12:05:10 14          MS. LEONARD:  She's trying to clarifying.
12:05:10 15   BY MS. DONOSSO:
12:05:12 16     Q.   Because you just told me that you felt that
12:05:14 17   the Utah State Office of Education gave you the
12:05:18 18   jurisdiction or authority and only you to have access to
12:05:23 19   this data.
12:05:24 20          MR. ROBINSON:  You called it a contract.
12:05:25 21   BY MS. DONOSSO:
12:05:25 22     Q.   You called it a contract, so we need to go
12:05:28 23   find this contract.
12:05:29 24     A.   You know, I'm not sure in terms of the legal
12:05:32 25   terms that you want to use for this.

Page 87

12:05:34  1     Q.   And usually the Utah State Office of
12:05:40  2   Education only uses MOUs or MOAs.
12:05:42  3     A.   It was -- I was paid -- so the CDC, so there
12:05:45  4   was a position statement from the US Department of
12:05:49  5   Education that the MOAs were not in compliance with FERPA
12:05:56  6   that education departments were using to do CDC
12:06:00  7   surveillance activities, so they advised people to do a
12:06:07  8   contract and pay the person to do it.  So whether you
12:06:13  9   want to call it a grant award or contract, that was how I
12:06:17 10   got the authority to collect the data, school data, and
12:06:22 11   the health department made a decision not to be involved
12:06:26 12   in that and that they would only request back from me
12:06:30 13   health data.
12:06:32 14          MR. ROBINSON:  So all I want to know is the
12:06:34 15   document.  Can you identify the document on which you
12:06:36 16   relied?
12:06:37 17          THE WITNESS:  I will -- we can give you the
12:06:41 18   discovery items that we've provided to you.
12:06:45 19          MR. ROBINSON:  Well, that doesn't help me.
12:06:49 20          Ashley, can you provide us with a Bates
12:06:51 21   number or something that identifies the document that she
12:06:54 22   relies on for this concept that she and only she can have
12:06:57 23   access to the URADD data?
12:06:59 24          MS. LEONARD:  We can go back and look through
12:07:02 25   our list but I can't do that right now.

Page 88

12:07:05  1          MR. ROBINSON:  During the lunch break?
12:07:10  2          MS. LEONARD:  I don't have my computer with
12:07:11  3   me.
12:07:11  4          THE WITNESS:  I was following the directions
12:07:14  5   that the Utah State Office of Education gave me to allow
12:07:22  6   us -- them to continue to collect data for the CDC grant.
12:07:27  7          MR. ROBINSON:  So you believe this document
12:07:30  8   that she's referring to is within the initial disclosure
12:07:32  9   documents that were produced?
12:07:33 10          MS. LEONARD:  Yes.
12:07:34 11          MR. ROBINSON:  Okay.  Very good.  Are we
12:07:39 12   going to take a lunch?
12:07:41 13          MS. DONOSSO:  We are.
12:07:41 14     Q.   We're going to take a lunch and I'm going to
12:07:44 15   go pull that document that says -- I mean, after the USOE
12:07:47 16   said we have issues with your data, then they sent a
12:07:51 17   letter back saying we feel -- you sent them a letter
12:07:54 18   saying -- let me clarify this, you then sent them a
12:07:57 19   letter saying I think if I do this, this will address
12:08:01 20   your concerns and then they sent a letter back saying,
12:08:04 21   yes, we think that if this is done, this will address
12:08:06 22   everything.
12:08:06 23     A.   They directed how it was to be handled, their
12:08:09 24   lawyers at the Utah State office.
12:08:11 25     Q.   And that final document, you believe that

Alpine Court Reporting
801-691-1000

Judith Zimmerman
September 16, 2015

Page 89

12:08:13  1   final document is what gives you the authority to do that
12:08:16  2   once all of those drafts back and forth went through, you
12:08:20  3   believe that's what gives you the authority to do that?
12:08:23  4       A.   To do what?
12:08:25  5       Q.   To be able to be the person who gathers and
12:08:30  6   collects data.
12:08:33  7       A.   Yes.
12:08:33  8           MR. ROBINSON:  And nobody else can have
12:08:33  9   access to it but you?
12:08:34  10          THE WITNESS:  According to the CDC
12:08:36  11  guidelines, I can't share.
12:08:37  12          MR. ROBINSON:  I just want to know what
12:08:39  13  document you're lying on for that proposition.
12:08:40  14  BY MS. DONOSSO:
12:08:40  15      Q.   Because Utah State Office of Education is
12:08:42  16  very different than CDC.  They're separate entities.  Do
12:08:47  17  you agree with that?
12:08:49  18          MS. LEONARD:  She realizes that.
12:08:51  19          THE WITNESS:  I realize that.
12:08:52  20  BY MS. DONOSSO:
12:08:52  21      Q.   Okay.
12:08:54  22      A.   That -- that is the crux of my questions to
12:08:56  23  the privacy office.
12:08:59  24      Q.   Okay.  We'll take a lunch break and go look
12:09:07  25  for that document.

Page 90

12:09:08  1           MS. LEONARD:  What time do you want to be
12:09:10  2   back?
12:09:11  3           MS. DONOSSO:  Maybe 1:00.
12:09:19  4           (Whereupon a recess was taken.)
12:09:19  5   BY MS. DONOSSO:
13:11:00  6       Q.   Okay.  Prior to the break, you had testified
13:11:08  7   that in your initial disclosures you believed that you
13:11:14  8   had provided us a document that gave you authorization to
13:11:27  9   have control over the data from the Utah State Office of
13:11:40  10  Education; is that correct?
13:11:41  11      A.   Yes.
13:11:42  12      Q.   Okay, so during the break, we went through
13:11:53  13  and we found, because I want to make sure we're all on
13:12:00  14  the same page, we found the original MOU that is dated
13:12:12  15  July 1st of 2008.  We produced it in discovery.  It was
13:12:17  16  Zimmerman PRD855 through 857, so we'll go ahead and now
13:12:25  17  produce it as what will be marked as Exhibit 80.
13:12:42  18          (Whereupon Exhibit 80 was marked for identification.)
13:12:42  19  BY MS. DONOSSO:
13:12:43  20      Q.   Do you recognize that document?
13:12:44  21      A.   This is the second, not the original MOA with
13:12:48  22  the Utah Department of Health and Utah State Office of
13:12:53  23  Education.
13:12:53  24      Q.   That's correct.  The original one is dated
13:12:57  25  2004.  So that is the second one that is dated 2008;

Page 91

13:13:02  1   correct?
13:13:02  2       A.   Yes.
13:13:03  3       Q.   And then after a year later in 2009, you
13:13:07  4   received a letter signed by Dr. Patti Harrington
13:13:14  5   informing you that she regretted that she had to rescind
13:13:18  6   the MOA signed in 2008.  I will now give what we will go
13:13:37  7   ahead and mark as Exhibit No. 81.
13:13:37  8           (Whereupon Exhibit 81 was marked for identification.)
13:13:37  9   BY MS. DONOSSO:
13:13:37  10      Q.   That was also produced by us with PRD numbers
13:13:43  11  955.  Do you recognize that letter?
13:13:44  12      A.   This is a letter not to me but it's to the
13:13:47  13  health department.
13:13:48  14      Q.   Yeah, but you were --
13:13:48  15      A.   Cc'd.
13:13:48  16      Q.   -- cc'd on it at the bottom.  Is that a true
13:13:53  17  and correct copy that you received from Dr. Harrington?
13:13:56  18      A.   Yes.
13:13:56  19      Q.   Okay, and it's your testimony that sometime
13:13:59  20  thereafter you received some documentation that you
13:14:07  21  believed gave you the authority to be able to exclusively
13:14:12  22  access the data from the State Office of Education; is
13:14:17  23  that correct?
13:14:18  24      A.   I received a document that allowed us to
13:14:21  25  collect education data for grant activities from the Utah

Page 92

13:14:27  1   State Office of Education.
13:14:27  2       Q.   And you previously testified that you -- it
13:14:30  3   is your recollection that you gave me that document in
13:14:34  4   discovery; is that correct?
13:14:39  5       A.   Yeah.
13:14:40  6       Q.   Okay.  Here is what you provided to me as
13:14:46  7   part of your initial disclosures.  It was marked
13:14:52  8   Documents 1 through 55 and this is what was supplemented
13:14:56  9   to me a couple days ago.  I would now like you to go
13:15:01  10  through these binders and show me what is that
13:15:03  11  document that gives you authority to exclusively access
13:15:08  12  that information.
13:15:10  13          MS. LEONARD:  You really want her to go
13:15:13  14  through all of this?
13:15:14  15          MS. DONOSSO:  I really do want to.
13:15:17  16          MS. LEONARD:  Well, this is an exhibit book
13:15:18  17  of the exhibits that we've used so far and Documents 1
13:15:21  18  through 558, we're going to spend time to go through all
13:15:28  19  of those?
13:15:28  20          MS. DONOSSO:  Right.
13:15:29  21          THE WITNESS:  And aren't there 5,000
13:15:31  22  documents?
13:15:32  23          MS. DONOSSO:  No, there aren't.
13:15:33  24          MR. ROBINSON:  No, but these are the
13:15:35  25  documents you produced.

23  (Pages 89 to 92)

Judith Zimmerman
September 16, 2015

## Page 93

13:15:37 1    MS. DONOSSO: This is everything that you've
13:15:39 2  given me in this lawsuit.
13:15:40 3    THE WITNESS: Did you get documents from
13:15:45 4  Phoenix EEOC?
13:15:46 5    MR. ROBINSON: That doesn't matter. What you
13:15:48 6  told us earlier is that the document that you were
13:15:50 7  referring to was in these documents. We can't readily
13:15:55 8  identify what document you're referring to, so we'd like
13:15:58 9  you to identify it for us.
13:15:59 10    MS. DONOSSO: Okay. Can you track how long
13:16:05 11  it takes her to go through it? I don't want my time
13:16:07 12  to --
13:16:07 13    MS. LEONARD: No, this is your time. This is
13:16:09 14  your time.
13:16:11 15    MS. DONOSSO: No, because it is your job,
13:16:12 16  this is her lawsuit, if whatever document --
13:16:15 17    MS. LEONARD: But this is your deposition.
13:16:17 18    MS. DONOSSO: Yeah.
13:16:18 19    MS. LEONARD: You've asked her to go through
13:16:20 20  all the documents that we've produced to you. It's your
13:16:23 21  time.
13:16:24 22    MS. DONOSSO: No, absolutely not. I get to
13:16:26 23  ask her whatever questions I want.
13:16:28 24    MS. LEONARD: Right, and you've asked her to
13:16:28 25  go through all the documents that you've given here,

## Page 94

13:16:33 1  that's your question.
13:16:33 2    MR. ROBINSON: Well, we're probably not going
13:16:35 3  to agree on this point. We probably have to agree to
13:16:39 4  disagree, but if Donna will keep track of the time, how
13:16:45 5  long it takes, and then we can fight about that in court
13:16:47 6  if we need to.
13:16:48 7    MS. LEONARD: Okay.
13:17:12 8    THE WITNESS: Can I ask a question?
13:17:12 9  BY MS. DONOSSO:
13:17:14 10    Q. Sure.
13:17:15 11    A. Did the privacy office of the university, did
13:17:17 12  you ask them for documents?
13:17:19 13    MR. ROBINSON: You know what? It doesn't
13:17:21 14  matter.
13:17:21 15    THE WITNESS: Okay.
13:17:21 16    MR. ROBINSON: Because the issue is you
13:17:24 17  testified that the document to which you're referring was
13:17:28 18  produced among these documents that you're going through,
13:17:33 19  so if you can just find that document for us, we'd
13:17:57 20  appreciate it.
13:17:57 21    THE WITNESS: Are these tabbed by document?
13:17:59 22  Is each tab a separate document?
13:18:03 23    MR. ROBINSON: You mean the little yellow
13:18:06 24  tab?
13:18:07 25    THE WITNESS: Yeah.

## Page 95

13:18:08 1    MR. ROBINSON: I don't believe so.
13:18:10 2    THE WITNESS: Okay.
13:28:46 3    So here's the one from Jordan School
13:28:48 4  District, 314.
13:28:57 5  BY MS. DONOSSO:
13:28:58 6    Q. Can you show that to me? If you can also
13:29:23 7  look for that E-mail --
13:29:23 8    A. Sure.
13:29:25 9    Q. -- between you and Bill.
13:29:27 10    A. What E-mail?
13:29:28 11    Q. The one where you allegedly had the
13:29:33 12  conversation with him in April of 2011.
13:29:36 13    MS. LEONARD: That was in the new production.
13:29:42 14    MS. DONOSSO: That is in this binder.
13:29:44 15    MR. ROBINSON: Is this the document that you
13:29:46 16  believe gives you authority to exclusively access the
13:29:51 17  URADD data?
13:29:52 18    THE WITNESS: So we were required to enter
13:29:54 19  into an agreement with the State Office of Education and
13:29:57 20  one school district required us to enter into the
13:30:03 21  agreement. This is Jordan School District.
13:30:06 22    MR. ROBINSON: I know this is the Jordan
13:30:07 23  School District. Is this the document that you believe
13:30:08 24  that gives you exclusive access to URADD?
13:30:12 25    THE WITNESS: Data from Jordan is this one,

## Page 96

13:30:18 1  school data from Jordan.
13:30:18 2    MR. ROBINSON: That doesn't answer the
13:30:21 3  question.
13:30:21 4    THE WITNESS: Jordan District had a separate
13:30:23 5  agreement, separate from the Utah State Office of
13:30:27 6  Education.
13:30:28 7    MR. ROBINSON: You think this is that
13:30:28 8  document?
13:30:32 9    THE WITNESS: For Jordan School District.
13:30:32 10    MR. ROBINSON: I understand that, but you --
13:30:32 11    THE WITNESS: I'm still looking for the other
13:30:34 12  one.
13:30:34 13    MR. ROBINSON: But I'm just trying to
13:30:35 14  understand now what you believe this document does. Is
13:30:38 15  it your -- is it my understanding that your testimony is
13:30:41 16  that the document you just showed us from Jordan School
13:30:45 17  District gives you exclusive access to the information,
13:30:49 18  the data received from Jordan School District?
13:30:54 19    THE WITNESS: I would read through it.
13:30:55 20    MR. ROBINSON: Well, I'm not asking -- I can
13:30:57 21  read through it. I'm asking is it your belief that that
13:31:00 22  document gives you exclusive access to information
13:31:04 23  obtained from Jordan School District?
13:31:07 24    THE WITNESS: I believe that it does not
13:31:09 25  allow -- it prohibits me from sharing it with anyone

24  (Pages 93 to 96)

Judith Zimmerman
September 16, 2015

Page 97

| | |
|---|---|
| 13:31:13 | 1 | else. |
| 13:31:13 | 2 | MR. ROBINSON:  Okay.  That is my question. |
| 13:31:15 | 3 | THE WITNESS:  Okay.  Thank you. |
| 13:31:17 | 4 | MR. ROBINSON:  That's your answer to my |
| 13:31:19 | 5 | question, yes. |
| 13:31:24 | 6 | MS. DONOSSO:  Let me go make a copy of this |
| 13:31:27 | 7 | document. |
| 13:31:27 | 8 | MR. ROBINSON:  Do you want me to go do that? |
| 13:31:29 | 9 | MS. DONOSSO:  Okay. |
| 13:31:45 | 10 | THE WITNESS:  There is also an earlier Jordan |
| 13:31:51 | 11 | School District contract.  I'll keep looking to see if |
| 13:31:54 | 12 | that is in here as well. |
| 13:33:46 | 13 | Here's the other one from Jordan, 411. |
| 13:34:59 | 14 | Here are some E-mails between me and Jocelyn |
| 13:35:03 | 15 | Taylor, 421 and 422, 426, 437 and 439. |
| 13:38:45 | 16 | I contacted the state office to see if they |
| 13:38:51 | 17 | had approved any agreement with McMahon. |
| 13:38:57 | 18 | MR. ROBINSON:  Well, I think we're getting |
| 13:39:00 | 19 | beyond the scope of what you're supposed to be looking |
| 13:39:02 | 20 | for. |
| 13:39:03 | 21 | THE WITNESS:  Are you done?  Do you want me |
| 13:39:05 | 22 | to keep looking? |
| 13:39:07 | 23 | MR. ROBINSON:  Let's make sure you understand |
| 13:39:09 | 24 | the parameter of our inquiry, because your testimony, Dr. |
| 13:39:11 | 25 | Zimmerman, was that you had a contract and then you |

Page 98

| | |
|---|---|
| 13:39:16 | 1 | weren't sure if it was a contract but you said there was |
| 13:39:18 | 2 | a document from the Utah State Office of Education that |
| 13:39:24 | 3 | gave you exclusive authority to access the URADD data, so |
| 13:39:30 | 4 | that is the document we're asking you to look for.  Now, |
| 13:39:33 | 5 | I don't know if any -- I mean, that I've seen so far -- |
| 13:39:35 | 6 | MS. DONOSSO:  None of these are from the Utah |
| 13:39:37 | 7 | State Office of Education. |
| 13:39:37 | 8 | MR. ROBINSON:  -- these came from the Jordan |
| 13:39:40 | 9 | School District.  There's a University of Utah letter.  I |
| 13:39:43 | 10 | mean, where is the document that you claim -- |
| 13:39:47 | 11 | THE WITNESS:  Look at C20 and the agreement. |
| 13:39:51 | 12 | MR. ROBINSON:  C20. |
| 13:39:53 | 13 | THE WITNESS:  Grant award.  I had a grant |
| 13:39:55 | 14 | from education. |
| 13:39:58 | 15 | MR. ROBINSON:  I just want to know what |
| 13:39:59 | 16 | document you rely for the proposition that you have |
| 13:40:05 | 17 | exclusive authority to access the URADD data. |
| 13:40:09 | 18 | THE WITNESS:  I have just provided them to |
| 13:40:12 | 19 | you. |
| 13:40:12 | 20 | MR. ROBINSON:  So all those documents that |
| 13:40:14 | 21 | you pulled are the ones that you think do that; is that |
| 13:40:17 | 22 | correct? |
| 13:40:18 | 23 | THE WITNESS:  Yes. |
| 13:40:18 | 24 | MR. ROBINSON:  Okay, so I'll go make copies |
| 13:40:21 | 25 | of all of these and then we can mark them all as an |

Page 99

| | |
|---|---|
| 13:40:25 | 1 | exhibit and identify them for the record so we know which |
| 13:40:30 | 2 | documents we're talking about. |
| 13:40:30 | 3 | BY MS. DONOSSO: |
| 13:40:33 | 4 | Q.   You do realize the C20 is just a fund |
| 13:40:40 | 5 | approval form that is signed by Patti and it's just a |
| 13:40:45 | 6 | $10,000 award and nowhere on this document does it say |
| 13:40:52 | 7 | something to the effect of Judy Zimmerman has exclusive |
| 13:40:58 | 8 | control of the data? |
| 13:41:01 | 9 | A.   My testimony is that I could not release data |
| 13:41:05 | 10 | that I obtained unless I had approval from the data |
| 13:41:09 | 11 | source.  If Jocelyn Taylor or the state office requested |
| 13:41:14 | 12 | me to get -- give any other person the data that I |
| 13:41:19 | 13 | collected in their behalf, I would have been happy to |
| 13:41:23 | 14 | give it to them. |
| 13:41:24 | 15 | Q.   That's correct, but you say this is the |
| 13:41:26 | 16 | document that does that because it has Patti's signature |
| 13:41:27 | 17 | and Jocelyn's name on it, but this -- all that this does |
| 13:41:35 | 18 | is give you an amount or an amount of amendment of |
| 13:41:39 | 19 | $10,000 and it says objective of award four, six- and |
| 13:41:45 | 20 | eight-year-old pupils in 2006 living in Utah, and then it |
| 13:41:49 | 21 | has one through five, and it just says mean age of |
| 13:41:54 | 22 | pupils, prevalent differences, classification shifting |
| 13:41:56 | 23 | over time, autism exceptionality, proportion of pupils |
| 13:42:01 | 24 | and then it's dated May 20th of 2009.  Nowhere does it |
| 13:42:06 | 25 | say Judith Zimmerman is the only person who controls this |

Page 100

| | |
|---|---|
| 13:42:12 | 1 | data. |
| 13:42:12 | 2 | MS. LEONARD:  What is your question to that? |
| 13:42:14 | 3 | BY MS. DONOSSO: |
| 13:42:14 | 4 | Q.   How does this document give you the sole |
| 13:42:17 | 5 | authority to control that data? |
| 13:42:19 | 6 | MS. LEONARD:  And I'll object to the |
| 13:42:20 | 7 | question.  It misstates her testimony.  She's testified |
| 13:42:23 | 8 | that the collective documents that she's just provided -- |
| 13:42:27 | 9 | MS. DONOSSO:  Okay.  Let's go through the |
| 13:42:29 | 10 | next document. |
| 13:42:30 | 11 | MR. ROBINSON:  Let's get copies and mark |
| 13:42:32 | 12 | those, so they're part of the record. |
| 13:44:07 | 13 | THE WITNESS:  Can I run to the restroom? |
| 13:44:13 | 14 | MS. LEONARD:  Sure. |
| 13:44:13 | 15 | COURT REPORTER:  Go off record? |
| 13:44:15 | 16 | MS. DONOSSO:  Yeah. |
| 13:44:32 | 17 | (Whereupon a recess was taken.) |
| 13:50:25 | 18 | (Whereupon Exhibit 82 was marked for identification.) |
| 13:50:25 | 19 | MS. DONOSSO: |
| 13:50:25 | 20 | Q.   I've handed what we will now mark as Exhibit |
| 13:50:30 | 21 | No. 82.  This is a packet of documents that you have |
| 13:50:35 | 22 | taken out the binder of documents that you produced to us |
| 13:50:42 | 23 | as part of your initial disclosures and these are the |
| 13:50:48 | 24 | documents that you believe -- that you believe support |
| 13:50:57 | 25 | your notion of being the documents that show that you had |

Alpine Court Reporting
801-691-1000

Judith Zimmerman
September 16, 2015

## Page 101

13:51:03  1    authority from the Utah State Office of Education to
13:51:06  2    exclusively have exclusive authority over the URADD data;
13:51:14  3    is that correct?
13:51:15  4        A.   These are the documents that I gave to the
13:51:18  5    privacy office to seek clarification if identifiable data
13:51:24  6    that I collected from the Utah State Office of Education
13:51:28  7    and local school districts if I was allowed to do that.
13:51:33  8        Q.   Okay, so let's go through each of these
13:51:41  9    documents separately.  Let's begin with the one on top
13:51:45 10    that is dated November 9th, 2011.  Do you see that one on
13:51:51 11    top?
13:51:52 12        A.   Yes.
13:51:52 13        Q.   It is JPZ 314 through 315.
13:51:59 14        A.   Yes.
13:52:00 15        Q.   This is a letter that is signed -- actually
13:52:04 16    it's not signed by Clyde Mason.  It's signed by you and
13:52:09 17    Amy Henderson.  And it's regarding a project that
13:52:20 18    apparently was similar to a project that was conducted in
13:52:24 19    2005 and it proposes some procedural safeguards regarding
13:52:31 20    the Jordan School District, some Jordan School District
13:52:36 21    information from the Jordan School District; is that
13:52:39 22    correct?
13:52:40 23        A.   Yes.
13:52:40 24        Q.   So how do you believe that the safeguards
13:52:45 25    that are listed in this letter gives you exclusive

## Page 102

13:52:50  1    authority over the information of school children
13:52:58  2    provided by the Utah State Office of Education?
13:53:01  3        A.   Item No. 1, and will not be disclosed to any
13:53:05  4    other party and will be stripped of all and any personal
13:53:09  5    and identifiable information.
13:53:10  6        Q.   Now, this letter is addressed to Ms.
13:53:15  7    Henderson.  It's not addressed to you.  So Item No. 1,
13:53:19  8    nowhere does it say Dr. Zimmerman is the only person who
13:53:24  9    has exclusive authority over this information; is that
13:53:27 10    correct?
13:53:28 11        A.   It is saying that I can't disclose it to
13:53:31 12    another party not involved in URADD.
13:53:35 13        Q.   That is correct.  It says data obtained in
13:53:39 14    this project will be retained by URADD in compliance with
13:53:43 15    FERPA and will not be disclosed to any other party.  Now,
13:53:49 16    that would imply that anybody working in your suite, like
13:53:54 17    your abstractors, Dr. Bilder, Dr. McMahon, your
13:53:59 18    epidemiologist, anybody working in the project would have
13:54:01 19    access to this data.
13:54:02 20        A.   The only people we gave access to the data
13:54:05 21    was under minimum necessary to do their work, so if they
13:54:09 22    needed identifiable data to do their work, they had
13:54:12 23    access; if they didn't, they didn't have access.
13:54:15 24        Q.   Because you work with other people on this
13:54:17 25    project; correct?

## Page 103

13:54:22  1        A.   The CDC grant staff, yes.
13:54:24  2        Q.   And you also worked with other people on
13:54:28  3    URADD.  You were not only the URADD employee, you were
13:54:33  4    not the only person working in the URADD grant?
13:54:37  5        A.   Dr. Bilder was not working on the grant,
13:54:39  6    neither was Dr. McMahon.
13:54:42  7        Q.   Did Dr. Bakian work on the URADD grant?
13:54:45  8        A.   She did until June of 2012.
13:54:48  9        Q.   Did anybody else work under the URADD grant?
13:54:52 10        A.   The data abstractors and the project
13:54:55 11    coordinator.
13:54:56 12        Q.   So they would've had to have access; correct?
13:54:58 13        A.   They were part of the URADD project, yes.
13:55:00 14        Q.   Okay, so why would you interpret that
13:55:03 15    language to mean that only you would have access to that
13:55:07 16    information?
13:55:07 17        A.   I said the URADD project would have access to
13:55:11 18    it as related to what was necessary for them to do their
13:55:17 19    work, so, for example, a clinician reviewer would have
13:55:23 20    been part of the URADD project but would have no need to
13:55:27 21    see identifiable data, and was, therefore, not given any
13:55:30 22    access to identifiable information, so it was based on
13:55:35 23    the ability for them to do their job.
13:55:39 24        Q.   So you were not the only exclusive party who
13:55:44 25    would be able to access the data?

## Page 104

13:55:45  1        A.   The CDC grant staff had access to the data on
13:55:49  2    the basis of need to know to do their job.
13:55:53  3        Q.   So this letter does not say you're the
13:55:56  4    exclusive person authorized to work on the URADD project?
13:56:03  5        A.   My -- I don't know what you want me to say.
13:56:06  6        Q.   I just want you to answer my question.
13:56:08  7        A.   I thought I did.  The project had access, so
13:56:14  8    me alone, no; my staff, yes.
13:56:17  9        Q.   Okay.
13:56:20 10            MR. ROBINSON:  Anybody working on the URADD
13:56:22 11    project?
13:56:23 12            THE WITNESS:  If you mean the CDC grant, yes.
13:56:27 13            MR. ROBINSON:  Anybody working --
13:56:27 14            THE WITNESS:  No.
13:56:28 15            MR. ROBINSON:  -- on the URADD project had
13:56:30 16    access to the URADD data?
13:56:32 17            THE WITNESS:  No.
13:56:32 18    BY MS. DONOSSO:
13:56:36 19        Q.   Then how could they help you do their job?  I
13:56:39 20    mean, you're not an epidemiologist.  I mean, someone
13:56:44 21    would have to help you.  Amanda Bakian would have to help
13:56:47 22    you while she's working on that grant.
13:56:51 23        A.   People were given access based on their need
13:56:53 24    to do their job.
13:56:55 25        Q.   That's correct.  As long as they needed to

Judith Zimmerman
September 16, 2015

---

Page 105

13:56:56  1  assist you.
13:56:56  2      A.   So if Dr. Bakian or whatever epidemiologist I
13:57:00  3  hired had need to access identifiable data, they would be
13:57:04  4  given access to the data.  If they didn't have a need to
13:57:07  5  access the data, they weren't given access.
13:57:10  6          MR. ROBINSON:  So PIs on the project could
13:57:15  7  access the data; right?
13:57:17  8          MS. LEONARD:  Jeff, Yvette can ask clarifying
13:57:20  9  questions.  It's her deposition.
13:57:20  10         Do you have a question, Yvette?
13:57:20  11 BY MS. DONOSSO:
13:57:20  12     Q.   Can you answer that question?
13:57:21  13     A.   Can you say it again?
13:57:22  14     Q.   Yeah, so the PI on the project could access
13:57:24  15 the data?
13:57:24  16     A.   I would access it per my need.  If I didn't
13:57:28  17 need to look at identifiable data, I didn't, depending
13:57:32  18 on what function I was doing, and the files were arranged
13:57:36  19 within the partition site based on the person's function.
13:57:46  20     Q.   So the purpose of this letter was not to give
13:57:52  21 you exclusive access to the Jordan School District's
13:57:57  22 database?
13:57:58  23     A.   I believe that I did not have the authority
13:58:01  24 to release any identifiable information outside of my
13:58:06  25 staff.

---

Page 106

13:58:07  1      Q.   That wasn't my question.  My question was:
13:58:12  2  The nature of this letter was not to provide you
13:58:16  3  exclusive access to the Jordan School District's or Utah
13:58:23  4  State Office of Education's data regarding the students?
13:58:26  5      A.   Me, myself, no; project staff, yes.
13:58:29  6      Q.   Okay.  Next letter, it's dated June 1st,
13:58:41  7  2005.  It's signed by Mr. Calvin Evans.  It says: "After
13:58:51  8  carefully reviewing the URADD proposal, I'm in full
13:58:54  9  support of this research.  Jordan District is pleased to
13:58:58  10 participate in the Utah State Department of Health and
13:59:01  11 the University Department of Medicine.  We've reviewed
13:59:08  12 the procedural safeguards implemented to assure
13:59:12  13 confidentiality and compliance."  Where in this letter
13:59:17  14 does it say that you will have the exclusive authority or
13:59:23  15 jurisdiction over the data?
13:59:24  16     A.   The safeguards that we provided to them were
13:59:26  17 the CDC policies and procedures of how confidentiality
13:59:31  18 would be maintained.
13:59:31  19     Q.   That's not my question.  Where does it say
13:59:34  20 anywhere on this letter Judy Zimmerman is the only person
13:59:39  21 who can access the data or who has exclusive control of
13:59:43  22 the data?
13:59:43  23     A.   In the second paragraph, it says: "We have
13:59:45  24 reviewed the procedural safeguards implemented by the
13:59:48  25 study to ensure confidentiality and compliance with

---

Page 107

13:59:52  1  FERPA."
13:59:54  2      Q.   Does that say Judy Zimmerman is the only
13:59:58  3  person?
13:59:59  4      A.   It says CDC grant.
14:00:00  5      Q.   It doesn't say CDC grant.  Where does it say?
14:00:02  6      A.   It says the study.
14:00:03  7          MS. LEONARD:  Just answer her question.
14:00:04  8          THE WITNESS:  Sorry.  Sorry.
14:00:05  9  BY MS. DONOSSO:
14:00:05  10     Q.   It says the study.  It doesn't say the CDC
14:00:08  11 study?
14:00:09  12     A.   This was the CDC study.
14:00:12  13     Q.   Does it even mention you by name in this
14:00:15  14 letter?
14:00:16  15     A.   It's addressed to me.
14:00:19  16     Q.   I understand that, but does it say anywhere
14:00:22  17 in this letter that you have exclusive authority to only
14:00:25  18 access the data?
14:00:26  19     A.   I believe it does and that's why I asked for
14:00:29  20 clarification from the privacy office.
14:00:32  21     Q.   But under the expressed terms of this letter,
14:00:35  22 it doesn't give you any exclusive control over the data
14:00:40  23 or the study?
14:00:40  24     A.   I asked for clarification from the privacy
14:00:42  25 office if that was the case.

---

Page 108

14:00:44  1      Q.   Can you, please, just answer my question?
14:00:47  2      A.   I thought I had.
14:00:48  3      Q.   You haven't.  Where on this letter does it
14:00:50  4  say Judy Zimmerman is the only person who has exclusive
14:00:55  5  control over URADD, the CDC or the data?  Can you point
14:00:59  6  to a sentence that says that?
14:01:00  7      A.   I have already told you my answer.  I don't
14:01:04  8  have anything else to add to it.
14:01:06  9      Q.   Next document, dated June 3rd, 2005, JPZ 412
14:01:16  10 and 413.  It's a letter signed by Clyde W. Mason.  It
14:01:22  11 says: "Dear Dr. Zimmerman.  In January of 2004, you
14:01:25  12 submitted a request to conduct a research project in the
14:01:28  13 Jordan School District concerning the Utah Registry of
14:01:32  14 Autism and Development."  Do you see that?
14:01:34  15     A.   Uh-huh.
14:01:35  16     Q.   And then it says that the school district had
14:01:38  17 some FERPA concerns and then it goes on to say that it's
14:01:41  18 his understanding that certain procedural safeguards have
14:01:45  19 been implemented, and then it goes on to list the FERPA
14:01:49  20 compliance concerns, one through five.  Do you see that?
14:01:51  21     A.   Uh-huh, yes.
14:01:52  22     Q.   Okay, and then in the second page it says:
14:01:57  23 "With these safeguards in place, our concerns regarding
14:02:00  24 FERPA have been addressed," etc., etc., "we're confident
14:02:04  25 the data generated will be valuable," da, da, da, da,

---

Alpine Court Reporting
801-691-1000

Judith Zimmerman
September 16, 2015

## Page 109

14:02:08  1   "thank you for your interest." Where in this letter does
14:02:11  2   it say something to the effect of Judy Zimmerman is the
14:02:15  3   only person who has the exclusive control or jurisdiction
14:02:18  4   over URADD or the database?
14:02:20  5       A.  So I sought legal clarification from Lyle
14:02:26  6   Odendahl in 2006, 2007, and the health department gave a
14:02:31  7   legal opinion that we did not have the authority to
14:02:35  8   release any data to the CDC, including deidentified data,
14:02:40  9   because of this agreement.
14:02:41 10       Q.  Okay. That's not my question, ma'am. Where
14:02:44 11   in this letter does it say that you are the only person
14:02:47 12   who is authorized to have control over URADD or over the
14:02:51 13   registry or over the database or over the data?
14:02:58 14       MS. LEONARD:  Objection.  Asked and answered.
14:03:00 15   She's testified multiple times that she and her staff
14:03:05 16   were the only ones who had access to the CDC data.
14:03:09 17       You can answer.
14:03:10 18       THE WITNESS:  Yes.
14:03:12 19       MR. ROBINSON:  Yes, what?
14:03:13 20   BY MS. DONOSSO:
14:03:14 21       Q.  Yes, what?
14:03:14 22       A.  Yes, my staff and I were the only ones that
14:03:18 23   had access to that data.  That was my understanding.
14:03:20 24       MR. ROBINSON:  That doesn't answer the
14:03:22 25   question.

## Page 110

14:03:23  1       THE WITNESS:  I'm sorry.
14:03:23  2   BY MS. DONOSSO:
14:03:24  3       Q.  You've told me that these are the documents
14:03:27  4   that you believed give you the authority to have access
14:03:32  5   to the data.
14:03:33  6       A.  And I have indicated that I sought legal
14:03:36  7   counsel.
14:03:36  8       Q.  And you then used these documents to go file
14:03:39  9   complaints with the IRB because you felt that this is
14:03:42 10   what gave you the authority to do that, and I'm asking
14:03:45 11   you where on these documents it states that you're the
14:03:50 12   person who is authorized to do that?
14:03:52 13       A.  Because I received the authorization from the
14:03:55 14   district as a grantee to do the study.
14:03:59 15       Q.  Okay, so show me where these documents say
14:04:02 16   that.
14:04:05 17       MR. ROBINSON:  Your counsel can't answer the
14:04:07 18   question for you, Dr. Zimmerman.  You need to answer it
14:04:10 19   yourself.
14:04:10 20       THE WITNESS:  I'm not sure I understand your
14:04:14 21   question.  I've answered the best I can.
14:04:14 22   BY MS. DONOSSO:
14:04:14 23       Q.  Are there other documents besides these
14:04:16 24   documents that show that?
14:04:17 25       A.  I'm sure the State Office of Education has

## Page 111

14:04:20  1   records regarding these contracts and agreements.
14:04:24  2       Q.  Then why haven't you provided those to us
14:04:27  3   during discovery, if they exist?
14:04:28  4       A.  Because I don't have access to them.  The
14:04:31  5   Utah State Office of Education would.
14:04:34  6       Q.  Then why hasn't your counsel requested them
14:04:37  7   during this lawsuit?  She can access them through GRAMA.
14:04:42  8   She can access them through any other means.
14:04:47  9       MS. LEONARD:  It would be speculation on
14:04:49 10   Judy's part why I didn't do something.
14:04:49 11   BY MS. DONOSSO:
14:04:52 12       Q.  Okay.  Are these -- let's continue through
14:04:54 13   these.  These are the only documents that you found in
14:04:57 14   that binder that you've produced that you believe gave
14:04:59 15   you the authority; is that correct?
14:05:01 16       A.  So far, yes.
14:05:02 17       Q.  Okay.
14:05:03 18       MR. ROBINSON:  So far?
14:05:05 19       THE WITNESS:  I finished.  I didn't go
14:05:07 20   through the rest.  I stopped when I found these.
14:05:10 21       MS. LEONARD:  She went through that binder.
14:05:12 22       MR. ROBINSON:  She went through this binder?
14:05:15 23       MS. LEONARD:  Yes.
14:05:15 24       MR. ROBINSON:  And earlier you told us that
14:05:17 25   the document was in that binder.

## Page 112

14:05:17  1       MS. LEONARD:  I don't know what this binder
14:05:17  2   is.
14:05:19  3       MR. ROBINSON:  Those are the supplemental
14:05:21  4   documents that were produced just this week.
14:05:23  5       MS. DONOSSO:  Are there any more in the
14:05:29  6   supplemental binder that we should let her review after
14:05:33  7   I'm done with these?
14:05:33  8       MS. LEONARD:  I don't think so.  I don't
14:05:34  9   know.  There are over 400 documents in there.  I don't
14:05:35 10   know.
14:05:35 11       MR. ROBINSON:  Okay.  Well, earlier before we
14:05:37 12   took lunch, we asked if the contract was in the documents
14:05:44 13   that you originally produced or the supplemental and you
14:05:48 14   told us the original ones.
14:05:50 15       MS. LEONARD:  Yes.
14:05:50 16       MR. ROBINSON:  Okay, so the original ones are
14:05:52 17   in this binder that you just went through, so you found
14:05:53 18   everything in this binder that you thought applied; is
14:05:56 19   that correct?
14:05:57 20       THE WITNESS:  Let me look through these
14:06:00 21   again.  That were in my possession, yes.
14:06:07 22       MR. ROBINSON:  I understand that.  So the
14:06:13 23   answer is yes?
14:06:14 24       MS. DONOSSO:  We can proceed?
14:06:29 25       THE WITNESS:  Yes.

28  (Pages 109 to 112)

Judith Zimmerman
September 16, 2015

## Page 113

```
14:06:30   1         MR. ROBINSON:  Very good.
14:06:31   2   BY MS. DONOSSO:
14:06:32   3         Q.   Let's look at the next document.  It's dated
14:06:35   4   February 23rd, 2009.  It's actually a letter from you to
14:06:41   5   Jocelyn Taylor and you expressed your gratitude for their
14:06:49   6   support to the URADD project and you actually just kind
14:06:56   7   of give her a report of the collaboration that has
14:07:00   8   happened throughout the years and you kind of tell her
14:07:04   9   what has happened, that the code has been modified, that
14:07:07  10   you've spoken with Lyle Odendahl and Carol Leer and that
14:07:11  11   there has been a memorandum of understanding.  How does
14:07:15  12   this kind of summary of events give you exclusive
14:07:23  13   authority over URADD and over the data?
14:07:26  14         A.   The purpose of this, Jocelyn Taylor asked me
14:07:30  15   to write a letter that the lawyers could look at for the
14:07:32  16   history.  This doesn't have -- she just asked me to
14:07:35  17   provide a summary of what had happened in the past.
14:07:40  18         Q.   So this per se does not give you any legal
14:07:43  19   authority from the Utah State Office of Education?
14:07:46  20         A.   No.
14:07:47  21         Q.   Okay.
14:07:48  22         MR. ROBINSON:  That answer is yes.
14:07:50  23         THE WITNESS:  I said no.
14:07:51  24         MR. ROBINSON:  I know you said no.  I'm
14:07:54  25   sorry, but the way the question is asked the answer is
```

## Page 114

```
14:07:58   1   really yes, yes, it does not provide that authority.
14:08:05   2         THE WITNESS:  Yes.
14:08:07   3         MR. ROBINSON:  Correct?
14:08:10   4         THE WITNESS:  Yes.
14:08:10   5   BY MS. DONOSSO:
14:08:12   6         Q.   Okay.  Let's move to the following document,
14:08:14   7   which is this C20 award approval, which is dated May 20,
14:08:21   8   2009.  Do you see that?
14:08:23   9         A.   Uh-huh, yes.
14:08:24  10         Q.   Okay, so this is also monitored by Jocelyn
14:08:31  11   Taylor.  It's signed by Superintendent Patti Harrington
14:08:38  12   and it's regarding a project involving an award of
14:08:41  13   $10,000.  Do you see that?
14:08:43  14         A.   Yes.
14:08:43  15         Q.   You're cc'd on it.  Now, this goes through
14:08:50  16   and talks about the award.  It talks about the mean of
14:08:56  17   age, the prevalences, the differences, the
14:09:00  18   classification, the LEAs, but nowhere in this award does
14:09:07  19   it say something to the effect of Dr. Zimmerman will be
14:09:11  20   the only person authorized to access URADD, the database;
14:09:20  21   is that correct?
14:09:20  22         A.   Yes, but it also doesn't give me the
14:09:23  23   authority to share it with anyone outside of URADD.
14:09:30  24         Q.   But you've testified earlier that your staff
14:09:34  25   and you and anyone working with you, that is -- that
```

## Page 115

```
14:09:39   1   needs to access it can access it in order to be able to
14:09:43   2   fulfill the requirements of the grants; is that correct?
14:09:46   3         A.   Only grant staff that need to do it have the
14:09:49   4   information for their job, yes.
14:09:55   5         Q.   Okay, but -- okay.  Okay.  Next document.
14:09:58   6   This is a multipage document.  It begins on Bates No. 427
14:10:10   7   and it goes all the way to 431.  It looks like it's a
14:10:15   8   proposal to the Office of Sponsored Projects.  It is
14:10:19   9   dated originally -- yeah, it looks like originally dated
14:10:23  10   2006 but it was revised in 2009 based on the prints on
14:10:30  11   the bottom of the page.  Do you see that at the bottom?
14:10:35  12         A.   Pardon?
14:10:36  13         Q.   Based on the print down at the bottom, it
14:10:39  14   looks like it was originally dated 2006 but then it was
14:10:49  15   revised in 2009.
14:10:52  16         MR. ROBINSON:  Or was it just printed on
14:10:55  17   2009.
14:10:55  18   BY MS. DONOSSO:
14:10:57  19         Q.   Yeah, printed in 2009.
14:10:57  20         A.   I think the form was revised.  I think that
14:11:00  21   revision date is related to the form itself.
14:11:03  22         Q.   Right.  Okay, and this relates to URADD, the
14:11:13  23   Utah Registry of Autism and Developmental Disabilities.
14:11:20  24   On the second page, it lists you as the PI.  On the third
14:11:27  25   page, it also lists a total budget of $10,000, and then
```

## Page 116

```
14:11:35   1   on the final page, it lists you as the PI, and then it's
14:11:41   2   signed by Bill McMahon as the department chair on
14:11:45   3   July 29th of 2009.  Do you see that?
14:11:49   4         A.   Yes.
14:11:49   5         Q.   Now, again, like I've been asking you for
14:11:58   6   every document, where does this document state or provide
14:12:02   7   that you will have the exclusive authority over the
14:12:05   8   registry or the database?
14:12:09   9         A.   So under 7(a), it says that there is an IRB
14:12:14  10   and the IRB does not allow -- I did not believe the IRB
14:12:22  11   allowed us to share data we obtained from the grant.
14:12:25  12         Q.   It doesn't state that anywhere in this
14:12:27  13   document, however; correct?
14:12:30  14         A.   So under 7(a) it says there is an IRB, does
14:12:35  15   this project involve human subjects, attach IRB.  This
14:12:46  16   document, I'd have to read through everything, but I
14:12:49  17   don't believe -- I believe that the intent is that
14:12:52  18   disclosure is contained in the IRB itself, re-disclosure.
14:13:00  19         Q.   But on the face, on its face, this document
14:13:03  20   does not grant you exclusive authority of URADD?
14:13:08  21         A.   This document on its face --
14:13:11  22         Q.   This does not say anywhere --
14:13:13  23         A.   -- no.
14:13:14  24         Q.   -- Judy has exclusive authority over URADD or
14:13:17  25   the database?
```

29 (Pages 113 to 116)

Judith Zimmerman
September 16, 2015

### Page 117

14:13:20  1    A.   But I think on face value, it does make me
14:13:24  2  responsible to know where the data is.
14:13:26  3    Q.   But this is just a proposal.
14:13:29  4    A.   This is the grant project, so I'm responsible
14:13:33  5  for the project, and it's not good if you don't know
14:13:41  6  where the data is.
14:13:46  7    Q.   But if someone were to pick up this document,
14:13:49  8  nowhere does it say -- nowhere does this document on its
14:13:52  9  face give you exclusive authority over the data?
14:13:56  10    A.   As a principal investigator, I think it does.
14:14:01  11    Q.   That's your opinion?
14:14:02  12    A.   That is my opinion.
14:14:03  13    Q.   Okay.  Okay.  Next document, it's dated May
14:14:11  14  11th, 2010, and it has Bates JPZ 437.  It's a letter
14:14:23  15  again from Mr. Mason and it says:  "Your request to
14:14:30  16  modify your currently approved research project to allow
14:14:34  17  for a pooled data set has been approved.  We recognize
14:14:40  18  the value of the maintaining the data set," etc., etc.
14:14:45  19  "We appreciate your ongoing research."  Again, nowhere
14:14:50  20  does this give you exclusive authority over the Jordan
14:14:57  21  School District or the Utah State Office of Education or
14:15:01  22  URADD'S registry or database; is that correct?
14:15:03  23    A.   This letter gives me the authority to share
14:15:07  24  the data I collected with Jordan School District in a
14:15:11  25  deidentified data set with the CDC, so this letter tells

### Page 118

14:15:17  1  me who I can share the data with and in what form.
14:15:21  2    Q.   But it doesn't give you the exclusive
14:15:24  3  authority over the data?
14:15:28  4    A.   They have -- they're the data source and any
14:15:31  5  ability to share the data would need to go through
14:15:34  6  them.
14:15:35  7    Q.   That's correct, they're the data source, yes,
14:15:38  8  but you previously testified that these documents gave
14:15:41  9  you the exclusive authority over the data.
14:15:44  10    A.   That --
14:15:46  11          MS. LEONARD:  Misstates testimony.
14:15:47  12    You can answer.
14:15:48  13          THE WITNESS:  My -- that was why I went to
14:15:51  14  the privacy office to get clarification if I could share
14:15:55  15  the data and in what form.
14:15:55  16  BY MS. DONOSSO:
14:15:59  17    Q.   So let me ask my question again.  This letter
14:16:01  18  does not give you the exclusive authority over the data;
14:16:05  19  is that correct?
14:16:09  20    A.   I never had -- I'm not sure.  I mean, you
14:16:14  21  keep asking the same thing over and over again and my
14:16:17  22  answer is same.  They gave me access to their data to
14:16:20  23  use.  I agreed not to share it without their permission.
14:16:26  24  But does this explicitly outline every detail of that
14:16:30  25  agreement?  No.

### Page 119

14:16:31  1    Q.   Okay, and this doesn't say Judy Zimmerman is
14:16:35  2  the only person who has exclusive authority over URADD or
14:16:39  3  the data?
14:16:40  4    A.   I was the principal investigator and I was
14:16:43  5  responsible for the study, so I believed I did.  I was
14:16:47  6  responsible for it.
14:16:47  7    Q.   But this letter does not say that?
14:16:50  8    A.   I've asked to us and I give the same
14:16:54  9  answer I've said to all of your other questions.
14:16:57  10    Q.   But can you answer it in regards to this
14:16:59  11  letter?
14:16:59  12    A.   I don't have a different answer for this
14:17:02  13  letter.
14:17:05  14    Q.   Okay.  Next document.  This is Utah State
14:17:11  15  Office of Education Standard Application for Financial
14:17:13  16  Assistance.  I guess it's several pages.  Oh, it's two
14:17:22  17  pages, 439 through 440.  Were you applying on behalf of
14:17:34  18  the Department of Psychiatry?
14:17:36  19    A.   On 427?
14:17:38  20          MS. LEONARD:  439.
14:17:40  21  BY MS. DONOSSO:
14:17:40  22    Q.   439 through 440.  No, because it says Jocelyn
14:17:49  23  Taylor is your immediate supervisor.  So I guess this was
14:17:52  24  still while you were at the Department of Health?
14:17:53  25          MR. ROBINSON:  Huh-uh, I believe it's 2012.

### Page 120

14:17:53  1  BY MS. DONOSSO:
14:17:58  2    Q.   Oh, no, it is dated 2012.  So beginning the
14:18:13  3  project 2011.  How does this application for financial
14:18:17  4  assistance give you any sort of exclusive access to the
14:18:24  5  data?
14:18:26  6    A.   Because I was the principal investigator and
14:18:28  7  I was responsible for the project.
14:18:30  8    Q.   So it's your testimony that any time that you
14:18:46  9  applied for an IRB or a grant and your name was on
14:18:51  10  the application as a PI, that you felt that that was what
14:18:55  11  was giving you authority to claim access or to claim
14:19:00  12  executive right over the data?
14:19:03  13    A.   It involved multiple -- so for this specific
14:19:08  14  study, the school districts were told that their
14:19:12  15  confidentiality would be maintained as per the CDC
14:19:17  16  requirements for the cooperative agreement.
14:19:20  17    Q.   But during the period of 2011, you were
14:19:25  18  employed as research professor at the University of Utah;
14:19:30  19  is that correct?
14:19:31  20    A.   An assistant research professor, yes.
14:19:34  21    Q.   Okay, and you were attending all of these
14:19:38  22  meetings with Jocelyn, with Harper, and all these
14:19:47  23  conferences at the CDC as an assistant research professor
14:19:49  24  at the University of Utah?
14:19:50  25    A.   As I said previously, the health department

30 (Pages 117 to 120)

Judith Zimmerman
September 16, 2015

## Page 121

```
14:19:53   1    decided not to enter into any agreements with education
14:19:56   2    during this time period.
14:19:57   3         Q.   That wasn't my question.  All of these
14:20:00   4    meetings, all of these grants, in fact, the E-mail you
14:20:03   5    were using, judithzimmerman@hacutahedu, all of these
14:20:11   6    grant applications, all those proposals, all these
14:20:14   7    meetings you were doing as an employee of the University
14:20:17   8    of Utah?
14:20:17   9         A.   Yes.
14:20:17  10         Q.   Next document, and I believe this is the
14:20:17  11    final one, it's JPZ 441 through 443.  It's another
14:20:38  12    E-proposal document summary sheet and I guess it's --
14:20:43  13    it's also to the Office of Sponsored Projects, so I'll
14:20:54  14    ask you again how does this proposal give you authority
14:21:05  15    over -- I guess this is for $10,000 again.  How does this
14:21:09  16    give you exclusive authority over the registry or the
14:21:15  17    data that you were getting from any of the school
14:21:18  18    districts or from the Utah State Office of Education that
14:21:20  19    was going into the registry for URADD?
14:21:24  20         A.   As the principal investigator, I thought I
14:21:26  21    was -- I did not -- I had the authority to maintain
14:21:30  22    confidentiality.
14:21:38  23         Q.   Okay.  One last document.  I guess it's Bates
14:21:42  24    numbered JPZ 492.  Do you have that in front of you or
14:21:48  25    was that just something else that was put accidentally in
```

## Page 122

```
14:21:52   1    front of me?
14:21:53   2         MS. LEONARD:  We have it.
14:21:54   3         MR. ROBINSON:  I think it's the last page of
14:21:56   4    the exhibit.
14:21:56   5    BY MS. DONOSSO:
14:21:56   6         Q.   So this is an E-mail to Jeff Botkin, dated
14:22:01   7    December 4th, and it just says: "Just an FYI, my liaison
14:22:06   8    at the Utah State Office of Education has indicated that
14:22:08   9    they do not have a contractual agreement with Dr.
14:22:11  10    McMahon."  Do you recognize this E-mail?
14:22:13  11         A.   Uh-huh, yes.
14:22:14  12         Q.   Is it a true and correct copy of the E-mail
14:22:17  13    that you sent to Mr. Botkin on that date?
14:22:18  14         A.   Yes.
14:22:22  15         Q.   And how do you believe that this E-mail gave
14:22:23  16    you the exclusive jurisdiction over the URADD database?
14:22:30  17         A.   I contacted Jocelyn Taylor, my supervisor at
14:22:33  18    the State Office of Education, and specifically asked her
14:22:37  19    if I had the authority to share any data we collected
14:22:43  20    with outside researchers and she said no and that Dr.
14:22:48  21    McMahon had not contacted her with regard to using the
14:22:51  22    data for any studies he was interested in doing.
14:23:36  23         Q.   Previously you testified that you contacted
14:23:42  24    Dr. Li's assistant, Christine Lasalle, sometime in June
14:23:49  25    of 2012; is that correct?
```

## Page 123

```
14:23:51   1         A.   Yes.
14:23:51   2         Q.   I will now give you what we're going to mark
14:23:57   3    as Exhibit No. 83.
14:24:08   4         (Whereupon Exhibit 83 was marked for identification.)
14:24:08   5    BY MS. DONOSSO:
14:24:09   6         Q.   Do you recognize this E-mail?  And I'll let
14:24:12   7    you look at it because it's a thread as well.
14:24:29   8         A.   Yes.
14:24:30   9         Q.   Is it a true and correct copy of the E-mail
14:24:35  10    exchange that you had with Ms. Lasalle?
14:24:41  11         A.   Yes.
14:24:41  12         Q.   And during this time, you -- this is a
14:24:52  13    follow-up to the E-mail that I had shown you previously
14:24:55  14    where you had began discussing the IRB issues with Ms.
14:25:04  15    Lasalle.  I'll draw your attention to PRD 9920 --
14:25:12  16         A.   Okay.
14:25:12  17         Q.   -- at the bottom.  In August, on August 1st
14:25:14  18    of 2012, you had an exchange with Ms. Lasalle where you
14:25:20  19    say: "I'm anxious to resolve the IRB issues related to
14:25:28  20    my CDC confidentiality agreement.  I will forward that
14:25:30  21    agreement to you."  Do you see that?
14:25:31  22         A.   Yes.
14:25:32  23         Q.   Okay, and then Ms. Lasalle responds to you
14:25:37  24    and she says: "My understanding is that Dr. McMahon
14:25:41  25    wants to meet with you.  I will follow up with him to
```

## Page 124

```
14:25:43   1    confirm that he gets back to you."  Do you see that?
14:25:46   2         A.   Yes.
14:25:46   3         Q.   Okay, and then your response is: "The legal
14:25:56   4    implications are huge for me."  And you go on to say:
14:26:00   5    "My request to Mr. McMahon had been twofold, one, to
14:26:06   6    change the PI listed on IRB 00011805 from him to me as I
14:26:15   7    am the PI on the grant and over all the data sharing
14:26:18   8    agreements, and, two, to have the ability to choose my
14:26:21   9    own research staff.  My sense is he's still unwilling to
14:26:26  10    do this or he would have made these changes by now."
14:26:32  11    Now, which one is IRB 00011805?  Is that the original IRB
14:26:40  12    from 2003?
14:26:42  13         A.   Yes.
14:26:42  14         Q.   Okay.  Why would he need to change the order
14:26:51  15    of the IRB?
14:26:55  16         A.   Because on the IRB, he lists himself as --
14:26:59  17    that he's receiving funding from the CDC to do a project
14:27:05  18    which he had not.
14:27:12  19         Q.   But that's -- that's not what the E-mail
14:27:12  20    says.  The E-mail says to change the PI listed from him
14:27:16  21    to me as I am the PI on the grant.  So were you asking
14:27:20  22    him to change the order since he was listed as the first
14:27:23  23    on the PI and you as a co-PI?
14:27:29  24         A.   I'd been asking him that for years.
14:27:32  25         Q.   Why would he need to do that?
```

Alpine Court Reporting
801-691-1000

Judith Zimmerman
September 16, 2015

---

Page 125

14:27:35   1    A.   Because he didn't do the grant.
14:27:40   2    Q.   But he's been working on this project from
14:27:43   3  the very beginning; isn't that correct?
14:27:45   4    A.   Working in a very minimal sense.
14:27:52   5    Q.   So that would mean that he has been on the
14:28:05   6  original PI from the beginning?
14:28:08   7    A.   He did -- in the original -- in 2002, McMahon
14:28:14   8  helped me get into some data sources as I've previously
14:28:20   9  mentioned.  I think he looked at a total three records
14:28:28  10  and that was it.
14:28:31  11    Q.   So he is listed as the original PI on the
14:28:36  12  original IRB?
14:28:37  13    A.   At the university because I wasn't at the
14:28:42  14  university.
14:28:45  15    Q.   Okay.
14:28:49  16    A.   So I believed it was a misrepresentation that
14:28:52  17  he was a PI on a grant that he had not received, nor was
14:28:56  18  he doing any work on the grant that was listed on the
14:28:59  19  IRB.
14:29:01  20    Q.   So you don't believe that him involving
14:29:06  21  people like Carmen Pingree, Eric Fombonne, and using his
14:29:13  22  reputation to help publish articles and bring grants and
14:29:20  23  prestige to URADD is part of his work on the IRB?
14:29:23  24    A.   I saw that as less than one percent effort on
14:29:26  25  the grant.

---

Page 126

14:29:28   1    Q.   Okay, but you do understand that he's been on
14:29:44   2  the IRB from the beginning and he has made contributions
14:29:52   3  to the IRB?
14:29:53   4    A.   Perhaps minimally in 2002 to -- I would say
14:30:06   5  after 2005 he pretty much did nothing.
14:30:10   6    Q.   Isn't he a member of the oversight committee?
14:30:13   7    A.   Correct.
14:30:16   8    Q.   Doesn't he go to all of those meetings as
14:30:18   9  part of the oversight committee?
14:30:20  10    A.   The oversight committee had nothing to do
14:30:23  11  with reviewing anything related to grant research.  That
14:30:26  12  went all through the CDC.
14:30:28  13    Q.   There is a CDC component and then there is an
14:30:32  14  oversight committee component?
14:30:34  15    A.   Correct.
14:30:34  16    Q.   And everybody has to collaborate as part of
14:30:38  17  the efforts for it to work?
14:30:39  18    A.   For the CDC grant, the CDC grant had a
14:30:44  19  different review process to use and utilize CDC data.
14:30:50  20  None of that went through the oversight committee.
14:30:54  21    Q.   Okay, so, because it's your opinion that he
14:31:00  22  doesn't do as much work as you do, you felt that he
14:31:03  23  should just be taken off as the order of the IRB
14:31:09  24  position?
14:31:09  25    A.   It was as well as him saying he didn't want

---

Page 127

14:31:14   1  to -- he wanted to share -- he wanted to contact families
14:31:22   2  using the data I collected.  He wanted to share
14:31:30   3  identifiable data with the Utah population database.  He
14:31:36   4  was not having Bilder or Bakian go through the oversight
14:31:48   5  committee for approval and the Utah Department of Health,
14:31:51   6  so it was multiple reasons and because I didn't want to
14:31:57   7  be around him.
14:32:09   8    Q.   Okay, and when did these concerns regarding
14:32:15   9  Dr. McMahon, when did you begin having these concerns
14:32:18  10  regarding Dr. McMahon?
14:32:20  11    A.   Which ones?
14:32:21  12    Q.   The one about you wanting to take him off the
14:32:26  13  original IRB.
14:32:27  14    A.   Around 2010, 2011.
14:32:36  15    Q.   Okay.
14:32:37  16    A.   I didn't want to take him off.  I wanted to
14:32:40  17  reverse the order.
14:32:53  18    Q.   So was it after Dr. Bakian was hired?
14:32:58  19    A.   Actually it was before Bakian was hired.
14:33:09  20  Judith Miller had written a grant where she indicated she
14:33:14  21  wanted to contact families off birth certificate
14:33:20  22  information.  He also was wanting to contact families off
14:33:24  23  registry data.  They were wanting to take maternal blood
14:33:42  24  spots that you obtain during -- when a baby is born, they
14:33:49  25  do a heel cord stick, so there is DNA in the blood.  They

---

Page 128

14:33:56   1  wanted to link blood spots with registry data.
14:34:16   2    Q.   Do you recall writing a memo regarding some
14:34:21   3  of these concerns to Dr. Li sometime in August of 2012?
14:34:28   4    A.   I believe that specific -- I recall -- I
14:34:36   5  don't recall.  I recall contacting her.  I know I asked
14:34:41   6  her about school data, trying to get clarification about
14:34:46   7  school data.  I was more trying to get clarification from
14:34:52   8  the health department because it was birth certificate
14:34:56   9  data on normal children, not just surveillance data.
14:35:05  10    Q.   When did you contact the health department?
14:35:07  11    A.   When didn't I contact the health department?
14:35:20  12        MR. ROBINSON:  I'm sorry, I didn't understand
14:35:22  13  that.
14:35:22  14        THE WITNESS:  So -- so my liaison with the
14:35:24  15  health department originally was George Delavan and then
14:35:29  16  he retired and then it switched to Harper Randall, so
14:35:34  17  anything --
14:35:36  18        MR. ROBINSON:  Well, the question was:  When
14:35:38  19  did you contact the health department with that concern?
14:35:40  20        MS. LEONARD:  No, the question was:  When did
14:35:45  21  you contact the health department?  And her answer was:
14:35:47  22  When did I not contact the health department?
14:35:50  23        THE WITNESS:  So if there was any question
14:35:52  24  about data collected through the -- by the health
14:35:55  25  department, I would seek clarification from them as to

---

Alpine Court Reporting
801-691-1000

Judith Zimmerman
September 16, 2015

---

Page 129

```
14:36:00   1    their position on that.
14:36:05   2        MR. ROBINSON:  Maybe I misunderstood the
14:36:06   3    question.  I thought the question was:  When did you
14:36:10   4    contact the Department of Health about your concerns that
14:36:18   5    you had expressed to Dr. Li.
14:36:22   6        MS. LEONARD:  The question was not that
14:36:24   7    specific.
14:36:24   8        MR. ROBINSON:  Oh, maybe we need to read the
14:36:28   9    question.
14:36:28  10    BY MS. DONOSSO:
14:36:29  11        Q.  So let me first finish my original question
14:36:32  12    regarding Dr. Li.  Did you -- do you recall writing a
14:36:37  13    confidential memo to Dr. Li when you were seeking
14:36:41  14    assistance regarding your request to change the orders of
14:36:48  15    the PI on the IRB?
14:36:50  16        A.  Which Li?  Oh, I'm confused.  So Dean Li?
14:36:53  17        Q.  Yes, Dean Li.
14:36:54  18        A.  So I first talked to Jeff Botkin in 2011.
14:36:59  19        Q.  Right.
14:37:00  20        A.  And then I talked to him in -- I sent him
14:37:07  21    some documents, it was either the end of July or the
14:37:10  22    first part of August.  It was somewhere between June and
14:37:12  23    August.
14:37:13  24        Q.  So let's focus first on Dean Li and then
14:37:16  25    we'll get to Jeff and then we'll get to the Department of
```

Page 130

```
14:37:19   1    Health, so that we can have some order, okay.  So let me
14:37:24   2    see if I can help refresh your memory regarding this memo
14:37:29   3    to Dean Li.
14:37:29   4        (Whereupon Exhibit 84 was marked for identification.)
14:37:29   5    BY MS. DONOSSO:
14:37:55   6        Q.  Do you recall this confidential memo?
14:37:57   7        A.  Yes.
14:38:00   8        Q.  Okay.  Is it a true and correct copy of the
14:38:02   9    memo that you sent --
14:38:03  10        A.  Yes.
14:38:04  11        Q.  -- to Dean Li?
14:38:07  12        A.  Yes.
14:38:07  13        Q.  It's dated August 16th of 2012.  It
14:38:17  14    references a meeting you had on July 5th, 2012, with Dean
14:38:23  15    Li?
14:38:23  16        A.  Yes.
14:38:24  17        Q.  And in it, it outlines some concerns and some
14:38:28  18    proposed solutions you have to your concerns?
14:38:30  19        A.  Correct.
14:38:31  20        Q.  So you, again, reference the original IRB
14:38:41  21    00011805 and you mentioned that historically Dr. McMahon
14:38:46  22    has represented himself as the original PI and that you
14:38:51  23    would like that changed, that you want to be the lead PI
14:38:55  24    on the original IRB; is that correct?
14:38:58  25        A.  Correct.
```

---

Page 131

```
14:38:59   1        Q.  Okay, your second concern is that Dr. Bakian,
14:39:07   2    Dr. Bilder and Dr. McMahon have amended the IRB, the
14:39:12   3    original IRB, that they did so in June 2012, to conduct
14:39:18   4    some research with identifiable surveillance data?
14:39:23   5        A.  Yes.
14:39:24   6        Q.  And you believe that is in violation of their
14:39:26   7    confidentiality agreements and you attached that in the
14:39:29   8    back and you're concerned about that as well because you
14:39:35   9    signed some contracts with the Utah Department of Health
14:39:43  10    Office of Vital Records.  Where is that contract with the
14:39:48  11    Office of Vital Records?  Are those the documents that
14:39:50  12    we've reviewed, that we just spent a long time reviewing
14:39:53  13    today or are those different than the ones we've reviewed
14:39:58  14    today?
14:39:58  15        A.  We've not reviewed that contract specifically
14:40:00  16    today.  There are so many documents.  I believe it's in
14:40:08  17    there but I'm not sure.
14:40:09  18        Q.  So do you believe that you produced in
14:40:14  19    discovery this contract with the Office of Vital Records?
14:40:18  20        A.  I hope so.
14:40:19  21        Q.  Okay, so you believed that we've now reviewed
14:40:22  22    all of the contracts you had with the State Office of
14:40:27  23    Education, that's what we've now marked as 82 I believe?
14:40:32  24        A.  There were some other -- you know, there are
14:40:41  25    some other letters of support, contracts that the health
```

Page 132

```
14:40:44   1    department would have that they may be able to provide to
14:40:49   2    you as well.
14:40:53   3        Q.  And you have not provided those to us in
14:40:57   4    discovery?
14:40:58   5        A.  I am not sure.
14:41:01   6        Q.  And you believe that you've provided to us
14:41:06   7    the contract with the Office of Vital Records?
14:41:10   8        A.  I believe so.
14:41:12   9        Q.  Okay.  Your solution to that concern is that
14:41:19  10    you made a report, a report was made with the Office of
14:41:23  11    Privacy.  That's the report you made with Jeff Botkin; is
14:41:27  12    that correct?
14:41:28  13        A.  No, in 2011, I talked to him about changing
14:41:35  14    the order of the PI and IRB 1111805.  I attempted to meet
14:41:44  15    with Dean Li and Bill McMahon on the 16th to get
14:41:49  16    clarification could I share identifiable data with
14:42:00  17    non-grant staff.
14:42:01  18        Q.  Okay.
14:42:03  19        A.  There was also another issue, financial, that
14:42:08  20    had to do with double dipping, so Bakian had already
14:42:14  21    received funds to do this study as part of the CDC grant,
14:42:21  22    so she was taking a research project in progress with the
14:42:26  23    CDC researchers and taking it to a different group of
14:42:30  24    researchers and she had already been paid to do it, so it
14:42:35  25    created a double dipping situation for me because I'd
```

33 (Pages 129 to 132)

Judith Zimmerman
September 16, 2015

Page 133

| | |
|---|---|
| 14:42:41 | 1 | already paid her to do it and she was duplicating that |
| 14:42:44 | 2 | project with a different group of researchers and would |
| 14:42:48 | 3 | be paid separately under a different group of people and |
| 14:42:52 | 4 | she had not followed her confidentiality agreement with |
| 14:42:55 | 5 | the CDC as part of that effort, research effort. |
| 14:43:03 | 6 | Q. Okay. Now, you go on to say that if there |
| 14:43:07 | 7 | was any outside copies of the data that this be returned |
| 14:43:11 | 8 | to you and you wanted Dr. Bakian removed from any grant |
| 14:43:18 | 9 | or URADD related projects and you wanted Dr. McMahon to |
| 14:43:22 | 10 | allow you to recruit or hire basically your own |
| 14:43:26 | 11 | personnel; is that correct? |
| 14:43:27 | 12 | A. So, in my previous meeting with Dr. Li, he |
| 14:43:33 | 13 | had informed me that as the PI of the CDC grant, I had |
| 14:43:38 | 14 | the authority to choose my own staff, and as far as that |
| 14:43:44 | 15 | I gave Bakian a choice, did she want to -- which group of |
| 14:43:52 | 16 | researchers did she want to work with on this project and |
| 14:43:55 | 17 | she didn't get back to me. |
| 14:43:56 | 18 | Q. Okay, so let's talk about your meeting with |
| 14:44:37 | 19 | Jeff Botkin. |
| 14:45:33 | 20 | (Whereupon Exhibit 85 was marked for identification.) |
| 14:45:33 | 21 | BY MS. DONOSSO: |
| 14:45:55 | 22 | Q. Do you recognize this E-mail? |
| 14:45:57 | 23 | A. Yes. |
| 14:45:58 | 24 | Q. It's dated April 14th, 2011, at least the |
| 14:46:08 | 25 | bottom portion of it, and it's from you to Jeff Botkin |

Page 134

| | |
|---|---|
| 14:46:13 | 1 | and its subject is IRB 0001185. |
| 14:46:19 | 2 | MR. ROBINSON: 805. |
| 14:46:24 | 3 | BY MS. DONOSSO: |
| 14:46:24 | 4 | Q. 805, sorry. Thank you. It's states: |
| 14:46:28 | 5 | "Thanks for talking with me by phone last week." So I'm |
| 14:46:31 | 6 | assuming that you had a meeting with him the previous |
| 14:46:34 | 7 | week. Was the first time that you spoke with Jeff |
| 14:46:40 | 8 | Botkin -- is it safe to say that the first time you spoke |
| 14:46:42 | 9 | with Jeff Botkin was sometime in maybe the first week of |
| 14:46:46 | 10 | 2011 regarding IRB 00011805? |
| 14:46:53 | 11 | A. I don't believe I met with him prior to -- |
| 14:46:57 | 12 | talked with him prior to -- I may have talked to him in |
| 14:47:01 | 13 | 2010, but when the IRB renewal came up again, I contacted |
| 14:47:09 | 14 | him in April of 2011. |
| 14:47:12 | 15 | Q. Okay, and was your first contact with him by |
| 14:47:17 | 16 | phone and then you followed up with this E-mail? |
| 14:47:20 | 17 | A. Yes. |
| 14:47:20 | 18 | Q. Okay, and then the E-mail goes on to say: |
| 14:47:29 | 19 | "The IRB for the study was conducted under 00011805. Dr. |
| 14:47:36 | 20 | McMahon listed as the primary investigator with me listed |
| 14:47:42 | 21 | co-investigator." And then you mentioned it was up for |
| 14:47:43 | 22 | renewal and you say: "Several weeks ago I sent an E-mail |
| 14:47:45 | 23 | to Dr. McMahon asking him if we could switch the order on |
| 14:47:48 | 24 | the IRB with me listed first and Dr. McMahon denied my |
| 14:47:53 | 25 | request. Do you have any advice for me? Would it be |

Page 135

| | |
|---|---|
| 14:47:59 | 1 | possible for me to submit a separate IRB?" What advice |
| 14:48:04 | 2 | did he provide to you? |
| 14:48:06 | 3 | A. He denied that McMahon would do what I had |
| 14:48:14 | 4 | suggested, that he told me I had the ability to recreate |
| 14:48:17 | 5 | my own IRB for my grant, which I did. |
| 14:48:22 | 6 | Q. Did he give you any other type of advice? |
| 14:48:27 | 7 | Did he tell you that you had the option of contacting |
| 14:48:32 | 8 | anybody else? |
| 14:48:33 | 9 | A. No, nor did he disclose his relationship with |
| 14:48:36 | 10 | McMahon. |
| 14:48:37 | 11 | Q. What relationship? |
| 14:48:39 | 12 | A. He had a conflict of interest. |
| 14:48:42 | 13 | Q. And that's not my question. What |
| 14:48:45 | 14 | relationship did he have with him? |
| 14:48:46 | 15 | A. They were coauthors on manuscripts and a |
| 14:48:51 | 16 | book. |
| 14:48:51 | 17 | Q. Okay. Did he -- he or anybody in his office |
| 14:49:01 | 18 | inform you that they didn't think this was an IRB issue? |
| 14:49:07 | 19 | A. The IRB thought it was a research compliance |
| 14:49:13 | 20 | integrity issue and referred me to Botkin. |
| 14:49:17 | 21 | Q. Okay, so let me give you what we'll mark -- |
| 14:49:35 | 22 | how shortly after the April 14th E-mail did they inform |
| 14:49:41 | 23 | you it was not an IRB issue? |
| 14:49:43 | 24 | A. It was at the same time. There are some |
| 14:49:46 | 25 | E-mails between myself and a Maureen Brinkman. |

Page 136

| | |
|---|---|
| 14:50:05 | 1 | (Whereupon Exhibit 86 was marked for identification.) |
| 14:50:06 | 2 | BY MS. DONOSSO: |
| 14:50:06 | 3 | Q. Do you recognize this E-mail? |
| 14:50:13 | 4 | A. Yes. |
| 14:50:14 | 5 | Q. Is this a true and correct copy of the E-mail |
| 14:50:16 | 6 | that Ms. Maureen Brinkman sent you on or about April |
| 14:50:22 | 7 | 26th, 2011? |
| 14:50:23 | 8 | A. Yes. |
| 14:50:23 | 9 | Q. Okay, and through this E-mail she said she |
| 14:50:27 | 10 | did not believe that this was an IRB issue; is that |
| 14:50:30 | 11 | correct? |
| 14:50:31 | 12 | A. Yes. |
| 14:50:32 | 13 | Q. So other than that phone conversation that |
| 14:50:39 | 14 | you had with him and this E-mail that you sent to Dr. |
| 14:50:43 | 15 | Botkin and this follow-up E-mail with Ms. Brinkman, did |
| 14:50:53 | 16 | you, at this time in April of 2011, actually file a |
| 14:51:02 | 17 | formal complaint with Mr. Botkin regarding the IRB issue? |
| 14:51:06 | 18 | A. I thought what I had sent was a formal |
| 14:51:11 | 19 | complaint. He didn't direct me otherwise. |
| 14:51:11 | 20 | Q. So he informed -- but you didn't fill out a |
| 14:51:14 | 21 | form, you just asked for advice. You said I want a good |
| 14:51:22 | 22 | relationship, do you have any advice for me, but did you |
| 14:51:26 | 23 | actually -- |
| 14:51:28 | 24 | A. So what happened is I also talked to Richard |
| 14:51:34 | 25 | Sperry, I can't remember his official title, about it and |

Alpine Court Reporting
801-691-1000

Judith Zimmerman
September 16, 2015

| Page 137 |
|---|

```
14:51:41  1   he indicated he would assist me with filing a formal
14:51:45  2   complaint.
14:51:46  3       Q.  But that would be with Mr. Sperry's office.
14:51:48  4   In April of 2011, did you -- other than sending this
14:51:52  5   E-mail seeking advice, did you file a formal complaint
14:51:56  6   with Mr. Botkin at this time in April of 2011?
14:51:59  7       A.  I thought my complaint was very clear.  He
14:52:03  8   chose not to investigate.
14:52:05  9       MR. ROBINSON:  That doesn't answer the
14:52:06 10   question.
14:52:07 11   BY MS. DONOSSO:
14:52:07 12       Q.  That doesn't answer my question.  Did you
14:52:07 13   file an actual like a complaint form?
14:52:10 14       A.  To me this was a complaint.
14:52:12 15       Q.  Okay.
14:52:13 16       MR. ROBINSON:  So the only complaint is the
14:52:16 17   E-mail, is that correct, that you filed with --
14:52:18 18       THE WITNESS:  And I talked to him and I
14:52:21 19   talked with IRB.
14:52:22 20       MR. ROBINSON:  We're talking about just Mr.
14:52:24 21   Botkin right now, just so the record is clear.
14:52:26 22       THE WITNESS:  Uh-huh.
14:52:27 23       MR. ROBINSON:  The only communication you had
14:52:29 24   with Mr. Botkin was the phone call and this E-mail that
14:52:33 25   was marked as Exhibit 85, no other reports with Mr.
```

| Page 138 |
|---|

```
14:52:37  1   Botkin; correct?
14:52:39  2       THE WITNESS:  At that time.
14:52:40  3       MR. ROBINSON:  At that time; correct?
14:52:43  4       THE WITNESS:  At that time.
14:52:44  5       MR. ROBINSON:  Okay.  Thank you.
14:52:44  6   BY MS. DONOSSO:
14:52:46  7       Q.  Okay.  Now, let's go back and talk about the
14:52:56  8   financial issues with Amanda.  You actually asked for a
14:53:20  9   financial investigation to be conducted based on your
14:53:25 10   concerns, didn't you?
14:53:26 11       A.  No, I was surprised they did an
14:53:33 12   investigation.
14:53:34 13       Q.  Well, you accused your colleague of double
14:53:38 14   dipping.  Don't you think that that's a serious
14:53:41 15   allegation?
14:53:41 16       A.  I was trying to figure out my financial
14:53:43 17   report to the CDC in terms of time spent with Bakian, and
14:53:54 18   I was overdrawn on some accounts, so I was trying to
14:53:59 19   figure out why.
14:54:04 20       Q.  Isn't it common though that sometimes the way
14:54:07 21   grants work, depending on the cycle, sometimes it is not
14:54:12 22   uncommon to be overdrawn especially where you're working
14:54:15 23   on various different grants?
14:54:17 24       A.  It wasn't common for me.
14:54:18 25       Q.  Okay.  Did you ever receive a report on the
```

| Page 139 |
|---|

```
14:54:27  1   results of the investigation regarding the financial
14:54:31  2   situation with Amanda Bakian?
14:54:34  3       A.  I remember getting a vague response saying
14:54:39  4   that -- that the PARs been readjusted or done
14:54:54  5   differently, so when he had -- McMahon had
14:54:57  6   committed me to pay 80 percent of her salary but I could
14:55:02  7   not account for that time, nor could I account that the
14:55:09  8   work related to what she was being paid for was being
14:55:15  9   done.
14:55:31 10       (Whereupon Exhibit 87 was marked for identification.)
14:55:32 11   BY MS. DONOSSO:
14:55:32 12       Q.  I'll give you an opportunity to review what
14:55:35 13   has been marked as Exhibit 87.  Do you recognize this
14:56:05 14   document?
14:56:05 15       A.  Yes.
14:56:05 16       Q.  Okay, and it was a financial audit that was
14:56:18 17   conducted.  It was completed in 2012.  You were
14:56:29 18   interviewed as part of this financial audit; isn't that
14:56:33 19   correct?
14:56:34 20       A.  Only briefly on the phone.
14:56:37 21       Q.  Okay.
14:56:38 22       A.  Basically what I was asking for was if they
14:56:40 23   could give me an accounting of the hours charged to which
14:56:46 24   activity report because the balances weren't matching.
14:56:54 25       Q.  Well, as part of the investigation, they did
```

| Page 140 |
|---|

```
14:56:57  1   review the PAR forms for Dr. Bakian for all of 2012
14:57:05  2   because there was a dispute obviously between you and Dr.
14:57:10  3   McMahon regarding how Dr. Bakian was being paid, and
14:57:16  4   based on the review of the PARs, Marjorie Goodrich, who
14:57:23  5   was the audit manager, found that none of Dr. Bakian's
14:57:28  6   efforts was being charged to your grant, that there was a
14:57:32  7   combination of payment being charged both to Dr.
14:57:41  8   McMahon's grants and department activities around, so
14:57:42  9   they concluded that there was no misappropriation of
14:57:47 10   funds.  Do you see that at the conclusion on the second
14:57:53 11   page?
14:57:55 12       A.  I see what they wrote there, yes.
14:57:58 13       Q.  Okay.  The assistant vice president of
14:58:05 14   auditing was cc'd on this audit.  Obviously that is not
14:58:11 15   something that is taken lightly at the university.  You
14:58:20 16   obviously have a copy of this since this was your
14:58:23 17   production.  Were you satisfied with the results?
14:58:26 18       A.  No.
14:58:30 19       Q.  Why not?
14:58:31 20       A.  Because funding for my grant was being
14:58:35 21   intermingled with other funding with the finance
14:58:39 22   department, so they looked like they were McMahon's
14:58:43 23   dollars and not my dollars.
14:58:44 24       Q.  And do you have proof of that?
14:58:46 25       A.  Yes.
```

Alpine Court Reporting
801-691-1000

Judith Zimmerman
September 16, 2015

---

Page 141

| | |
|---|---|
| 14:58:47 | 1 |
| 14:58:51 | 2 |
| 14:58:54 | 3 |
| 14:58:56 | 4 |
| 14:59:02 | 5 |
| 14:59:04 | 6 |
| 14:59:08 | 7 |
| 14:59:14 | 8 |
| 14:59:16 | 9 |
| 14:59:19 | 10 |
| 14:59:21 | 11 |
| 14:59:24 | 12 |
| 14:59:30 | 13 |
| 14:59:37 | 14 |
| 14:59:37 | 15 |
| 14:59:46 | 16 |
| 14:59:51 | 17 |
| 14:59:52 | 18 |
| 14:59:53 | 19 |
| 15:01:04 | 20 |
| 15:01:06 | 21 |
| 15:01:11 | 22 |
| 15:01:17 | 23 |
| 15:01:20 | 24 |
| 15:01:20 | 25 |

Q.   And was that provided to us during discovery
or is that just your opinion?
     A.   You provided us a document of a financial
report prepared by Dan Hogge from 2011.
     Q.   Okay.
     A.   And McMahon was listing himself as the
financial person for grants that I had received and
another faculty member had received.
     Q.   And you believed that that's evidence of
misappropriation of funds?
     A.   What I'm saying is I don't know because I
didn't see her PARs and I was supposed to be supervising
her, so I don't know how the money was moved around.  I
don't know.
     Q.   Okay.  Do you recall meeting with Dr. McMahon
and Dr. Macintosh in August 2012 as part of your annual
faculty evaluations?
     A.   Yes.
     Q.   This has been previously marked as
Exhibit 38.  It was kind of the calendar of the faculty
reviews.  You may not recognize this document but maybe
you do.  Do you recall having your faculty review on
August 17th at around 1:30 p.m.?
     A.   Yes.
     Q.   And in anticipation of that meeting, do you

---

Page 142

| | |
|---|---|
| 15:01:55 | 1 |
| 15:02:01 | 2 |
| 15:02:02 | 3 |
| 15:02:02 | 4 |
| 15:02:06 | 5 |
| 15:02:06 | 6 |
| 15:02:08 | 7 |
| 15:02:13 | 8 |
| 15:02:15 | 9 |
| 15:02:19 | 10 |
| 15:02:19 | 11 |
| 15:02:22 | 12 |
| 15:02:26 | 13 |
| 15:02:27 | 14 |
| 15:02:29 | 15 |
| 15:02:31 | 16 |
| 15:02:36 | 17 |
| 15:02:41 | 18 |
| 15:02:47 | 19 |
| 15:02:49 | 20 |
| 15:02:53 | 21 |
| 15:02:54 | 22 |
| 15:03:00 | 23 |
| 15:03:05 | 24 |
| 15:03:08 | 25 |

recall preparing what has been previously marked as
Exhibit No. 37?
     A.   Yes.
     Q.   Do you recognize this document?
     A.   Yes.
     Q.   What is it?
     A.   We were required to submit our activities
from the previous year.
     Q.   And did you prepare this document?
     A.   Yes.
     Q.   Okay, and then did you submit it to someone
in anticipation of your interview on August 17th?
     A.   Yes.
     Q.   And who did you submit it to?
     A.   Barbara Young.
     Q.   Okay, and let's go through it a little bit,
so here it says -- it goes through and I guess it says
that you -- it talks about your academic achievements for
the year.  It says that you had a couple of lectures and
it lists your active grants; is that correct?
     A.   Yes.
     Q.   And so it talks about -- lists you as the
principal investigator for CDC, Centers for Disease
Control, and lists you as the principal investigator, and
then it also lists you for URADD, Utah Registry of Autism

---

Page 143

| | |
|---|---|
| 15:03:15 | 1 |
| 15:03:18 | 2 |
| 15:03:22 | 3 |
| 15:03:28 | 4 |
| 15:03:37 | 5 |
| 15:03:45 | 6 |
| 15:03:46 | 7 |
| 15:03:47 | 8 |
| 15:03:50 | 9 |
| 15:03:50 | 10 |
| 15:03:59 | 11 |
| 15:04:03 | 12 |
| 15:04:03 | 13 |
| 15:04:04 | 14 |
| 15:04:16 | 15 |
| 15:04:20 | 16 |
| 15:04:26 | 17 |
| 15:04:31 | 18 |
| 15:04:33 | 19 |
| 15:04:33 | 20 |
| 15:04:37 | 21 |
| 15:04:37 | 22 |
| 15:04:43 | 23 |
| 15:04:44 | 24 |
| 15:04:48 | 25 |

and Developmental Disabilities, and it also lists you as
the principal investigator and then it lists an active
contract for URADD as well and then it goes through and
lists one, two, three, three peer review journal
articles; is that correct?  One, two -- yeah, three.
          MR. ROBINSON:  Is that correct?
BY MS. DONOSSO:
     Q.   Is that correct?
     A.   One of them has been retracted.
     Q.   Oh, which one?
     A.   Because of errors made by Bakian, 2011.
     Q.   There are two that say 2011.
     A.   The first one.
     Q.   The first one, okay, and then it goes through
and talks about the goals for the academic year beginning
on July 1st, so is this what you used to talk about
during your meeting with Dr. Macintosh and Dr. McMahon
during your meeting on August 17th?
     A.   Yes.
     Q.   How long was your meeting that day on
August 17th?
     A.   I don't recall.  Probably at least half an
hour, 45 minutes.
     Q.   Okay.  During that meeting -- I mean, you had
met the year before.  You had this outline, but you also

---

Page 144

| | |
|---|---|
| 15:04:51 | 1 |
| 15:04:55 | 2 |
| 15:04:56 | 3 |
| 15:04:56 | 4 |
| 15:04:59 | 5 |
| 15:05:02 | 6 |
| 15:05:02 | 7 |
| 15:05:07 | 8 |
| 15:05:10 | 9 |
| 15:05:16 | 10 |
| 15:05:16 | 11 |
| 15:05:19 | 12 |
| 15:05:24 | 13 |
| 15:05:30 | 14 |
| 15:05:36 | 15 |
| 15:05:37 | 16 |
| 15:05:38 | 17 |
| 15:05:42 | 18 |
| 15:05:47 | 19 |
| 15:05:50 | 20 |
| 15:05:51 | 21 |
| 15:05:56 | 22 |
| 15:06:07 | 23 |
| 15:06:10 | 24 |
| 15:06:13 | 25 |

just met the year before and gone through that outline of
expectations?
     A.   Correct.
     Q.   Did you guys talk about that outline of
expectations and talk about any progress that had been
made?
     A.   He did not ask me about the executive
coaching.  The only question he asked -- I indicated that
I had added Eric Fombonne to the study that he required
me to add him to.
     Q.   Okay.
     A.   He asked me about Deb Bilder and helping Deb
Bilder and I said I wasn't aware of any studies Deb
Bilder was doing using URADD data.  This, that's it.
     Q.   Well, what else did you talk about during
that half hour?
     A.   These accomplishments, the grant, what we
were working on, who we'd collaborated with.
     Q.   Did you talk about the collegiality issues
and the need to --
     A.   The only thing was mentioned at all was Deb
Bilder and he seemed unaware that I had no idea what he
was talking about.
     Q.   What do you mean that he was unaware that you
didn't understand what he was talking about during that

---

Alpine Court Reporting
801-691-1000

Judith Zimmerman
September 16, 2015

15:06:15  1  meeting?
15:06:15  2      A.   He asked me if I was helping Deb Bilder and I
15:06:19  3  said I thought Deb Bilder had all the data she needed.  I
15:06:23  4  wasn't aware of any help that she needed.
15:06:27  5      Q.   Okay.  During that meeting, did you make him
15:06:30  6  aware that you had already begun conversations about
15:06:35  7  transferring to another department?
15:06:36  8      A.   He knew that when I had met with Dean Li.
15:06:42  9  We'd talked about it.
15:06:43  10     Q.   So you'd met with Dean Li the previous month.
15:06:47  11  How would he have been aware of that?
15:06:49  12     A.   How who would be aware of?
15:06:49  13     Q.   How would --
15:06:52  14     A.   We'd met the -- was it the day before?  It
15:06:53  15  was right about the same time.  He knew I wanted to leave
15:06:57  16  when we met with Dean Li.
15:06:59  17     Q.   Was he present during the meeting with Dean
15:07:02  18  Li?
15:07:02  19     A.   Yes.  Yes.
15:07:02  20     Q.   I thought you and Dean Li had met alone.
15:07:06  21     A.   The first meeting was alone.  The second
15:07:10  22  meeting was with McMahon.
15:07:12  23     Q.   Okay, and that happened before this meeting
15:07:14  24  on August 17th?
15:07:16  25     A.   Right, and I had -- after the meeting with

15:07:22  1  Dean Li and McMahon, I wasn't able to resolve the privacy
15:07:27  2  issues, so we talked about that I needed clarification
15:07:32  3  from them regarding the agreements and what data could be
15:07:35  4  shared and couldn't be shared.
15:07:37  5      Q.   Okay.
15:07:38  6      A.   So it was the day before.
15:07:47  7      Q.   Okay, and did you share any concerns that you
15:08:06  8  had or anything else with him during this annual review
15:08:14  9  meeting?
15:08:14  10     A.   I'd shared them the day before.  At the same
15:08:18  11  time -- was it the 16th?  What was the date of my meeting
15:08:21  12  with Dean Li?  I think it was the day before, wasn't it?
15:08:25  13         MR. ROBINSON:  Well, the confidential memo
15:08:27  14  was marked as Exhibit 84.
15:08:29  15  BY MS. DONOSSO:
15:08:29  16     Q.   Was dated August 16th.
15:08:30  17     A.   So Dean Li and McMahon and I met on
15:08:34  18  August 16th.
15:08:35  19         MR. ROBINSON:  After you provided the
15:08:38  20  confidential memo to Dean Li or before?
15:08:39  21         THE WITNESS:  Yes, I had asked to be able to
15:08:42  22  talk to him about the IRB issues and resolve that to find
15:08:45  23  out which data I could share, which data I couldn't, IRB
15:08:52  24  issues, and they didn't want to talk about it, and I just
15:08:58  25  said, before we move ahead, I need to get clarification

15:09:02  1  because I need to know where the data is before I leave.
15:09:02  2  BY MS. DONOSSO:
15:09:13  3      Q.   By data, you mean which one of the databases
15:09:15  4  you could take with you to the department?
15:09:16  5      A.   No, where the data had went.  I had lost the
15:09:21  6  chain of custody of the data.  So the IRB that Bilder,
15:09:31  7  McMahon and Bakian submitted indicated they were
15:09:36  8  using identifiable data from my CDC grants.  I didn't
15:09:42  9  have an IRB from the health department for Bakian and
15:09:48  10  Bilder to access identifiable data.  I had nothing from
15:09:52  11  the school district saying they could use that data, so I
15:09:56  12  had lost the chain of custody of my data.  Had I just
15:10:01  13  gotten anything from the health department or State
15:10:05  14  Office of Education or data sources saying they could
15:10:06  15  have the data, I would've gladly given it to them, but
15:10:11  16  they didn't go through the process of the health
15:10:13  17  department or contact the State Office of Education.
15:10:18  18     Q.   Okay.
15:10:29  19     A.   So my hope was that they would tell me where
15:10:32  20  the data was and that they would clarify who could have
15:10:40  21  access to identifiable data.
15:10:46  22     Q.   So your concern was that they had created an
15:11:01  23  amendment to the IRB and they were using that data under
15:11:04  24  their own research projects?
15:11:06  25     A.   So when the IRB that ends in 05 came up for

15:11:15  1  renewal, they indicated that I had given them
15:11:21  2  identifiable data that they were using to do research,
15:11:31  3  including birth certificate data and grant data from
15:11:37  4  school and health sources.  They were also indicating on
15:11:41  5  that IRB that they were receiving funding from the CDC,
15:11:47  6  and because he was not willing to switch the order on the
15:11:54  7  grant, I did my own IRB for my own grant efforts, which
15:12:01  8  was paid for by the CDC.
15:12:09  9         Also in discovery, there is an IRB that
15:12:13  10  Bilder, Bakian and McMahon created saying they were the
15:12:18  11  PIs on the CDC grant and receiving funding from the CDC.
15:12:26  12     Q.   Right.  Let's look at that.  So as a result
15:13:05  13  of your concerns, you actually ended up filing two
15:13:09  14  separate complaints with the IRB office; isn't that
15:13:14  15  correct?
15:13:15  16     A.   I sought clarification on multiple issues
15:13:21  17  with the IRB from 2011 until I left.
15:13:25  18     Q.   Okay, so let's begin with Complaint No. 1.
15:13:52  19  So let's start with the Botkin one, and then we'll work
15:13:58  20  our way through the John Stillman ones.  How is that?  So
15:14:03  21  we're on Exhibit 88?
15:14:25  22         COURT REPORTER:  Yes.
15:14:25  23         (Whereupon Exhibit 88 was marked for identification.)
15:14:26  24  BY MS. DONOSSO:
15:14:31  25     Q.   So do you recognize this document?

37 (Pages 145 to 148)

Judith Zimmerman
September 16, 2015

Page 149

```
15:14:34   1        A.   Yes.
15:14:35   2        Q.   So this is a summary of the former complaint
15:14:46   3   that you filed with Jeff Botkin on November 30th, 2012,
15:15:10   4   and it states -- it references the original IRB 00011805
15:15:23   5   and it goes on to say that Bill McMahon modified the
15:15:28   6   original IRB in June of 2012 indicating his intent to use
15:15:33   7   identifiable school and health data, i.e., maternal birth
15:15:41   8   addresses, as you have previously testified, obtained
15:15:44   9   through grant and contract activities, as you've
15:15:48  10   previously testified, this was your complaint, in this
15:15:50  11   IRB Dr. McMahon suggests that he's authorized to use this
15:15:52  12   data as he is a PI on the CDC Autism Surveillance grant,
15:15:57  13   for, which I am the PI, and implies that he has approval
15:15:59  14   to use identifiable school data, and then you go on to
15:16:04  15   say: "To my knowledge, Dr. McMahon never had a
15:16:07  16   cooperative agreement with the CDC or a contractual
15:16:11  17   agreement with education."  And by education, I'm
15:16:16  18   assuming you mean the Utah State Office of Education as
15:16:19  19   well as maybe even broader, the Jordan School District,
15:16:20  20   etc., etc.; is that correct?
15:16:21  21        A.   Yes, you know, as required by local education
15:16:26  22   authorities.
15:16:26  23        Q.   Okay.  Then you also go on to say: "Dr.
15:16:30  24   McMahon has signed a nondisclosure form in my grant
15:16:34  25   activities and has never had direct access to
```

Page 150

```
15:16:37   1   identifiable data."  You go on to say: "Based on the
15:16:43   2   contents of Dr. McMahon's IRB, I have reason to believe
15:16:47   3   that Dr. Amanda Bakian has copied my identifiable
15:16:51   4   research files without my knowledge, also in violation of
15:16:58   5   signed confidentiality and security agreements."  And
15:17:07   6   then you go on to say that Dr. McMahon abruptly stopped
15:17:12   7   your HR recruitment efforts and so you go on to explain
15:17:17   8   that you've sought the assistance of the privacy office
15:17:21   9   and Dean Li and the IRB.  So this is the complaint that
15:17:28  10   you filed with Jeffrey Botkin on November 30th, 2012.  Is
15:17:35  11   that an accurate summary?
15:17:36  12        A.   Yes.
15:17:37  13        Q.   Let me now show what was sent to you, an
15:18:38  14   E-mail.
15:18:54  15        (Whereupon Exhibit 89 was marked for identification.)
15:18:54  16   BY MS. DONOSSO:
15:19:00  17        Q.   Do you recognize this document?
15:19:01  18        A.   Yes.
15:19:02  19        Q.   Is it an E-mail from Jeff Botkin to you dated
15:19:10  20   December -- and I'm focusing on the second paragraph,
15:19:14  21   December 2nd, 2012.
15:19:15  22        A.   Yes.
15:19:16  23        Q.   And it references I guess a phone call he had
15:19:21  24   with you the previous week I'm assuming and it says: "I
15:19:26  25   have reviewed the information you provided in your
```

Page 151

```
15:19:29   1   E-mail.  It appears that both the privacy office and the
15:19:32   2   IRB have evaluated your concerns regarding HIPAA and
15:19:39   3   HITECH and have found no violations.  It is evident that
15:19:43   4   Dr. McMahon is a co-signer on the CDC privacy agreement,
15:19:48   5   so this indicates to me, as determined by the privacy
15:19:51   6   office, that Dr. McMahon is approved for access to this
15:19:55   7   data.  The other questions are whether FERPA violations
15:20:00   8   have occurred or whether there have been inappropriate
15:20:04   9   access to files in you office.  I will check with Robert
15:20:09  10   Payne."  Etc. Etc.  And then he goes on to say: "I
15:20:12  11   suspect the conclusion will be the same if Dr. McMahon is
15:20:14  12   also a co-signer on agreements regarding access to
15:20:18  13   education data.  I will forward this to general counsel
15:20:22  14   and see if I can get back to you."
15:20:28  15        And then at the top you did send him a
15:20:31  16   response telling him that you believed that the
15:20:34  17   information is incorrect.  Do you recall getting this
15:20:40  18   response from Jeff Botkin in December of 2012?
15:20:43  19        A.   Yes.
15:20:44  20        Q.   What did you do after he told you that in his
15:20:57  21   opinion there were no violations, no privacy violations?
15:21:05  22        A.   So that the letter I received from the
15:21:08  23   privacy office said they didn't look into FERPA issues,
15:21:23  24   so, and he was no longer on the grant and I still didn't
15:21:39  25   know where the data was, so we met with the health
```

Page 152

```
15:21:47   1   department on December 10th, 2012, and the health
15:21:58   2   department confronted him, McMahon, about bypassing the
15:22:04   3   oversight committee process.  I asked Rich Harwood, who
15:22:04   4   was a bureau director, I believe he was a bureau
15:22:22   5   director, if he knew where the data was, if he could just
15:22:27   6   tell me where the health department data was, and he said
15:22:28   7   I have no idea, the health department didn't set up
15:22:32   8   contracts appropriately.
15:22:35   9        MR. ROBINSON:  Did or did not?
15:22:36  10        THE WITNESS:  Did not.
15:22:38  11        MR. ROBINSON:  The health department did not
15:22:41  12   do that?  That's yes?
15:22:43  13        THE WITNESS:  Yes.  And I indicated to him
15:22:48  14   that if that -- and Harper Randall indicated she had no
15:22:54  15   idea who had access to URADD data, even though she was to
15:22:59  16   approve oversight committee approvals, so given the fact
15:23:07  17   that I didn't know where the data was, the privacy office
15:23:11  18   had not decided on the FERPA issue, Robert Payne hadn't
15:23:20  19   gotten back to me, the health department didn't know
15:23:23  20   where the data was, I contacted state IT person to let
15:23:32  21   them know that I didn't know where the data was, the
15:23:37  22   state IT person brought with him Ryan Van Fleet, who was
15:23:43  23   with the public safety office, and --
15:23:43  24   BY MS. DONOSSO:
15:23:53  25        Q.   I think you're confusing the issue.  You seem
```

38 (Pages 149 to 152)

Judith Zimmerman
September 16, 2015

Page 153

| | |
|---|---|
| 15:23:56 | 1 |
| 15:23:59 | 2 |
| 15:24:02 | 3 |
| 15:24:06 | 4 |
| 15:24:09 | 5 |
| 15:24:12 | 6 |
| 15:24:16 | 7 |
| 15:24:16 | 8 |
| 15:24:20 | 9 |
| 15:24:25 | 10 |
| 15:24:29 | 11 |
| 15:24:35 | 12 |
| 15:24:41 | 13 |
| 15:24:44 | 14 |
| 15:24:48 | 15 |
| 15:24:52 | 16 |
| 15:24:55 | 17 |
| 15:24:59 | 18 |
| 15:25:03 | 19 |
| 15:25:07 | 20 |
| 15:25:12 | 21 |
| 15:25:16 | 22 |
| 15:25:18 | 23 |
| 15:25:22 | 24 |
| 15:25:28 | 25 |

to keep alleging that the data was lost. My
understanding was that the URADD database was always
housed in a server at the University. Am I mistaken?
       A.  It was housed on a secured server that only
authorized data users could access.
       Q.  So why do you keep referring to it as being
lost?
       A.  Because my understanding was that from my
mentor that Bakian had copied it from the secured site
and put it on her own computer and was sharing it, which
was consistent with the testimony that Bilder gave, and I
had no agreements from any of the sources that gave me
permission to share that data with them.
       Q.  Bilder also testified that it wasn't being
shared. It was only being used in order to continue to
do the work related to the grants.
       A.  She wasn't on the grant, so when they took
it, they weren't on the grant.
       Q.  I guess there's a dispute of fact on that
issue, but, anyway, so, I mean, so the data -- I mean,
the data was always on the University of Utah's server.
It was never lost; is that correct?
       A.  I don't know who had the data, so the
question was where was the data and non-authorized users
had taken the data. That was the question. So I didn't

Page 154

| | |
|---|---|
| 15:25:31 | 1 |
| 15:25:33 | 2 |
| 15:25:36 | 3 |
| 15:25:38 | 4 |
| 15:25:44 | 5 |
| 15:25:45 | 6 |
| 15:25:47 | 7 |
| 15:25:47 | 8 |
| 15:25:53 | 9 |
| 15:25:54 | 10 |
| 15:25:55 | 11 |
| 15:26:00 | 12 |
| 15:26:06 | 13 |
| 15:26:10 | 14 |
| 15:26:13 | 15 |
| 15:26:15 | 16 |
| 15:26:15 | 17 |
| 15:26:17 | 18 |
| 15:26:21 | 19 |
| 15:26:28 | 20 |
| 15:26:31 | 21 |
| 15:26:32 | 22 |
| 15:26:35 | 23 |
| 15:26:38 | 24 |
| 15:26:40 | 25 |

know where the data was.
       Q.  Okay, so --
           MR. ROBINSON:  Can we just define the data?
Are we talking about all the data on the URADD database?
           THE WITNESS:  I don't know what they took.
           MR. ROBINSON:  You don't know if they took
anything?
           THE WITNESS:  I believe they did. They did
in December.
           MR. ROBINSON:  I know you believe, but you
don't know what or if they took anything?
           THE WITNESS:  From the response from the
privacy office, they indicated that he -- I was expecting
them to say here's where the data is because that was my
question, can you tell me where the data is.
           MR. ROBINSON:  And he told you that they had
authorized access to the data?
           THE WITNESS:  To HIPAA data, to the extent it
was deidentified, and they had an approved IRB saying
they were using identifiable data, so that is why I asked
privacy's help.
           MR. ROBINSON:  You still don't know today
what data? You can't identify the data for us today?
           THE WITNESS:  No, I think you would need the
privacy office to do that.

Page 155

| | |
|---|---|
| 15:26:41 | 1 |
| 15:26:45 | 2 |
| 15:26:49 | 3 |
| 15:26:50 | 4 |
| 15:26:52 | 5 |
| 15:36:27 | 6 |
| 15:36:27 | 7 |
| 15:38:20 | 8 |
| 15:38:54 | 9 |
| 15:39:01 | 10 |
| 15:39:08 | 11 |
| 15:39:13 | 12 |
| 15:39:16 | 13 |
| 15:39:19 | 14 |
| 15:39:19 | 15 |
| 15:39:28 | 16 |
| 15:39:32 | 17 |
| 15:39:38 | 18 |
| 15:39:47 | 19 |
| 15:39:51 | 20 |
| 15:39:57 | 21 |
| 15:40:19 | 22 |
| 15:40:20 | 23 |
| 15:40:20 | 24 |
| 15:40:52 | 25 |

           MR. ROBINSON:  Okay.
           THE WITNESS:  That was my question.
           MS. DONOSSO:  Okay.
           MS. LEONARD:  Can we take a short break?
           MS. DONOSSO:  Sure.
           (Whereupon a recess was taken.)
BY MS. DONOSSO:
       Q.  So let's talk now -- so on December 2nd, is
when you had that conversation, that exchange, with Jeff
Botkin regarding the status of your complaint with him;
is that correct?  In December of 2012 is when you had
that E-mail exchange with Jeff Botkin regarding the
status of your complaint with him; is that correct?
       A.  Yes.
       Q.  Do you recall when you received your
non-renewal letter from the University of Utah?
       A.  I believe it was the 14th.
       Q.  The 14th of December?
       A.  I believe that is the date. It was a day or
two after I met with the IT people.
       Q.  Let me give you what we'll now mark as
Exhibit 90.
           (Whereupon Exhibit 90 was marked for identification.)
BY MS. DONOSSO:
       Q.  Do you recognize this document?

Page 156

| | |
|---|---|
| 15:40:53 | 1 |
| 15:40:54 | 2 |
| 15:40:55 | 3 |
| 15:41:03 | 4 |
| 15:41:04 | 5 |
| 15:41:08 | 6 |
| 15:41:26 | 7 |
| 15:41:28 | 8 |
| 15:41:29 | 9 |
| 15:41:36 | 10 |
| 15:41:40 | 11 |
| 15:41:41 | 12 |
| 15:41:42 | 13 |
| 15:41:45 | 14 |
| 15:41:46 | 15 |
| 15:41:50 | 16 |
| 15:41:55 | 17 |
| 15:41:58 | 18 |
| 15:42:00 | 19 |
| 15:42:00 | 20 |
| 15:42:05 | 21 |
| 15:42:09 | 22 |
| 15:42:18 | 23 |
| 15:42:20 | 24 |
| 15:42:24 | 25 |

       A.  Yes.
       Q.  Can you tell me what it is?
       A.  I just notified Botkin that my contract
wasn't being renewed.
       Q.  Now, previously in that exhibit binder, if
you turn to Exhibit 20, do you recognize that document?
       A.  Yes.
       Q.  What is that document?
       A.  That he's not renewing my contract.
       Q.  Right, but that is your non-renewal letter;
is that correct?
       A.  Yes.
       Q.  And this document is dated December 10th,
2012; is that correct?
       A.  I did not receive it until after I met with
the privacy -- the IT people and the privacy officer.
       Q.  Right, but this document is dated
December 10th, 2012; correct?
       A.  Yes.
       Q.  And did you receive this document via mail or
hand delivery?
       A.  I think he handed it to me at the end of the
day or sort on this day.
       Q.  Okay, so according to Exhibit --
       A.  I don't remember.

39 (Pages 153 to 156)

Judith Zimmerman
September 16, 2015

---

Page 157

15:42:26  1      Q.  -- 90, so although your non-renewal letter is
15:42:29  2  dated December 10th.
15:42:29  3      A.  Right.
15:42:33  4      Q.  Okay.  According to what has now been marked
15:42:35  5  as Exhibit 90, it appears that you actually received it
15:42:39  6  and learned that you were not having your annual contract
15:42:44  7  renewed on or about December 12th --
15:42:46  8      A.  Correct.
15:42:46  9      Q.  -- of 2012; is that correct?
15:42:48  10      A.  Yes.
15:42:48  11      Q.  Okay, and was Jeff Botkin the first person
15:43:02  12  that you contacted at the time that you received your
15:43:05  13  non-renewal letter?
15:43:08  14      A.  I don't recall.
15:43:09  15      Q.  Okay.  Why was it your first instinct to
15:43:15  16  figure out how to file a retaliation complaint when you
15:43:19  17  learned of your non-renewal?
15:43:22  18      A.  I believe that I was being retaliated for
15:43:26  19  reporting privacy concerns and plagiarism.
15:43:34  20      Q.  Okay.
15:43:36  21      A.  And ethical concerns.
15:43:39  22      Q.  Let me give you what we'll now mark as
15:44:56  23  Exhibit 91.
15:44:56  24  (Whereupon Exhibit 91 was marked for identification.)
15:44:56  25  BY MS. DONOSSO:

---

Page 158

15:44:57  1      Q.  Do you recognize this document?
15:44:58  2      A.  Yes.
15:45:00  3      Q.  Can you tell me what it is?
15:45:02  4      A.  It's a complaint I filed with the privacy
15:45:06  5  office.
15:45:06  6      Q.  You mean the Office of Equal Opportunity and
15:45:11  7  Affirmative Action?
15:45:11  8      A.  Yes.
15:45:11  9      Q.  And it is dated December 14th, 2012; correct?
15:45:17  10      A.  Uh-huh, yes.
15:45:18  11      Q.  So this would have been two days after you
15:45:21  12  received your non-renewal letter; correct?
15:45:24  13      A.  Yes.
15:45:24  14      Q.  And according to this form, complaint form,
15:45:29  15  you -- your charge, your complaint form states that
15:45:35  16  you're filing a complaint for religion, sex, age,
15:45:39  17  disability and retaliation; is that correct?
15:45:42  18      A.  Yes.
15:45:43  19      Q.  And you attached a two-page, single spaced
15:45:54  20  summary of your allegations to this form; is that
15:45:58  21  correct?
15:45:58  22      A.  Yes.
15:45:59  23      Q.  And is this a true and correct copy of what
15:46:08  24  you submitted to OEO on December 14th of 2012?
15:46:15  25      A.  Yes.

---

Page 159

15:46:15  1      Q.  Previously to this date, had you filed any
15:46:24  2  complaints of discrimination during your tenure at the
15:46:28  3  university?
15:46:30  4      A.  Yes.
15:46:30  5      Q.  What complaints had you filed with the OEO
15:46:37  6  prior to December of 2012?
15:46:39  7      A.  I filed with Dean Li.
15:46:42  8      Q.  Dean Li is not with the OEO.  I'm talking
15:46:46  9  about with the OEO.
15:46:48  10      A.  This is the first one with the OEO.
15:46:52  11      Q.  Okay.  You previously testified that you
15:49:09  12  consulted regarding your concerns with the Department of
15:49:14  13  Health; is that correct?
15:49:14  14      A.  Concerns about what?
15:49:17  15      Q.  Related to privacy and URADD and the data; is
15:49:23  16  that correct?
15:49:23  17      A.  Yes.
15:49:23  18      Q.  Did you get any type of advice or
15:49:35  19  recommendations from them in regards to your questions?
15:49:44  20      A.  My understanding was that I needed written
15:49:48  21  approval from the oversight committee and the university
15:49:54  22  or the health department IRB to give any data to anyone
15:49:58  23  that I had collected under my grant.
15:50:01  24      Q.  And who gave you that understanding?
15:50:07  25      A.  Harper Randall, Marc Babitz, Lyle Odendahl,

---

Page 160

15:50:14  1  Nan Streeter.
15:50:18  2      Q.  Okay, so let me show you what we'll mark as
15:50:27  3  Exhibit No. 92.
15:51:16  4  (Whereupon Exhibit 92 was marked for identification.)
15:51:16  5  BY MS. DONOSSO:
15:51:17  6      Q.  Do you recognize this E-mail?
15:51:19  7      A.  Yes.
15:51:19  8      Q.  Okay, so this is about a week before you got
15:51:25  9  your non-renewal letter, around Thanksgiving time, and
15:51:29  10  you say to Harper:  "I just wanted to let you know the
15:51:34  11  University is still reviewing a number of questions that
15:51:35  12  I have related to privacy.  I thought it may be something
15:51:38  13  you want to know as there are papers that may come to
15:51:46  14  URADD oversight committee and perhaps other non-health
15:51:52  15  agencies process or authority independent from yours.
15:51:56  16  Thanks for your patience as I try to get clarification as
15:52:00  17  I know privacy is important to us," and then Harper
15:52:05  18  responds and says, Judy, and there is a typo here, but it
15:52:09  19  says:  "Are that you are saying no one except you should
15:52:14  20  have any access to URADD data?  How do you know that it
15:52:20  21  someone gone through the proper channel and has access to
15:52:23  22  URADD?  I do not want to obstruct others from using this
15:52:28  23  data as this is one of the functions of this registry to
15:52:32  24  foster the understanding of ASDs.  Harper."  And then you
15:52:39  25  respond:  "Sorry for the confusion.  Who has access to

---

Alpine Court Reporting
801-691-1000

Judith Zimmerman
September 16, 2015

```
15:52:42   1   URADD data?  It is up to health to decide and under what
15:52:51   2   circumstances."  Do you see that?
15:52:52   3       A.  I see it.
15:52:53   4       Q.  So if it is up to health to decide and under
15:52:57   5   what circumstances, why would you be concerned about
15:53:03   6   where the data is?
15:53:04   7       A.  Because the contract I had entered into with
15:53:08   8   vital records said that we could not share the data.
15:53:11   9       Q.  Okay.  See, you keep changing all the answers
15:53:13  10   on me.  First I asked you why you're so concerned and you
15:53:16  11   tell me because you have this contract with USOE.  Then I
15:53:20  12   asked you why you're so concerned and then you say it's
15:53:22  13   because the data is lost.  Then you tell me because
15:53:25  14   you're asking health and now you're telling me it's vital
15:53:27  15   records.  So you keep moving the ball on me and then
15:53:33  16   there is all these E-mails where you keep going to all
15:53:37  17   these people about this IRB and they keep telling you
15:53:41  18   there is no issue here because Bill is listed on this
15:53:45  19   IRB, so he can use the data as long as he's listed on the
15:53:50  20   IRB.  Are you just creating an issue where there is not
15:53:53  21   an issue, Judy?
15:53:54  22       A.  No.
15:53:55  23       Q.  Is that your opinion or is that a matter of
15:53:59  24   fact?
15:54:02  25       A.  I disagree with what you said that that no one was
```

```
15:54:07   1   concerned.
15:54:08   2       Q.  I think you were the only one who was
15:54:10   3   concerned because other people are feeling that
15:54:17   4   somehow -- I mean, Harper is saying, are you saying no
15:54:17   5   one except you should have access to URADD data, that is
15:54:22   6   pretty direct.
15:54:23   7       A.  Some of my agreements indicated I had to
15:54:26   8   destroy the data.
15:54:27   9       Q.  But do you understand that these are not your
15:54:29  10   agreements?  You're not signing the agreements on behalf
15:54:31  11   of the university.  Do you understand that?
15:54:34  12       A.  I was an employee of the university.
15:54:36  13       Q.  Correct, so you're signing those agreements
15:54:40  14   as an employee of the university, not as Judy Zimmerman.
15:54:46  15       A.  What is your question?
15:54:47  16       Q.  Do you understand that you signed those
15:54:50  17   agreements as an employee of the university, not
15:54:52  18   personally or individually?
15:55:02  19       A.  Yes.
15:55:02  20       Q.  Did anybody else ever say to you that Bill
15:55:07  21   did not have access to the URADD data?
15:55:10  22       A.  I'm not -- I don't understand the question.
15:55:12  23       Q.  Did Harper Randall ever say to you Bill does
15:55:15  24   not have access to that data?
15:55:18  25       A.  Harper Randall said to me that the data I
```

```
15:55:22   1   collected, identifiable data that researchers would get
15:55:24   2   from me needed to have oversight approval and UDOH IRB.
15:55:28   3       Q.  That wasn't my question.  Did Harper Randall
15:55:31   4   or Marc Babitz or Nan Streeter ever say to you Bill
15:55:37   5   McMahon does not have access to the URADD data?
15:55:41   6       A.  What do you mean by URADD data?  Health data
15:55:42   7   collected under the health rule?  No.
15:55:44   8       Q.  Okay.  Did anybody at CDC, did anybody from
15:55:50   9   Georgia at the CDC ever say to you Bill McMahon does not
15:55:55  10   have access to that data?
15:55:57  11       A.  The agreement implies that he's not allowed
15:55:59  12   to have the data unless he gets approval from the data
15:56:02  13   sources in writing.
15:56:05  14       Q.  But if he has -- that wasn't my question.
15:56:08  15   Did anybody ever call you and say he cannot look at this
15:56:11  16   data, touch this data, access this data?
15:56:14  17       A.  From the CDC?
15:56:16  18       Q.  Yes.
15:56:17  19       A.  No, they wouldn't know unless they heard it
15:56:20  20   from me.
15:56:21  21       Q.  Correct.  Did anybody at the Utah -- from the
15:56:28  22   university IRB ever call, office of the university IRB
15:56:32  23   ever call you and say Bill McMahon cannot access this
15:56:38  24   data?
15:56:39  25       A.  No.
```

```
15:56:40   1       Q.  Okay.  Did anybody from the privacy office or
15:56:54   2   the security office ever contact you and say Bill McMahon
15:57:00   3   cannot access the data?
15:57:03   4       A.  The privacy office made it clear that they
15:57:06   5   did not look at FERPA issues, as Bill McMahon was not the
15:57:09   6   PI on the CDC grant nor with the State Office of
15:57:11   7   Education, so they didn't answer the question for me.
15:57:13   8       MR. ROBINSON:  That's not the question.
15:57:15   9   BY MS. DONOSSO:
15:57:15  10       Q.  That wasn't my question.
15:57:16  11       A.  Then ask it again.
15:57:18  12       Q.  Did anybody from the security or privacy
15:57:21  13   office ever say to you Bill McMahon, it would be a
15:57:25  14   violation of university policy for Bill McMahon to access
15:57:29  15   this data?
15:57:29  16       A.  I never got a final determination from the
15:57:33  17   university privacy office.
15:57:33  18       MR. ROBINSON:  Still not answering the
15:57:35  19   question.
15:57:35  20   BY MS. DONOSSO:
15:57:35  21       Q.  Did they ever tell you that he cannot access
15:57:39  22   the data?
15:57:39  23       A.  They didn't tell me one way or the other.
15:57:42  24   They didn't tell me.
15:57:42  25       Q.  Did they tell you this is not even a privacy
```

Alpine Court Reporting
801-691-1000

Judith Zimmerman
September 16, 2015

Page 165

```
15:57:46  1    or a security issue?
15:57:48  2        A.  No.
15:57:48  3        Q.  Okay.  You filed a report, a concern, a
15:58:22  4    complaint with the university IRB office in July of 2012;
15:58:28  5    is that correct?
15:58:29  6        A.  Yes.
15:58:48  7        (Whereupon Exhibit 93 was marked for identification.)
15:58:48  8    BY MS. DONOSSO:
15:58:49  9        Q.  Let me give you what we've marked as
15:58:52 10    Exhibit 93.  Do you recognize this document?
15:58:58 11        A.  Yes.
15:58:59 12        Q.  Okay.  Let's turn to the third page, which
15:59:16 13    has PRD No. 9985 and this is where you're asked to
15:59:26 14    provide a narrative or description of the problem.  Do
15:59:30 15    you see that?
15:59:32 16        A.  On Page 3?
15:59:34 17        Q.  Uh-huh.  Page 3.
15:59:36 18        A.  Yes.
15:59:37 19        Q.  Where it says provide a narrative description
15:59:44 20    of corrective action, intervention or treatment provided,
15:59:50 21    here you wrote down reported concerns to Dr. McMahon and
15:59:56 22    Bakian, sought assistance from dean of research, filed a
15:59:57 23    concern, notified Centers of Disease Control and removed
16:00:01 24    Dr. Bakian's assess to any research files.  Do you see
16:00:08 25    that?
```

Page 166

```
16:00:08  1        A.  I see it.
16:00:09  2        Q.  Do you believe that's a clear description of
16:00:17  3    your concern?
16:00:22  4        A.  Yes.
16:00:23  5        Q.  Now, in your -- in your first amended
16:00:38  6    complaint, you've essentially alleged serious ethical
16:00:53  7    concerns, research misconduct, breach of security
16:00:59  8    agreements.  Is that a fair statement?
16:01:02  9        A.  Yes.
16:01:02 10        Q.  On Page 1, why did you put other problem or
16:01:09 11    event instead of breach of security?
16:01:17 12        A.  So your question is under?
16:01:20 13        Q.  Under type of report.
16:01:22 14        A.  It was just a pull down file.
16:01:25 15        Q.  Right, and one of your options is breach of
16:01:29 16    confidentiality or security.
16:01:30 17        A.  I don't recall.
16:01:34 18        Q.  On the third page under your narrative, why
16:01:45 19    didn't you just -- why didn't you say I believe my --
16:01:50 20    there has been a breach of security agreements?  Why did
16:01:54 21    you instead write down a list of what you've done as
16:01:58 22    opposed to explaining that you felt that there was a
16:02:01 23    breach of security and confidentiality agreements?
16:02:03 24        A.  As I recall the question was what action have
16:02:05 25    you taken to try and resolve this.
```

Page 167

```
16:02:08  1        Q.  After you filed this report, did the IRB
16:02:26  2    office contact you seeking clarification of your report?
16:02:30  3        A.  Nope.
16:02:31  4        Q.  Okay, and did you eventually get an answer
16:02:39  5    from them regarding this report?
16:02:42  6        A.  My understanding was they said there was no
16:02:45  7    breach because it was accessed by university employees.
16:02:52  8    They didn't address the question about access by
16:02:55  9    non-authorized users and they indicated that I may have
16:03:00 10    to file something at the end of the grant cycle.
16:03:06 11        Q.  Let's look at the completion letter so we're
16:03:11 12    accurate about what they said.
16:03:36 13        (Whereupon Exhibit 94 was marked for identification.)
16:03:36 14    BY MS. DONOSSO:
16:03:52 15        Q.  Do you recognize this document?
16:03:54 16        A.  Yes.
16:03:54 17        Q.  Is it a true and correct copy of the response
16:04:00 18    that you received to your first complaint to the IRB
16:04:03 19    office?
16:04:03 20        A.  Yes.
16:04:04 21        Q.  And this is dated approximately October 29th,
16:04:15 22    2012, and it states:  "Dr. Zimmerman.  We have received
16:04:19 23    the information you have provided."  And it is their
16:04:25 24    determination that, quote:  "A breach of privacy
16:04:28 25    confidentiality did not occur; therefore, the IRB will
```

Page 168

```
16:04:32  1    close out the report."  And their explanation is:  "This
16:04:39  2    not the cases, as any data would have been transferred or
16:04:43  3    viewed by other university employees.  It appears that
16:04:47  4    your report stems from a concern about how the data was
16:04:51  5    transferred or viewed."  Do you see that in the second
16:04:53  6    paragraph?
16:04:54  7        A.  Yes.
16:04:54  8        Q.  Okay.  "If this is a concern of overlapping
16:05:00  9    objectives amongst studies within your department, that
16:05:04 10    concern should be addressed within your department and/or
16:05:05 11    in a consultation with the Office of Research Integrity."
16:05:09 12    Did you, in fact, consult with the Office of Research
16:05:14 13    Integrity?
16:05:14 14        A.  That is Dr. Botkin.
16:05:16 15        Q.  Okay, and we already read their
16:05:18 16    recommendation into the record.  Okay, and then after
16:05:25 17    this, you, in fact, did file a second complaint with the
16:05:32 18    IRB office again; correct?
16:05:34 19        A.  I don't recall.  Oh, yes, notifying them,
16:05:41 20    yes.
16:06:10 21        (Whereupon Exhibit 95 was marked for identification.)
16:06:10 22    BY MS. DONOSSO:
16:06:13 23        Q.  Do you recognize this document?
16:06:14 24        A.  Yes.
16:06:15 25        Q.  Is it a true and correct copy of the second
```

42 (Pages 165 to 168)

Judith Zimmerman
September 16, 2015

Page 169

16:06:20 1   report that you filed with the IRB office on or about
16:06:24 2   January 4th of 2013?
16:06:27 3       A.   Yes.
16:06:27 4       Q.   Now, again, you had the option on the pull
16:06:37 5   down menu of choosing breach of confidentiality but you
16:06:42 6   chose to use the other problem or event option under
16:06:48 7   Paragraph 2 on the first page.  Do you use that?
16:06:52 8           MS. LEONARD:  I want to clarify for the
16:06:54 9   record that on the face of the document, you can't tell
16:06:57 10  if there is a pull down screen.
16:06:59 11          MS. DONOSSO:  We'll go over that on John
16:07:03 12  Stillman's deposition tomorrow.
16:07:18 13      Q.   Okay.  Let's turn to -- let's turn to Page 2
16:07:30 14  under problem or event description.  Here you do provide
16:07:38 15  the narrative, you state:  "Dr. McMahon took over access
16:07:43 16  of my grant files for which I was the principal
16:07:46 17  investigator on January 4th."  Do you see that?  And then
16:07:48 18  you also state that he blocked your access to the files
16:07:53 19  for your research of the Utah IRB.  And then do you
16:08:11 20  recall getting a response to this complaint?
16:08:18 21      A.   I don't recall.
16:08:21 22      Q.   Okay.
16:08:42 23      (Whereupon Exhibit 96 was marked for identification.)
16:08:42 24  BY MS. DONOSSO:
16:08:43 25      Q.   Does this refresh your recollection?

Page 170

16:08:46 1       A.   Yeah, let me read it for a second.
16:08:49 2       Q.   Absolutely.
16:09:05 3       A.   Yes.
16:09:05 4       Q.   Okay, and you did not receive this until
16:09:09 5   after you were no longer with the university because this
16:09:13 6   completion letter is dated July 22nd, 2013, and it states
16:09:26 7   that after reviewing your report form, as it was
16:09:34 8   previously determined in the previous complaint, they
16:09:39 9   don't believe that the present report form does not
16:09:46 10  represent an unanticipated problem involving risk to
16:09:46 11  participants or others and, therefore, they determined
16:09:48 12  that a breach of privacy or confidentiality did not
16:09:53 13  occur; therefore, they will close out the report.  Do you
16:09:56 14  see that on the second paragraph?
16:09:58 15      A.   I do.
16:09:59 16      Q.   Okay.  Okay.  I'm only aware of these two
16:10:12 17  formal complaint forms with the IRB office.  Did you file
16:10:19 18  any other complaint forms after these two or are these
16:10:22 19  two the only ones that you filed with the IRB office?
16:10:26 20      A.   These are the only two that I can recall.
16:10:45 21      Q.   Okay.  There was an investigation conducted
16:10:45 22  by Chris Kidd and Jerry Smith regarding the allegations
16:10:52 23  of HIPAA, HITECH and FERPA regulations.  I want to
16:10:59 24  address those at this time.  Okay, we have these.  Do we
16:12:34 25  have this one or not, the original exhibit?  I don't want

Page 171

16:12:38 1   to mark something twice.
16:13:41 2           MS. LEONARD:  It's 39.
16:13:43 3           MS. DONOSSO:  I thought was that.  Thank you,
16:13:47 4   okay.
16:13:47 5       Q.   Let me show what we have previously marked as
16:13:51 6   Exhibit No. 39.  Do you recognize this document?
16:13:56 7       A.   Yes.
16:13:57 8       Q.   So this is a final report that was prepared
16:14:11 9   by Jerry Smith, who is a senior analyst at the security
16:14:17 10  and privacy office.  It looks like it was finalized on
16:14:32 11  October 2nd of 2012; is that correct?
16:14:38 12      A.   I don't know.
16:14:41 13      Q.   Well, it says right there, October 2nd, 2012,
16:14:46 14  that is just the date that is listed.
16:14:48 15      A.   It wasn't signed, so I don't know.
16:14:50 16      Q.   Yeah.  Have you ever seen this document
16:14:52 17  before?
16:14:52 18      A.   Yes, I received it from our financial person.
16:14:55 19      Q.   Would that be Dan Hogge?
16:14:59 20      A.   Yes.
16:14:59 21      Q.   Okay, and, now, according to this document,
16:15:06 22  he says that he began his investigation on
16:15:12 23  September 2nd -- September 7th, excuse me, September 7th,
16:15:20 24  2012; is that correct?
16:15:22 25      A.   I don't know when he began his investigation

Page 172

16:15:24 1   but that's what it says.
16:15:25 2       Q.   Okay, and it states on the document that this
16:15:34 3   arose based on allegations by Dr. Judy Zimmerman that Dr.
16:15:38 4   Bill McMahon had accessed data in violation of HIPAA,
16:15:45 5   HITECH and FERPA regulations.  He does state that
16:15:50 6   his report does not address any FERPA issues and you had
16:15:53 7   previously testified to that.  As the information,
16:15:56 8   security and privacy office is charged only with HIPAA
16:16:00 9   and HITECH compliance.  Do you see that at the first
16:16:04 10  sentence of the second paragraph?
16:16:05 11      A.   I see that, but I doubled check with the
16:16:07 12  privacy office and they said that is incorrect.  They
16:16:11 13  deal with FERPA issues as well.
16:16:13 14      Q.   Who told you that?
16:16:14 15      A.   Brad Nelson.
16:16:16 16      Q.   Okay.  When did he tell you that?
16:16:23 17      A.   Sometime shortly after I received this.
16:16:33 18      Q.   Now, here it says:  "I would direct Dr.
16:16:35 19  Zimmerman to contact Robert Payne in the office of
16:16:38 20  general counsel with any allegations of violations of
16:16:41 21  FERPA."  Did you ever contact Robert Payne?
16:16:44 22      A.   Yes.
16:16:44 23      Q.   And when did you contact him?
16:16:46 24      A.   There is some E-mails.  I don't recall but it
16:16:52 25  was shortly after this.

43  (Pages 169 to 172)

Judith Zimmerman
September 16, 2015

## Page 173

16:16:53 1    Q. What did Mr. Payne tell you regarding the
16:16:57 2  FERPA violations?
16:16:58 3    A. Nothing.
16:16:59 4    Q. Did you ask him to do something and did he
16:17:05 5  just not follow through with it or what happened?
16:17:08 6    A. We had no response.
16:17:09 7    Q. So what did you ask Mr. Payne to do that he
16:17:14 8  didn't respond to?
16:17:16 9    A. We asked him about this question and my
16:17:21 10  attorney contacted him as well.
16:17:23 11    Q. Well, there's no question here.  He just
16:17:27 12  directed you to contact him.  Did you give him any
16:17:29 13  specific assignment or did you give him a specific
16:17:33 14  directive?
16:17:33 15    A. My attorney at that time dealt with him.
16:17:36 16    Q. Okay.  I have not seen any E-mails regarding
16:17:47 17  FERPA or between Lisa and Robert Payne.  Would you be
16:17:52 18  willing to provide those to us before the close of
16:17:55 19  discovery regarding what happened between Lisa and Robert
16:18:00 20  regarding any FERPA allegations or violations?
16:18:03 21    MS. LEONARD:  We'll provide any
16:18:04 22  non-privileged communications, sure.
16:18:07 23    MS. DONOSSO:  Yeah, of course.
16:18:09 24    Q. Okay, so then he goes on to say that he
16:18:12 25  arranged interviews with yourself as well as with Dr.

## Page 174

16:18:18 1  McMahon and it is his opinion that given the fact that
16:18:31 2  the data is -- in the second page, sorry, I've moved on
16:18:34 3  really quickly because I recognize there is a lot to go
16:18:37 4  through and I don't want to just read the letter, since
16:18:40 5  it speaks for itself.  The last paragraph states: "To
16:18:43 6  the extent that the data are deidentified, Dr. McMahon's
16:18:46 7  use of such data would not violate HIPAA.  To the extent
16:18:50 8  that the data are identifiable, Dr. McMahon was permitted
16:18:54 9  by the relevant data use agreements, grant documents or
16:18:59 10  by authority of the Department of Health to access this
16:19:01 11  data for legitimate purposes.  In my opinion, Dr. McMahon
16:19:08 12  did not violate HIPAA or organizational policy."  So this
16:19:13 13  was the conclusion of this investigation; is that
16:19:17 14  correct?
16:19:17 15    A. I don't know.
16:19:18 16    Q. Well, you filed a complaint, the university
16:19:24 17  investigated it, concluded its investigation and this is
16:19:28 18  what the conclusion of the report states.
16:19:31 19    A. And then my attorney and I met with Phyllis
16:19:36 20  Vetter and Dean Li.
16:19:37 21    Q. Okay, but do you agree that that's what the
16:19:40 22  report states what I just read to you, the last paragraph
16:19:43 23  of this report states that there was no HIPAA violation?
16:19:48 24    A. To the extent that the data was deidentified.
16:19:53 25  I'm not sure if you're asking me to say this looks like

## Page 175

16:19:56 1  what Jerry Smith submitted on 10/02/2012.
16:20:01 2    Q. So according to -- let me ask you the
16:20:04 3  question again.  According to the investigation conducted
16:20:08 4  by Mr. Smith in the fall of 2012, he did not find that
16:20:13 5  Dr. McMahon committed any HIPAA violations?
16:20:17 6    A. That's what it looks like.
16:20:19 7    Q. We're going to go back to the complaint.  Do
16:20:58 8  you still have a copy of the complaint in front of you?
16:21:01 9    A. Yes.
16:21:01 10    Q. Let's turn to Page 19.  In your complaint,
16:21:11 11  you have a third cause of action, which is property
16:21:16 12  interest with due -- without due process under Section
16:21:18 13  1983.  Can you just briefly state for me what is the
16:21:23 14  basis of this claim?
16:21:26 15    MS. LEONARD:  I'll just object that the
16:21:27 16  document speaks for itself and calls for a legal
16:21:30 17  conclusion.
16:21:33 18    You can answer.
16:21:34 19    THE WITNESS:  I had collected data prior to
16:21:40 20  my employment at the university, which I had IRBs to have
16:21:46 21  the data.  I had IRBs at the Utah Department of Health,
16:21:54 22  as well as the University of Utah, none of those IRBs
16:21:59 23  have been rescinded, and my access to my grant files were
16:22:05 24  blocked and I was unable to continue on a multimillion
16:22:14 25  dollar grant and/or continue my research using the data

## Page 176

16:22:20 1  that I had IRBs to access the data.
16:22:25 2    BY MS. DONOSSO:
16:22:33 3    Q. Okay.  You also have a fourth cause of
16:22:37 4  action, which is depravation of property interest without
16:22:41 5  due process under the Utah Constitution.  What is your
16:22:45 6  basis for this claim?
16:22:48 7    MS. LEONARD:  Same objections.
16:22:49 8    THE WITNESS:  You know, I'm not familiar with
16:22:51 9  the legal terminology on how cause three and four
16:22:58 10  differentiate, but there again, I had grant awards of
16:23:02 11  considerable value that I was prohibited from completing.
16:23:12 12    BY MS. DONOSSO:
16:23:12 13    Q. Let's turn to Page 22.  Now, this cause of
16:23:18 14  action you are alleging against both the University of
16:23:21 15  Utah and Dr. McMahon, both as in his individual and
16:23:24 16  official capacities.  What are your bases for this cause
16:23:31 17  of action?
16:23:33 18    MS. LEONARD:  Same objections.
16:23:37 19    THE WITNESS:  You know, the comments that
16:23:40 20  were made about me, hurt my reputation and my integrity.
16:23:46 21  I committed to all the data sources that the data would
16:23:49 22  not be shared with third parties and that the CDC
16:23:54 23  policies and procedures would be followed and I wasn't
16:23:58 24  allowed to keep those promises.
16:24:01 25    BY MS. DONOSSO:

44 (Pages 173 to 176)

Judith Zimmerman
September 16, 2015

Page 177

16:24:02  1        Q.  But specifically how has the university
16:24:09  2   impugned your good name, reputation or integrity
16:24:09  3   publicly?
16:24:10  4        A.  Well, in a faculty meeting, they
16:24:15  5   accused me of having a personality disorder because I'm
16:24:18  6   older and I can't keep up.  I'm not as smart even though
16:24:25  7   I'm old.
16:24:25  8        Q.  Are you referring to your third year review?
16:24:27  9        A.  That was a public meeting with faculty.
16:24:31  10       Q.  But you realize that people had to be invited
16:24:34  11  to that meeting, it was not a public faculty meeting?
16:24:37  12       A.  I had faculty come to me saying how
16:24:39  13  embarrassed they were with the comments that were made
16:24:42  14  about me.
16:24:42  15       Q.  What faculty?
16:24:43  16       A.  Janet Lainhart.  Deb Bilder was telling the
16:25:00  17  CDC I wouldn't work with them, when, in fact, McMahon had
16:25:04  18  told them I couldn't work on the grant.  He called the
16:25:08  19  police on me.  He accused me falsely with unsubstantiated
16:25:16  20  claims with the police.  This data that was published,
16:25:23  21  the work I did was published under somebody else's name
16:25:28  22  and it's wrong.  There are errors in it.  Research that I
16:25:34  23  had done was published under other people's names and
16:25:38  24  plagiarized.
16:25:52  25       Q.  And you have evidence that Dr. McMahon did

Page 178

16:25:56  1   this?
16:25:56  2        A.  Did what?
16:25:57  3        Q.  That Dr. McMahon plagiarized your work?
16:26:03  4        A.  My research in progress was published and
16:26:09  5   given to Bakian and Bilder and two years of my grant work
16:26:15  6   was published under Bilder and McMahon's name.
16:26:19  7        Q.  Are you referring to the article that you
16:26:22  8   were not willing to finish and that they had to finish
16:26:25  9   for you because you refused to finish that article?
16:26:28  10       A.  That was six weeks before I left and staff
16:26:30  11  had been told they couldn't talk to me.  I'd been locked
16:26:36  12  out of my office, the data was wrong and I'd been told I
16:26:40  13  couldn't work on it.
16:26:41  14       Q.  They sent you E-mails asking you to, please,
16:26:44  15  finish that article and, please, finish working on those
16:26:45  16  grants.
16:26:45  17       A.  But I didn't have the tools necessary to do
16:26:47  18  that because the data had been locked from my access.
16:26:51  19       Q.  Do you not recall getting E-mails from Dr.
16:26:56  20  Bilder asking you to, please, collaborate with her on
16:26:59  21  finishing those grants and helping her finish the work on
16:27:02  22  those grants and on that article?
16:27:02  23       A.  My directive from McMahon was that I couldn't
16:27:05  24  work on those grants and I didn't have the authority to
16:27:08  25  work on those grants and I knew the errors hadn't been

Page 179

16:27:11  1   corrected and I knew when they took the data that they
16:27:16  2   didn't have any authorization from the data sources to
16:27:19  3   have the data.
16:27:24  4        Q.  Okay.  How has the university foreclosed
16:27:31  5   employment opportunities?
16:27:32  6        A.  Well, my hope was to be able the leave the
16:27:37  7   psychiatry department and continue the grant in a
16:27:39  8   different department and it foreclosed that opportunity.
16:27:45  9   People were told that if they saw me near the building, I
16:27:48  10  was to be reported.  Bilder told people I had a
16:27:53  11  personality disorder.
16:28:01  12       Q.  And what has Dr. McMahon done to foreclose
16:28:05  13  employment opportunities?
16:28:06  14       A.  To do research, you billed on your past
16:28:10  15  research, so McMahon took away all of my research in
16:28:15  16  progress and the data I had collected over a 10-year
16:28:18  17  period, so it's -- it's very difficult to start all over
16:28:25  18  again when you have worked for 10 years to collect data
16:28:29  19  and start research that you can't finish.
16:28:32  20       Q.  Did he do that simply by not renewing your
16:28:36  21  contract?
16:28:36  22       A.  He did that by blocking my access to the data
16:28:43  23  before my contract was through.  He did that by --
16:28:53  24       Q.  Why did he have to block your access to the
16:28:55  25  data?

Page 180

16:28:57  1        MS. LEONARD:  Was there something else you
16:28:58  2   wanted to say?
16:29:00  3        THE WITNESS:  I don't know.
16:29:02  4        MS. LEONARD:  She cut you off.
16:29:03  5        THE WITNESS:  Could you repeat the question?
16:29:03  6   BY MS. DONOSSO:
16:29:07  7        Q.  Did you give him reasons to cut off your
16:29:10  8   access to the data?
16:29:12  9        A.  He cut off access to -- so all the files for
16:29:19  10  my research were on a partition server and they were
16:29:23  11  labeled different things by me and staff, not related
16:29:29  12  to the content of those files, and so he blocked access
16:29:39  13  to a file named URADD, which did not necessarily mean --
16:29:51  14  he had not collected the data.  It was all data collected
16:29:55  15  for my grants and research and he blocked access to that
16:29:59  16  file, which was necessary to continue with the grant,
16:30:04  17  correcting the grant errors.
16:30:05  18       Q.  That wasn't my question.  Did you give him
16:30:07  19  reasons, especially during your last six months at the
16:30:10  20  university, to remove you from URADD and the CDC grants?
16:30:15  21       A.  I think the reason that he had was he -- I
16:30:20  22  had reported him.
16:30:21  23       Q.  So you weren't -- you did not instruct your
16:30:25  24  abstractors to start making photocopies of information
16:30:31  25  and clinical reports --

45 (Pages 177 to 180)

Judith Zimmerman
September 16, 2015

Page 181

```
16:30:31   1      A.  When?
16:30:36   2      Q.  -- at the department of health?
16:30:38   3      A.  After?
16:30:39   4      Q.  No, like in January and February of 2012.
16:30:44   5      A.  No.
16:30:45   6      Q.  No.
16:30:47   7      A.  Not that I recall.  I mean, I don't know
16:30:49   8   what -- we were scanning in documents that went into --
16:30:56   9   but, no, I don't recall.  If they were, it was grant
16:31:04  10   files.  I am aware that Janet Lainhart had her staff
16:31:10  11   copying records because they were concerned that they
16:31:16  12   also would have their access blocked by McMahon.
16:31:25  13      Q.  And you don't recall packing up clinicians
16:31:30  14   notes, 20 boxes of clinicians notes and making a
16:31:33  15   photocopy of the hard drive and taking it home with you?
16:31:36  16      A.  So in November, I did take -- I was asked to
16:31:39  17   remove the boxes from the university because he did not
16:31:46  18   want to store them there.  As we were finished with them,
16:31:50  19   I rented a storage space and put them there in November
16:31:55  20   of -- first part of November and they were all grant
16:31:59  21   related files that were deidentified.
16:32:01  22      Q.  What about the hard drive, Judy?
16:32:04  23      A.  The hard drive, we were required to have a
16:32:08  24   backup copy of the CDC files off-site on an encrypted
16:32:14  25   hard drive.  When my office was ransacked and we weren't
```

Page 182

```
16:32:21   1   able to change the locks and there were -- there was a
16:32:24   2   master key that anyone that could come in the office had
16:32:29   3   and the codes for the safe were known, I took that hard
16:32:42   4   drive home as required by the CDC and I returned it the
16:32:47   5   day I removed as the CDC PI and I dropped it off at
16:32:53   6   the Office of Public Safety because I'd been locked out
16:32:57   7   of my office.
16:33:06   8      Q.  Did your attorney -- did you discuss that
16:33:08   9   with your attorney?
16:33:12  10         MS. LEONARD:  Anything you and I have talked
16:33:14  11   about is confidential.
16:33:20  12         THE WITNESS:  My attorney communicated
16:33:23  13   information to Scott Smith.
16:33:23  14   BY MS. DONOSSO:
16:33:32  15      Q.  Did you tell anybody that you had removed a
16:33:35  16   hard drive containing protected information of minors, of
16:33:44  17   over 160,000 minors, that you were storing at your house
16:33:49  18   for several months?
16:33:51  19      A.  They weren't stored at my house for several
16:33:51  20   months.  It was only several weeks.
16:33:54  21      Q.  What would have happened if one of your staff
16:33:57  22   members had taken a hard drive with that kind of
16:34:00  23   information to their house for several weeks?
16:34:02  24      A.  First of all, they didn't have a safe and
16:34:07  25   they weren't required to have a backup copy of their
```

Page 183

```
16:34:10   1   records off-site, which I was required by the CDC.
16:34:13   2      Q.  So then why didn't you do that from 2008 to
16:34:17   3   2013, Judy?
16:34:18   4      A.  Because we were -- because we didn't have a
16:34:21   5   hard drive that was capable of being encrypted and we had
16:34:25   6   it back ordered from the -- we tried to get one through
16:34:29   7   the bookstore for months and it was on back order.  So
16:34:35   8   what we had learned from our previous privacy
16:34:40   9   investigation was that if -- had we been able to prove a
16:34:45  10   certain encryption level and somebody had stolen it, all
16:34:50  11   those files would not be accessible to anyone and it'd be
16:34:59  12   the end of the story, but because we couldn't prove when
16:35:05  13   the thumb drive was stolen, that it met the standards, it
16:35:09  14   went through a rigorous review and we were in the process
16:35:17  15   of transferring our files to a different server and I
16:35:24  16   thought I was being moved to a different department.
16:35:27  17      Q.  So why when some of your staff members, as
16:35:33  18   much as lost a flash drive with information in it, why
16:35:38  19   were they written up and eventually fired just for losing
16:35:43  20   a flash drive or a laptop with information in it?
16:35:46  21      A.  The problem with that flash drive was it was
16:35:49  22   supposed to be returned to the office and that flash
16:35:53  23   drive had data on it, which it shouldn't have had data on
16:35:57  24   it, and the health department couldn't prove that the
16:36:01  25   flash drive that they purchased was encrypted to the CDC
```

Page 184

```
16:36:07   1   standards.
16:36:07   2      Q.  So who gave you authority in writing to be
16:36:11   3   able to store this information off-site?
16:36:14   4      A.  In the CDC policy, we're required to do that.
16:36:18   5      Q.  Okay, so show me anywhere in this contract
16:36:21   6   where it says that you're required to store that
16:36:24   7   off-site, because actually I just read it and it says the
16:36:30   8   opposite, Judy.
16:37:36   9      A.  Backup files will be stored in a secured
16:37:41  10   off-site facility.
16:37:43  11      Q.  But these were not backup files.
16:37:44  12      A.  They were backup files of all my grant files
16:37:47  13   and research files.
16:37:48  14      Q.  You took everything.
16:37:50  15      A.  Everything was my research and grant files.
16:37:54  16      Q.  How could everything belong to you when it
16:37:57  17   had been gathered in collaboration for over ten -- for
16:38:00  18   like almost eight years by all of these abstractors
16:38:04  19   working for the university?
16:38:05  20      A.  They were backup files for grants that I was
16:38:09  21   the PI on.
16:38:09  22      Q.  And that Bill McMahon was also the PI on?
16:38:13  23      A.  He was not.
16:38:14  24      Q.  Both of you were listed on these grant
16:38:18  25   applications, so you honestly expect us to believe that
```

Alpine Court Reporting
801-691-1000

Judith Zimmerman
September 16, 2015

Page 185

16:38:22  1   you have evidence that everything that was -- like all
16:38:25  2   this information data that had been gathered by the
16:38:29  3   school districts throughout the Wasatch Front, throughout
16:38:32  4   the entire state for years, from before you even came to
16:38:36  5   the University of Utah, all belonged to you?
16:38:39  6        A.  I'm not saying they belonged to me.  They
16:38:42  7   were a backup file, and when I was taken off the grant, I
16:38:46  8   returned it to the Office of Public Safety because I
16:38:49  9   didn't know who owned the data.
16:38:50  10       Q.  So, okay, so you're saying you didn't even
16:38:52  11  know who owned the data and you decided to just take it
16:38:55  12  home with you for three weeks?
16:38:57  13       A.  I'm saying I had the backup file in case we
16:39:01  14  needed it, so, for example, at the health department --
16:39:05  15       Q.  Didn't answer my question.  You just said
16:39:07  16  you didn't even know who it belonged to, and so since you
16:39:10  17  didn't know who it belonged to, you decided to take it
16:39:15  18  home for three weeks?
16:39:16  19       A.  I took my grant files that I had collected,
16:39:20  20  that were highly encrypted to protect because of
16:39:24  21  security issues in the office and I returned them.
16:39:29  22       Q.  What security issues?  Everybody had just
16:39:33  23  given you reports saying that there was no issue, that
16:39:35  24  this is not an IRB issue, this is not a security issue.
16:39:39  25  You had just started to get all kinds -- by February when

Page 186

16:39:41  1   you did this, all of these people had gotten back to you
16:39:45  2   and said this is not an IRB issue.
16:39:47  3        A.  So I went to the health department and I said
16:39:51  4   have you rescinded my access to the data I collected at
16:39:55  5   the health department or for the CDC grant or any of my
16:39:59  6   IRBs that gave me access to this data and they said no.
16:40:05  7   The legal opinion from Rex Scott from the Utah Department
16:40:12  8   of Health indicated I had authorization to have those
16:40:14  9   data because I had -- I had IRBs to have the data.
16:40:16  10       Q.  So why haven't you produced this legal
16:40:21  11  opinion from Rex Scott during this lawsuit?
16:40:24  12       A.  It's in the discovery items you've sent us.
16:40:26  13       Q.  From Rex Scott saying that --
16:40:28  14       A.  Rex Olsen, excuse me.
16:40:30  15       Q.  Okay.  That I sent you?
16:40:33  16       A.  It was in the discovery items, so.
16:40:40  17       Q.  An attorney general has given you an E-mail
16:40:44  18  saying that you own all of this data?
16:40:46  19       A.  No, the attorney general, after the fact,
16:40:51  20  after I had already returned the files, said that I had
16:40:55  21  authority to have the files because I had IRBs to have
16:40:59  22  the files, and they had not rescinded my IRBs, the
16:41:05  23  university had not rescinded my IRBs, nor had the health
16:41:07  24  department at any time, nor did the health department at
16:41:10  25  any time notify me that they had rescinded my authority

Page 187

16:41:15  1   to do grant activities.
16:41:20  2        Q.  So this is your basis for believing that
16:41:22  3   you -- this is your intellectual property?
16:41:25  4        A.  All I'm saying is --
16:41:28  5        Q.  Is it Rex Olsen's E-mail or is it this
16:41:32  6   letter that you received from the vital records?
16:41:33  7        MR. ROBINSON:  I think she actually testified
16:41:35  8   a moment ago that it belonged to the Department of
16:41:38  9   Health.
16:41:38  10       THE WITNESS:  So I found it interesting in
16:41:42  11  McMahon's testimony he said it belonged -- the data
16:41:45  12  belonged to the health department.  In Bilder's
16:41:47  13  testimony, she stated that the data belonged to the
16:41:51  14  university.  I would say I don't know who owns the data,
16:41:57  15  so I returned it.
16:41:59  16       MR. ROBINSON:  Well, you said just a moment
16:42:01  17  ago that the Department of Health owns it, so you don't
16:42:03  18  own it?
16:42:04  19       THE WITNESS:  I don't believe I own it.
16:42:07  20       MR. ROBINSON:  Very good.  Thank you.
16:42:08  21       THE WITNESS:  And I returned it the day I was
16:42:11  22  informed I was no longer on the grant and I established a
16:42:18  23  proper chain of custody so I wouldn't be accused of
16:42:22  24  anything later.
16:42:22  25       BY MS. DONOSSO:

Page 188

16:42:54  1        Q.  So we're up to Claim 6.  This is also a
16:43:15  2   liberty interest but this is under the Utah Constitution.
16:43:18  3   What is your basis for this claim?
16:43:20  4        A.  Which one?
16:43:21  5        MS. LEONARD:  Objection to the extent it
16:43:23  6   calls for a legal conclusion and document speaks for
16:43:26  7   itself.
16:43:26  8   BY MS. DONOSSO:
16:43:27  9        Q.  This is on Page 23 of the amended complaint.
16:43:33  10       A.  I think it's similar to what I said before.
16:43:36  11       Q.  Okay, so then let's turn to Page 24, which is
16:43:45  12  your seventh cause of action and this one is against both
16:43:48  13  the University of Utah and Dr. McMahon.  This is your
16:43:54  14  deprivation of first amendment right under Section 1983.
16:43:56  15  What is the basis for this claim?
16:43:58  16       MS. LEONARD:  Same objections.
16:43:59  17       THE WITNESS:  I believe that because I raised
16:44:05  18  questions and sought clarification about privacy issues
16:44:10  19  and the sharing of identifiable data that I was
16:44:15  20  retaliated against.
16:44:18  21  BY MS. DONOSSO:
16:44:19  22       Q.  So you believed that filing all of the
16:44:22  23  various complaints that was -- you believed that was
16:44:27  24  protected speech?
16:44:29  25       MS. LEONARD:  Objection that it calls for a

47 (Pages 185 to 188)

Judith Zimmerman
September 16, 2015

## Page 189

16:44:31  1  legal conclusion.

16:44:33  2      You can answer.

16:44:37  3      THE WITNESS:  I don't know the legal

16:44:39  4  ramifications of this.

16:44:39  5  BY MS. DONOSSO:

16:44:42  6      Q.  Other than filing the complaints that we've

16:44:44  7  talked about with Botkin, with OEO, the privacy office,

16:44:48  8  with the IRB, did you do anything else?  Did you contact

16:44:52  9  the media?  Did you send out mass E-mails to other

16:44:57 10  people?

16:44:57 11      A.  No one.  I did report to Utah State Office of

16:45:06 12  Education and Eric Fombonne that the data -- that I was

16:45:16 13  retracting an article and why and I notified the journal.

16:45:21 14      Q.  Who is the journal?

16:45:23 15      A.  Journal of Autism and Developmental

16:45:26 16  Disabilities.

16:45:27 17      Q.  Okay.

16:45:27 18      A.  I notified the journal where my grant data

16:45:33 19  was published under McMahon's and Bilder's name that

16:45:38 20  there were errors in it and that they didn't do the work.

16:45:41 21      Q.  Okay.  Assuming all of these various

16:45:46 22  complaints that you filed with the university were

16:45:48 23  protected speech, how do you believe that this was a

16:45:52 24  motivating factor of the university's decision not to

16:45:55 25  renew your contract?

## Page 190

16:45:57  1      MS. LEONARD:  Objection in that it calls for

16:45:58  2  a legal conclusion.

16:45:59  3      THE WITNESS:  Because I had no problems with

16:46:02  4  performance until I brought these concerns to the

16:46:05  5  attention of the university.

16:46:06  6  BY MS. DONOSSO:

16:46:18  7      Q.  Let's move onto your next cause of action,

16:46:21  8  which is on Page 25, and it's your depravation of first

16:46:28  9  amendment rights under the Utah Constitution.  It's very

16:46:34 10  similar to your seventh cause of action.  Would you

16:46:36 11  change your testimony at all or is this the same thing?

16:46:39 12      A.  On No. 8?

16:46:40 13      A.  Uh-huh.  It's also related to protected

16:46:45 14  speech.

16:46:45 15      A.  Just the economic impact has been huge.

16:46:55 16      Q.  But other than making the complaint we've

16:46:59 17  talked about to Botkin, the OEO, privacy, the IRB, was

16:47:02 18  there any other speech that has not been mentioned during

16:47:07 19  your deposition that you consider to be protected?

16:47:12 20      A.  I think the fact that I reported data errors,

16:47:18 21  research misconduct is significant.

16:47:21 22      Q.  Who did you report those to?

16:47:24 23      A.  I reported it to Dean Li, Dr. Parks and

16:47:27 24  President Pershing and I reported it to the CDC.

16:47:36 25      Q.  When did you report those to the CDC?

## Page 191

16:47:43  1      A.  Right before I was taken off the grant.

16:48:01  2      Q.  Who did you report those to the CDC?

16:48:04  3      A.  John Baio, Anita Washington, there was

16:48:11  4  another epidemiologist and I can't remember for sure if

16:48:19  5  Marshall and Urgan Alsop was on call as well.

16:48:21  6      Q.  So you made this during a phone call or did

16:48:25  7  you do this in writing via E-mail?

16:48:26  8      A.  Phone call.

16:48:27  9      Q.  Okay.  Let's turn to Page 26 of your

16:48:39 10  complaint.  This is your ADA claim.  What is your basis

16:48:47 11  of your ADA claim?

16:48:49 12      A.  I don't have anything to add other than what

16:48:53 13  we've already talked about.

16:48:54 14      Q.  So you never, other than what we've talked

16:49:02 15  about as far as getting out of that meeting, you actually

16:49:04 16  never asked for any other accommodations?

16:49:11 17      A.  I asked that my chair be returned after they

16:49:16 18  put me in a different office because it was a special

16:49:20 19  chair, which they returned.

16:49:20 20      Q.  Okay.  Then Page 27, this is your ADEA cause

16:49:34 21  of action.  This is your age cause of action.  What is

16:49:37 22  the basis of this claim?

16:49:40 23      MS. LEONARD:  Objection in that it calls for

16:49:41 24  a legal conclusion and the document speaks for itself.

16:49:45 25      THE WITNESS:  Basically I felt like the

## Page 192

16:49:50  1  standards were different for me because I was older, and

16:49:57  2  I was required to give my research ideas and funding to

16:50:03  3  support younger female faculty and he gave my research in

16:50:09  4  progress to younger females.

16:50:09  5  BY MS. DONOSSO:

16:50:22  6      Q.  But your non-renewal letter does not mention

16:50:26  7  age anywhere; is that correct?

16:50:30  8      A.  I don't believe so.

16:50:32  9      Q.  Okay.

16:50:36 10      A.  He told me he could get Amanda on the cheap.

16:50:41 11      Q.  Okay, and when do you allege that that

16:50:44 12  happened?

16:50:44 13      A.  I say that happened around the spring of

16:50:52 14  2012.

16:50:57 15      Q.  And your outline of expectations also does

16:51:01 16  not mention age anywhere?

16:51:05 17      A.  No.

16:51:16 18      MR. ROBINSON:  No, it does not?

16:51:18 19      THE WITNESS:  The outline of expectations?

16:51:21 20      MR. ROBINSON:  Are you saying, no, it does

16:51:23 21  not mention age?

16:51:25 22      THE WITNESS:  I don't see that.

16:51:26 23      MR. ROBINSON:  Okay.

16:51:26 24  BY MS. DONOSSO:

16:51:28 25      Q.  Okay.  Now, on Page 29 of your complaint,

Judith Zimmerman
September 16, 2015

## Page 193

16:51:31  1   that's where we have your eleventh cause of action, which
16:51:36  2   is discrimination based on religion.  What's the basis of
16:51:40  3   this claim?
16:51:41  4        MS. LEONARD:  Same objections as previous.
16:51:43  5        THE WITNESS:  That in private meetings he
16:51:50  6   ridiculed me for wanting to become a chaplain.  In a
16:51:57  7   public faculty meeting, he brought up activities that I
16:52:01  8   did not job related.
16:52:06  9   BY MS. DONOSSO:
16:52:06  10       Q.   What kind of activities?
16:52:07  11       A.   My pursuing to become a chaplain.
16:52:15  12       Q.   But you did previously testify that during
16:52:19  13  that summer when you wanted to pursue, wanted to work
16:52:26  14  part time at St. Mark's and South Jordan, West Jordan, I
16:52:32  15  can't remember, the university did not have a problem
16:52:34  16  with you having that flexible schedule to do that; is
16:52:40  17  that correct?
16:52:41  18       A.   No.
16:52:46  19       MR. ROBINSON:  You're saying it was not
16:52:49  20  correct?
16:52:49  21       THE WITNESS:  I was ridiculed for wanting to
16:52:52  22  do that.
16:52:52  23       MR. ROBINSON:  But they allowed you to adjust
16:52:55  24  your schedule to do that?
16:52:55  25       THE WITNESS:  They allowed me to adjust my

## Page 194

16:52:59  1   schedule but I was half time anyway, so it was not --
16:53:03  2        MR. ROBINSON:  But they did allow you to
16:53:05  3   adjust your schedule?
16:53:25  4        THE WITNESS:  They did.
16:53:25  5        (Whereupon Exhibit 97 was marked for identification.)
16:53:25  6   BY MS. DONOSSO:
16:53:48  7        Q.   Do you recognize this document?
16:53:50  8        A.   Totally forgot about this.  I do recall them
16:53:58  9   approaching me about being a backup responder to provide
16:54:06  10  volunteered chaplain services.  I talked to Bill about it
16:54:12  11  and I felt like if I was going to work as a chaplain at
16:54:16  12  the university, I should be paid, and I wanted Bill to
16:54:27  13  know that I had been asked to do that.
16:54:31  14       Q.   Was he supportive of you doing volunteered
16:54:34  15  work as a chaplain?
16:54:36  16       A.   No.
16:54:36  17       Q.   Why would he care either way?
16:54:38  18       MS. LEONARD:  Objection.  Speculation.
16:54:40  19       THE WITNESS:  I don't know.
16:54:40  20  BY MS. DONOSSO:
16:54:41  21       Q.   Okay, so in this E-mail, all it states is
16:54:47  22  that you said that you were grateful that they were
16:54:50  23  considering you but that philosophically and morally you
16:54:56  24  just thought that you should get paid for it?
16:54:58  25       A.   Right.

## Page 195

16:54:58  1        Q.   And it doesn't really mention that you
16:55:03  2   consulted Bill about it.  You just forwarded it to him
16:55:05  3   and said I thought I'd just let you know that I was asked
16:55:08  4   for this request?
16:55:09  5        A.   We talked about it afterwards.
16:55:12  6        Q.   Okay, so why would you document the fact that
16:55:22  7   it would make you feel uncomfortable to do this on a
16:55:27  8   volunteered situation but not document the fact that Bill
16:55:33  9   would not be supportive of that?
16:55:36  10       A.   Why didn't I document it?
16:55:37  11       A.   Yeah.
16:55:38  12       A.   Why would I?
16:55:43  13       Q.   You seem to be very good at documenting a lot
16:55:47  14  of stuff.  That's why we have so many documents in this
16:55:51  15  case.
16:55:51  16       A.   You know, my goal was to get away from that
16:55:58  17  situation.  I changed mentors.  I tried to leave the
16:56:01  18  department.  I tried to --
16:56:02  19       Q.   That wasn't going on in 2009.
16:56:05  20       A.   Discrimination was going on since I started.
16:56:10  21       Q.   Then why did you wait until 2012 to contact
16:56:13  22  the OEO about it?
16:56:15  23       A.   Because I was trying to do a work around and
16:56:18  24  I was told by one of the major department heads that the
16:56:24  25  university would do nothing to help me on any issue.

## Page 196

16:56:29  1        Q.   So I guess I have to ask:  Why were you
16:56:39  2   morally opposed to doing chaplain work on a volunteered
16:56:44  3   basis?
16:56:44  4        A.   Because I believe that chaplain is a trained
16:56:48  5   position.  It requires an extensive amount of education
16:56:52  6   and skill level, and to expect people to volunteer to do
16:56:57  7   that, seems very unprofessional.  It seems very
16:57:02  8   unprofessional and -- what's the word I'm trying to find?
16:57:09  9   I think it undermines the profession to expect someone
16:57:15  10  who is providing that kind of service to not pay them to
16:57:20  11  do it.
16:57:36  12       Q.   You realize in that E-mail there is
16:57:39  13  absolutely no inference that the university was in any
16:57:43  14  way, shape or form discriminating against you because you
16:57:47  15  wanted to do chaplain work; on the contrary, they were
16:57:52  16  inviting you to do work?
16:57:56  17       A.   For free.
16:57:57  18       Q.   And was that offensive or discriminatory to
16:58:01  19  you?
16:58:01  20       A.   It was offensive.  They were paying other
16:58:05  21  people to do chaplaincy work at the university.
16:58:06  22       Q.   Here the E-mail makes it very clear that they
16:58:09  23  don't have the budget to do it.  It says:  "I keep trying
16:58:27  24  to explain to my boss that people who have been trained
16:58:29  25  really expect to receive compensation and deserve it;

Alpine Court Reporting
801-691-1000

Judith Zimmerman
September 16, 2015

---

Page 197

16:58:34  1   however, she gives me the old line there's no money.  Use
16:58:40  2   volunteers."  Where does it say that there are people
16:58:43  3   getting paid and you were the only one not getting paid?
16:58:44  4       A.   Because other people doing chaplaincy work at
16:58:45  5   the university are getting paid.
16:58:51  6       Q.   Like in other departments and maybe just not
16:58:54  7   this one?
16:58:55  8       A.   The chaplaincy program, Susan Roberts was
16:59:00  9   getting paid, Linda Brewers was getting paid, there are
16:59:05  10  some other chaplains that are getting paid.
16:59:08  11      Q.   And this was going on back in 2009 or as of
16:59:13  12  recent?
16:59:13  13      A.   I don't recently know what's going on.  I see
16:59:15  14  positions opened for chaplains at the U, paid positions.
16:59:19  15      Q.   But you don't know what was going on back in
16:59:22  16  2009?
16:59:22  17      A.   They were being paid.
16:59:24  18      Q.   But at this time, she was just asking you to
16:59:29  19  volunteer.
16:59:29  20      A.   Right.
16:59:30  21      Q.   Maybe just as a startup position.  You don't
16:59:32  22  know that?
16:59:32  23      A.   No, it was just a volunteer.
16:59:37  24          MR. ROBINSON:  Were there others who were
16:59:40  25  volunteering their services?

---

Page 198

16:59:42  1           THE WITNESS:  I don't know.  I don't know.
16:59:43  2   BY MS. DONOSSO:
16:59:44  3       Q.   Okay.  Let's turn to your last cause of
17:00:03  4   action on Page 30, wrongful termination.  So what is the
17:00:06  5   basis of this claim?
17:00:06  6           MS. LEONARD:  Objection.  It calls for a
17:00:08  7   legal conclusion and document speaks for itself.
17:00:19  8           THE WITNESS:  I believe that I was reporting
17:00:27  9   legitimate concerns about privacy and research
17:00:32  10  misconduct, plagiarism, and that that was why I was
17:00:38  11  terminated.
17:00:38  12  BY MS. DONOSSO:
17:00:41  13      Q.   Now, on Paragraph 151, I want to draw your
17:00:44  14  attention to that, you specifically alleged that you were
17:00:47  15  exercising your legal right by reporting the university's
17:00:50  16  illegal activity to public authorities?
17:00:53  17      A.   Yes.
17:00:53  18      Q.   What do you mean by that?
17:00:59  19          MS. LEONARD:  Objection.  Document speaks for
17:01:01  20  itself and that Judy didn't draft the document.
17:01:01  21  BY MS. DONOSSO:
17:01:05  22      Q.   What public authorities were you reporting
17:01:09  23  illegal activities to?
17:01:11  24      A.   The U.S. Department of Education and the
17:01:14  25  Utah -- and the HHS, U.S. Health and Human Services.

---

Page 199

17:01:22  1       Q.   Okay.  What did your report to them?
17:01:25  2       A.   Same concerns I reported to the university's
17:01:29  3   privacy office.
17:01:30  4       Q.   And when did you report these concerns to
17:01:33  5   them?
17:01:34  6       A.   In December 2012.
17:01:39  7       Q.   Okay, so was that before or after you got
17:01:41  8   your non-renewal letter?
17:01:45  9       A.   I reported it to Ryan Van Fleet before and he
17:01:50  10  told me to report it to them, which I did, and I don't
17:01:54  11  recall the exact date.  It was give or take a day or two.
17:01:57  12      Q.   Before or after you got your non-renewal
17:02:01  13  letter?
17:02:01  14      A.   Which?  The U.S. Department of Health?  I
17:02:05  15  don't recall.
17:02:05  16      Q.   Okay.
17:02:10  17      A.   I reported to the health department before I
17:02:13  18  got my non-renewal letter.
17:02:17  19      Q.   Was that the E-mail that I read to you
17:02:20  20  regarding Harper where you were discussing general
17:02:24  21  privacy and security concerns?
17:02:25  22      A.   No, it was at our meeting on December 10th
17:02:29  23  when they told me they didn't know where the data was.  I
17:02:34  24  told them I was going to have to report it.
17:02:37  25      Q.   Okay.  Let me give you a copy of this before

---

Page 200

17:02:44  1   we move on.  I had previously shown you your complaint
17:02:51  2   form to the OEO --
17:02:55  3       A.   Yes.
17:02:56  4       Q.   -- dated December 14th, 2012, and I did not
17:02:59  5   have the final report they gave back to you, which we
17:03:03  6   will now mark as Exhibit No. 98.
17:03:17  7       (Whereupon Exhibit 98 was marked for identification.)
17:03:18  8   BY MS. DONOSSO:
17:03:19  9       Q.   Do you recognize this document?
17:03:19  10      A.   Yes.
17:03:20  11      Q.   It's a very long document.
17:03:22  12      A.   Yes, it is.
17:03:23  13      Q.   And I will not go through it all, but is this
17:03:28  14  a true and correct copy of the document that you received
17:03:33  15  some time in July of 2013?  It is dated July 22nd of
17:03:37  16  2013.
17:03:38  17      A.   I believe so, yes.
17:03:41  18      Q.   It is 23 pages long and it was prepared by I
17:03:50  19  believe Brian Nicholls in response to the original
17:03:55  20  complaint that you filed --
17:03:56  21      A.   Yes.
17:03:57  22      Q.   -- in December of 2012, and I'll go to the
17:04:08  23  last page, because it is lengthy, but the point of this
17:04:12  24  is that after their lengthy investigation of your
17:04:19  25  complaint, they found that there was, quote, no cause to

---

Alpine Court Reporting
801-691-1000

Judith Zimmerman
September 16, 2015

| Page 201 |
| --- |

17:04:26 1   support your claim of discrimination based on age, sex,
17:04:29 2   religion or disability. They also found that there is no
17:04:37 3   cause to support your claim of retaliation, end of quote;
17:04:39 4   is that correct?
17:04:39 5      A. That's what the letter, yes.
17:04:41 6      Q. Okay, and my understanding is that you did
17:04:49 7   file an appeal to this and, in fact, all the way to the
17:04:56 8   President's Office but the president declined to hear
17:05:00 9   your appeal; is that correct?
17:05:01 10      A. Yes.
17:05:38 11   (Whereupon Exhibit 99 was marked for identification.)
17:05:38 12   BY MS. DONOSSO:
17:05:54 13      Q. Do you recognize this document, Dr.
17:05:57 14   Zimmerman?
17:06:00 15      A. I'm just looking at it.
17:06:02 16      Q. This is the notice of claim that was provided
17:06:09 17   to us by your then attorney, Lisa Peterson, and it's
17:06:18 18   dated October 25th of 2013. Have you seen a copy of this
17:06:22 19   before?
17:06:23 20      A. I may have. I don't recall.
17:06:25 21      Q. Okay. I'd like to draw your attention --
17:06:37 22   it's very lengthy.
17:06:38 23      A. Yeah.
17:06:40 24      Q. -- to the last page, which is the statement
17:06:46 25   of claim, it's JPZ 00021. How many causes of actions do

| Page 202 |
| --- |

17:07:05 1   you see on that page?
17:07:06 2      A. Two.
17:07:07 3      Q. Actually, it's just one. It's the Utah
17:07:15 4   Protection of Public Employees Act. Do you see that?
17:07:16 5      A. I do.
17:07:16 6      Q. And how many causes of actions did we just go
17:07:20 7   through on your first amended complaint?
17:07:24 8      A. I don't know, nine, ten.
17:07:27 9      Q. Twelve.
17:07:30 10      A. Twelve.
17:07:31 11      Q. So does your notice of claim contain a breach
17:07:40 12   of contract claim?
17:07:44 13      MS. LEONARD: You can answer.
17:07:45 14      THE WITNESS: I don't know.
17:07:46 15   BY MS. DONOSSO:
17:07:47 16      Q. Well, this one -- so the Utah Protection of
17:07:49 17   Public Employees Act, that is your first cause of action,
17:07:53 18   that is the whistleblower's claim, so that one is
17:07:57 19   contained in your notice of claims. Do you see your
17:07:59 20   second clause of action? Do you see your breach of
17:08:02 21   contract claim listed in here?
17:08:04 22      A. No.
17:08:04 23      Q. Do you see your third cause of action, your
17:08:07 24   property interest and violation of Section 1983?
17:08:10 25      A. No.

| Page 203 |
| --- |

17:08:10 1      Q. Do you see your fourth cause of action, your
17:08:13 2   due process and violation of the Utah Constitution?
17:08:18 3      A. No.
17:08:19 4      Q. Do you see your fifth cause of action, your
17:08:23 5   depravation of liberty interests and violation of Section
17:08:28 6   1983?
17:08:29 7      A. No.
17:08:29 8      Q. Do you see your sixth cause of action, your
17:08:31 9   depravation of liberty interest and violation of the Utah
17:08:33 10   Constitution?
17:08:33 11      A. No.
17:08:33 12      Q. Do you see your seventh cause of action, your
17:08:38 13   depravation of First Amendment Rights in violation of
17:08:43 14   Section 1983?
17:08:45 15      A. No.
17:08:45 16      Q. Do you see your eighth cause of action, your
17:08:47 17   depravation of right of free speech and violation of the
17:08:49 18   Utah Constitution?
17:08:50 19      A. No.
17:08:51 20      Q. Do you see your ninth cause of action, your
17:08:54 21   violation of ADA?
17:08:55 22      A. We were waiting for a right to sue. We need
17:08:58 23   a right to sue from Phoenix before we could file that.
17:09:02 24      Q. Okay, but do you see it in here?
17:09:04 25      A. No.

| Page 204 |
| --- |

17:09:05 1      Q. Do you see your tenth cause of action, your
17:09:07 2   violation of ADEA?
17:09:10 3      A. No.
17:09:10 4      Q. Do you see your eleventh cause of action,
17:09:14 5   your discrimination based on Title 7 based on religion?
17:09:20 6      A. No.
17:09:20 7      Q. Do you see your twelfth cause of action, your
17:09:24 8   wrongful termination and violation of public policy?
17:09:27 9      A. No.
17:10:24 10   (Whereupon Exhibit 100 was marked for identification.)
17:10:24 11   BY MS. DONOSSO:
17:10:25 12      Q. Do you recognize this document, Dr.
17:10:27 13   Zimmerman?
17:10:27 14      A. Yes.
17:10:28 15      Q. And it actually has three different
17:10:32 16   certificates, so maybe you want to flip through them.
17:10:35 17   The first one is a HIPAA Basics, the second one is a
17:10:39 18   HIPAA Academic and Research and the third one is
17:10:42 19   Information, Security Advanced. They're all dated
17:10:44 20   May 31st of 2009. How often, while you were employed at
17:10:54 21   the University of Utah, did you conduct these HIPAA and
17:11:01 22   information security trainings?
17:11:03 23      MS. LEONARD: Object to foundation and she
17:11:07 24   didn't conduct anything.
17:11:07 25   BY MS. DONOSSO:

Alpine Court Reporting
801-691-1000

Judith Zimmerman
September 16, 2015

17:11:08  1      Q.  I mean, not conduct.  Sorry, I didn't eat
17:11:11  2  lunch.  How often were you required to attend these HIPAA
17:11:19  3  research and information security trainings as part of
17:11:23  4  your employment?
17:11:24  5      A.  I don't recall.
17:11:25  6      Q.  Did you attend one in at least the spring of
17:11:32  7  2012?
17:11:34  8      A.  As I recall, they're online.
17:11:37  9      Q.  Right.  That's what others have testified.
17:11:40 10  So would the case one that you attended have been this
17:11:43 11  one in 2009 --
17:11:44 12      A.  No.
17:11:44 13      Q.  -- or would there have been others following
17:11:47 14  this one?
17:11:48 15      A.  There would likely be others.
17:11:50 16      Q.  Okay, so it's fair to say that when you
17:12:01 17  removed the clinicians notes and the hard drive from the
17:12:08 18  university in the spring of 2013, you at least had some
17:12:12 19  basic HIPAA and security information training during your
17:12:18 20  tenure at the University of Utah; is that correct?
17:12:20 21      A.  Yes.
17:12:23 22      Q.  So let's take a break and then we'll come
17:12:26 23  back and finish up my other exhibits.
17:18:12 24          (Whereupon a recess was taken.)
17:18:12 25  BY MS. DONOSSO:

17:21:50  1      Q.  Have you ever had any discrimination
17:21:52  2  complaints made against you?
17:21:53  3      A.  Yes.
17:21:53  4      Q.  By whom?
17:21:55  5      A.  Jerilyn NuNu and an employee at the health
17:22:02  6  department.
17:22:02  7      Q.  Okay, so let's focus on the ones on Jerilyn
17:22:08  8  NuNu because those were the ones at the university.
17:22:11  9  Okay.  This is going to be 101.
17:22:23 10          (Whereupon Exhibit 101 was marked for identification.)
17:22:23 11  BY MS. DONOSSO:
17:22:24 12      Q.  What was the nature of Jerilyn NuNu's
17:22:27 13  complaints?
17:22:27 14      A.  After she was terminated, she made a
17:22:35 15  complaint with I believe the university OEO and I recall
17:22:44 16  it had something to do with -- she believed she was
17:22:51 17  terminated because I discriminated against her.  I think
17:23:00 18  it had to do with some gay/lesbian issues and it was
17:23:07 19  against my religion as a chaplain.
17:23:10 20      Q.  Actually it was because of her sexual
17:23:13 21  orientation and her religion.
17:23:16 22      A.  Oh, okay.
17:23:18 23      Q.  Do you know what her religion was?
17:23:27 24      A.  No.
17:23:27 25      Q.  Why do you believe she felt that she was

17:23:29  1  being discriminated against because of her sexual
17:23:31  2  orientation or religion?
17:23:33  3      A.  I don't know.
17:23:34  4      Q.  So you never made any comments regarding her
17:23:42  5  sexual orientation and her religion?
17:23:45  6      A.  No.  I didn't know what her sexual
17:23:48  7  orientation was.  I don't recall.  Maybe she did disclose
17:23:53  8  her religion.  I don't recall her religion.
17:24:02  9      Q.  Okay.  Did anybody ever discuss her complaint
17:24:09 10  with you?
17:24:09 11      A.  Krista Pickens came to my office and she
17:24:15 12  asked me some questions and that was the last I'd heard
17:24:18 13  of it.
17:24:19 14      Q.  Okay.  Were you -- and did you ever meet her
17:24:24 15  partner?
17:24:24 16      A.  I believe I met her, I didn't know she was
17:24:35 17  her partner, her friend when she picked her up at the
17:24:41 18  airport.
17:24:42 19      Q.  So she was the one that was terminated for
17:24:52 20  one of the flash drive issues and performance issues.
17:24:57 21  She alleges that she did not start having these issues
17:24:59 22  until you met her partner at the airport.  Were you ever
17:25:05 23  interviewed and had to address that with Krista?
17:25:07 24      A.  Yes.
17:25:08 25      Q.  Okay, and what was the result of that?

17:25:15  1      A.  I don't know.  I never heard back.
17:25:17  2      Q.  Okay.
17:25:22  3      A.  She was not terminated over the thumb drive.
17:25:34  4      Q.  What was she terminated for?
17:25:37  5      A.  Performance issues and privacy concerns.
17:25:41  6      Q.  Okay.
17:26:16  7          (Whereupon Exhibit 102 was marked for identification.)
17:26:16  8  BY MS. DONOSSO:
17:26:17  9      Q.  Do you recognize this document?
17:26:19 10      A.  I do.
17:26:20 11      Q.  Okay.  Can you tell me what it is?
17:26:22 12      A.  It looks like a printout of my curriculum
17:26:31 13  vitae from the university's MBM system.
17:26:35 14      Q.  I recognize that it looks like it was just
17:26:37 15  last dated July of 2012; is that correct?
17:26:40 16      A.  Yes, that's what it says.
17:26:44 17      Q.  Okay, so it may not be your most recent CV,
17:26:52 18  at least this is what was going on when you were
17:26:56 19  terminated from the university.  So according to this,
17:27:01 20  you have a bachelor's degree in speech pathology; is that
17:27:06 21  correct?
17:27:06 22      A.  Yes.
17:27:06 23      Q.  You have a Ph.D. in language pathology; is
17:27:11 24  that correct?
17:27:12 25      A.  It's speech language pathology.

Judith Zimmerman
September 16, 2015

Page 209

17:27:14  1        Q.   Okay, and you were employed by the Department
17:27:22  2   of Health from 1996 to 2005 and then by the University
17:27:28  3   of Utah from 2005 through June of 2013 but obviously that's
17:27:36  4   not here, but would that be an accurate representation of
17:27:41  5   your work history?
17:27:42  6        A.   So tell me -- so say that again.
17:27:44  7        Q.   So according to this, it says you were at the
17:27:48  8   Department of Health from 1996 through 2005 and then you
17:27:54  9   were at the University of Utah from 2005 and then here it
17:27:59 10   says through the present but obviously we know that you
17:28:02 11   were employed through June of 2013 at the University of
17:28:06 12   Utah; is that correct?
17:28:06 13        A.   It says I was employed from the health
17:28:09 14   department from 1978 to 2005.
17:28:11 15        Q.   Okay. Thank you, so 1978 to 2005. Thank
17:28:16 16   you. During that time, you also had various other
17:28:21 17   positions, for example, you're an instructor and a
17:28:25 18   clinical supervisor and research assistant at other
17:28:29 19   various places, including being a chaplain at St. Mark
17:28:33 20   and Jordan Valley in 2008 and 2009; correct?
17:28:39 21        A.   Yes.
17:28:39 22        Q.   And then on Page 3 it lists some of the
17:28:48 23   various grants that you've been involved in throughout
17:28:51 24   the years?
17:28:53 25        A.   Yes.

Page 210

17:28:53  1        Q.   As well as on Page 4, and then I'd like to
17:29:05  2   draw your attention to Pages 5 and 6, so this is where it
17:29:10  3   lists your various peer review journal articles?
17:29:15  4        A.   Yes.
17:29:15  5        Q.   So you previously testified that one of your
17:29:18  6   articles was I guess recalled or rescinded due to bad
17:29:22  7   information. Which one is that one in here? Which
17:29:25  8   number is that? It was one from 2011 you said?
17:29:39  9        A.   It's No. 9.
17:29:40 10        Q.   Okay, so No. 9, okay. So in total, you have
17:29:46 11   11 publications instead of 12; is that correct?
17:29:51 12        A.   Yes.
17:29:52 13        Q.   But prior to coming to the University of
17:30:02 14   Utah, you only had two peer review journals. I'm going
17:30:06 15   to go by the numbers. One and two; is that correct?
17:30:10 16        A.   And three.
17:30:19 17        Q.   Well --
17:30:20 18        A.   Excuse me, you're right, one and two.
17:30:20 19        Q.   So approximately about 70 percent of your
17:30:29 20   publications happened while you were employed at the
17:30:31 21   University of Utah?
17:30:33 22        A.   Yes.
17:30:34 23        Q.   Okay, and actually -- let's see, at least
17:30:49 24   four out of the -- four out of the ten, so almost like
17:30:58 25   60 percent of those. Four out of the seven that you

Page 211

17:31:05  1   published at the University of Utah happened during
17:31:08  2   Amanda Bakian's tenure or after 2010.
17:31:14  3        A.   So -- so just let me clarify, most of these
17:31:19  4   studies were published using data I collected while I was
17:31:24  5   an employee at the health department, so.
17:31:30  6        Q.   But you were an employee of the health
17:31:33  7   department until 2005.
17:31:35  8        A.   And they allowed me to take the data with me
17:31:37  9   to the university, which I used to publish No. 4, 5, 6,
17:31:50 10   7, 8, 9.
17:31:55 11        Q.   So you were using the health department's --
17:31:58 12        A.   Ten.
17:31:59 13        Q.   Right, okay, I got 10. But, nevertheless,
17:32:30 14   you published all of these while you were an employee of
17:32:34 15   the University of Utah, a vast majority of these?
17:32:39 16        A.   Of the articles, yes.
17:32:41 17        Q.   And even the ones that you just named off
17:32:46 18   that used the data of the Department of Health?
17:32:48 19        A.   Yes.
17:32:49 20        Q.   A lot of these involved having as a coauthor
17:32:54 21   either Bilder or Bakian?
17:32:55 22        A.   Let's see, the one that was retracted was a
17:33:01 23   Bakian article. Satterfield did most of the work on 10.
17:33:08 24        Q.   Then why isn't he listed on 10?
17:33:11 25        A.   He is. So Bakian is listed on 10, which was

Page 212

17:33:25  1   retracted.
17:33:27  2        Q.   I thought nine was the one that was
17:33:29  3   retracted.
17:33:29  4        A.   Excuse me, nine is retracted, and she was
17:33:33  5   listed on ten, but that was mostly from the work of
17:33:43  6   Satterfield, not Bakian.
17:33:48  7        Q.   But Satterfield is listed on ten, not nine?
17:33:52  8        A.   So Satterfield is listed on -- so Bakian did
17:33:57  9   the epidemiology support for nine, which was retracted.
17:34:02 10        Q.   Retracted.
17:34:04 11        A.   Ten, Satterfield did the majority of the
17:34:08 12   work, and on No. 6, Satterfield did the majority of the
17:34:15 13   work but was not credited. So the only one, unless I'm
17:34:37 14   missing something, that Bakian was on is No. 10 and she
17:34:42 15   did not do most of the work.
17:34:53 16        Q.   Okay. I think I'm done for now because I
17:35:39 17   want to reserve some of my time for follow-up questions.
17:35:44 18             MS. LEONARD:   I don't have any questions.
17:35:47 19             MS. DONOSSO:   Oh, okay. Let me quickly
17:35:49 20   consult with my co-counsel then.
17:35:49 21             (Whereupon a recess was taken.)
17:35:49 22   BY MS. DONOSSO:
17:46:45 23        Q.   Do you recall when you spoke with Mr. Sperry
17:46:49 24   for the first time?
17:46:50 25        A.   I want to say 2010.

53 (Pages 209 to 212)

Alpine Court Reporting
801-691-1000

Judith Zimmerman
September 16, 2015

## Page 213

17:46:54  1   Q.   Do you remember approximately a month?
17:46:57  2   A.   I don't.
17:46:58  3   Q.   Okay, and what concerns did you share with
17:47:02  4   him at that time?
17:47:03  5   A.   Just the general atmosphere of the department
17:47:15  6   and my concerns about the chairman taking credit for my
17:47:24  7   work.
17:47:24  8   Q.   Did you speak with him over the phone?  In
17:47:28  9   person?
17:47:29  10  A.   I met with him in person two or three times.
17:47:32  11  Q.   During the same month or over the same year?
17:47:37  12  A.   No, over a two-year period.
17:47:39  13  Q.   Starting sometime in 2010?
17:47:41  14  A.   As I recall.
17:47:42  15  Q.   Did you ever document your conversations in
17:47:45  16  writing?
17:47:46  17  A.   With him?
17:47:47  18  Q.   Yes.
17:47:48  19  A.   It would be my E-mails and he did tell me
17:47:51  20  that he would help me file a discrimination -- no, an
17:47:57  21  ethics complaint, but when I went to go back, he had
17:48:01  22  abruptly left the university.
17:48:04  23  Q.   Do you have copies of these E-mails that you
17:48:09  24  sent to him?
17:48:09  25  A.   I'll have to look but we've asked for

## Page 214

17:48:12  1   archived E-mails from the university and have not gotten
17:48:16  2   them and they are on my archived E-mails that I have
17:48:20  3   not -- that I didn't have access to.
17:48:23  4   Q.   All right.  Do you recall when you talked to
17:48:29  5   Dr. Parks for the first time?
17:48:31  6   A.   For sure in 2011, and I may have talked to
17:48:41  7   him once before that but I don't recall.  There, again,
17:48:44  8   my E-mails would be -- so there should be E-mails.  They
17:48:49  9   should have E-mails.  We haven't gotten those either.
17:48:52  10  Q.   And what concerns did you share with him?
17:48:55  11  A.   The first time was that I shared with him the
17:49:01  12  situation in the department.  I shared with him concerns
17:49:13  13  that other faculty had shared with me about McMahon and I
17:49:21  14  asked him IRB questions.  The second time I met with --
17:49:27  15  the second or third time I met with him, I shared with
17:49:32  16  him my concerns that a study that I had originated in
17:49:39  17  2007 and my grant activities were being turned over to
17:49:45  18  younger female faculty and -- and I shared concerns about
17:49:59  19  privacy as well that basically I had funded, helped given
17:50:10  20  all the data to an individual who then took the research
17:50:15  21  to another, to a different research group, and he said
17:50:22  22  he'd never heard of that before.
17:50:24  23  Q.   Did you speak with him over the phone?  In
17:50:29  24  person?
17:50:29  25  A.   In person.

## Page 215

17:50:30  1   Q.   At his office?  Your office?
17:50:32  2   A.   Yes.
17:50:34  3   Q.   Did you document any of these conversations
17:50:37  4   in writing?
17:50:38  5   A.   I did, just that I met with him and then I
17:50:43  6   documented -- so one of my approvals for a study that was
17:50:48  7   in progress was being held up until I put McMahon's
17:50:57  8   friend on the study and I documented that and I sent
17:51:02  9   those concerns to Dr. Parks as well.
17:51:05  10  Q.   Did you ever officially file any complaints
17:51:09  11  with either Dr. Sperry or Dr. Parks or were these just
17:51:15  12  E-mails where you were expressing your concerns and
17:51:18  13  asking for advice?
17:51:19  14  A.   I never got a sense that they would help me.
17:51:29  15  MR. ROBINSON:  So the answer is, no, you
17:51:32  16  didn't?
17:51:32  17  THE WITNESS:  I believe my complaints were
17:51:34  18  official by meeting with them and telling them of them
17:51:37  19  and they knew of other complaints.
17:51:39  20  MR. ROBINSON:  But you didn't file a written
17:51:41  21  complaint?
17:51:41  22  THE WITNESS:  Other than Sperry offered to
17:51:46  23  help me do that.
17:51:48  24  MR. ROBINSON:  But you didn't file a written
17:51:50  25  complaint?

## Page 216

17:51:51  1   THE WITNESS:  I filed a written E-mail to
17:51:53  2   Botkin.  I filed a complaint to Parks about withholding
17:51:59  3   my approvals.
17:52:01  4   MR. ROBINSON:  Did you file an official
17:52:03  5   complaint with Parks?
17:52:05  6   THE WITNESS:  I don't know what the official
17:52:06  7   complaint process is.  I don't know what -- I was told I
17:52:15  8   couldn't.  I couldn't appeal any performance evaluations.
17:52:15  9   BY MS. DONOSSO:
17:52:25  10  Q.   So other than meeting with him and asking for
17:52:27  11  advice, you never actually filed any form of formal
17:52:32  12  complaint with either Dr. Sperry or with Dr. Parks?
17:52:35  13  A.   I thought my complaints were formal, that I
17:52:37  14  went in and I met with them and I told them what was
17:52:40  15  going on and that was official.  They never asked me to
17:52:43  16  fill out any paperwork or forms.
17:52:47  17  Q.   So would your answer be yes or no?
17:52:49  18  A.   No.  No.  Yes, I filed.  I believe I filed
17:52:53  19  complaints.
17:52:53  20  MR. ROBINSON:  In writing?
17:52:54  21  BY MS. DONOSSO:
17:52:55  22  Q.   In writing?  Did you give them something in
17:52:57  23  writing, like here's my complaint, here's my history?
17:52:59  24  A.   Yes.
17:53:00  25  Q.   What did you give them in writing?

Alpine Court Reporting
801-691-1000

Judith Zimmerman
September 16, 2015

Page 217

| | | |
|---|---|---|
| 17:53:02 | 1 | A.  I gave them E-mails.  I gave Botkin E-mails. |
| 17:53:08 | 2 | MR. ROBINSON:  We're not talking about |
| 17:53:08 | 3 | Botkin. |
| 17:53:08 | 4 | BY MS. DONOSSO: |
| 17:53:09 | 5 | Q.  We're not talking about Botkin.  We've gone |
| 17:53:10 | 6 | over the written information for Botkin.  But during this |
| 17:53:14 | 7 | timeframe in 2010 and 2011 with Drs. Sperry and Parks, |
| 17:53:18 | 8 | you were meeting with them and sharing with them your |
| 17:53:21 | 9 | concerns.  Did you actually give them -- |
| 17:53:23 | 10 | A.  I'd have to look at the E-mails. |
| 17:53:25 | 11 | Q.  -- a formal complaint? |
| 17:53:25 | 12 | A.  I don't know how you define formal complaint. |
| 17:53:27 | 13 | I met with them.  I told them my concerns.  I documented |
| 17:53:31 | 14 | that I met with them.  I documented the issues. |
| 17:53:34 | 15 | MR. ROBINSON:  Let's try it this way:  Did |
| 17:53:37 | 16 | you give them anything in writing other than E-mails? |
| 17:53:41 | 17 | THE WITNESS:  I was not asked to. |
| 17:53:44 | 18 | MR. ROBINSON:  So the answer is? |
| 17:53:46 | 19 | THE WITNESS:  No. |
| 17:53:48 | 20 | MR. ROBINSON:  Okay. |
| 17:53:48 | 21 | BY MS. DONOSSO: |
| 17:53:52 | 22 | Q.  Other than Dr. Sperry and Dr. Parks, did you |
| 17:53:57 | 23 | meet with anybody else prior to your meeting with Jeff |
| 17:54:06 | 24 | Botkin in April of 2011? |
| 17:54:08 | 25 | A.  Yes. |

Page 218

| | | |
|---|---|---|
| 17:54:08 | 1 | MR. ROBINSON:  In which you expressed |
| 17:54:10 | 2 | concerns? |
| 17:54:10 | 3 | BY MS. DONOSSO: |
| 17:54:11 | 4 | Q.  Regarding Dr. McMahon. |
| 17:54:12 | 5 | A.  Yeah, I met with Sperry before. |
| 17:54:15 | 6 | Q.  Other than Sperry and Parks, prior to April |
| 17:54:19 | 7 | of 2011, did you meet with anybody else where you |
| 17:54:22 | 8 | expressed concerns? |
| 17:54:23 | 9 | A.  At the university? |
| 17:54:24 | 10 | Q.  At the university where you expressed |
| 17:54:26 | 11 | concerns regarding Dr. McMahon. |
| 17:54:28 | 12 | A.  I met with my mentor. |
| 17:54:40 | 13 | MR. ROBINSON:  Who was? |
| 17:54:42 | 14 | THE WITNESS:  Macintosh. |
| 17:54:42 | 15 | BY MS. DONOSSO: |
| 17:54:45 | 16 | Q.  What concerns did you express to him? |
| 17:54:48 | 17 | A.  The same ones that everybody knew about in |
| 17:54:53 | 18 | the department. |
| 17:54:55 | 19 | Q.  And did you give him anything in writing that |
| 17:55:00 | 20 | he could use that could be viewed as a formal complaint? |
| 17:55:04 | 21 | A.  He would not -- he did not -- he saw that he |
| 17:55:09 | 22 | was powerless and couldn't help me. |
| 17:55:12 | 23 | Q.  So would that be yes or no? |
| 17:55:13 | 24 | A.  So the question is did I give -- |
| 17:55:18 | 25 | Q.  Dr. Macintosh any type of like written |

Page 219

| | | |
|---|---|---|
| 17:55:24 | 1 | summary, formal complaint regarding McMahon. |
| 17:55:26 | 2 | A.  I sent him E-mails outlining the concerns I |
| 17:55:30 | 3 | wanted to talk to him about. |
| 17:55:33 | 4 | Q.  Those were concerns.  Did you give him a |
| 17:55:34 | 5 | formal complaint? |
| 17:55:36 | 6 | A.  In terms of semantics, to me writing down a |
| 17:55:42 | 7 | summary of my complaints is a formal complaint.  Whether |
| 17:55:44 | 8 | they had a formal complaint process separate from that, |
| 17:55:46 | 9 | no one told me. |
| 17:55:47 | 10 | MR. ROBINSON:  So did you file anything in |
| 17:55:51 | 11 | writing other than E-mails? |
| 17:55:53 | 12 | THE WITNESS:  To Botkin. |
| 17:55:54 | 13 | MR. ROBINSON:  No, to Dr. Macintosh. |
| 17:55:54 | 14 | BY MS. DONOSSO: |
| 17:55:55 | 15 | Q.  No, to Dr. Macintosh. |
| 17:55:56 | 16 | A.  Just E-mails. |
| 17:55:57 | 17 | Q.  Okay, so other than Dr. Sperry and Dr. Parks |
| 17:56:02 | 18 | and Dr. Macintosh, did you meet with anybody, prior to |
| 17:56:08 | 19 | April of 2011, regarding concerns about Dr. McMahon? |
| 17:56:12 | 20 | A.  I believe I may have met with another |
| 17:56:18 | 21 | department chairman, Ed Clark. |
| 17:56:26 | 22 | Q.  And when did you meet with Ed Clark? |
| 17:56:29 | 23 | A.  I met with him on several occasions and I'd |
| 17:56:34 | 24 | have to check my E-mails. |
| 17:56:35 | 25 | Q.  Do you recall if it was prior to April of |

Page 220

| | | |
|---|---|---|
| 17:56:36 | 1 | 2011? |
| 17:56:38 | 2 | A.  I don't recall.  I was trying to leave.  I |
| 17:56:41 | 3 | was trying to get out of the department.  I wanted to |
| 17:56:44 | 4 | move to a different department. |
| 17:56:45 | 5 | Q.  So would it have been during the summer of |
| 17:56:49 | 6 | 2012 when you were already meeting with Dean Li? |
| 17:56:53 | 7 | A.  No, it was before that and I also met with |
| 17:56:55 | 8 | the health department.  I met with -- |
| 17:56:58 | 9 | MR. ROBINSON:  We're talking about the |
| 17:56:59 | 10 | university. |
| 17:57:00 | 11 | THE WITNESS:  Yeah. |
| 17:57:00 | 12 | BY MS. DONOSSO: |
| 17:57:01 | 13 | Q.  Okay.  Anybody else that you recall? |
| 17:57:04 | 14 | A.  Not that I recall right now. |
| 17:57:06 | 15 | Q.  Did you make any sort of written reports or |
| 17:57:11 | 16 | complaints to Ed Clark regarding Dr. McMahon? |
| 17:57:13 | 17 | A.  Ed Clark indicated that no one at the |
| 17:57:18 | 18 | university would help me and that he had advised me to |
| 17:57:21 | 19 | get as far away from McMahon as possible, which I tried |
| 17:57:27 | 20 | to do. |
| 17:57:29 | 21 | Q.  So you never gave him any written complaint |
| 17:57:32 | 22 | or report either? |
| 17:57:34 | 23 | A.  He did not see it as his responsibility.  He |
| 17:57:38 | 24 | had no authority. |
| 17:57:41 | 25 | MR. ROBINSON:  So the answer is no? |

55 (Pages 217 to 220)

Judith Zimmerman
September 16, 2015

## Page 221

17:57:43  1          THE WITNESS:  He was not the person to file a
17:57:47  2   written complaint with, so, no.
17:57:49  3          MR. ROBINSON:  Very good.
17:57:51  4   BY MS. DONOSSO:
17:57:52  5      Q.  Okay.  Anybody else that you would have
17:57:55  6   talked to?
17:57:55  7      A.  I talked to other faculty about my concerns
17:58:02  8   and they shared their experiences, but there again, they
17:58:10  9   had no authority to do anything.
17:58:14  10     Q.  Okay.
17:58:15  11     A.  And they had shared their concerns with
17:58:18  12  management as well.
17:58:26  13     Q.  Okay, so Botkin, OEO, privacy, IRB, Sperry,
17:58:31  14  Parks.
17:58:37  15     A.  My mentor, I shared my concerns with my
17:58:39  16  mentor.
17:58:40  17     Q.  Macintosh.
17:58:42  18         MR. ROBINSON:  Macintosh.
17:58:43  19         THE WITNESS:  Oh, excuse me, my coach, my
17:58:45  20  executive coach was a vice president of HR.
17:58:45  21  BY MS. DONOSSO:
17:58:50  22     Q.  Okay.  What was his or her name?
17:58:51  23     A.  Marry Ann Beazin.
17:58:59  24         MR. ROBINSON:  Spell that.
17:59:00  25         THE WITNESS:  I think B-e-a-z-i-n.

## Page 222

17:59:07  1          MR. ROBINSON:  And that's prior to April of
17:59:09  2   2011.
17:59:11  3          THE WITNESS:  It was when -- when I started
17:59:14  4   my executive coaching, so it would have been --
17:59:17  5          MR. ROBINSON:  So after June --
17:59:19  6          THE WITNESS:  After my performance review --
17:59:22  7          MR. ROBINSON:  After June --
17:59:22  8          MS. LEONARD:  Will you let her finish?
17:59:23  9          MR. ROBINSON:  Sorry.
17:59:23  10  BY MS. DONOSSO:
17:59:24  11     Q.  So this would have been after June of 2011
17:59:26  12  when you had your outline of expectations meeting?
17:59:30  13     A.  Yes.
17:59:30  14     Q.  Okay.  Anybody else that you can recall?
17:59:40  15     A.  Not right off.
17:59:43  16     Q.  Okay.
17:59:49  17         MS. LEONARD:  Okay.
17:59:50  18         MS. DONOSSO:  Okay.
17:59:51  19         MS. LEONARD:  We're done.
          20  (Whereupon the deposition concluded at 5:59 p.m.)
          21
          22
          23
          24
          25

## Page 223

1   Case:  Zimmerman V University of Utah
    Case No.:  2:13cv1131
2   Deposition Date:  September 16, 2015
    Reporter:  Donna Ward, RPR, CSR
3
            WITNESS CERTIFICATE
4
    State of Utah          )
5                          ss.
    County of Salt Lake    )
6
        I, JUDY ZIMMERMAN, HEREBY DECLARE:  That I am the
7   witness referred to in the foregoing testimony; that I
    have read the transcript and know the contents thereof;
8   that with these corrections I have noted this transcript
    truly and accurately reflects my testimony.
9   PAGE-LINE      CHANGE/CORRECTION        REASON
10  ____ ____   _____    _____
11  ____ ____   _____    _____
12  ____ ____   _____    _____
13  ____ ____   _____    _____
14  ____ ____   _____    _____
15  ____ ____   _____    _____
16  ____ ____   _____    _____
17  ____ ____   _____    _____
18  ____ ____   _____    _____
19  ____    No corrections were made.
20
21  _____
            JUDY ZIMMERMAN
22
    SUBSCRIBED and SWORN to before me on this _____day of
23  _____, 2015.
24
            _____
25             Notary Public

## Page 224

1   STATE OF UTAH        )
2                        )
    COUNTY OF UTAH       )
3
4
5       I, DONNA M. WARD, a Certified Shorthand Reporter,
    Registered Professional Reporter, certify:
6
7       That the deposition of JUDY ZIMMERMAN was taken
    before me pursuant to Notice at the time and place
8   therein set forth, at which time the witness was by me
    duly sworn to testify the truth.
9       That the testimony of the witness and all
    objections made and all proceedings had at the time of
10  the examination were recorded stenographically by me and
    were thereafter transcribed.  And I hereby certify that
11  the foregoing deposition transcript is a full, true, and
    correct record of my stenographic notes so taken.
12
        I further certify that I am neither counsel for or
13  related to any party to said action nor in anywise
    interested in the outcome thereof.
14
        IN WITNESS WHEREOF, I have hereunto subscribed my
15  hand and affixed my official seal this 16th day of
    September, 2015.
16
17
18
        _____
19      DONNA M. WARD, CSR, RPR
        Certified Shorthand Reporter
20      Registered Professional Reporter
21
22
23
24
25

Alpine Court Reporting
801-691-1000