# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| JUDITH PINBOROUGH ZIMMERMAN,<br><br>Plaintiff,<br>v.<br><br>UNIVERSITY OF UTAH and WILLIAM MCMAHON,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING SUMMARY JUDGMENT ON PLAINTIFF'S SEVENTH CAUSE OF ACTION**<br><br>Case No. 2:13-cv-01131-JNP-BCW<br><br>District Judge Jill N. Parrish |

Before the court is a Motion for Partial Summary Judgment filed by Defendants University of Utah and William McMahon. (Docket No. 103). Defendants ask this court to enter summary judgment as to Plaintiff Judith Pinborough Zimmerman's Seventh Cause of Action, a claim of retaliation in violation of the First Amendment to the United States Constitution. As explained below, the court finds the Motion to be well-taken and holds that Defendants are entitled to summary judgment and dismissal of Plaintiff's Seventh Cause of Action.

## BACKGROUND

This lawsuit arises from a long-simmering employment dispute that eventually resulted in the termination of Plaintiff, Dr. Judith Pinborough Zimmerman, from her position as a Research Assistant Professor in the Department of Psychiatry at the University of Utah. Prior to her termination, Plaintiff was employed by the University's School of Medicine not only as a researcher, but also as director of the Utah Registry of Autism and Developmental Disabilities ("URADD"), a database of medical and educational data related to autism and other developmental disorders gathered from various clinics, hospitals, schools, and special education programs. Plaintiff was evidently instrumental in the creation of URADD prior to her

employment at the University of Utah and was hired to maintain and develop the database once the University began housing the data. URADD was intended as a repository for research-ready data relating to autism and other developmental disorders as well as a starting point for the dissemination of useful public health information. As director of URADD for the University, Plaintiff oversaw the maintenance of data then currently stored within the database and developed the database by negotiating new agreements with outside entities to provide additional data. Plaintiff also executed and ensured URADD's compliance with various confidentiality agreements with data sources, including the Jordan School District and various other medical and educational entities.

The database itself is the product of overlapping interests and extensive collaboration between numerous state and national entities. The State of Utah's Department of Health ("UDOH") originally authorized URADD's development, supervised its continued operation, regulated access to data, and owned all of the data stored in the database. The University of Utah maintained URADD's data on a campus-based computer network administered by the University's information technology organization and was therefore subject to the University's internal security and privacy regulations, state laws regarding security and privacy of confidential data, as well as oversight by the State of Utah's Department of Technology Services. The U.S. Centers for Disease Control and Prevention ("CDC") provided the vast majority of the funding for the database. Because the data stored in URADD included confidential medical and educational information, it was subject to certain federal laws and regulations—namely, the Health Information Portability and Accountability Act of 1996 ("HIPPA") and the Family Educational Rights and Privacy Act of 1974 ("FERPA")—administered by the U.S. Department of Health and Human Services and the U.S. Department of Education.

During the course of Plaintiff's employment, her relationship with her direct supervisor, Defendant Dr. William McMahon, and certain other researchers, including Drs. Amanda Bakian and Deborah Bilder, was often characterized by significant friction. During 2011, 2012, and early 2013, Plaintiff filed numerous complaints to multiple individuals and entities regarding Drs. McMahon, Bakian, and Bilder, alleging unauthorized access to confidential URADD data, disruption of her grant-related work, plagiarism, and other misconduct. Plaintiff's Seventh Cause of Action revolves around her allegation that these complaints triggered significant retaliation from Dr. McMahon and other individuals, culminating Plaintiff's removal as director of URADD and her eventual termination from employment at the University. Plaintiff alleges that this retaliation was in direct violation of her First Amendment rights and accordingly seeks both injunctive and monetary relief.

On November 29, 2016, Defendants filed the instant Motion for summary judgment on Plaintiff's Seventh Cause of Action, arguing that all of her reports and communications were made pursuant to her official duties and were therefore not actionable under the First Amendment. (Docket No. 103). Plaintiff filed a memorandum in opposition to the Motion on January 17, 2017. (Docket No. 107). Defendants replied on January 30, 2017. (Docket No. 108). The court heard argument on the Motion on June 8, 2017. (Docket No. 113). The court now considers the arguments of the parties under jurisdiction granted by 28 U.S.C. § 1331.

## **STANDARD**

Rule 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In applying this standard, the court must "construe the evidence and the reasonable inferences drawn therefrom in the light most favorable to the

nonmovant." *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 972 (10th Cir. 2002); *see also*

*Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013) ("The nonmoving party

is entitled to all reasonable inferences from the record."). However, the nonmoving party "is

entitled to only those inferences that are 'reasonable.'" *See Hornady Mfg. Co. v. Doubletap, Inc.*,

746 F.3d 995, 1004 (10th Cir. 2014). "A fact is 'material' if, under the governing law, it could

have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a

rational jury could find in favor of the nonmoving party on the evidence presented." *Tabor v.*

*Hilti, Inc.*, 73 F.3d 1206, 1215 (10th Cir. 2013) (quoting *E.E.O.C. v. Horizon/CMS Healthcare*

*Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000)).

"[T]he movant bears the burden of showing the absence of a genuine issue of material

fact, [but] the movant need not negate the nonmovant's claim." *Jenkins v. Wood*, 81 F.3d 988,

990 (10th Cir. 1996). "[A] movant may make its prima facie demonstration by pointing out to the

court a lack of evidence on an essential element of the nonmovant's claim." *Libertarian Party of*

*N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007). Once the movant meets this initial

burden, the "nonmovant may not rest on its pleadings, but must bring forward specific facts

showing a genuine issue for trial as to those dispositive matter for which it carries the burden of

proof." *Jenkins*, 81 F.3d at 990. The court also recognizes that "conclusory allegations without

specific supporting facts have no probative value" and that a conclusory affidavit is "insufficient

to support summary judgment." *Fitzgerald v. Corrections Corp. of Am.*, 403 F.3d 1134, 1145

(10th Cir. 2005) (internal citations and quotations omitted). Ultimately, "the plain language of

Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon

motion, against a party who fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Here, Plaintiff purports to dispute approximately twelve of Defendants' statements of undisputed material fact. However, many of Plaintiff's disputes are plainly not material to the outcome of this Motion. *See Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1251 (10th Cir. 2015) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). These include Plaintiff's assertion that she was in fact a "principal investigator" and not a "co-principal investigator." (Docket No. 107, at 2).

The remaining disputes are mostly disagreements with Defendants' characterization of certain facts or assertions that Defendants have failed to list certain relevant communications. In particular, Plaintiff argues that many of her reports of potential misconduct were not concerned solely with "privacy" but with "plagiarism" or other misconduct. (*See, e.g.*, Docket No. 107, at 3). These are not genuine disputes of fact, but rather inferences drawn from material facts that the court will evaluate in more detail below. Additionally, the court notes that Defendants do not appear to dispute that Plaintiff made certain additional reports beyond what they term "privacy concerns," including a report of financial misconduct by Plaintiff's supervisor and coworkers. Accordingly, the court treats all of the facts recited in this decision—stripped of both parties' characterizations and legal arguments—as undisputed for purposes of this Motion.

As there is "no genuine issue as to any material fact," the court need only apply the relevant substantive law to the undisputed facts[1] in order to determine if Defendants are entitled to summary judgement as a matter of law. *See* FED. R. CIV. P. 56(a); *BancOklahoma Mortg.*

---

[1] The court notes that it has considered certain materials in the record not directly referenced by the parties in their briefing in order to properly decide this Motion. *See* FED. R. CIV. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

*Corp. v. Capital Title Co.*, 194 F.3d 1089, 1097 (10th Cir. 1999) (indicating that, under Rule 56, district courts must determine "whether any genuine issue of material fact [is] in dispute, and, if not, whether the moving party [is] entitled to judgment as a matter of law").

## DISCUSSION

The relevant substantive law in this instance arises from the First Amendment's guarantee of the right of the citizenry to "freedom of speech." *See* U.S. CONST. amend. I. Plaintiff's Seventh Cause of Action alleges that Defendants retaliated against her "because she engaged in speech that addressed a matter of public concern. Specifically, [Plaintiff] spoke out and identified her concerns about . . . privacy issues and unauthorized access to secure data at the University." (Docket No. 32, at 24–25). As a public employee, Plaintiff did "not relinquish First Amendment rights to comment on matters of public interest by virtue of [her] government employment." *Connick v. Myers*, 461 U.S. 138, 140 (1983). At the same time, "the State's interests as an employer in regulating the speech of its employees 'differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general.'" *Id.* (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). In other words, "while the First Amendment invests public employees with certain rights, it does not empower them to constitutionalize the employee grievance." *Garcetti v. Ceballos*, 547 U.S. 410, 420 (2006). In order to balance these competing interests, the court employs the "*Garcetti/Pickering* analysis," *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1202 (10th Cir. 2007), an analytical approach based on the Supreme Court's twin opinions in *Garcetti v. Ceballos*, 547 U.S. at 410, and *Pickering v. Bd. of Educ.*, 391 U.S. at 563. The analysis which determines whether a public employee's speech is protected from employer retaliation by the First Amendment consists of five steps:

(1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009). The only step at issue in the instant Motion is the first—"whether the speech was made pursuant to [Plaintiff's] official duties." *See id.*

## I.     EMPLOYEE SPEECH PURSUANT TO OFFICIAL DUTY

The first step of the *Garcetti/Pickering* analysis is an issue of law "to be resolved by the district court," *see Brammer-Hoelter*, 492 F.3d at 1203, which requires "review [of] disputed facts . . . in the light most favorable to the non-moving party at the summary judgment stage," *Rohrbough v. Univ. of Colo. Hosp. Auth.*, 596 F.3d 741, 746 (10th Cir. 2010). This step is based on a seemingly simple premise: "[W]hen public employees speak 'pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.'" *Casey v. W. Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1328 (10th Cir. 2007) (quoting *Garcetti*, 547 U.S. at 421); *Brammer-Hoelter*, 492 F.3d at 1202 (quoting *Garcetti*, 547 U.S. at 422) ("If the employee speaks pursuant to [her] official duties, then there is no constitutional protection because the restriction on speech 'simply reflects the exercise of employer control over what the employer itself has commissioned or created.'"). Neither the Supreme Court nor the Tenth Circuit has "developed a set of bright line rules to determine when an employee speaks pursuant to her official duties." *Rohrbough*, 596 F.3d at 746. But the Tenth Circuit has "taken a broad view of the meaning of speech that is pursuant to an employee's official duties," *Thomas v. City of*

*Blanchard*, 548 F.3d 1317, 1324 (10th Cir. 2008) (quotations omitted), and has characterized the first step as a "heavy barrier" to claims of First Amendment retaliation by public employees, *see Casey*, 473 F.3d at 1331.

The official duties of a government employee may be explicitly spelled out in an employment contract or otherwise specifically delineated by the employer. *See id.* at 1329 (citing *Garcetti*, 547 U.S. at 419–21) (indicating that speech concerning a matter within the employee's "portfolio" is made "pursuant to her official duties"). Nevertheless, "[a]n employee's official job description is not dispositive, . . . because speech may be made pursuant to an employee's official duties even if it deals with activities that the employee is not expressly required to perform." *Brammer-Hoelter*, 492 F.3d at 1203. Even speech that "concerns an unusual aspect of an employee's job that is not part of [her] everyday functions" may be made "pursuant to official duties if it is generally consistent with 'the type of activities [the employee] was paid to do.'" *Id.* (alterations added and in original) (citing *Green v. Bd. of Cty. Comm'rs*, 472 F.3d 794, 801 (10th Cir. 2007)). Ultimately, the court must determine "'whether the employee speaks as a citizen or instead as a government employee.'" *Rohrbough v. Univ. of Colo. Hosp. Auth.*, 596 F.3d 741, 746 (10th Cir. 2010) (quoting *Brammer-Hoelter*, 492 F.3d at 1203). To this end, the Tenth Circuit has prescribed a "case-by-case approach, looking both to [1] the content of the speech, as well as [2] the employee's chosen audience, to determine whether the speech is made pursuant to an employee's official duties." *Id.*

### A. CONTENT OF EMPLOYEE SPEECH

In keeping with this approach, the court must first evaluate whether the content of the speech indicates that it was made pursuant to the employee's official duties. *Id.* In making this evaluation, the court "must take a practical view of all the facts and circumstances surrounding

the speech and the employment relationship." *Brammer-Hoelter*, 492 F.3d at 1204. The Tenth

Circuit has explained that "if an employee engages in speech during the course of performing an

official duty and the speech reasonably contributes to or facilitates the employee's performance

of the official duty, the speech is made pursuant to the employee's official duties." *Id.* at 1203.

However, the Tenth Circuit also cautioned that "not all speech that occurs at work is made

pursuant to an employee's official duties. Nor is all speech about the subject matter of an

employee's work necessarily made pursuant to the employee's official duties." *Id.* at 1204

(internal citations and footnote omitted) (citing *Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d

689, 693 (5th Cir. 2007); *Garcetti*, 547 U.S. at 419–423). Nevertheless, as noted above, speech

may "be considered within the scope of an employee's official duty even if 'the speech concerns

an unusual aspect of an employee's job that is not part of [her] everyday functions.'" *Rohrbough*,

596 F.3d at 749 (quoting *Brammer-Hoelter*, 492 F.3d at 1203).

       In the context of an employee's report of alleged wrongdoing, the fact that the content of

the report deals with the employee's work may not be dispositive. In *Thomas*, for example, the

Tenth Circuit held that a city home inspector was not acting pursuant to his official duties when

he reported suspected fraudulent inspection certificates to a state oversight board. The *Thomas*

court reasoned that, although the alleged wrongdoing was technically related to the inspector's

job, he "was not hired to detect fraud in connection with the issuance of certificates of

occupancy; he was hired to inspect houses." 548 F.3d at 1324. His independent report to a state

agency therefore "went well beyond his official responsibilities." *Id.* Thus, a finding that "the

employee's job responsibilities d[o] not relate to reporting wrongdoing" suggests that the

employee's report was not made pursuant to official duties. *See Reinhardt v. Albuquerque Pub.*

*Schs. Bd. of Educ.*, 595 F.3d 1126, 1135–36 (10th Cir. 2010); *id.* at 1136 (finding that a teacher's

filing of a state complaint regarding federal regulatory compliance in public schools was not pursuant to her official duties because "she was not hired to ensure . . . compliance," but to "provide speech and language services . . . to students"); *Casey*, 473 F.3d at 1332–33 (finding that director of an educational program was not acting pursuant to her official duties when she reported a school board's alleged violation of the Open Meetings Act to a state attorney general because she had no official "responsibility for the [b]oard's meeting practices").

At the same time, a finding that an employee's duties implicated the reporting of wrongdoing or noncompliance suggests that any reports of wrongdoing or noncompliance are made pursuant to official duties. *See Casey*, 473 F.3d at 1330–31. In *Casey*, the Tenth Circuit held that the director of a state educational program acted pursuant to official duties when she reported a school board's potential violations of certain federal regulations. As will be explored in more detail below, the *Casey* court explained that the director's "responsibilities . . . included a duty to report the [school] [d]istrict's noncompliance to federal authorities because she would be held legally responsible for having knowledge of" potential violations and failing to report them to proper authorities. *Id.* at 1330 (quotations omitted). Although not explicitly a part of the director's duties, such reporting arose naturally from the position she held and was therefore implicitly required of her as director of the educational program. *See id.* at 1330–31. Such an evaluation reflects the "practical view of all the facts and circumstances surrounding the speech and the employment relationship" that courts must take when evaluating a government employee's claim to First Amendment protection. *See Brammer-Hoelter*, 492 F.3d at 1204.

## B. EMPLOYEE'S CHOSEN AUDIENCE

Next, the court must evaluate whether the "employee's chosen audience, or chosen method of disseminating speech" indicates that the speech was made pursuant to the employee's

official duties. *Rohrbough*, 596 F.3d at 747. A useful example of this evaluation arose in *Brammer-Hoelter*, where the Tenth Circuit found that some of the plaintiff teachers' speech regarding teacher salaries and staffing levels was not made pursuant to their official duties and was therefore entitled to First Amendment protection. 492 F.3d at 1205. In reaching that conclusion, the court emphasized that the speech was directed at "ordinary citizens and parents" and occurred after school hours and off school grounds. *Id.* Although the content of the speech was clearly related to the teachers' official duties and had significant bearing on their day-to-day work, the speech was not made pursuant to their official duties because of their chosen audience and the circumstances of the communication. *Id.* Similarly, the *Garcetti* Court explained that "[e]mployees who make public statements outside the course of performing their official duties retain some possibility of First Amendment protection because that is the kind of activity engaged in by citizens who do not work for the government." 547 U.S. at 423. Thus, "communicating with newspapers or . . . legislators" regarding work-related issues or participating in "some similar activity afforded citizens" is likely not a part of the employee's official duties. *See Green*, 472 F.3d at 800. By contrast, speech is less likely to be protected "when there is 'no relevant analogue to speech by citizens who are not government employees.'" *Rohrbough*, 596 F.3d at 746 (quoting *Garcetti*, 547 U.S. at 424).

In the context of an employee's reports of alleged wrongdoing, "speech directed at an individual or entity *within* an employee's chain of command is often found to be pursuant to that employee's official duties." *Id.* at 747 (emphasis added); *see also Davis v. McKinney*, 518 F.3d 304, 313 (5th Cir. 2008) ("Cases from other circuits are consistent in holding that when a public employee raises complaints or concerns up the chain of command at his workplace about his job duties, that speech is undertaken in the course of performing his job."). At the same time,

"speech directed at an individual or entity *outside* of [the] employee's chain of command is often outside of [the] employee's official duties." *Rohrbough*, 596 F.3d at 747 (emphasis added) (citing *Thomas*, 548 F.3d at 1325; *Casey*, 473 F.3d at 1332–33). Indeed, "it would be going too far to hold that every time a public employee discovers alleged wrongdoing related to [her] job and brings it to the attention of law enforcement or other outside parties, the speech is unprotected." *Thomas*, 548 F.3d at 1324.     Nevertheless, "an employee's decision to go outside [her] ordinary chain of command does not necessarily insulate [her] speech." *Rohrbough*, 596 F.3d at 747; *see also Chavez-Rodriguez v. Santa Fe*, 596 F.3d 708, 716 (10th Cir. 2010) (explaining that Tenth Circuit case law has not "establish[ed] a per se rule that speaking outside the chain of command is protected"). Instead, the court must ultimately decide "whether the speech 'stemmed from and was of the type that the employee was paid to do,' regardless of the exact role of the individual or entity to which the employee has chosen to speak." *Rohrbough*, 596 F.3d at 747 (alterations omitted) (quoting *Green*, 472 F.3d at 798).

## II.     SCOPE OF PLAINTIFF'S OFFICIAL DUTIES

With this legal standard in mind, the court first examines Plaintiff's official duties as a researcher and as director of URADD. As a researcher, Plaintiff was expressly expected to orchestrate "new studies of autism and other developmental disabilities," and "collaborate in the development of new research grant applications and contracts." (Docket No. 103-6, at 2). As the director of URADD, Plaintiff was to "maintain and develop" the database. (*Id.*). Plaintiff also appears to concede that these URADD-related responsibilities included maintaining the integrity and confidentiality of protected health and educational information stored in the database and ensuring general compliance with grant requirements, federal and state privacy laws, as well as the terms of data-sharing and confidentiality agreements.

However, at oral argument and in briefing, Plaintiff insisted that her undisputed duties to maintain URADD and to preserve the privacy of protected health and educational data stored therein did not include any duty to report suspected data breaches or privacy violations to appropriate authorities. Plaintiff urged that there was no written evidence in the record that indicated such reporting was within Plaintiff's official duties as director of URADD. (*See* Docket No. 107, at 11). But "[a]n employee's official job description is not dispositive . . . because speech may be made pursuant to an employee's official duties even if it deals with activities that the employee is not expressly required to perform." *Brammer-Hoelter*, 492 F.3d at 1203. Instead, when "an employee engages in speech during the course of performing an official duty and the speech reasonably contributes to or facilitates the employee's performance of the official duty, the speech is made pursuant to the employee's official duties." *Id.*

Here, the reporting of privacy violations and data breaches to proper authorities did far more than "reasonably contribute[] to or facilitate[]" Plaintiff's "performance of [her] official duties"—the reporting was absolutely crucial to her work as a researcher and as director of URADD. Indeed, the security and confidentiality of data was essential to the continuance of Plaintiff's research and the ongoing viability of URADD itself. Plaintiff herself explained in one version of her complaint:

> As principal investigator [("PI")] . . . on a Centers for Disease Control and Prevention . . . autism surveillance grant, PI on a contract with the Utah State Office of Education, and director of the Utah Registry of Autism and Development Disabilities (URADD)[,] *I have committed to [data] grantors non-disclosure of identifiable health and education data and adherence to strict security and confidentiality agreements* . . . . Personnel and co-investigators are required to sign non-disclosure statements and are granted access to data on a need to know basis.

(Docket No. 103-6, at 50 (emphasis added)).

Plaintiff could not possibly uphold her contractual obligations to protect confidential research data as a principal investigator or preserve the integrity and security of URADD while failing to properly address data breaches or other privacy violations. Failure to address data breaches or other privacy violations would necessarily undermine Plaintiff's efforts to secure additional data or maintain the data she already had. In other words, it cannot seriously be argued that Plaintiff could keep such issues to herself and keep her job. *See Hornady Mfg. Co.*, 746 F.3d at 1004 ("On summary judgment . . . a nonmovant is entitled to only those inferences that are reasonable."); *cf. Casey*, 473 F.3d at 1330 ("[A]t the time these events took place, individuals, like Ms. Casey, with knowledge of financial irregularities risked civil and criminal liability by remaining silent in the face of such knowledge."). Thus, as a general matter, any reports of privacy issues and unauthorized data access made to proper authorities necessarily "stemmed from and were the type of activities that [Plaintiff] was paid to do." *See Green*, 472 F.3d at 801. Accordingly, the court finds that Plaintiff had an official duty to report suspected data breaches and privacy violations related to her research and URADD to proper authorities as a matter of law.

With this affirmative duty in mind, the court can easily identify a handful of communications alleged by Plaintiff that were indisputably made "in . . . her professional capacity." *See Garcetti*, 547 U.S. at 424. Specifically, (1) Plaintiff's various communications with the Utah Department of Health ("UDOH"), (2) her report to the University Information Security and Privacy Office ("UISP"), and (3) her complaint to the University's Institutional Review Board were all made pursuant to her official duty as director of URADD as a matter of law. This conclusion is evinced by both the content and the chosen audience of these communications. *See Rohrbough*, 596 F.3d at 746–47.

As to content, Plaintiff testified that her reports to UDOH dealt with her concerns "[r]elated to privacy and URADD and the data," (Docket No. 103-2, at 56). Likewise, her initial report to the University's Institutional Review Board was entitled "Privacy [C]oncern" and dealt with a potential "breach of confidentiality or privacy" by Drs. McMahon and Baikan related to URADD data. (Docket No. 103-6, at 52). And Plaintiff's complaint to the UISP similarly revolved around an allegation "that Dr. . . . McMahon had accessed data in violation of HIPPA, HITECH, and FERPA regulations." (Docket No. 103-6, at 6). Each of these concerns fell squarely within Plaintiff's duty to maintain the security of URADD data and to report potential breaches of privacy related to that data, strongly indicating that these communications were made pursuant to Plaintiff's official duties.

As to her chosen audience, Plaintiff made these reports to UDOH, an entity to which she had independent obligations to maintain the privacy of identifiable data, (*see* Docket No. 103-1, at 19–20 (indicating that URADD data was the property of UDOH)); the UISP, an entity tasked with overseeing data security and privacy in the University, (*see* Docket No. 103-6, at 6–7 (outlining the UISP's findings after its investigation of Plaintiff's allegation)); and the University's Institutional Review Board, an entity that apparently has administrative oversight of research conduct at the University, (*see* Docket No. 107-1, at 43–44 (detailing Plaintiff's reports to this entity)). The evidence in the record indicates that all of these entities were within Plaintiff's ordinary chain of command. *See Rohrbough*, 596 F.3d at 747 ("[S]peech directed at an individual or entity within an employee's chain of command is often found to be pursuant to that employee's official duties."); *Thomas*, 548 F.3d at 1325 n.1 (explaining that outside agencies may nonetheless be within an employee's "ordinary chain of command" if the employee has independent reporting obligations to those agencies). The fact that these communications were

directed to entities tasked with overseeing Plaintiff's professional obligations also strongly indicates that the communications were made pursuant to Plaintiff's official duties. *See Rohrbough*, 596 F.3d at 747.

In sum, both the content of these communications and the audience to which they were directed plainly indicate that Plaintiff acted according to her official duties in reporting these concerns. Moreover, Plaintiff does not appear to dispute these findings in her briefing. Accordingly, the court finds that these particular communications were made pursuant to her official duties and are not protected speech under the First Amendment as a matter of law.

Though it appears that the vast majority of Plaintiff's remaining claims to First Amendment protection are fatally undermined by the finding that she had an official duty to report to proper authorities any suspected data breaches and privacy violations related to her research and URADD, *see Rohrbough*, 596 F.3d at 746–47 ("The court has also noted that speech pursuant to an employee's duty to report a particular activity is usually within that employee's official duties."), specific application of this finding to Plaintiff's arguments requires some additional analysis.

## III.    PLAINTIFF'S COMMUNICATIONS

Having established the general contours of Plaintiff's job duties, the court now turns to an analysis of those specific communications that Plaintiff argues fell outside the scope of those duties. As explained above, the court looks "both to [1] the content of the speech, as well as [2] the employee's chosen audience, to determine whether the speech is made pursuant to an employee's official duties." *Id.* at 746. The court will first address what may be generally termed as Plaintiff's "privacy concerns" and then address other reported concerns that Plaintiff asserts were entitled to protection under the First Amendment.

## A. REPORTED PRIVACY CONCERNS

As to her privacy-related concerns, Plaintiff argues that her various communications with (1) Dr. Dean Li; (2) Dr. Jeffrey Botkin; (3) the University's Office of General Counsel ("OGC"); (4) the U.S. Department of Education ("USDOE") and the U.S. Department of Health and Human Services ("HHS"); and (5) the Utah Department of Technology Services ("State IT Office") and the Utah Department of Public Safety ("UDPS"), were not made pursuant to her official duties and are therefore protected speech. Defendants argue that all of these communications fell well within the ambit of Plaintiff's official duties and are therefore not actionable under the First Amendment. As explained below, the court agrees with Defendants and holds that all of these communications were made pursuant to Plaintiff's official duties as a matter of law.

### 1. COMMUNICATIONS WITH DR. LI

The court first addresses Plaintiff's communications with Dr. Dean Li, Vice Dean of Research at the University of Utah. On July 5, 2012, Plaintiff met with Dr. Li and expressed concerns regarding URADD and other research issues. Many of these concerns evidently revolved around her working relationship with Dr. McMahon, her department chairman and direct supervisor. (*See* Docket No. 103-6, at 41 ("Thank you for meeting with me on July 5, 2012 to discuss the authority of the princip[al] investigator as they [sic] interface with their [sic] department chairman.")). On July 13, 2012, Plaintiff sent an email to Dr. Li,[2] adding another specific concern related to the conduct of Dr. McMahon and other researchers:

---

[2] This email was also directed to Dr. Thomas N. Parks. (Docket No. 103-6, at 14). Dr. Parks was, according to Plaintiff's complaint, the "Vice President of Research," (Docket No. 32, at 8), which appears to be a supervisory capacity similar to that of Dr. Li. Plaintiff does not appear to dispute this characterization in her briefing. Accordingly, any analysis applicable to Plaintiff's communications with Dr. Li is also applicable to her ostensibly identical communications with Dr. Parks.

I was just updating another IRB when I saw that Dr. McMahon has listed himself
as the PI on a grant for which I am the PI. . . . Researchers Bakian, McMahon, and
Bilder are implying [that] they are currently part of the CDC grant which they are
not. Dr. McMahon has taken portions of my IRB . . . and moved them under this
IRB. Could you please include this as part of the issues that you are looking into
as I am very concerned about my liability and ability to fulfill the obligations of
grants and data sharing agreements for which I am the lead PI.

(Docket No. 103-6, at 14).

On August 16, 2012, Plaintiff sent another email to Dr. Li, following up on their in-

person meeting. (Docket No. 103-6, at 41). That email detailed the concerns she had raised in the

in-person meeting and suggested several solutions to resolve those concerns. Plaintiff alleged

that Dr. McMahon had listed himself as lead principal investigator on a CDC grant when, in fact,

Plaintiff was the lead principal investigator. Plaintiff recommended that Dr. McMahon

voluntarily change the grant IRB to reflect Plaintiff's status as lead principal investigator, that he

and other researchers be removed as co-principal investigators, and that he and other researchers

be required to independently seek authorization "for use of *de-identified* ASD surveillance data

for research purposes" in the future. (*Id.* (emphasis in original)).

The August 16 email also reiterated in more detail Plainitiff's concern expressed in the

July 13 email and recommended an immediate report to the University's "Office of Privacy

followed by an investigation to ensure compliance [with] privacy agreements with the [CDC],

Office of Vital Records, and Utah State Office of Education." (*Id.*). Plaintiff further

recommended that all identifiable ASD surveillance data be returned to her, that Dr. McMahon

agree "to the removal of Dr. Bakian from any grant or URADD[-]related projects" after

completion of a specific URADD-related project, and that Dr. McMahon allow Plaintiff to fill

vacant URADD and grant-related positions. (*Id.* at 42). As explained below, the court finds that

both the content and the target audience of these communications establish that they were made pursuant to Plaintiff's official duties.

First, the content of the emails squarely aligned with Plaintiff's duty to maintain data privacy and ensure the integrity of URADD. Specifically, each of the concerns Plaintiff presented to Dr. Li related to other researchers' allegedly inappropriate attempts to access confidential data from URADD or their potential violation of existing confidentiality agreements. In the July 13 email to Dr. Li, Plaintiff alleged that Dr. McMahon insisted on being listed as the lead principal investigator for a CDC grant and that Drs. McMahon, Bakian, and Bilder improperly implied that they were currently part of that CDC grant, allowing them to access identifiable data without adhering to proper confidentiality procedures. Plaintiff explained that these alleged misstatements and improper access of identifiable data could expose her to "liability" and could negatively affect her "ability to fulfill the obligations of grants and data sharing agreements for which" she was the lead principal investigator. (Docket No. 103-6, at 14). In the August 16 email, Plaintiff reiterated these same accusations and requested that Dr. McMahon be removed as lead principal investigator on any reports and that he and his associates be required to go through proper channels to obtain further data for their research. Thus, Plaintiff's express purpose in submitting these concerns was to halt unauthorized access and prevent further violations of confidentiality agreements.[3] These purposes are wholly within the

---

[3] It is also worth noting that Plaintiff's contact with Christine LaSalle, an associate of or assistant to Dr. Li, during this same period reflected the same concerns. In addition to arranging for a meeting with Dr. Li, Plaintiff wrote the following to Ms. LaSalle:

> I wondered if it might be possible to get a legal opinion whether or not I need to report to the CDC regarding my grant IRB that was copied into another IRB. Dr. Bakian agreed not to disclose identifiable data collected under the cooperative agreement she signed for my CDC grant. Point source maternal birth addresses are identifiable[] and have only been collected under my grant IRB with the University and/or through a UDOH epidemiologist. Thanks for any assistance in clarifying my *contractual obligation to report to the CDC*.

(Docket No. 103-6, at 39 (emphasis added)).

scope of Plaintiff's duty to abide by the terms of certain "grants and data sharing agreements" and to maintain the integrity and security of URADD as a whole. (*See id.*).

Plaintiff insists that the concerns she outlined to Dr. Li were broader than privacy, and included allegations that "McMahon was taking credit for her work." (Docket No. 107, at 13). Plaintiff argues that she had no duty to report such malfeasance, so her reports to Dr. Li could not be pursuant to her official duties. Because this is not a reasonable inference that can be drawn from the undisputed evidence, the court disagrees. *See Hornady Mfg. Co.*, 746 F.3d at 1004 ("On summary judgment . . . a nonmovant is entitled to only those inferences that are reasonable.").

As an initial matter, the court is skeptical that such allegations of professional misconduct against a coworker, related to Plaintiff's work and directed to a mutual supervisor, would be outside of the mainstream of what Plaintiff was "paid to do." *See Rohrbough*, 596 F.3d at 747; *McArdle v. Peoria Sch. Dist. No. 150*, 705 F.3d 751, 754 (7th Cir. 2013) ("[A] public employee's commentary about misconduct affecting an area within her responsibility is considered speech as an employee even where investigating and reporting misconduct is not included in her job description or routine duties."). But, in any event, all of Plaintiff's concerns plainly stemmed from Plaintiff's role as safekeeper of identifiable data, and not from her exasperation at Dr. McMahon's alleged dishonesty. In fact, her complaints repeatedly emphasized the fact that Dr. McMahon's alleged misrepresentation allowed him unauthorized access to identifiable data stored in URADD. Plaintiff explained in the July 13 email to Dr. Li that her primary concern was the effect of Dr. McMahon's conduct on her "ability to fulfill the obligations of grants and data sharing agreements" and her potential "liability" due to unauthorized data access. (*See* Docket No. 103-6, at 14). The August 16 email similarly cites to potential violations of required confidentiality agreements by Drs. McMahon, Bakian, and Bilder as the impetus for the report.

While Plaintiff discusses Dr. McMahon's alleged misstatement of his own position on the project in the August 16 email, the clear thrust of that accusation is that the misstatement allowed him improper access to identifiable data. This is made plain by the solution Plaintiff proffered to resolve her concern: that Dr. McMahon be removed as principal investigator, that Drs. Bilder, Bakian, and McMahon be removed as co-investigators, and that, in the future, they be allowed to access only "de-identified" data—data without identifiable personal information—through proper channels. (Docket No. 103-6, at 41). Thus, each report to Dr. Li was expressly linked to Plaintiff's duty to prevent unauthorized access to health and education data and her interrelated duty to ensure database users' adherence to confidentiality agreements.[4]

Moreover, Plaintiff directed these concerns to the Vice Dean of Research for the University,[5] an individual in a supervisory position over Plaintiff and her immediate supervisor, Dr. McMahon. Thus, Plaintiff raised these concerns within her ordinary chain of command, further confirming that these reports were made pursuant to her official duties. *See Rohrbough*, 596 F.3d at 747 ("[S]peech directed at an individual or entity within an employee's chain of command is often found to be pursuant to that employee's official duties under *Garcetti/Pickering*.").

In sum, the content and chosen audience of these reports demonstrate that they were made pursuant to Plaintiff's official duties as a lead researcher on certain CDC grants and as

---

[4] As described above, Plaintiff evidently met with Vice Dean Li on July 5, 2012. (*See* Docket No. 103-6, at 41). As it appears that this meeting dealt with subject matter identical to Plaintiff's emails, (*see* Docket No. 107, at 11), the same analysis applicable to those communications applies to Plaintiff's in-person report to Dr. Li. In other words, that in-person communication was pursuant to Plaintiff's official duty and is therefore not protected by the First Amendment as a matter of law.

[5] Plaintiff's communications refer to Dr. Li as "Chief of Research." (*See* Docket No. 103-6, at 41). There appears to be little substantive distinction between this title and the designation as Vice Dean of Research that appears in the parties' briefing.

director of URADD. The court therefore holds that these reports are not entitled to First Amendment protection as a matter of law.

## 2. COMMUNICATIONS WITH DR. BOTKIN

Next, the court addresses Plaintiff's numerous reports to Dr. Jeffrey Botkin, Chief of Ethics in the University's Office of Research Integrity. At various points in 2011 and 2012, Plaintiff communicated her various concerns regarding Dr. McMahon's conduct to Dr. Botkin. The record contains several emails and reported in-person meetings between Plaintiff and Dr. Botkin during this period. One email in particular, sent November 30, 2012, provided a "summary of [Plaintiff's] concerns with supporting documentation." (Docket No. 103-6, at 50). That message contained a section entitled "Privacy," which outlined Plaintiff's allegations that Dr. McMahon and Dr. Bakian had accessed or intended to access identifiable data from URADD without the proper authorization in violation of numerous confidentiality agreements. Plaintiff followed up with more information on these allegations on December 4, 2012: "Just an FYI, my liaison at the Utah State Office of Education has indicated that they do not have a contractual agreement with Dr. McMahon." (Docket No. 107-1, at 32). Again, the court finds that both the content and the target audience of these privacy-related communications indicate that they were made pursuant to Plaintiff's official duties.

First, like the reports to Vice Dean Li, the content of the communications with Dr. Botkin regarding her privacy concerns squarely aligned with Plaintiff's duty to maintain strict data privacy and ensure the integrity of URADD. Each of Plaintiff's reports and complaints to Dr. Botkin dealt with unauthorized "sharing of confidential data [Plaintiff] had collected as part of [her] grants" and potential breaches of URADD by Dr. McMahon and his associates. (*See, e.g.*, Docket No. 103-2, at 16). Plaintiff herself characterized the content of her reports as "legal

questions regarding the sharing of confidential data I had collected as part of my grants." (*See* Docket No. 107-1, at 11). These issues plainly arose from Plaintiff's official duties to preserve the integrity of URADD's data and to prevent unauthorized access to identifiable educational and health data.

While Plaintiff again protests that she was more broadly concerned with Dr. McMahon's alleged dishonesty, she previously testified that she was primarily "concerned about [her] *liability* with [Dr. McMahon] continuing to list his name as the principal investigator of [the CDC] study when, in fact, he wasn't." (Docket No. 103-2, at 18 (emphasis added)). More explicitly, Plaintiff wrote to Dr. Botkin in November of 2012 that IRB information "was modified in June of 2012 by Dr. . . . McMahon indicating his intent to use identifiable school and health data . . . obtained through [Plaintiff's] grant and contract activities. . . . Dr. McMahon suggests that he is authorized to use this data as he is a PI on a CDC autism surveillance grant for which I am the PI and implies that he has approval to use identifiable school data." (Docket No. 103-6, at 50). Plaintiff concluded that same communication as follows:

> I am very concerned as I have promised and committed to the Utah State Office of Education and local schools that no identifiable data would be released by me in order to secure access to their data. Access to school information is crucial to my research as well as to other states conducting surveillance through the [CDC]. I have been told by the CDC . . . that failure to have access to school data will severely reduce the likelihood of renewal of my grants with the CDC.

(*Id.* at 51). Thus, Plaintiff's primary concern was not the ethical implications of Dr. McMahon's alleged misconduct, but its effect on her legal liability for data breaches, the future of her research, and the integrity of URADD as a whole. The court holds as a matter of law that these

reports were made pursuant to Plaintiff's official duties, regardless of whether Plaintiff had some ulterior desire to expose alleged ethical breaches by Dr. McMahon.[6]

Additionally, Plaintiff's chosen audience for these reports was clearly within her ordinary chain of command. Dr. Botkin oversaw the Office of Research Integrity and there appears to be no dispute that this position placed him in a supervisory position over both Dr. McMahon and Plaintiff. In fact, Plaintiff testified that the University's IRB had explicitly "deferred [certain concerns] to [Dr.] Botkin" for resolution. (Docket No. 107-1, at 11). As Chief of Ethics for the entire University research structure, Dr. Botkin was in a natural position to address such allegations and resolve any conflict between Plaintiff and her supervisor. Accordingly, the court finds he was in Plaintiff's ordinary chain of command. This finding bolsters the court's conclusion that Plaintiff's communications were made pursuant to her official duties. *See Rohrbough*, 596 F.3d at 747 ("[S]peech directed at an individual or entity within an employee's chain of command is often found to be pursuant to that employee's official duties under *Garcetti/Pickering*.").

---

[6] Although Plaintiff does not appear to dispute the point, the court notes that this conclusion also holds true for Plaintiff's report to Dr. Botkin that Dr. McMahon had interfered with her recruitment efforts related to the CDC grant. At heart, this report addressed Plaintiff's efforts to hire staff for her grant-related activities. Plaintiff captioned her report to Dr. Botkin "Authority of the Principal Investigator versus Department Chairman"—indicating that she was seeking clarification from Dr. Botkin regarding her authority to hire new employees and, relatedly, Dr. McMahon's authority to oversee that hiring process. (Docket No. 103-6, at 51). Plaintiff told Dr. Botkin that Dr. McMahon's interference had "negatively affected [her] grant[-]related activities." (*Id.*). It is undisputed that Plaintiff was paid to undertake such administrative activities in her role as a lead researcher. Plaintiff's attempts to clarify her own duties as a lead researcher and her report of a supervisor who allegedly interfered with those duties—all directed to a mutual supervisor—clearly "contribute[d] to or facilitate[d]" her performance of her official duties. *See Brammer-Hoelter*, 492 F.3d at 1204. Consequently, this communication was made pursuant to her official duties as a matter of law and is unprotected by the First Amendment.

Although neither party directly raises the issue, this same analysis applies with equal force to Plaintiff's report to Dr. Parks regarding Dr. McMahon's alleged attempt to force Plaintiff to hire a "friend" as a co-investigator on a particular study. (Docket No. 107-2, at 18). Again, Plaintiff was undisputedly in charge of hiring researchers and other staff for her grants and related administrative functions. Her report of a direct supervisor's interference with those functions to their mutual superior clearly "contribute[d] to or facilitate[d]" her performance of her official duties. *See Brammer-Hoelter*, 492 F.3d at 1204.

In sum, the content and chosen audience of Plaintiff's reports to Dr. Botkin demonstrate that they were made pursuant to Plaintiff's official duties as a lead researcher on certain CDC grants and as director of URADD. The court therefore holds that these reports are not entitled to First Amendment protection as a matter of law.

### 3. REPORTS TO USDOE AND HHS

Next, the court addresses Plaintiff's reports to the U.S. Department of Education ("USDOE") and the U.S. Department of Health and Human Services ("HHS"). Plaintiff testified that her reports to these agencies in December 2012 included the "[s]ame concerns [she had] reported to the [UISP]" earlier in 2012. (*See* Docket No. 107-1, at 51). These reports revolved around the allegation that Dr. McMahon and his associates may have accessed or distributed identifiable educational and health data stored in URADD without authorization, violating both FERPA and HIPPA. (*See* Docket No. 103-6, at 6 (detailing Plaintiff's report to UISP)).

At oral argument, Plaintiff insisted that her reports to federal agencies regarding suspected FERPA and HIPPA violations related to URADD were not made pursuant to her official duties. Specifically, Plaintiff asserted that she had no official duty to report violations of federal law to outside agencies and that the federal agencies to which she reported were outside of her ordinary chain of command. Because binding precedent plainly forecloses these arguments, the court disagrees.

Although an employer may or may not explicitly require an employee to report violations of federal law, that employee may nonetheless have "an independent legal obligation imposed as a function of [her] official position" that requires such reporting. *See Trant v. Oklahoma*, 426 F. App'x 653, 660 (10th Cir. 2011) (unpublished); *Casey*, 473 F.3d at 1330. And because such reporting is a "function of [the employee's] official position," *see Trant*, 426 F. App'x at 660, the

reporting falls within her "portfolio" of official duties, *see Casey*, 473 F.3d at 1329, and the "outside authority or agency" to which she reports falls within her ordinary chain of command, *see Thomas*, 548 F.3d at 1325 n.1.

This principle is perhaps best illustrated in *Casey*, where the titular plaintiff, a director and CEO of a federally-funded Head Start program, reported suspected violations of Head Start-related federal regulations to federal agencies. The Tenth Circuit concluded that such reports were made pursuant to Casey's official duties as director of the Head Start program and were therefore not entitled to First Amendment protection. "[A]s the CEO and person primarily responsible for the sound administration of the [school] [d]istrict's Head Start program," Casey "necessarily assumed certain responsibilities, . . . and these included acting pursuant to, or in compliance with certain federal regulations." *Casey*, 473 F.3d at 1330. "Casey [herself] was liable under federal statute as the director of a federally funded program, and she was the person 'primarily responsible' for the program being free of fraud." *Thomas*, 548 F.3d at 1326 (quoting *Casey*, 473 F.3d at 1330). Consequently, the investigation and reporting of suspected irregularities in the school district's administration of a federally funded program fell squarely within Casey's "portfolio" of official duties as CEO and director of the program. *See Casey*, 473 F.3d at 1330. In short, a "close relationship" existed "between [1] the authority who issued the regulations, [2] the content of those regulations, and [3] the scope of Casey's professional responsibilities." *See Thomas*, 548 F.3d at 1326.

Plaintiff's reports to USDOE and HHS similarly reflect the "close relationship" described above. She reported potential violations of two statutes—HIPPA and FERPA—that prohibit unauthorized disclosures of confidential information to two agencies—USDOE and HHS—

directly responsible for investigating and punishing violations of those statutes.[7] And, as established previously, Plaintiff's professional responsibilities plainly encompassed such reporting: As director of URADD and steward of its confidential data, Plaintiff was "primarily responsible for the sound administration" of the database and "necessarily assumed certain responsibilities, . . . and these included acting pursuant to, or in compliance with certain federal regulations." *See Casey*, 473 F.3d at 1330. Plaintiff herself has repeatedly acknowledged her own potential liability as director of URADD for any breaches of confidential data. In short, the security and integrity of URADD were "committed to her care and . . . she had independent responsibilities to the federal government" to report irregularities that might violate federal law. *See id.* at 1332.

Based on the above analysis, the court holds that Plaintiff's reports to USDOE and HHS were made pursuant to her official duties. As a result, the reports are not protected under the First Amendment as a matter of law.

### 4. COMMUNICATIONS WITH THE UNIVERSITY'S OFFICE OF GENERAL COUNSEL

Next, the court addresses Plaintiff's communications with the University's Office of General Counsel ("OGC"). At various points in 2012, Plaintiff communicated with the OGC regarding her concerns both personally and through counsel. When directed to do so by the UISP

---

[7] FERPA prohibits the unauthorized disclosure of confidential educational data, while HIPPA prohibits the unauthorized disclosure of confidential health data. USDOE is specifically tasked with the investigation of suspected FERPA violations and enforcement of the law's terms. *See* 20 U.S.C. § 1232g(f), (g); *Gonzaga Univ. v. Doe*, 536 U.S. 273, 279 (2002). Likewise, HHS is specifically tasked with investigation of suspected HIPPA violations and enforcement of the law's terms. *See* 42 U.S.C. § 1320d-5; 45 C.F.R. § 160.306; *Royce v. Veteran Affairs Reg'l Office*, No. 08-cv-01993, 2009 WL 1904332, at *6 (D. Colo. 2009) (unpublished) ("HIPPA expressly provides the penalties for improper disclosures of medical information[,] . . . and limits enforcement to the Secretary of HHS."). Moreover, HHS' Office for Civil Rights—the division to which Plaintiff reported her concerns—is directly responsible for fielding HIPPA-related complaints and administering penalties. *See Brown v. Hill*, 174 F. Supp. 3d 66, 71 (D.D.C. 2016) ("[A]n individual's only redress for an alleged HIPPA violation is to lodge a written complaint with the Secretary of Health and Human Services, through the Office for Civil Rights, which has the discretion to investigate the complaint and impose sanctions, both civil and criminal." (internal quotations omitted)).

and Dr. Botkin, Plaintiff personally reported her allegations of FERPA violations related to URADD to Robert Payne, associate general counsel in the OGC. (Docket No. 107-1, at 44). Additionally, Plaintiff reported, through counsel, her "privacy concerns" regarding potential HIPPA and FERPA violations in relation to URADD and other grant data to Phyllis Vetter, another associate general counsel. (Docket No. 32-3, at 5; *see also* Docket No. 107-1, at 45). Plaintiff, accompanied by counsel, met with Ms. Vetter and Dr. Li in person to air these concerns on October 4, 2012. Plaintiff's counsel remained in contact with the OGC until Plaintiff was terminated. (Docket No. 32-3, at 5). As with the previous communications analyzed, the court finds that the content and chosen audience of these communications indicate that they were made pursuant to Plaintiff's official duties as director of URADD as a matter of law.

As to content, Plaintiff explained that she asked the OGC "to provide further clarification as to FERPA privacy concerns." (Docket No. 103-6, at 51). Indeed, both Dr. Botkin and the UISP had previously directed Plaintiff to the OGC to deal with her allegation that "Dr. . . . McMahon had accessed data in violation of . . . FERPA." (Docket No. 103-6, at 6; *see also* Docket No. 107-1, at 39). Plaintiff's own "Notice of Claim" regarding this lawsuit states that she met with the OGC "to address the privacy concerns and the blatantly insufficient nature of [the UISP's] so-called investigation [into HIPPA violations]." (Docket No. 32-3, at 5). Once again, reports of potential privacy breaches or improper access to data were well within Plaintiff's "portfolio" of official duties as director of URADD, strongly indicating that her communications were made pursuant to her official duties. *See Casey*, 473 F.3d at 1329. Moreover, these communications with the OGC concerned Plaintiff's independent liability to federal entities for potential violations of HIPPA and FERPA, which the court has already concluded was part and

parcel of her official position as safekeeper of confidential health and educational data. *See id.*;
*cf. Trant*, 426 F. App'x at 660.

Plaintiff argues, somewhat confusingly, that she could not have met with the OGC
pursuant to her official duties relating to URADD because the UISP's investigation had cleared
Dr. McMahon of any wrongdoing related to HIPPA. That argument is plainly unavailing. As an
initial matter, Plaintiff believed that the UISP's investigation was "blatantly insufficient" to
address her HIPPA-related concerns.[8] (Docket No. 32-3, at 5). More to the point, Plaintiff's
independent legal obligations to state and federal agencies regarding protected data did not
suddenly disappear once the brief internal investigation by the UISP was concluded. And even if
the UISP's investigation somehow obviated most of Plaintiff's liability to state and federal
agencies, the UISP investigation did not address Plaintiff's FERPA-related concerns, leaving
Plaintiff potentially liable for violations of that law. Indeed, there must be some reason that
Plaintiff attended the OGC meeting with her own counsel in tow and diligently communicated
with the OGC through counsel thereafter, demanding further information. It is clear that Plaintiff
was justifiably concerned that she was still on the hook to various state and federal agencies for
ongoing data breaches, whatever the results of the privacy office's narrow investigation of Dr.
McMahon's conduct.

Additionally, Plaintiff made these reports to the OGC, an entity that fell within Plaintiff's
ordinary chain of command. It is undisputed that Plaintiff was explicitly directed by the UISP to
contact the OGC regarding her specific concerns of FERPA violations, designating that office as
the proper authority to deal with such allegations. (*See id.*, at 6). Additionally, it appears that Dr.
Botkin, also within Plaintiff's ordinary chain of command, forwarded her concerns regarding

---

[8] In fact, directly after Dr. Botkin reported to Plaintiff that the privacy office had cleared Dr. McMahon, Plaintiff
insisted in a reply email that the privacy office's memo was flawed and reiterated facts she believed the privacy
report had ignored. (Docket No. 107-6, at 1).

FERPA to the OGC. (Docket No. 107-1, at 39). Thus, regardless of whether Plaintiff typically reported to the OGC, that entity was apparently the best internal authority to address Plaintiff's FERPA-related concerns. Moreover, it appears that Plaintiff only contacted the OGC regarding other privacy-related concerns after the allegedly "insufficient" investigation by the UISP had concluded. (Docket No. 107-5, at 5). Under such circumstances, Plaintiff's contact with the OGC served as an appeal to a higher authority to properly address her privacy concerns and her potential liability for alleged data breaches. It seems beyond any genuine dispute that such matters—i.e., alleged violations of federal and state law by University employees and the potential disruption of contractual privacy agreements between the University or its employees and outside entities—were within the supervisory purview of the OGC. In other words, the undisputed facts indicate that Plaintiff was simply following the proper internal hierarchy to pursue her grievances when she approached the OGC with FERPA-related concerns.

Plaintiff maintains that the OGC in fact fell outside of her ordinary chain of command. Based on the above analysis, the court disagrees and concludes that the OGC was plainly within her ordinary chain of command. But even if Plaintiff is somehow correct, "an employee's decision to go outside of [her] ordinary chain of command does not necessarily insulate [her] speech." *Rohrbough*, 596 F.3d at 747. Instead, the ultimate question this court must answer is "whether the speech 'stemmed from and was of the type that the employee was paid to do,' regardless of the exact role of the individual or entity to which the employee has chosen to speak." *Id.* (quoting *Green*, 472 F.3d at 798). As explained repeatedly above, the privacy-related concerns that Plaintiff presented to the OGC clearly "stemmed from and w[ere] of the type that [she] was paid to" handle in her role as a researcher and director of URADD. *See id.* Thus, the

court concludes that Plaintiff's privacy-related communications to the OGC were made pursuant to her official duties as a matter of law.

**5. REPORT TO THE UTAH DEPARTMENT OF TECHNOLOGY SERVICES AND THE UTAH DEPARTMENT OF PUBLIC SAFETY**

Finally, the court turns to Plaintiff's report to the Utah Department of Technology Services ("State IT Office") and the Utah Department of Public Safety ("UDPS"). This report revolved around the same concerns Plaintiff had previously expressed to the UISP, namely that Dr. McMahon and his associates may have accessed and distributed identifiable data stored in URADD without proper permission from Plaintiff or the oversight committee. As discussed above, Plaintiff raised this and related privacy issues with various University authorities and UDOH. Plaintiff explained that these efforts stalled and, as a result, she reported to the State IT Office that she could not fully account for the security of URADD data. It also appears Plaintiff reached out to the State IT Office in order to determine whether the data had in fact been accessed. Plaintiff testified that her UDOH liaison

> had no idea who had access to URADD data, even though she [was in charge of UDOH] oversight committee approvals, so given the fact that I didn't know where the data was, the [UISP] had not decided on the FERPA issue, [the OGC] hadn't gotten back to me, the health department didn't know where the data was, I contacted [the] [S]tate IT person to let them know that I didn't know where the data was, [and] the [S]tate IT person brought with him Ryan Van Fleet, who was with the [UDPS].

(Docket No. 107-1, at 39). Once Plaintiff explained her concerns, Mr. Van Fleet instructed Plaintiff to contact USDOE and HHS regarding potential FERPA and HIPPA violations related to the data. (Docket No. 107-1, at 51). As with all of the previously analyzed communications, both the content and chosen audience of these communications plainly indicate that they were made pursuant to Plaintiff's official duties.

As to content, Plaintiff reported the same concerns she had already relayed within the University system "regarding [the] security and privacy" of URADD data. (*See* Docket No. 107, at 12). Specifically, Plaintiff reported that she was concerned that Dr. McMahon or his associates possibly accessed and distributed identifiable data stored in URADD. The court has already established that these concerns squarely aligned with Plaintiff's official duty to preserve the security of confidential data stored in URADD and to report potential privacy breaches to proper authorities. As director of URADD and signatory on numerous confidentiality agreements with state entities, Plaintiff "necessarily assumed certain responsibilities, . . . and these included acting pursuant to, or in compliance with certain [state] regulations" applicable to the data she stewarded. *See Casey*, 473 F.3d at 1330. Indeed, Plaintiff was personally liable to state entities "for costs related to data breaches if negligence was involved" because of the confidentiality agreements she had signed. (*See* Docket No. 32, at 7 (asserting that Plaintiff "had signed contracts with the State IT [Office]" and that the Office had "informed employees [that] they could be held personally responsible for costs related to data breaches")). As with her reports to USDOE and HHS, Plaintiff's reports to the State IT Office and the UDPS reflected her "independent responsibilities" to government agencies to report potential breaches of confidential data stored in URADD. *See Casey*, 473 F.3d at 1332. The fact that these communications dealt directly with the security and privacy of URADD data strongly indicates that the reports were made pursuant to Plaintiff's official duties.

Nevertheless, Plaintiff again argues that she did not report to these state agencies pursuant to her official duties because the UISP's "audits and investigations of her concerns had cleared [Dr.] McMahon" of wrongdoing, indicating she was not concerned with her own liability. (Docket No. 107, at 13). The court again disagrees. Once more, Plaintiff's independent

obligations to state entities did not suddenly disappear at the conclusion of the UISP's investigation of Dr. McMahon. All record evidence points to Plaintiff's continuing liability to outside entities for potential violations of confidentiality agreements regardless of the UISP's narrow conclusion that Dr. McMahon had not violated HIPPA or HITECH by accessing URADD data.

Moreover, Plaintiff's chosen audience for these communications also indicate that they were made pursuant to her official duties. Plaintiff reported her privacy concerns to the State IT Office, an entity with which she had signed confidentiality agreements regarding URADD data. (Docket No. 32, at 7 (alleging that Plaintiff had signed confidentiality agreements with the State IT Department and that she could be held personally liable for breaches)). Plaintiff's independent obligations to report to this outside agency regarding her job responsibilities meant that the agency fell within her ordinary chain of command. *See Thomas*, 548 F.3d at 1325 n.1 (indicating that "outside authorities" are "nonetheless . . . within [an employee's] normal chain of command" where the employee has an independent obligation to report to the outside authorities); *Rohrbough*, 596 F.3d at 747 ("[S]peech directed at an individual or entity within an employee's chain of command is often found to be pursuant to that employee's official duties.").

At oral argument and in briefing, Plaintiff suggested that Mr. Van Fleet, who represented the UDPS at the meeting, was not within her ordinary chain of command. The court disagrees. While there is no evidence in the record indicating that Plaintiff had an independent obligation to report potential data breaches to the UDPS, the fact remains that Plaintiff originally reported her concerns only to the State IT Office. According to Plaintiff's own testimony, she did not initiate any report to the UDPS; instead, the State IT representative "brought . . . [Mr.] Van Fleet" to a meeting with Plaintiff. (Docket No. 107-1, at 39). Thus, whether or not Plaintiff typically

reported to UDPS, an entity within her ordinary chain of command deliberately facilitated her report to UDPS. By putting Plaintiff in contact with Mr. Van Fleet, the State IT Office in essence directed Plaintiff to report to UDPS. The fact that the State IT Office believed that Mr. Van Fleet should hear Plaintiff's URADD-related concerns reflects that agency's determination that her concerns might implicate the UDPS's authority. Consequently, the court concludes that the UDPS was effectively within Plaintiff's chain of command for purposes of her conversation with the State IT Office's representative and Mr. Van Fleet.

In any event, even if UDPS was not technically within Plaintiff's ordinary chain of command, "an employee's decision to go outside of [her] ordinary chain of command does not necessarily insulate [her] speech." *Rohrbough*, 596 F.3d at 747; *see also Chavez-Rodriguez v. City of Santa Fe*, 596 F.3d 708, 716 (10th Cir. 2010) (explaining that Tenth Circuit case law has not "establish[ed] a per se rule that speaking outside the chain of command is protected"). Instead, the court must determine "whether the speech 'stemmed from and was of the type that the employee was paid to do,' regardless of the exact role of the individual or entity to which the employee has chosen to speak." *Rohrbough*, 596 F.3d at 747 (quoting *Green*, 472 F.3d at 798 (alterations omitted)). Here, it is clear that Plaintiff's communication to Mr. Van Fleet "stemmed from and was of the type that [Plaintiff] was paid to do." *See id.* (alterations and quotations omitted). Plaintiff reported the same privacy concerns to Mr. Van Fleet that the court has already determined stemmed from her official duty to ensure the security of URADD data. Whether or not Plaintiff had any specific obligation to report to UDPS, her report to Mr. Van Fleet nonetheless reflected a broader duty to seek assistance from whatever agency or institution might help her to resolve potential data breaches related to URADD—especially where it appeared that other institutions had thus far failed to properly address her concerns. Moreover, the direction

that Mr. Van Fleet provided regarding Plaintiff's concerns—i.e., that Plaintiff should report suspected violations of FERPA and HIPPA to proper federal authorities—indicates that she sought his advice in determining how to proceed after unfruitfully seeking resolution within the University system. This indicates that Plaintiff was "striving diligently to fulfill a[n] . . . obligation directly bearing on her by virtue of the office she held." *See Casey*, 473 F.3d at 1331; *id.* at 1330–31 (indicating that a plaintiff acted pursuant to official duties when she reported to an outside agency because she "merely wanted to 'get direction from somebody and find out what to do' in reporting [her employer's financial] irregularities" (alterations in original omitted)).

In sum, both the content and chosen audience of Plaintiff's report to the State IT Office and UDPS strongly indicate that she acted pursuant to official duties. Accordingly, the court holds that she acted pursuant to official duties as a matter of law.

## B. OTHER REPORTED CONCERNS

In addition to the privacy concerns addressed above, Plaintiff made other reports expressing various concerns which she claims fall outside of her official duties and are therefore entitled to First Amendment protection.[9] The court now turns to an evaluation of these reports.

---

[9]  The court notes that while Plaintiffs' complaint discusses reports of "ethical concerns" and "potential research misconduct," (Docket No. 32, at 5), her claim for relief mentions only her speech regarding "concerns about [] privacy issues and unauthorized access to secure data at the University" as the basis of her First Amendment retaliation claim, (*id.* at 24). Plaintiff's assertion, at this late date, that her reports "ethical concerns," "research misconduct," and other alleged malfeasances were a part of her claim for relief is better read as an attempt to raise a factually distinct claim for relief at the summary judgment stage. "Issues raised for the first time in a plaintiff's response to a motion for summary judgment may be considered a request to amend the complaint, pursuant to FED. R. CIV. P. 15." *Viernow v. Euripides Dev. Corp.*, 157 F.3d 785, 790 n.9 (10th Cir. 1998). Here, the court would likely deny such a request due to Plaintiff's inexplicable delay in seeking to update her complaint to reflect insights gained in discovery. *See Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1205 (10th Cir. 2006) ("[A] party who delays in seeking an amendment is acting contrary to the spirit of the rule and runs the risk of the court denying permission because of the passage of time."). However, it appears that Defendants do not oppose the court's ruling on this issue as if it were part of the complaint. Accordingly, the court considers these new claims on summary judgment.

The court will first address certain financial misconduct Plaintiff reported and other reports of what Plaintiff broadly terms "plagiarism."[10]

## 1. "FINANCIAL MISCONDUCT"

First, the court addresses Plaintiff's allegations of "financial misconduct" by Dr. McMahon, which she directed to the OGC. Sometime in mid-2012, Plaintiff spoke with the OGC regarding certain financial issues involving Dr. McMahon's financial oversight of the department and Dr. Bakian's salary. Specifically, Plaintiff alleged that "Dr. McMahon [had] required her to

---

[10] Although Defendants only lightly broach the issue and Plaintiff avoids it completely in briefing, Plaintiff also evidently reported "data errors" or what she terms "research misconduct" in publications or ongoing research involving URADD data in either late 2012 or early 2013. (Docket No. 107-1, at 49). She reported these concerns to Dr. Li, Dr. Parks, University President David W. Pershing, and the CDC. (*Id.*). Specifically, Plaintiff alleged that certain publications by her fellow faculty members based on URADD data "contained uncorrected errors." (*Id.* at 12). As with all of the other communications analyzed, the content and chosen audience of these reports establish that, in making these reports, Plaintiff spoke pursuant to her official duties.

As to content, it appears from the undisputed facts that these "data errors" involved URADD data. The perpetuation of erroneous or otherwise improper use of URADD data would directly undermine the database as a whole. As it was Plaintiff's professional responsibility to "maintain and develop" URADD, (Docket No. 103-6, at 2), she had an obligation to report uses of URADD data that might undermine the database or otherwise impair her continued ability to obtain new data. *See McArdle*, 705 F.3d at 754 ("[A] public employee's commentary about misconduct affecting an area within her responsibility is considered speech as an employee even where investigating and reporting misconduct is not included in her job description or routine duties.").

As to audience, Plaintiff reported these concerns only to individuals and entities within her chain of command. She reported internally to Dr. Li and Dr. Parks, and externally to certain epidemiologists at the CDC, an agency that funded URADD and oversaw its development. Dr. Li, Dr. Parks, and President Pershing were all in a supervisory capacity over Plaintiff and her work on URADD or as a researcher, while Plaintiff undisputedly had independent contractual obligations to the CDC as a function of the same work. Therefore, it appears that Plaintiff was raising all of her concerns regarding "data errors" and "research misconduct" within her chain of command. *See Rohrbough*, 596 F.3d at 747 ("[S]peech directed at an individual or entity within an employee's chain of command is often found to be pursuant to that employee's official duties."); *Thomas*, 548 F.3d at 1325 n.1 (explaining that outside agencies may nonetheless be within an employee's "ordinary chain of command" if the employee has independent reporting obligations to those agencies).

The court acknowledges that President Pershing seems an unusual target for Plaintiff's reports. Insofar as President Pershing fell outside of Plaintiff's ordinary chain of command, the content of her communications to the University's President—regarding erroneous or improper usage of data stored in a University database by University employees—nonetheless indicate that she spoke pursuant to her official duties. *See Rohrbough*, 596 F.3d at 747 (explaining that "an employee's decision to go outside [her] ordinary chain of command does not necessarily insulate [her] speech" and the court must ultimately decide "whether the speech stemmed from and was of the type that the employee was paid to do, regardless of the exact role of the individual or entity to which the employee has chosen to speak" (quotations omitted)).

Given the above analysis, the court concludes that these reports "reasonably contribute[d] to or facilitate[d]" Plaintiff's work as director of URADD, *see Brammer-Hoelter*, 492 F.3d at 1203, and were therefore work "of the type that [she] was paid to do," *see Rohrbough*, 596 F.3d at 746 (quoting *Green*, 472 F.3d at 801) (alterations in original omitted). These communications, like those previously analyzed, are therefore not entitled to protection under the First Amendment as a matter of law.

inappropriately charge time for [Dr.] Bakian . . . to grants [overseen by Plaintiff]." (Docket No. 107-4, at 1). Plaintiff explained: "McMahon had committed me to pay 80 percent of [Dr. Bakian's] salary, but I could not account for that time, nor could I [determine] that the work . . . she was being paid for was being done." (Docket No. 107-1, at 36; *see also* Docket No. 107-4, at 2 ("Dr. Zimmerman stated that Dr. McMahon insisted that she pay Dr. Bakian from her grants, even though, in her estimation, Dr. Bakian had done little work for her.")). Plaintiff also appeared to believe that Dr. Bakian was being paid simultaneously from Plaintiff's CDC grant funds and from a separate research fund for the same work. (Docket No. 107-1, at 34–36). This report triggered an audit by the OGC, which concluded that "the allegation was unfounded" because "none of Dr. Bakian's effort was actually charged to Dr. Zimmerman's grants." (Docket No. 107-4, at 1–2).

Plaintiff asserts that this report to the OGC was not pursuant to her official duties because "reports of financial misconduct were not part of her duties as a researcher." (Docket No. 107, at 13). The court disagrees. While Plaintiff may not have had an obligation to report any old wrongdoing that occurred among her coworkers, she certainly had an obligation to ensure that the funds she oversaw were managed and administered properly. According to Plaintiff's own testimony, part of her job was to account for grant-related funds and to pay individual researchers for grant-related work. (*See* Docket No. 107-1, at 34–36). Plaintiff cannot reasonably argue that these responsibilities did not encompass a duty to report the potentially fraudulent appropriation of the very funds she was tasked with administering. *See Hornady Mfg. Co.*, 746 F.3d at 1004 ("On summary judgment . . . a nonmovant is entitled to only those inferences that are reasonable."). Had Plaintiff failed to report a situation where she believed she was paying a researcher for work that had not occurred or that had already been compensated, she would not

have kept her lead research position for long. Such matters are clearly within the "portfolio" of a lead researcher tasked with the administration and allocation of grant funds, strongly indicating that Plaintiff's allegations were made pursuant to her official duties. *See Casey*, 473 F.3d at 1329; *Renken v. Gregory*, 541 F.3d 770, 773–74 (7th Cir. 2008) (finding that a research professor who oversaw grant funds as a principal investigator was "speaking as a faculty employee, and not as a private citizen" when he reported alleged misuse of grant funds "because administering the grant as a PI fell within the teaching and service duties that he was employed to perform"); *Klaassen v. Univ. of. Kan. Sch. of Med.*, 84 F. Supp. 3d 1228, 1252–53 (D. Kan. 2015) (finding research professor spoke pursuant to his official duties when he criticized grant-related financial management because he "had an active [professional] interest in ensuring proper grant administration, proper use of [university] funds, and prudent [financial] governance" at the university).

Insofar as Plaintiff argues that her reports to the OGC went outside of her ordinary chain of command, the court rejects that argument as well. As the OGC fielded Plaintiff's allegations, initiated an audit with the University's Internal Audit Department to address her concerns, and apparently coordinated with Plaintiff regarding the results of the audit, (*see* Docket No. 107-4, at 1–2), it is apparent to the court that the OGC functioned in a supervisory and administrative capacity over Plaintiff in this instance. It is also apparent that Plaintiff herself considered the OGC as an authority to which she could report such issues, as she approached the entity in the first place seeking clarification regarding her "financial report to the CDC in terms of time spent with [Dr.] Bakian." (*See* Docket No. 107-1, at 36). In short, the court finds that the OGC was within Plaintiff's ordinary chain of command, further confirming that her communications to that entity were pursuant to her official duties as a researcher. *See Rohrbough*, 596 F.3d at 747.

As Plaintiff's communications regarding potential financial misconduct fell clearly within the ambit of her official responsibilities and she directed her allegations within her ordinary chain of command, the court finds that these communications were made pursuant to Plaintiff's official duties as a matter of law.

## 2. "PLAGIARISM"

Finally, the court addresses Plaintiff's specific reports to University officials of what she terms "plagiarism" by Dr. McMahon and other researchers. In April 2011, Plaintiff emailed Dr. Botkin to report that Dr. McMahon "had historically mandated that [Plaintiff] place her CDC grant activities under his name with the University's Institutional Review Board." (Docket No. 107-2, at 10–11). Similarly, a portion of Plaintiff's November 2012 communication with Dr. Botkin included a separate section entitled "Misrepresentation of authorship role on the Centers for Disease Control and Prevention ASD surveillance grant." (Docket No. 103-6, at 51). In that section, Plaintiff detailed three allegations of "[m]isrepresentation of authorship" by Dr. McMahon. First, Plaintiff alleged that Dr. McMahon had represented that he and another researcher had authored Plaintiff's CDC grant during Plaintiff's annual performance review.[11] Second, Plaintiff asserted that she was forced to provide documentation to a University review panel to prove that she had authored the grant as many on the panel erroneously believed that Dr. McMahon had authored the grant. Finally, she asserted that she had requested that Dr. McMahon retract an article that "appeared in a magazine." (Docket No. 103-6, at 51). Although the letter to Dr. Botkin does not elaborate on the nature of the content Plaintiff demanded be retracted, Plaintiff testified that the article "gave . . . credit to another junior faculty member" for Plaintiff's

---

[11] Plaintiff made a similar accusation in an email to Dr. Li in July 2012. (Docket No. 107-3, at 1). The court's analysis below regarding her similar communication with Dr. Botkin is equally applicable to her email to Dr. Li.

research. (Docket No. 107-1, at 13). The court finds that both the content and audience of these communications indicate that they were made pursuant to Plaintiff's official duties.

As to content, the court concludes that nearly all of these concerns arose from Plaintiff's broader concern that the misrepresentations allowed Dr. McMahon or his associates unauthorized access to identifiable data. Plaintiff herself explained in deposition that her primary concern

> was that [Dr.] McMahon was listing [himself as principal investigator] on an IRB [and] that he was conducting the research and had cooperative agreements with the CDC when he, in fact, had none *and I was concerned about my liability with him continuing to list his name as the principal investigator of that study when, in fact, he wasn't.*

(Docket No. 103-2, at 18 (emphasis added)). Indeed, her complaints regarding the misrepresentations were bookended by explicit privacy concerns and the following summation: "I am very concerned as I have promised and committed to the Utah State Office of Education and local schools that no identifiable data would be released by me in order to secure access to their data." (Docket No. 103-6, at 51). And, again, in her July 13, 2012 email to Dr. Botkin, Plaintiff reiterated similar concerns and highlighted her potential "liability and ability to fulfill the obligations of grants and data sharing agreements for which [she was] the lead PI." (Docket No. 103-6, at 14). As explained previously, reporting of such concerns fell squarely within Plaintiff's "portfolio" of official duties. *See Casey*, 473 F.3d at 1329.

But even if these complaints regarding Dr. McMahon's alleged misrepresentations were somehow separable from her privacy concerns, the complaints still stemmed from the effect Dr. McMahon's conduct had on Plaintiff's work for the University. Plaintiff complained that her annual performance review was tainted by the misrepresentations and that she had been forced to demonstrate that she had actually authored certain work when her authorship was in question

before a University review panel. Plaintiff further complained that another University employee received credit for research she had conducted on behalf of the University in a publication. Thus, the clear thrust of Plaintiff's concerns was the negative effect the misrepresentations had on her work for the University and on her position as a researcher within the University. Once again, the court concludes that alerting a superior to such issues "reasonably contribute[d] to or facilitate[d]" Plaintiff's work as a researcher, *Brammer-Hoelter*, 492 F.3d at 1203, and was therefore work "of the type that [she] was paid to do," *Rohrbough*, 596 F.3d at 746 (quoting *Green*, 472 F.3d at 801) (alterations in original omitted). In other words, the content of her communication to Dr. Botkin clearly indicates that she spoke pursuant to her official duties as a researcher.

Plaintiff once again protests she had no official duty to report to her superiors what she terms "plagiarism" or other ethical lapses by her coworkers. Whether or not Plaintiff had a general duty to report misconduct, there can be no serious dispute that Plaintiff's position as a researcher necessarily required her to address conduct by coworkers or supervisors that directly undermined or otherwise disrupted her own work. *See McArdle*, 705 F.3d at 754 ("[A] public employee's commentary about misconduct affecting an area within her responsibility is considered speech as an employee even where investigating and reporting misconduct is not included in her job description or routine duties."); *Harrison v. Oakland Cty.*, 612 F. Supp. 2d 848, 867 (E.D. Mich. 2009) ("In the wake of *Garcetti*, the courts generally have held that internal complaints to supervisors about workplace conditions or co-worker misconduct do not qualify as speech 'as a citizen' that is entitled to First Amendment protection."). Plaintiff alleged conduct by Dr. McMahon that undermined or disrupted her work for the University and her standing as an employee of the University. Her reports to a superior in an attempt to resolve

these concerns and undo whatever professional damage she may have suffered "reasonably contribute[d] to or facilitate[d]" her work as a researcher. *Brammer-Hoelter*, 492 F.3d at 1203.

Moreover, Plaintiff was expressly required "to work with Dr. McMahon and other researchers to design and carry out new studies of autism and other developmental disabilities." (Docket No. 103-6, at 2). Here, Plaintiff explained to Dr. Botkin that she "very much wanted to retain a good working relationship with Dr. McMahon" and asked if it would "be possible for [her] to submit a *separate* IRB to cover [her] grant . . . ." (Docket No. 103-6, at 48 (emphasis omitted and added)). It is apparent from these communications that the alleged misconduct was a direct impediment to Plaintiff's official duty to conduct collaborative research with Dr. McMahon and his associates or to conduct research effectively at all. Thus, Plaintiff's complaints to Dr. Botkin seeking redress for such conduct "reasonably contribute[d] to or facilitate[d]" her work as a collaborative researcher, strongly indicating that the complaints were made pursuant to her official duties. *See Brammer-Hoelter*, 492 F.3d at 1203; *cf. Kubiak v. City of Chi.*, 810 F.3d 476, 481–482 (7th Cir. 2016) (explaining that plaintiff's complaints regarding a coworker's harassment at work "reflected an employee's attempt to improve her work environment so that she would not be harassed again" and finding that her speech was therefore "made as a public employee and not as a private citizen").

And, even more crucially, the chosen audience for this complaint was the head of the University's Office of Research Integrity, a supervisor of both Plaintiff and Dr. McMahon in their research capacities. Plaintiff did not seek out news reporters or her local legislator in airing these concerns, *see Green*, 472 F.3d at 800—instead, she directed reports of alleged misconduct up her ordinary chain of command, *see Rohrbough*, 596 F.3d at 747 (explaining that "speech directed at an individual or entity within an employee's chain of command is often found to be

pursuant to that employee's official duties"). Plaintiff's use of the University's internal hierarchy to address her supervisor's work-related conduct confirms that her complaint was made pursuant to her official duties as a University employee. *See Casey*, 473 F.3d at 1329 (finding that a plaintiff spoke pursuant to official duties and emphasizing that she directed her comments "*only to her supervisors*" (emphasis added)).

In sum, Plaintiff's concerns, as expressed to Dr. Botkin, revolved around the effect that Dr. McMahon's alleged misconduct had on Plaintiff's own work, and were directed to their mutual superior for resolution. These circumstances preclude a finding that Plaintiff was speaking in her capacity "as a citizen"—she was clearly speaking "instead as a government employee."[12] *Rohrbough*, 596 F.3d at 746 (quoting *Brammer-Hoelter*, 492 F.3d at 1203). Thus, these communications were made pursuant to her official duties and are not entitled to First Amendment protection as a matter of law.

## **CONCLUSION**

---

[12] Although neither party directly raised the issue, this analysis applies with equal force to Plaintiff's allegations of "plagiarism" by Dr. McMahon to Dr. Parks, another mutual supervisor, in July and August 2011. (*See* Docket No. 107-2, at 17–18). In short, these reports clearly "contribute[d] to or facilitate[d]" her performance of her official duties, *see Brammer-Hoelter*, 492 F.3d at 1203, and were directed to individuals in a supervisory capacity over Plaintiff and the subject of the complaints for resolution, *see Rohrbough*, 596 F.3d at 747 (explaining that "speech directed at an individual or entity within an employee's chain of command is often found to be pursuant to that employee's official duties").

Additionally, although neither party directly raised the issue, the same general analysis also applies to Plaintiff's reports of "discrimination" to Dr. Li in July 2012 and her meetings with Dr. Parks wherein she alleged that Dr. McMahon had given her "research in progress to younger females under [his] supervision." (*See* Docket No. 107-2, at 17–18). Again, the conduct alleged clearly undermined Plaintiff's work as a researcher and impaired her ability to carry out her official duties. Generally speaking, an employee who believes her direct supervisor is inappropriately discriminating against her and otherwise favoring other coworkers by transferring her work to those individuals would be expected to report such conduct to a mutual superior. *Cf. Kubiak*, 810 F.3d at 481–82 ("Generally, an employee who is verbally assaulted by a colleague would be expected to report the inappropriate behavior to a supervisor."). Indeed, Plaintiff reported these allegations to two individuals, Dr. Parks and Dr. Li, who undisputedly occupied supervisory positions over Plaintiff and Dr. McMahon for resolution. As with the allegations of plagiarism, these circumstances preclude a finding that Plaintiff was speaking in her capacity "as a citizen"—she was clearly speaking "instead as a government employee." *Rohrbough*, 596 F.3d at 746 (quoting *Brammer-Hoelter*, 492 F.3d at 1203). Thus, these communications were not entitled to protection under the First Amendment as a matter of law.

As all of the communications examined above were made pursuant to Plaintiff's official duties as a researcher and director of URADD, the First Amendment provides her no protection from any purported retaliation by her supervisors or coworkers. As a result, she cannot maintain a cause of action for First Amendment retaliation and Defendants are accordingly "entitled to judgment as a matter of law" on that claim. *See* FED. R. CIV. P. 56(a). The court therefore **GRANTS** Defendants' Motion for Partial Summary Judgment (Docket No. 103) and **DISMISSES** Plaintiff's Seventh Cause of Action with prejudice.

IT IS SO ORDERED.

Signed this 14th day of August, 2017.

BY THE COURT

Jill N. Parrish
United States District Court Judge